1
2
3
4
5
6
7

**IN THE SUPERIOR COURT OF WASHINGTON FOR KING COUNTY**

8

| | |
|---|---|
| JAMES and SHAYLEE MEDICRAFT, husband and wife and the marital community thereof, themselves and on behalf of their minor children: J.M., A.M., E.M., M.M. and N.M., | **CASE NO.** |
| | **COMPLAINT FOR DAMAGES** |
| Plaintiffs, | JURY DEMANDED |
| v. | |
| THE STATE OF WASHINGTON; DEREK P. LEUZZI and JANE DOE LEUZZI, husband and wife and the marital community thereof; TANESSA SANCHEZ and JOHN DOE SANCHEZ, husband and wife and the marital community thereof; TABITHA CULP and JOHN DOE CULP, husband and wife and the marital community thereof; ELIZABETH STERBICK and JOHN DOE STERBICK, husband and wife and the marital community thereof; CLEVELAND KING and JANE DOE KING, husband and wife and the martial community thereof; TABITHA POMEROY and JOHN DOE POMEROY, husband and wife and the marital community thereof; PHOENIX PROTECTIVE CORP., a Washington State corporation; and JOHN DOES 1 through 20, residents of Washington, | |
| Defendants. | |

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

## I.  INTRODUCTION

24

1. The "interest of parents in the care, custody, and control of their children—is perhaps the

25

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

# EXHIBIT A

oldest of the fundamental liberty interests recognized by" the Supreme Court of the United States. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Children "have a substantive due process right to be free from unreasonable risk of harm, including a risk flowing from the lack of basic services, and a right to reasonable safety." *Braam v. State of Washington*, 150 Wn. 2d 689, 699-700, 81 P.3d 851 (2003). Defendants, State of Washington and its agents, by perjury and other unlawful means, took the Plaintiff children from their parents, and while the children were in the State's custody, the State subjected them to grievous psychological, physical, and sexual abuse. Although the Honorable Judge Amini reunited the family nearly a year into their ordeal, nothing can fully mend the harm done by the State and its agents. Plaintiffs come to this Court for such relief as the law can provide.

## II.   PARTIES AND JURISDICTION

2. Plaintiffs James and Shaylee Medicraft are a married couple now residing in South Carolina.

3. Plaintiffs J.M., A.M., E.M., M.M., and N.M. are the minor children of James and Shaylee Medicraft, also residing in South Carolina (collectively the "children").

4. The State of Washington (the "State") is a Defendant in this matter due to the actions of its agency, the Department of Children, Youth and Families (the "Department").

5. Defendant Derek P. Leuzzi is, upon information and belief, a married individual residing and/or conducting business in King County, Washington, and an agent of the State of Washington. Upon information and belief, the acts complained of herein were performed on behalf of his marital community.

6. Defendant Tanessa Sanchez is, upon information and belief, a married individual residing and/or conducting business in King County, Washington and an agent of the Department. Upon information and belief, the acts complained of herein were performed on behalf of her marital community.

COMPLAINT FOR DAMAGES - 2

7.  Defendant Tabitha Culp is, upon information and belief, a married individual residing and/or conducting business in King County, Washington and an agent of the Department. Upon information and belief, the acts complained of herein were performed on behalf of her marital community.

8.  Defendant Elizabeth Sterbick is, upon information and belief, a married individual residing and/or conducting business in King County, Washington and an agent of the Department. Upon information and belief, the acts complained of herein were performed on behalf of her marital community.

9.  Defendant Cleveland King is, upon information and belief, a married individual residing and/or conducting business in King County, Washington and an agent of the Department. Upon information and belief, the acts complained of herein were performed on behalf of his marital community.

10. Defendant Tabitha Pomeroy is, upon information and belief, a married individual residing and/or conducting business in King County, Washington and an agent of the Department. Upon information and belief, the acts complained of herein were performed on behalf of her marital community.

11. Defendant Phoenix Protective Corporation ("Phoenix") is a Washington for profit corporation doing business in King County.

12. Additional unnamed Defendants John Does are, on information and belief, agents of the State of Washington and/or Phoenix and residents of Washington, names currently unknown, whose most material misconduct is alleged below.

13. This Court has jurisdiction over this action under RCW 2.08.010.

14. This Court has concurrent jurisdiction of actions brought under 42 U.S.C. § 1983. *Haywood v. Drown*, 556 U.S. 729, 731, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009); *Robinson v. City of Seattle*, 119 Wash.2d 34, 57, 830 P.2d 318 (1992).

15. Venue is appropriate in King County pursuant to RCW 4.92.010 (2) & RCW 4.12.020.

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

### III.   FACTS

16. On or about December 6, 2019, the children were taken from their parents by the State, following a prior brief removal and reunion.

17. The children ranged in age from one to nine years old.

18. The Department used false sworn statements under penalty of perjury in court proceedings to justify taking and/or keeping the children from their home.

19. The false sworn statements were intentionally fabricated by Defendant Derek Leuzzi, a Washington State Assistant Attorney General, and by Defendants Elizabeth Sterbick, Tabitha Culp, Tanessa Sanchez, and/or Cleveland King, social workers employed by the Department.

20. The Defendants knew, or should have known, that the false sworn statements were proffered by individuals unable to make such statements truthfully.

21. The Department, in violation of its own policy, and law, separated the children from one another.

22. Not until ten months after the children were wrongfully seized by the Department, were they reunited with their parents, upon court order after a dependency hearing before the Honorable Susan H. Amini.

23. A true and correct copy of the Order Dismissing Dependency is attached hereto as Exhibit A and that Court's findings of fact are incorporated here as if fully set forth.

24. The State attempted to use Mrs. Medicraft's childhood California child protective services files, including information protected by HIPAA, against her and her family at the dependency hearing.

25. While in the State's custody, the three older children, and possible a fourth, were forced by agents of the Department, names currently unknown, to spend nights in the Department's office, hotels, and State vehicles. Order Dismissing Dependency, Fact No. 24 & 57.

COMPLAINT FOR DAMAGES - 4

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

26. Agents of the Department, names currently unknown, forced the children to sleep in cars expressly as punishment.

27. Agents of the Department, names currently unknown, purposefully, and as punishment, would refuse the children blankets during overnight stays in cars, and would roll down windows and adjust climate control to make the children less comfortable.

28. Attached as Exhibit B is a Whistleblower Complaint describing a policy of punishing children as described above and instituted by Defendant Tabitha Pomeroy.

29. Attached as Exhibit C is an internal Departmental memo describing one of the children's car stays, during which he was deprived of a blanket and was told he must "be on [his] best behavior to stay in hotel rooms."

30. While in the State's custody, at least the three older children were forced to spend days in a locked visitation room at the Department's Kent Office, stripped of all furniture and toys. Order Dismissing Dependency, Fact No. 31.

31. Attached as Exhibits D–F are images of the visitation room described above.

32. Agents of the Department, names currently unknown, purposefully, and as punishment, would take the children's clothing, including taking their shoes and jackets, before forcing them to stand outside in the rain.

33. While in the State's custody, the three older children were physically assaulted by agents of the Department, names currently unknown. Order Dismissing Dependency, Fact No. 33.

34. In addition to the facts found by Judge Amini, the children were also beaten, held down, thrown to the ground, handcuffed, and subjected to basket holds so severe that, on at least one occasion, one of the children lost consciousness. All this by various agents of the Department, names currently unknown.

35. The three older children were physically assaulted by agents of Defendant Phoenix, names currently unknown.

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

36. During one such episode of physical abuse, a social worker for the Department called the Kent Police Department to report their own security, provided by Phoenix.

37. Despite complaints, the Department failed to investigate the assaults. The Department failed to take necessary action to prevent assaults by its agents.

38. While in the State's custody, the three older Medicraft Children were physically assaulted by other children.

39. At least some of these assaults took place in overcrowded hotel rooms and Department offices.

40. Attached as Exhibit G is an image of one of the children's pillows, soaked in blood from the night after one such assault.

41. Despite complaints, the Department failed to investigate these assaults either. The Department failed to take necessary action to prevent assaults.

42. Attached as Exhibits H–U are photographs, redacted where appropriate to protect the child's identity, which depict physical injuries sustained by the children while in the State's custody.

43. Attached as Exhibit V-X are video of the children, blurred to protect their identities, describing abuse at the hand of the Department.

44. While in the State's custody, at least one of the three older children was sexually assaulted by an agent of the Department, name currently unknown.

45. Despite the child's complaint, the Department failed to investigate this assault either. The Department failed to take necessary action to prevent assaults by its agents.

46. While in the State's custody, at least one of the children was sexually assaulted by older children.

47. The Department was on notice of the assaults of the children, including the sexual assaults. Attached as Exhibits Y & Z are email strings from Plaintiff James Medicraft to various Defendants.

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

48. Despite the child's complaint, the Department failed to investigate the assault. The Department failed to take necessary action to prevent assaults.

49. Despite complaints, the Department failed to investigate these assaults either. The Department failed to take necessary action to prevent assaults by its agents.

50. On at least one occasion, when one of the children complained of abuse, and asked to speak to a Judge, the child was placed in overnight solitary confinement as a punishment.

51. When the parents brought legitimate safety concerns to the attention of the Department, they were threatened with the loss of visitation rights, which were ultimately, and improperly, terminated by the Department.

52. The Department, on at least one occasion, attempted to coerce the children into perjuring themselves through threats.

53. Exhibit X, above, further describes the Department coercing the children to run from their parents in an attempt to disparage the parents.

54. At least one of the children was injured in a car accident while an agent of the Department was operating the motor vehicle the child was riding in.

55. The Department failed to perform proper evaluation of the children before or while having them in custody. Order Dismissing Dependency, Fact No. 38.

56. The Department caused or allowed "the children [to be] placed in difficult experiences directly prior to the evaluations," and misinformed or failed to inform the evaluator of these and other material facts about the children to defeat dismissal of the dependency. Order Dismissing Dependency, Facts No. 30–34.

57. While in the Department's custody, at least the three older children were, without prescription, and without the attendance of any licensed medical professional, and without parental advice, routinely medicated by agents of the Department, names currently unknown.

58. Exhibit Y is a photograph of James Medicraft holding a handful of what appears to be

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

Benadryl, found in one of the children's possession while in the Department's custody.

59. On information and belief, the Department gave the children medication for off-label purposes, including, to reduce hunger and cause drowsiness, to make the children easier to control, and to administer psychotropic medications without parental consent.

60. The Department's off-label, unprescribed use of medication on the children was intentionally harmful, reckless, or at least grossly negligent.

61. On many occasions, the Department failed to give some or all of the children enough to eat while they were in the Department's custody.

62. On several occasions, agents of the Department, names currently unknown, deprived some of the children of food as punishment.

63. The three older children were deprived of the use of the bathroom throughout the day while being held in Department offices.

64. The Department lost physical custody the three older children on repeated occasions.

65. The children were denied regular education while in the Department's custody, including support services under the three older children's Individualized Education Plans.

66. The children were denied healthcare on certain occasions when they suffered injuries or illnesses while in the Department's custody.

67. The children were denied appropriate psychiatric case while in the Department's custody.

68. Both A.M. and E.M. were deprived of their prescribed inhalers while in the Department's custody.

69. M.M., while in the Department's custody was denied follow-up visits to Seattle Children's Hospital, despite the Department's knowledge of a serious heart condition.

70. When the Medicraft parents inquired about M.M.'s follow-up, the Department lied and claimed it occurred when it did not.

71. The Department was aware that the three older children required eyeglasses but lost and/or took their eyeglasses from them and failed to provide them with routine and

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

necessary optometrist visits.

72. The children further suffered neglect of their dental health after being taken from their parents, including the loss of J.M.'s orthodontic spacer.

73. Agents of the Department, names currently unknown, expressly threatened the three older children with institutionalization out-of-state, including at institutions which other states, and Disability Rights Washington, have deemed unfit to receive foster children.

74. Agents of the Department, names currently unknown, expressly threatened the four older children with arrest, and called the police to further the threat.

75. Contrary to their own policy and in violation of RCW 13.34.025, the Department improperly withheld or threatened to withhold the Medicraft parents' visitation rights to coerce their and their children's cooperation or silence.

76. Contrary to their own policy and in violation of RCW 13.34.025 and *Braam v. Washington*, the Department improperly withheld or threatened to withhold the children's right to visit one another to coerce cooperation or silence from them.

77. James Medicraft, acting *pro se*, filed a complaint in the Federal District Court in and for the Western District of Washington.

78. A true and correct copy of that pleading, as redacted by Court Order, is attached as Exhibit BB, and the facts alleged therein are incorporated as if fully set forth herein.

79. Despite Judge Amini's ruling to reunite the family, the Department refused, and an emergency hearing had to be held to enforce the Court's orders.

80. Once reunited, Mr. and Mrs. Medicraft took their children to South Carolina. Since their move, someone calling from a Washington State area code phone number has repeatedly contacted South Carolina's Child Protective Services agency to falsely report abuse of the children and the Medicraft's younger child.

81. South Carolina's Child Protective Services agency has investigated the Medicrafts and found no basis for these complaints.

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

82. On information and belief, one or more agents of the Department, names currently unknown, are responsible for these false reports to South Carolina, to harass Plaintiffs.

83. The children have developed serious behavioral issues and other signs of trauma since, and as a result of, their improper removal from their parents and the abuse they suffered while in the Department's custody and at the Department's hands.

84. "[T]he timeline of the behaviors shows that the behaviors *began* and worsened as Department intervention increases…. At different times in January and February of 2019 [sic] [the three older] children were hospitalized at Seattle Children's Hospital. Prior to their removal, none of the children had required this type of intervention." Order Dismissing Dependency, Fact No. 48.

85. On December 26, 2019, Elizabeth Sterbick physically accosted Mrs. Medicraft, which was reported to the Kent Police Department, Case No. 19-18684.

86. Plaintiffs have incurred, and will continue to incur, costs and expenses for medical care and therapy to try to undo the harm done to them by Defendants.

87. In all their acts alleged above, Phoenix agents acted within the scope of their agency and Phoenix is fully liable for their acts.

88. Defendants knew or should have known that their misconduct would violate Plaintiffs' clearly established rights.

## IV.   FIRST CAUSE OF ACTION – Deprivation of James Medicraft's Rights under 42 U.S.C. § 1983

89. Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

90. James Medicraft, as the father of the children, has a fundamental liberty interest in the care, custody, and management of his children.

91. James Medicraft's liberty interest was violated when the State improperly removed his children.

92. James Medicraft's liberty interest was violated when the State abused and/or allowed for

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

the abuse of his children.

93. James Medicraft's liberty interest was violated when the State provided false testimony in the matter of his children's dependency.

94. James Medicraft's liberty interest was violated when the State arranged for negative evaluations.

95. James Medicraft's liberty interest was violated when the State improperly denied him visitation with his children.

96. James Medicraft has been damaged in an amount to be proven at trial.

## V.     SECOND CAUSE OF ACTION – Deprivation of Shaylee Medicraft's Rights under 42 U.S.C. § 1983

97. Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

98. Shaylee Medicraft, as the mother of the children, has a fundamental liberty interest in the care, custody, and management of her children.

99. Shaylee Medicraft's liberty interest was violated when the State improperly removed her children.

100.  Shaylee Medicraft's liberty interest was violated when the State abused and/or allowed for the abuse of her children.

101.  Shaylee Medicraft's liberty interest was violated when the State arranged for negative evaluations.

102.  Shaylee Medicraft's liberty interest was violated when the State provided false testimony in the matter of her children's dependency.

103.  Shaylee Medicraft's liberty interest was violated when the State improperly denied her visitation with her children.

104.  Shaylee Medicraft's liberty interest was violated when the State attempted to use her prior, and irrelevant, medical records against her.

105.  Shaylee Medicraft has been damaged in an amount to be proven at trial.

COMPLAINT FOR DAMAGES - 11

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

## VI.   THIRD CAUSE OF ACTION – Deprivation of J.M.'s Rights
## under 42 U.S.C. § 1983

106.  Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

107.  J.M. has a fundamental liberty interest in living with his parents and not being abused by agents of the State.

108.  J.M.'s fundamental liberty interest was infringed by his improper removal by the State from his parents.

109.  J.M.'s fundamental liberty interest was infringed upon through the abuse he suffered in State custody.

110.  J.M.'s fundamental liberty interest was violated when the State acted in a way that would essentially guarantee negative evaluations.

111.  J.M. has been damaged in an amount to be proven at trial.

## VII.  FOURTH CAUSE OF ACTION – Deprivation of A.M.'s Rights
## under 42 U.S.C. § 1983

112.  Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

113.  A.M. has a fundamental liberty interest in living with his parents and not being abused by agents of the State.

114.  A.M.'s fundamental liberty interest was infringed by his improper removal by the State from his parents.

115.  A.M.'s fundamental liberty interest was infringed upon through the abuse he suffered in State custody.

116.  A.M.'s fundamental liberty interest was violated when the State acted in a way that would essentially guarantee negative evaluations.

117.  A.M. has been damaged in an amount to be proven at trial.

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

## VIII.   FIFTH CAUSE OF ACTION – Deprivation of E.M.'s Rights
### under 42 U.S.C. § 1983

118.  Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

119.  E.M. has a fundamental liberty interest in living with his parents and not being abused by agents of the State.

120.  E.M.'s fundamental liberty interest was infringed by his improper removal by the State from his parents.

121.  E.M.'s fundamental liberty interest was infringed upon through the abuse he suffered in State custody.

122.  E.M.'s fundamental liberty interest was violated when the State acted in a way that would essentially guarantee negative evaluations.

123.  E.M. has been damaged in an amount to be proven at trial.

## IX.   SIXTH CAUSE OF ACTION – Deprivation of M.M.'s Rights
### under 42 U.S.C. § 1983

124.  Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

125.  M.M. has a fundamental liberty interest in living with her parents and not being abused by agents of the State.

126.  M.M.'s fundamental liberty interest was infringed upon through the abuse she suffered in State custody.

127.  M.M.'s fundamental liberty interest was infringed by her improper removal by the State from his parents.

128.  M.M. has been damaged in an amount to be proven at trial.

## X.   SIXTH CAUSE OF ACTION – Deprivation of N.M.'s Rights
### under 42 U.S.C. § 1983

129.  Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

130.  N.M. has a fundamental liberty interest in living with his parents and not being abused

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

1    by agents of the State.

2    131.  N.M.'s fundamental liberty interest was infringed by his improper removal by the State

3         from his parents.

4    132.  N.M. has been damaged in an amount to be proven at trial.

5              **XI.    SEVENTH CAUSE OF ACTION – Assault and Battery of J.M.**

6    133.  Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

7    134.  While in the State's custody, J.M. was subjected to harmful bodily contact.

8    135.  While in the State's custody, J.M. was placed in imminent fear of bodily harm.

9    136.  J.M. has been damaged in an amount to be determined at trial.

10             **XII.   EIGHTH CAUSE OF ACTION – Assault and Battery of A.M.**

11   137.  Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

12   138.  While in the State's custody, A.M. was subjected to harmful bodily contact.

13   139.  While in the State's custody, A.M. was placed in imminent fear of bodily harm.

14   140.  A.M. has been damaged in an amount to be determined at trial.

15             **XIII.  NINTH CAUSE OF ACTION – Assault and Battery of E.M.**

16   141.  Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

17   142.  While in the State's custody, E.M. was subjected to harmful bodily contact.

18   143.  While in the State's custody, E.M. was placed in imminent fear of bodily harm.

19   144.  E.M. has been damaged in an amount to be determined at trial.

20        **XIV.   TENTH CAUSE OF ACTION – Assault and Battery of Shaylee Medicraft**

21   145.  Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

22   146.  Elizabeth Sterbick subjected Shaylee Medicraft to harmful bodily contact.

23   147.  Elizabeth Sterbick placed Shaylee Medicraft in imminent fear of bodily harm.

24   148.  Shaylee Medicraft has been damaged in an amount to be determined at trial.

25             **XV.    ELEVENTH CAUSE OF ACTION – Negligence**

     149.  Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

150. The State had a duty to care for and to prevent physical and emotional harm to the children while they were in its custody, and a duty to the children and their parents to conduct evaluations in good faith, competently, and with due care, a duty to investigate complaints, and a duty to supervise its agents.

151. The State breached its duties to Plaintiffs.

152. Plaintiffs were physically and emotionally harmed by the State's breach of its duties to them.

153. Plaintiffs have been damaged in an amount to be determined at trial.

### XVI.   TWELFTH CAUSE OF ACTION – Negligent and/or Intentional Infliction of Emotional Distress

154. Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

155. Defendants engaged in extreme and outrageous conduct toward Plaintiffs.

156. The complained of conduct was intentional and/or reckless.

157. The complained of conduct actually resulted in severe emotional distress to Plaintiffs.

158. Plaintiffs have been damaged in an amount to be determined at trial.

### XVII.  THIRTEENTH CAUSE OF ACTION – Civil Conspiracy

159. Plaintiffs re-allege all allegations of this Complaint as if fully set forth herein.

160. The Defendants combined to accomplish both unlawful purposes and/or lawful purposes by unlawful means.

161. The Defendants entered into an agreement to violate the rights of the Plaintiffs.

162. Plaintiffs have been damages by this civil conspiracy.

### PRAYER FOR RELIEF

NOW, THEREFORE, Plaintiffs, pray for the following:

1. Judgment against Defendants on all claims;

2. Damages in an amount to be proven at trial;

3. Punitive damages as allowed by statute;

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

4.   Reasonable attorney's fees and costs as authorized by statute; and

5.   Such other and further relief as the Court deems just and equitable.

DATED this 17th day of August 2021.

**ARNOLD & JACOBOWITZ PLLC**

/s/ Nathan J. Arnold
Nathan J. Arnold, WSBA No. 45356
R. Bruce Johnston, WSBA No. 4646
2701 First Ave., Ste. 200
Seattle, WA 98121
(206) 799-4221
Nathan@CAJLawyers.com
*Counsel for Plaintiffs*

# EXHIBIT A

**Superior Court of Washington
County of King Juvenile Court**

Dependency of:



No. 19-7-01266-6 KNT
19-7-01267-4 KNT
19-7-01268-2 KNT
19-7-01270-4 KNT
19-7-01271-2 KNT

**Findings of Fact and Conclusions of
Law and,
Order Dismissing Dependency**
Clerk's Action Required

## I. Basis

A petition was filed by DCYF alleging that the each of the above-named children is dependent.

This matter came before the court for a dependency fact-finding trial on September 2, 3, 10, 22, 23, 24, 30 and October 1, 5, 6, 7, 8, 12, 13, 14, 15, 19, 20, 21, 22. The Washington State Department of Children Youth and Families (DCYF) appeared through its social worker Tabitha Culp, represented by Derek Leuzzi, Assistant Attorney General. The mother, Shaylee Medicraft, appeared represented by Hannah Gold and Kathleen McClellan, Northwest Defenders Division, King County Department of Public Defense. The father, James Medicraft Sr., appeared represented by Helen Redman and Justine Olimene, The Defender Association Division, King County Department of Public Defense. GAL Virginia Whalen appeared, represented by Kathleen Martin, King County CASA Department. The court delivered its ruling on the record on October 22, 2020.

The court heard the testimony of James Medicraft, Sr., Shaylee Medicraft, Tanessa Sanchez, Natalie Cukierman, Hannah Tilden, Lisa Reasner, Dr. Joanne Solchany, Megan Meyer, Amanda Fry, Tabitha Culp, Virginia Whalen, Michelle Ruelas, and Jennifer Watts. The court also admitted the following exhibits into evidence: 2-9, 11-13, 16-18, 24-29, 3, 85, 145, 150-151, 153, 201, 202, 208, 213, 349-350, 364, 393, 622, 626-628, 630-632, 1007.

Due to the COVID-19 pandemic, this fact-finding trial was conducted via zoom. All parties and all witnesses appeared via zoom for this trial.

The findings and conclusions below are based upon admitted exhibits and the witness testimony, including the court's observation of the witnesses. In addition to the findings and conclusions below, the court hereby incorporates its oral ruling on October 22, 2020.

## II. Findings

The court reviewed all the testimony and admitted exhibits presented at trial and finds that dismissal is appropriate.

Except where otherwise indicated, the following facts have been established by a preponderance of evidence.

The State has failed to prove that the Medicraft children are dependent pursuant to RCW 13.34.030(6)(c). Pursuant to RCW 13.34.030(6)(c), the Department had the burden of proving by a preponderance of the evidence that that the Medicraft children have "no parent" . . . "capable of adequately caring" for them such that they are "in circumstances which constitute a danger of substantial damage" to their "psychological or physical development." The Department did not meet its burden.

1. **Children's Indian Status:** On 04/30/19, the court asked each participant on the record whether the participant knows or has reason to know the children are Indian children. The petitioner has made a good faith effort to determine whether the children are Indian children. Based upon the following, there is not a reason to know the children are Indian children as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do not apply to this proceeding: The mother and father have reported they do not have Native American ancestry and the children are not Native American, as defined by the Indian Child Welfare Act. There is no reason to know the children are members of a federally recognized tribe or the biological children of members of a federally recognized tribe and eligible for membership in the tribe.

2. Shaylee Medicraft and James Medicraft are the parents of five children: ███ Medicraft (age 10), ███ Medicraft (age 8), ███ Medicraft (age 7), ███ Medicraft (age 6), ███ Medicraft (age 2).

3. DCYF has the burden of proof by presenting substantive evidence to this Court, in support of its allegations against Mr. and Mrs. Medicraft, and proving its allegations by a preponderance of the evidence.

4. The Department failed to prove that the parents are not capable of adequately caring for their children.

5. Removal of the children in this case was based on alleged non-violent violation of a protection order that the mother had obtained in New York prohibiting the father from having contact with her or the children. A transcript of the mother's testimony from October 16, 2018, in support of that the original temporary order of protection was admitted as Exhibit 18. In that original testimony in New York, Mrs. Medicraft did not allege any acts of physical violence by Mr. Medicraft against herself or the children. Mrs. Medicraft testified that she sought the order of protection because she feared that Mr. Medicraft was going to take her children out of state and interfere with her custody of the children at that time. At this trial, Mrs. Medicraft testified that she went to the courthouse to seek an order that would prevent Mr. Medicraft and the children from leaving without her. Mrs. Medicraft further testified that once at the courthouse, she was told that they only way to get such an order was to file for a domestic violence order of protection. Ms. Medicraft testified that she felt pressured to follow through with the order of protection, and that the individuals that assisted her in drafting the documents told her that she had to follow through with this order or CPS would get involved with her children. The documents she filed to obtain that order are only partially in her handwriting. Ms. Medicraft testified that she tried several times to have the order lifted but was

unsuccessful until the order was terminated in Washington on February 5, 2020. The Court finds Mrs. Medicraft's testimony regarding the protection order plausible.

6. On June 19, 2019, the Montgomery Family Court in New York entered an order declining jurisdiction by New York over this matter, which was admitted into evidence as Exhibit 17. This order specifically stated that the Superior Court of Washington for the County of King Juvenile Department is the most appropriate forum to determine the issues of enforcement, modification, and/or violation of the Order of Protection issued by Montgomery County. The order of protection was subsequently terminated by the King County Superior Court Judge Berns on February 5, 2020.

7. The mother is capable of adequately caring for her children. The mother is able to care for all 5 children by herself. The children lived with their mother continuously since birth until they were briefly removed by the Department on April 25, 2019, only to be returned by the dependency court after a contested shelter care hearing April 30, 2019. They then remained in their mother's care until December 6, 2019, when the Department abruptly removed them a second time.

8. All through the fact finding hearing the Court heard testimony that the children love their mother and that they are closely bonded with their mother.

9. Tanessa Sanchez, the initial CPS Investigator, transferred the case to CFWS social worker Megan Meyer in approximately late May 2019. Ms. Meyer was the assigned CFWS social worker for the family until approximately late October 2019. Leticia Sabado was the assigned CFWS social worker and Elizabeth Sterbick was the assigned DCYF Supervisor until January 2020. Leticia Sabado and Elizabeth Sterbick were assigned to work with this family when DCYF made the decision to remove the children from the mother on December 6, 2020. DCYF did not call either DCYF SW Sabado or DCYF Supervisor Sterbick to testify during this trial. On January 6, 2020, CFWS social worker Tabitha Culp and supervisor J'aime Allbee were assigned to the Medicraft family and remained assigned at the time of trial.

10. Megan Meyer and Tanessa Sanchez, two DCYF social workers assigned to work with the family during the time that Mrs. Medicraft had the children in her care in shelter care status, both testified to the mother's ability to care for the children on her own, including out in the community.

11. In July 2019, Tanessa Sanchez investigated two intakes involving Ms. Medicraft and the Medicraft children. After her investigation, and in consultation with her supervisor Amanda Fry, DCYF issued a decision that the intakes were "unfounded." This included the intake made to DCYF by Hannah Tilden, an employee with Camp Orkila, in July 2019. In September 2019, Tanessa Sanchez investigated an additional intake involving Ms. Medicraft and the Medicraft children. Again, after her investigation, and in consultation with her supervisor Amanda Fry, DCYF issued a decision that intake was "unfounded." Exhibit 364, admitted into evidence, is the letter that DCYF sent Ms. Medicraft informing her that the findings were unfounded. Ms. Medicraft cooperated with the DCYF investigations.

12. While the children were placed in her care from April 25, 2019 to December 6, 2019, Ms. Medicraft cooperated with DCYF and engaged in services requested by DCYF. Ms. Medicraft participated in in-home services, called Homebuilders, when requested by DCYF. Ms. Medicraft also engaged in other services, including but not limited to, programming through the Broadview shelter, programming through the Vine Maple Program, parenting classes, and individual mental health counseling. Ms. Medicraft enrolled ███████████████████ n counseling services with Therapeutic Health Services in the summer of 2019.

13. Ms. Meyer testified that in June 2019, she met the mother at Harborview with all five children when they were there for the children's immunization and blood work, and that the children were able to listen and follow their mother's directions and all of them were clean and well groomed. She testified that in July, August and September, all children were comfortable with their mother,

were well groomed and seemed bonded with their mother in the home. She testified that any bruises on the children seemed age appropriate and noted no concerns. She testified that the Homebuilder's therapist had no concerns of physical discipline in September of 2019.

14. Ms. Sanchez testified that she observed a lot of really creative play between Mrs. Medicraft and her children and neither she nor the Homebuilder's therapist who worked with the mother observed any violent behaviors, signs of physical, sexual, or emotional abuse, nor signs of neglect in the home. She testified that the children were affectionate with their mother and that Mrs. Medicraft improved her parenting strategies through her work with the Homebuilder's therapist.

15. The father is capable of adequately caring for the children.

16. Mr. Medicraft testified twice. He testified about his and Mrs. Medicraft's care of the children and their efforts to provide for their children. The Court finds the father's testimony credible.

17. Exhibits 201 and 202 are photographs of the children taken at various times during the years that the parents cared for the children, Mr. Medicraft testified that the photographs are from a time period spanning 2015/2016 to September 2018 and show the parents and children engaged in normal childhood activities like holidays, school activities, school field trips, playing outside, and family vacations.

18. Megan Meyer testified that she supervised three visits between the father and children and that the father was affectionate, encouraged the children to take turns, and she had no concerns about violence or aggression during visits.

19. Michelle Ruelas is a forensic social worker with over 40 years of experience in child welfare. She worked as a DCYF case worker for over 26 years. She is now semi-retired and testified for the defense. Ms. Ruelas testified that she observed a total of six visits by the father and his children in October and November 2019. These visits were divided into two- visits on Tuesdays with the younger two children and on Wednesdays with the older three children. She testified that during these visits, she observed the father to be patient, calm, and shared time equally among his children. He also encouraged his children to share with each other. She testified that she observed the children being spontaneously affectionate with their father, talkative, looking comfortable and cuddling with their father. She testified that the father always brought food, drinks and something for the children to do during visits. She testified that she observed the father change the youngest child, ███████ diaper at each visit. The children also brought schoolwork and crafts that they had made for their father in school. She testified that she did not see the father yell, lose his temper or act inappropriately with the children.

20. Ms. Ruelas also testified that she observed two visits with both parents and four of their children, on February 21 and 26, 2020. She testified that she observed both parents sharing equally in the parenting duties. The parents looked comfortable with each other and the children were comfortable and affectionate with both parents and responded to redirection from the parents. Ms. Ruelas also attended an IEP meeting at Des Moines Elementary where the parents engaged with school staff and asked good questions. She also observed the father responding to a request from the Department to come help keep the children calm.

21. Tabitha Culp testified and identified herself as the petitioner and the primary DCYF employee responsible for this case. Ms. Culp is a "social service specialist" as opposed to a "social worker" as she has yet to obtain a degree in social work and the Court denied the Department's request to certify her as an expert in social work. Although she testified to frequent interactions with the parents and the children it was unclear from her testimony whether she ever observed an entire in-person visit with either parent. When asked on direct examination by her attorney for specific examples of parental behavior to support her request for a dependency, she testified that she had observed the father making very negative statements about DCYF in front of the children and observed father not to redirect the children when engaging in profanity or unsafe behaviors. She

provided no specific examples of problematic behavior by the mother in response to the question from her counsel about her basis for seeking a dependency.

22. On cross-examination, Ms. Culp testified that after the termination of the protection order and after the court ordered the Department to provide the father with his visits, the Department began allowing the parents to visit together. Ms. Culp testified that in February and March 2020, the Department allowed the parents frequent visitation with the children. These visits were very frequent – typically daily – until DCYF cut off in-person visitation at the end of March 2020. There were two periods of time when Ms. Medicraft stayed in the night-to-night hotel room to care for some of the children. By March 2020, the parents were arriving at the hotel in the morning on a daily basis and helping the children bathe, get dressed, provided all meals, and transitioned into spending the whole day with the children, sometimes in the community doing fun things like going to various parks and arcade type places.

23. Ms. Culp testified that in March, when ████, ███████████ were suspected of having COVID-19, the mother was asked by the Department to quarantine at a motel with the children. She testified that the father brought lots of groceries for the family to the motel. She testified that once the children's COVID-19 results returned negative, the children were once again taken away from the mother without any notice. The Department relied on the mother to stay with the children in the motel while the Department employees remained outside of the room. The Department had no alternative plan in the event that the mother had declined or was unable to remain with the children in the motel. When in-person visits were cut-off, Ms. Medicraft was only able to visit with her children remotely by telephone or video.

24. Ms. Culp testified that DCYF called the police on the children multiple times and that there was a time where police were coming to the DCYF office frequently; that DCYF sent the children to Seattle Children Hospital multiple times for psychiatric hospitalization, the last hospitalizations being in February 2020, and that DCYF threatened the children with being sent to the hospital if they did not behave. She testified that the parents expressed concern about the children's hygiene; that during the COVID pandemic the children were being cared for by a rotating team of social workers and security guards, that the department lost or misplaced the children's prescribed inhalers and eyeglasses and that the parents had to get replacements; that ████ was assaulted by a security guard, that on another occasion a security guard threatened to hit ████ with a belt; and that ██████ was slapped across the face by a social worker. She testified that the children spent some nights either at the DCYF office, or in a state issued car. She testified that ██████ reported sexual abuse by one of the overnight social workers in March/April 2020 and that Department's investigation regarding ██████ report only started in September 2020. She testified that ████ spent the night in the car on January 20, 2020.

25. Photos of the children taken by the parents were admitted into the evidence (Exs. 626, 627, 628, 631, 632, 1007). The parents testified that the children were removed from the mother on December 6, 2019 and that during their December visit with the children, they noticed multiple bruises and scratched on the children. The parents took photos of the children's injuries. Father protested to the Department employee present at the visit and criticized the Department for lack of care of the children while in the Department's care.

26. Ms. Culp testified that the father made his comments during the visitation and that there was a social worker present in the visitation room. While the Department objected to the father's criticism, there was no testimony that the Department acknowledged the numerous bruises on the children, or addressed them in any way with the parents. Ms. Culp testified that the Department obtained a court order telling the father what not to say during visits and that the Department ultimately obtained court orders to stop his visits with his 3 older children. This Court is not convinced that the Department fully explained father's concerns and the reasons for his protest and criticism when the Department brought their motion. In her testimony, Ms. Culp did not testify to any steps taken by the Department to protect the children from physical injuries while in the Department's care. DCYF points to the parents for raising concerns about their children's

treatments and argues that this was evidence that they are not capable of caring for their children and meeting their children's needs.   DCYF did not demonstrate that the parents' actions were inappropriate or harmful to their children.  On the contrary, the parents' concerns for the health, safety, and welfare of their children were understandable and warranted under the circumstances and the condition that they found their children.

27. Both Mr. and Mrs. Medicraft testified credibly that it was very difficult for them to see the treatment and condition of their children while in DCYF care.  This made the parents relationship with DCYF difficult.  Based on the evidence presented throughout trial, the Medicrafts' concern about the care of their children by DCYF was credible.  Objecting to DCYF's care of your children and believing DCYF's actions are harmful to your children, is not a basis for a dependency.  Despite the parents' grave concern about DCYF's care of their children and their disagreement with the decision for the children to be removed from the mother, both parents made significant efforts to be available to assist DCYF in caring for their children and in managing their behavior.

28. Ms. Culp testified that since December 2019, while the Department has called Law Enforcement and has taken ▇▇▇▇ to the Children's Hospital due to his behavior, the Department has not started mental health treatment for ▇▇▇▇. Department has begun horse therapy for ▇▇▇▇ but not mental health therapy.

29. Regarding children's behaviors, Ms. Culp testified on direct examination that she started seeing improvements in March and April, but later testified on cross-examination that in May and June 2020, there were incidents where Law Enforcement had to be called for the children, and that the children were still assaultive and destroying property. Ms. Culp testified that although the children have not been suspended from school during this school year, they have been in a much smaller class and have separately attended school only a few hours a day. She testified that the children, especially ▇▇▇▇ and ▇▇▇▇, still experienced problematic behaviors and that the Behavior Rehabilitation Services ("BRS") caregiver had noted new concerning behaviors in the summer of 2020.

30. Ms. Culp's testimony was vague at best and contradictory most of the time. While she testified with confidence during her direct examination, during the cross examination, she had to correct and change most of her testimony. She would answer in general terms and at times wandered off to other topics rather than directly answer to the question. Throughout her testimony, Ms. Culp attempted to make connections between the children's behavior and the parents' visitation schedule, but this testimony was not supported by the facts elicited at trial.

31. Ms. Culp repeatedly testified to remembering or witnessing things when questioned by her attorney or the CASA attorney that she corrected on cross-examination and acknowledged that her first answers were not accurate.  For example, she originally testified that in January of 2020, the parents were visiting together, but then later had to acknowledge that the parents did not start visiting together until after the protection order was terminated on February 5, 2020.  She claimed that the children's behaviors were escalated and the children damaged a visitation room after visitation with both parents on or around January 30, 2020. She then had to acknowledge on cross-examination that the father's visits were summarily suspended by the Department without a court order on January 24, 2020, and then only reinstated by the court on February 6, 2020, so he could not have been visiting the children at the time of the escalated behavior and property destruction.  She admitted that neither parent was present when the three boys destroyed DCYF property and that, in fact, the Department was keeping the three oldest Medicraft children in a visitation room that was stripped of all furniture and toys. The boys were left alone in the room while social workers observed them through a one-way glass. On cross-examination, Ms. Culp also acknowledged some positive interactions with the father in February 2020, including him talking with ▇▇▇▇ about his behavior and making efforts to work with Ms. Culp to help stabilize ▇▇▇▇ behavior.

**Order Dismissing Dependency - Page 6 of 12**
**WPF JU 03.0650** (07/2018)– RCW 13.34.237. 13.34.267

32. With regard to Dr, Solchany's evaluations, Ms. Culp testified that the night before the evaluation, ████ was at a night-to-night foster home and that there was an altercation with another boy; that in the early hours of the morning, ████ was picked up by a social worker and that he had spent the night/early morning sleeping in the lobby of the DCYF office in Kent (on the floor or on a couch) before his evaluation with Dr. Solchany on February 6, 2020. She further testified that ████ had been placed in Poulsbo and had to be picked up at the Poulsbo Ferry terminal at 5:50 in the morning on the day of his evaluation, be driven to the DCYF office in Kent before being driven from Kent to Lynnwood to Dr. Solchany's office for his evaluation on February 7, 2020. ████ had also been assaulted by a security officer the day prior to his evaluation.

33. Jenn Watts, WISE parent partner, testified. Ms. Watts was a member of the WISE team for ████. Ms. Watts testified that immediately after the first WISE meeting, on February 6, 2020, she witnessed an incident where ████ was being physically pinned to the ground by a security guard in the Kent DCYF lobby. This incident occurred while Ms. Medicraft and other professionals involved in the case were meeting, and upon exiting the meeting room, she heard screams coming from the lobby. ████ and ████ witnessed this incident. Ms. Medicraft immediately intervened. Ms. Watts testified that Ms. Medicraft held ████ in her lap and consoled and comforted him after this incident. This incident occurred the afternoon before ████ was evaluated by Dr. Solchany.

34. The time frame that Dr. Solchany evaluated ████, ████, and ████ was during a time when their behavior was significantly elevated, and the children were in a very unstable placement situation in DCYF night-to-night placements. At the time Dr. Solchany evaluated ████, ████, and ████, they had been in an unstable placement environment since their removal from their mother on December 6, 2020. All three children had to be transported a long distance for this evaluation. There was evidence that the children were placed in difficult experiences directly prior to their evaluations. Dr. Solchany was not aware of the events that occurred with the children in the days and hours prior to the start of her evaluation. Dr. Solchany admitted that the children's instability and environmental stressors at the time of the evaluation could have impacted the evaluation.

35. The Court has additional concerns about Dr. Solchany's testimony. Dr. Solchany's testimony showed that she did not know about the children's behavior before April 2019 (when the children were first removed from the mother). Dr. Solchany further testified to factors about the children that she had considered where such factors were not established during the trial. As an example, she testified several times that the family lived in isolation, and "off the grid". Nothing in the record pointed to the family having lived "off the grid" or in isolation. It also appeared to the Court that Dr. Solchany did not have a balanced information about the children. It seemed that Dr. Solchany had relied only on the information given to her from the Department and on her observation of the children when they had experienced assaultive incidents and had not had a chance of proper sleep.

36. As part of her evaluation, Dr. Solchany testified that she had collateral contact with DCYF social worker Tabitha Culp, DCYF supervisor Leticia Sabado, and GAL Virginia Whalen. Dr. Solchany also testified that she reviewed collateral information provided to her by DCYF, the GAL, and parents' counsel. Despite being specifically asked to do so by mother's counsel, Dr. Solchany did not have any contact with Ms. Medicraft as part of the evaluation of the three children. From her testimony, it did not appear that Dr. Solchany gave much weight to or paid much attention to the information provided by parents' counsel. Instead, it appears that Dr. Solchany relied heavily on the information provided by DCYF. Dr. Solchany did not have any direct contact with anyone from the children's school, from Seattle Children's Hospital, or from any of the children's treating mental health counselors.

37. Dr. Solchany acknowledged that, at the time she evaluated the children, they were experiencing trauma responses to their removal from their mother and their unstable living environment. Given the timing of Dr. Solchany's evaluation, the environmental stress the children were under at the time of the evaluation, the limitations in the scope of her evaluation, and the concerns related to

the reliability of the information used to render her opinions, Dr Solchany's opinions do not provide useful and reliable information to make a current assessment of the mental health needs of ███, ███ and ███ now. It has now been more than eight months since Dr. Solchany had contact with any of the three children.

38. While Dr. Solchany's testimony is considered by the Court, it was not convincing to the Court that a proper evaluation of the children was done. Additionally, because of the dramatic events in the lives of the children right before being brought for Dr. Solchany's evaluation and because Dr. Solchany was not notified of such events and did not take them into consideration (she testified that such events would have had an impact on her evaluation), the Court finds her testimony to be of minimal help for the Court and the Court has given very little weight to Dr. Solchany's testimony.

39. The Court is dismayed that the Department did not plan the children's appointments with Dr. Solchany with practical consideration of the children's placement locations, time and length of travel or other factors that would have an affect on the children such as having been assaulted. There was no testimony that the Department could not schedule the evaluations for a time that would, for example allow ███ sufficient sleep. Dr. Solchany testified that the Poulsbo Ferry terminal was only about half an hour from her office, but ███ was picked up at the Ferry terminal in the early hours of the morning, driven south to the Kent office only to be turned around and driven back up to the doctor's office. Dr. Solchany was not aware of how long ███ had been in transit.

40. Shaylee Medicraft testified twice during this trial. She was initially called as a witness by DCYF as part of DCYF's case in chief, and she testified as part of her case in chief. Ms. Medicraft's testimony was credible. Ms. Medicraft testified that she and Mr. Medicraft were having problems with their relationship in October 2018, and this contributed to her decision to seek the order of protection. Ms. Medicraft also testified that both she and Mr. Medicraft were influenced by gossip and reports from other people about each other. Ms. Medicraft further testified that once the order of protection was lifted in February 2020, she and Mr. Medicraft were able to communicate and work through their past issues. Ms. Medicraft testified about the efforts that they have made to improve their communication, and how that has had a positive change in their relationship. Ms. Medicraft testified that Mr. Medicraft has never physically hurt her. Ms. Medicraft testified that she does not feel unsafe with Mr. Medicraft. Ms. Medicraft testified that she does not have any safety concerns about her children in the care of Mr. Medicraft, and that if she did, she would take action to protect them. Ms. Medicraft testified that there is no domestic violence in her relationship with Mr. Medicraft.

41. The Department and CASA made allegations related to domestic violence but failed to support these allegations with any substantive evidence of actual or threatened violence as required by RCW 26.50.010. Additionally, per RCW 26.44.020(18), "exposure to domestic violence as defined in RCW 26.50.010 that is perpetrated against someone other than the child does not constitute negligent treatment or maltreatment in and of itself."

42. DCYF did not present substantive evidence, proving by a preponderance of the evidence, that there were any incidents of physical domestic violence by Mr. Medicraft towards Ms. Medicraft or any of the children. DCYF did not present substantive evidence, proving by a preponderance of the evidence, that there were any incidents of emotional or verbal domestic violence by Mr. Medicraft towards Ms. Medicraft or any of the children. DCYF did not present substantive evidence, proving by a preponderance of the evidence, that the children have been exposed to any domestic violence while in the care of either of their parents.

43. DCYF's allegations in this case were premised in large part on allegations reported by individuals from New York State. Neither DCYF nor the CASA called any individuals to testify at this trial that were allegedly involved with this family in New York State. While referenced in passing during

**Order Dismissing Dependency -** Page 8 of 12
**WPF JU 03.0650** (07/2018) – RCW 13.34.237. 13.34.267

trial as part of the hearsay evidence forming the basis of certain witnesses' opinions, this Court did not receive any substantive evidence or testimony from Michael Sutton, Lindsay Hodge, any New York State social workers, or any New York state school employees. The Court did not receive any substantive evidence or testimony from any social workers or school personnel that had contact with this family in any states that they lived in other than Washington. The parents also testified extensively about these pleadings and provided additional context to circumstances surrounding these court filings. While these pleadings indicate that the fall of 2018 was a difficult time in the parents' marriage and there was a breakdown in communication, as acknowledged by Ms. Medicraft during her testimony, that played out in family court litigation, these pleadings do not prove that parents are not currently capable of adequately caring for their children. The parents' statements in these pleadings, particularly when reviewed in conjunction with their current testimony, are not sufficient to establish the existence of past domestic violence in this family. The parents' statements in these pleadings do not establish that the children were exposed to domestic violence in the family.  Ms. Medicraft credibly testified about positive changes in her marriage since the order of protection was lifted on February 5, 2020.

44. The parents have both been living in Washington since at least February 2019. DCYF has presented no evidence of any incidents of domestic violence of any type while the family has lived in Washington.   The order of protection has been terminated since February 5, 2020.  DCYF has presented no evidence of any incidents of domestic violence of any type since the order was terminated.

45. This Court admitted into evidence previous court orders from this dependency case that were entered during the course of proceedings prior to the trial (Exs 24-29, 31, 85, 150, 151). However, these court orders were admitted for the limited purpose of establishing the case history and the existence of such orders. These orders were entered while the case was in the shelter care status, under different legal and evidentiary standards than this fact finding trial. This Court does not adopt any of the factual findings or conclusions of law contained in these court orders as part of its ruling in this trial. Similarly, this Court does not adopt any of the factual findings or conclusions of law contained in these court orders as a basis for a dependency finding.

46. Similarly, this Court admitted into evidence court orders entered by the Montgomery County Family Court in New York in 2018 and 2019 (Exs.4, 6, 8, 11, 13, 16, 17).  These court orders were admitted for the limited purpose of establishing the case history and that such orders were entered.  This Court does not adopt any of the factual findings or conclusions of law contained in these court orders as part of its ruling in this trial.  Similarly, this Court does not adopt any of the factual findings or conclusions of law contained in these court orders as a basis for a dependency finding.

47. GAL Virginia Whalen testified. Ms. Whalen testified to the expressed wishes of ███, ███, ███, and ███ of consistently having been their wish to return home to their parents. Ms. Whalen testified that due to his age, she did not gather ███ expressed wishes. Ms. Whalen testified in support of a dependency finding. Ms. Whalen also made three different intake reports regarding the children's report of physical altercations and abuse.

48. The Department attempted to link the children's behaviors to the parents but the timeline of the behaviors actually shows that the behaviors began and worsened as Department intervention increased. DCYF was not able to appropriately manage the behaviors of ███, ███ and ███ after the children were removed from Ms. Medicraft.  At different times in January and February 2019, all three children were hospitalized at Seattle Children's Hospital.  Prior to their removal, none of the children had required this type of intervention.

49. ███ ███, and ███ were enrolled in Des Moines Elementary School in the spring 2019. Two employees from the school testified:  Natalie Cukierman and Lisa Reasner.  Ms. Reasner, the school counselor, testified that when she first met the children her first impressions were that ███ was a polite, typical student, and a little quiet; she described ███ as friendly, with a lot of

energy, and talkative; she described ▆▆▆▆ as more similar to ▆▆▆▆ – quiet and polite.  This was prior to the first DCYF removal of the children from their mother.

50. When ▆▆▆ and ▆▆▆ displayed some behavioral issues at the Des Moines Elementary School in the fall of 2019, Mrs. Medicraft was actively involved with the school staff to work to address the issues collaboratively.  Mrs. Medicraft was responsive to the school staff, and as requested by the school, she spent time in the school with the children to help with their behavior. Mrs. Medicraft requested that the school put Individualized Education Programs ("IEP")s in place for ▆▆▆▆ and ▆▆▆▆. After some initial delay, the school started the IEP process and both Mr. and Mrs. Medicraft actively engaged in the process and participated in the IEP meetings. IEPs were finalized for ▆▆▆, ▆▆▆, and ▆▆▆ late in the 2019-2020 school year. The 2020-2021 school year is the first school year where these children began to receive the benefit of their IEPs in the school environment.

51. On December 6, 2020, DCYF removed the five Medicraft children from their mother's care.   The Court heard testimony that the DCYF showed up unannounced at the Des Moines Elementary School to remove ▆▆▆ ▆▆▆ and ▆▆▆ from the school, and then to remove ▆▆▆ and ▆▆▆ from Mrs. Medicraft when she arrived to pick up the older children.

52. The Court heard testimony that the DCYF's action and the method of removal of the children was based on the concern that the mother would leave the state with the children. The mother's history with DCYF, however showed that DCYF had previously removed the children, albeit for a short time, and the mother had not left the state. The history of the family shows that the Mother had remained in the state with her children and worked with DCYF and the school.

53. Amanda Fry testified that upon removal from the mother, all five children were visibly upset.  The behaviors of ▆▆▆, ▆▆▆, and ▆▆▆ immediately escalated after removal from their mother

54. The removal of the children at the school appears to have been a traumatic experience for the five children as well as Mrs. Medicraft. The Court heard testimony that DCYF was aware that ▆▆▆, ▆▆▆, and ▆▆▆ had expressed fear and concern that they would be removed and separated from their mother. The Court heard testimony from DCYF that the children were closely bonded with their mother, that the children followed the mother's directions and that the mother was able to calm them down.

55. The testimonies before the Court showed that the children's behavior worsened after their removal in December 2019.

56. There was ample evidence that the children's behaviors were better in the care of Ms. Medicraft, both prior to and after removal on December 6, 2020.  There was ample evidence of Ms. Medicraft being able to successfully manage her children's behaviors.

57. All five children have been in multiple placements since their removal. ▆▆▆ placement situation has been the most stable. ▆▆▆ has had multiple placements as well, although she is currently in a stable placement.  From December 6, 2019 – mid-May 2020, ▆▆▆ was primarily placed in night-to-night DCYF placement.  From December 6, 2019 to mid-June 2020, ▆▆▆ was primarily placed in night-to-night DCYF placement.  From December 6, 2019 to mid-June 2020, ▆▆▆ was primarily placed in night-to-night DCYF placement but did have one placement that lasted about 30 days.  Night-to-night placement typically meant staying in a hotel with DCYF staff and other children in DCYF-care, but also included a night-to-night stay in foster homes where the child is dropped off late in the evening and picked up early in the morning. ▆▆▆, ▆▆▆ and ▆▆▆ spent a significant amount of time in DCYF offices being supervised by revolving shifts of DCYF social workers.

58. The Medicrafts purchased a home in South Carolina in February 2020.  Mr. Medicraft testified that the intention was to relocate to South Carolina after the conclusion of the dependency trial and

after the children were returned to them. The dependency trial however was delayed several times throughout this case. Mr. Medicraft testified that they remained in Washington as they were able to have in-person visitation with the children until late March when the Department cancelled all in-person visitation due to COVID-19 pandemic. Mr. Medicraft testified that they would have remained if they could have in-person visits with the children.

59. Mr. and Mrs. Medicraft had to make a financial decision to go stay in their home in South Carolina as they did not have the means to remain in Washington at that time.  Mrs. Medicraft was able to have some in-person visits with ███████, ██████, and ███████ starting in July of 2020, and she had one in-person visit with ███████

60. While the parents are currently located in South Carolina, this is not a factor in whether or not these children are dependent children. Both parents testified that they can travel to Washington immediately to pick up the children if the children are released to their care. The parents have a home prepared for the children in South Carolina, and have access to resources and care providers in South Carolina. The parents would be capable of caring for the children in their home in South Carolina.  The parents are currently caring for a younger child, who is not a subject to these proceedings, in this home.

61. Since the removal of the children Mr. and Mrs. Medicraft have shown that they are available to parent their children. In fact, DCYF and the children's school have relied on the parents to care for the children on a daily basis. From early February to late March, the parents took care of all of the children's daily needs. During this time, the father's visitation time with the children was limited to two hours per week with DCYF having the authority to expand his visitation, which DCYF did. DCYF also had the authority to cut back the father's visitation to the two hours per week. DCYF did not do so. In fact, the parents had visitation with the children all day, every day and were able to go to the community. The parents' time with the children were supervised by DCYF and there were no reason or occasion that caused DCYF to reduce the parents' time with the children until the COVID-10 pandemic.

62. There was no evidence presented to suggest that ███████ or ██████ have any special needs. There was no credible evidence presented that the parents are not capable of adequately caring for ███████ and ███████.

63. ██████, ██████, and ███████ do have some behavioral challenges.  The evidence is clear that these behavioral challenges were less severe when the children resided with Ms. Medicraft. It also appears that these behavioral challenges have lessened since the children have been placed in actual placements, and were no longer subject to DCYF night-to-night care.  Even when the children's behaviors were more challenging in January – March 2020, the evidence was overwhelming that the children's behavior was better when they were in the care of their mother during visits.  DCYF acknowledged this by increasing her visitation with the children and relying on Ms. Medicraft to assist them with caring for the children.  The evidence has shown that Ms. Medicraft is capable of advocating for the children in obtaining services – like IEPs and counseling – and she has been actively involved in those processed for her children.   DCYF failed to prove the parents are not capable of adequately caring for ███████ or ███████.

64. The Petitioner, DCYF, did not prove, by a preponderance of the evidence that ██████, ███████ ██████, ██████ or ███████ Medicraft are dependent children within the meaning of RCW 13.34.030(6)(c).  Specifically, the Petitioner failed to prove that any of the children have no parent capable of caring for them such that capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

## III.  Conclusions of Law

**Jurisdiction**: The court has jurisdiction over: the children, the mother, and the father

**Notice**: The following have received timely and proper notice of these proceedings: the mother and the father

**Dependency**: The children are not dependent pursuant to RCW 13.34.030(6) and the matter should be dismissed

## IV. Order

**Dependency**: The children: ▉▉▉▉, ▉▉▉▉, ▉▉▉▉, ▉▉▉▉, and ▉▉▉▉ Medicraft are not dependent pursuant to RCW 13.34.030(6)(c).

For the reasons above, the dependency proceedings as to ▉▉▉▉, ▉▉▉▉, ▉▉▉▉, ▉▉▉▉, and ▉▉▉▉ Medicraft are dismissed.

Dated: October 28, 2020

_____
**Judge Susan H. Amini**

**Order Dismissing Dependency -** Page 12 of 12
**WPF JU 03.0650** (07/2018)– RCW 13.34.237. 13.34.267

# EXHIBIT B

# Whistleblower Referral

**Referral ID:** ▮▮▮▮   **Case Number:** N/A   **Date Submitted:** 01/06/2021

## WB Info

**Rejected:** ☑   **Date Rejected:** 01/08/2021

**Reason Rejected:** There is another avenue available for addressing the matter

**Initial Assertion:**

**Assigned Team:** (select team)   **Closed Date:** 01/08/2021

**Date Assigned:**   **Records Destroyed:**

**Report Issued:** ☐   **Report Date:**

**Audit Number:**   **Related Case Number:**

### WB Dates

| | 15 days | 60 days | 120 days | 365 days |
|---|---|---|---|---|
| **Deadline:** | 01/27/2021 | 03/31/2021 | 06/23/2021 | 01/06/2022 |
| **Mailed On:** | 01/08/2021 | | | |
| **Agency Notified On:** | | | | |
| **Subject Notified On:** | | | | |

## Subject Info

| Subject Name | Entity |
|---|---|
| Tabitha Pomeroy | Department of Children, Youth, and Families |

## Contact Info

**Contact Preference:** ☐ Day Phone  ☐ Night Phone  ☐ Email  ☐ Regular Mail

**Agency:** NULL

**Division:**

**Current Position:**

| Contact ID | FirstName | LastName | Email |
|---|---|---|---|
| ▮▮▮▮ | | | |

## Details

**What type of improper governmental action are you reporting?**

- ☐ Conflict of Interest/Nepotism
- ☐ Contract Issues
- ☑ Gross mismanagement
- ☐ Gross waste of public funds
- ☑ Other improper governmental action per state law (Chapter 42.40 RCW)
- ☐ Personal Use of State Resources
- ☐ Preventing dissemination of scientific opinion or altering technical findings
- ☐ Special Privilege
- ☑ Substantial and specific danger to the public health and safety
- ☐ Time and Attendance
- ☐ Travel
- ☑ Violation of state law or regulation

**Which RCW(s) or WAC(s) have been violated?**

**When and where did the improper governmental action take place?**

**Please describe the improper governmental action in detail.**
**The more detailed information you provide us, the better we will be able to asses your concerns.**
***Improper governmental action cannot be related to personnel matters.***

At an all staff meeting for the MLK office on 12/16/2020, an employee asked a question about whether rumors they had heard were true regarding foster kids having to sleep in cars with state employees or on the floors in state offices with no beds, blankets, pillows. Tabitha Pomeroy, the AA of the office, stated that "yes that is absolutely happening and it is coming from me." She went on to explain that the foster youth were "violent" and were "getting the office kicked out of hotels", so when a group home placement or a night to night placement was found and a foster youth did not want to go, she was directing staff to not request a hotel and to make the youth sleep in the car or the office until they accept the placement. She stated she was "not going to reward their tantrums by letting them stay in a hotel or on a comfortable couch (in the office)." She spoke several times about how the foster youth were "violent" and "destroyed property" often. Several employees asked questions and voiced their concern with this practice in the zoom chat or out loud in the zoom meeting. An employee mentioned that this was not a trauma informed approach to housing and taking care of foster youth. Another employee stated that it was not appropriate to remove children from their homes for abuse or neglect and then force them to sleep on floors or in cars. An employee asked that if the state would not pay for hotels, could we have beds and blankets and make a room in the office for youth to sleep comfortably. This was ignored. Ms. Pomeroy did respond by suggesting that an employee who asked a question about the ethics of having youth sleep in cars or on floors "work a 24 hour shift to keep this from happening". The meeting ended before more could be said or discussed. Ms Pomeroy is using her power as the AA to make executive decisions as to youth and those decisions are not in the youth's best interest. DCYF is meant to protect youth and advocate for their safety, permanency, and well-being. Ms. Pomeroy is abusing her power and going against DCYF's mission, policy, and codes as well as the NASW's code of ethics by refusing them a place to sleep comfortably when the means exist. In addition, this practice is especially harmful to workers and youth during COVID.

**Can we find, or can you provide, additional information to support your assertions?**

**Yes   No**

**Are there other witnesses?**

**Yes   No**

**If yes, please provide their contact information.**

Again, any employee at the MLK office of DCYF who was present during this all staff.

**How do you know about the information you are disclosing here?**

**Have you already summitted this assertion?**

**Yes   No**

## Outcome

☐ All Assertions Not Substantiated

☐ Closed in Preliminary

☐ Ethical Violation

☐ Workpapers Sent to Executive Ethics Board

☐ Ethics Board Enforcement - Dollar Amount:

☐ External Law Enforcement - Entity:

☐ No Action Was Taken

☐ Other

## Investigators

| Investigator Name |
|---|

**Investigator Comments:**

## Activity Log

| Entry Date | Log Entry |
|---|---|
| 1/8/2021 | Referral updated by gillisj |
| 1/8/2021 | Attachment added by gillisj |
| 1/8/2021 | On 1/7/21 committee reviewed and determined to close with an fyi to the agency, the submission was anonymous therefore no letter will be sent to the wb. |
| 1/6/2021 | Referral submitted from external site |

## Documents

| Attachment |
|---|
| DCYF_180172_FYILtr.pdf |

**Subject's Name:** Tabitha Pomeroy

**Agency:** Department of Children, Youth, and Families

**Division:**                    **Position:** Area Adminstrator

**Location:** Seattle          **Phone:** ████████

**Subject's Supervisor(s):** Erik Applebee

**Supervisor's Position(s):** Regional Administrator

**Supervisor's Phone(s):**

**Outcome:**   ☐ Resigned
               ☐ Terminated
               ☐ Disciplined
               ☐ Demoted
               ☐ Required to Take Training



## Office of the Washington State Auditor
## Pat McCarthy

January 8, 2021

Ross Hunter, Secretary
Department of Children, Youth and Families

███████████████████

Dear Secretary Hunter:

We recently received a whistleblower complaint asserting improper governmental activity at the Department of Children, Youth, and Families.

We have completed our initial analysis of the concern and determined your agency may effectively address the issue. Therefore, we will not open an official whistleblower investigation (RCW 42.40.040(1)(b)).

Briefly, the complaint stated:
At an all staff meeting for the MLK office on 12/16/20, an employee asked a question about whether rumors they had heard were true regarding foster kids having to sleep in cards with state employees or on the floors in state offices with no beds, blanket, pillows. Tabitha Pomeroy, the AA of the office stated "yes that is absolutely happening and it is coming from me." She went on to explain that the foster youth were "violent" and were "getting the office kicked out of hotels", so when a group home placement or a night to night placement was found and a foster youth did not want to go, she was directing staff to not request a hotel and to make the youth sleep in a car or the office floor until they accept the placement.

If you have questions or need further information, please contact me at ████████████.

Sincerely,

**TROY NIEMEYER**
ASSISTANT DIRECTOR OF STATE AUDIT

TN:jmg

cc: Liana Dupont-Smith, Internal Audit Manager
Ref: 180172

# EXHIBIT C

| Case Name: | Case ID: | Case Note ID: | Note Finalized ☐ |
|---|---|---|---|
| | | | |

| Case Note Category: CFWS | Case Note Type: Contact |
|---|---|
| Date Occurred | Time Occurred: 12:00 AM |
| Date Entered:     10:06 AM | Note Entered by: |
| Related Participants and Collaterals: | Related Intakes: |

### ACTIVITIES

Activity: Child - Face to Face with Child    Participant:

Location: Other (License or Unlicensed)    Time: 12:00 AM    TCM: No

### CONTACTS

### NARRATIVE

Case Note 1 of 1    Entered By :            Date Entered :         Time Entered : 10:06 AM

AHSW         arrived at the Bellevue office at 12:00am and noticed     was in the staff work area. AHSW        along with staff supervision     at the time immediately tried to get     out of the staff work area and out of the building. AHSW      was able to get    out of the building and into the state vehicle. Because James re-directed to instruction, AHSW      et     pick out three food items from 7-11. AHSW      drove for 35 minutes before     went to sleep in the back seat.     knows how to adjust the child locks

on the back doors, allowing the door to be opened from the inside. AHSW ███████ arked at the Kent office until 4:00am,at that time ████ awoke and became agitated because he didn't want to sleep in the car and didn't have his blanket. I did explain to him that we have to be on our best behavior to stay in hotel rooms. AHSW ██████ leparted Kent office and arrived at the Bellevue office at 4:30am and ████ vent back to sleep and didn't awake until 8:48am. AHSW Stallworth did purchase a breakfast sandwich from McDonald for ████ and he had no issues listening this morning knowing his treats would be taken away for non-compliance. Supervision was transferred to AHSW ███ at 9:35am.



# EXHIBIT D



# EXHIBIT E



# EXHIBIT F



# EXHIBIT G



# EXHIBIT H



# EXHIBIT I



# EXHIBIT J

# EXHIBIT K



# EXHIBIT L



# EXHIBIT M



# EXHIBIT N



# EXHIBIT O



# EXHIBIT P



# EXHIBIT Q



# EXHIBIT R



# EXHIBIT S



# EXHIBIT T

# EXHIBIT U



# EXHIBIT V

# SEE VIDEO ATTACHMENT

# EXHIBIT W

# SEE VIDEO ATTACHMENT

# EXHIBIT X

# SEE VIDEO ATTACHMENT

# EXHIBIT Y

**From:** Olimene, Justine (DPD) <jolimene@kingcounty.gov>
**To:** Gold, Hannah <Hannah.Gold@kingcounty.gov>; Redman, Helen <Helen.Redman@kingcounty.gov>;
King, Cleveland (DCYF) <cleveland.king@dcyf.wa.gov>; Culp, Tabitha M (DCYF)
<tabitha.culp@dcyf.wa.gov>; Whalen, Virginia <vwhalen@kingcounty.gov>; Allbee, J'aime (DCYF)
<jaime.allbee@dcyf.wa.gov>
**Cc:** Leuzzi, Derek P. (ATG) <derek.leuzzi@atg.wa.gov>; McClellan, Kathleen
<Kathleen.McClellan@kingcounty.gov>; Martin, Kathleen <Kathleen.Martin@kingcounty.gov>
**Sent:** Wednesday, March 25, 2020, 05:13:55 PM PDT
**Subject:** RE: James Medicraft allegations of sexual abuse by Department staff

Hello,

I am following up on the emails below. Is there an update on this investigation? Can you please let us
know what steps have been taken since this was reported?

Thank you!

Justine

**From:** Gold, Hannah <Hannah.Gold@kingcounty.gov>
**Sent:** Friday, March 20, 2020 2:46 PM
**To:** Redman, Helen <Helen.Redman@kingcounty.gov>; King, Cleveland (DCYF)
<cleveland.king@dcyf.wa.gov>; Culp, Tabitha M (DCYF) <tabitha.culp@dcyf.wa.gov>; Whalen, Virginia
<vwhalen@kingcounty.gov>; Allbee, J'aime (DCYF) <jaime.allbee@dcyf.wa.gov>
**Cc:** Leuzzi, Derek P. (ATG) <derek.leuzzi@atg.wa.gov>; McClellan, Kathleen
<Kathleen.McClellan@kingcounty.gov>; Olimene, Justine (DPD) <jolimene@kingcounty.gov>; Martin,
Kathleen <Kathleen.Martin@kingcounty.gov>
**Subject:** RE: James Medicraft allegations of sexual abuse by Department staff

We join in Helen's concerns. I am available for a meeting as well. I can be reached at 206-743-4582. I
would hope that this is already being done, but none of the Medicraft children should be around the
alleged perpetrator until this investigation is complete. I assume that is Dept protocol, but wanted to
reinforce this.

**From:** Redman, Helen <Helen.Redman@kingcounty.gov>
**Sent:** Friday, March 20, 2020 2:41 PM
**To:** King, Cleveland (DCYF) <cleveland.king@dcyf.wa.gov>; Culp, Tabitha M (DCYF)
<tabitha.culp@dcyf.wa.gov>; Whalen, Virginia <vwhalen@kingcounty.gov>; Allbee, J'aime (DCYF)
<jaime.allbee@dcyf.wa.gov>
**Cc:** Leuzzi, Derek P. (ATG) <derek.leuzzi@atg.wa.gov>; McClellan, Kathleen

<Kathleen.McClellan@kingcounty.gov>; Gold, Hannah <Hannah.Gold@kingcounty.gov>; Olimene, Justine (DPD) <jolimene@kingcounty.gov>; Martin, Kathleen <Kathleen.Martin@kingcounty.gov>
**Subject:** James Medicraft allegations of sexual abuse by Department staff

Hello,

I have been informed that James (the child not the father) Medicraft reported sexual abuse by DCYF staff.  My understanding is that he may have already talked to several people about it.  My hope is that the Department is following normal protocol and referring this to law enforcement.  This child should not be interviewed by multiple people prior to having a forensic interview with law enforcement.  Please keep us informed about the status of this investigation.  I was called because it sounded like there was going to be a meeting about it. If the Department wants to meet with my client about this issue, I want to be on the phone.  I can be reached at 206-743-2592.  I have other meetings this afternoon from 3-5 and will not be available for such a meeting until Monday.

Thank you,

Helen

Helen Redman

Supervising Attorney, Family Defense Unit

The Defender Association Division (TDAD)

King County Department of Public Defense

710 Second Avenue

Suite 700

Seattle, WA 98104

206-477-8700, Ext. 78807

Pronouns: she, her, hers

NOTICE: DCYF - Sending emails to counsel is not a substitution for providing information to parents or youth.  This counsel is not responsible for communicating Department (DCYF) information to the parents or youth on your caseload.

**Confidential:** This message is intended for the use of the individual or entity to which it is emailed and may contain information that is privileged, confidential and exempt from disclosure under applicable laws.  If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone, (206) 477-8700, or email.

# EXHIBIT Z

**From:** James Medicraft <jmedicraft@yahoo.com>
**To:** shey7734@gmail.com <shey7734@gmail.com>; Olimene, Justine (DPD)
<jolimene@kingcounty.gov>; Redman, Helen <helen.redman@kingcounty.gov>;
kathleen.mcclellan@kingcounty.gov <kathleen.mcclellan@kingcounty.gov>; Gold, Hannah
<hannah.gold@kingcounty.gov>; Allbee, J'aime (DCYF) <jaime.allbee@dcyf.wa.gov>
**Cc:** Leuzzi, Derek P. (ATG) <derek.leuzzi@atg.wa.gov>; Culp, Tabitha M (DCYF)
<tabitha.culp@dcyf.wa.gov>; King, Cleveland (DCYF) <cleveland.king@dcyf.wa.gov>; Jenn Watts
<jenn.watts@sound.health>; Alexandra Dean <alexandra.dean@sound.health>; Kyna Wilson
<kyna.wilson@sound.health>; Marlene Andrews <marlene.andrews@sound.health>; Virginia Whalen
<vwhalen@kingcounty.gov>
**Sent:** Monday, April 20, 2020, 07:13:32 AM PDT
**Subject:** Re: Phone call

Jamie, Yes, I have some questions.  Thank you for asking. During the limited visit time
you allow us to have with our children, whom you clearly seem to be coaching and
guiding away from their natural parents by your comments, both James and Arthur
indicated that you described the place you want to send them much like a "fun
disneyland" for kids.  This is as unusual another misleading deliberate cover-up of truths
and facts to what is the real truth and reality behind cps and the environment children
are forced and coerced into.  It is more manipulation of people.  Did you tell the children,
their parents, or those involved about this case the actual known cases for child
molestation, sexual abuse and assault by underpaid, low educated staff members at
NIA, which is run by Sequel?  Did you inform the children that where you want to send
them staff members have been jailed for their crimes against children?  These actions,
much liked the actions we have witnessed, and others have witnessed with our children
while at Kent dcyf, are criminal. Did you inform our children, that just a few months ago,
Senator Sara Gelser of Oregon is investigating NIA in Illinois for abusing one of
Oregon's children.  The same place you want to so lovingly send "our" children.  The
Senator from Oregon stated "I hope that people will take a very close look at the record
of this organization."  The Senator went on to say, "Sequel executives provided
demonstrably false information to lawmakers".   There are also reviews about this place
by employees there, reviews describing it as "hellish". One review says "this place
needs to get shut down."  The staff in one review calls them uneducated. Another
former staff member speaks of all the violent attacks.  Is this what you willfully describe
to my kids as a fun place?  Another employee says it's hard to distinguish patients from
staff. Did you while deliberately and conveniently sugar coating to our children tell them
of a child being punched in the face by a staff member at NIA? Did you tell OUR
children how another staff member was jailed for choking a young child?  Did you tell
our children they can perhaps look forward to being choked and assaulted there?   Did
you tell "our" children another staff member was jailed for sexual abuse?  When you
and The aag attemot to send our children to this nightmare, will you inform the judge of
these facts, of where you want to send them?  This is what goes on at these facilities
that rarely gets seen or reported.  This is what we have witnessed first hand with our
children at dcyf in Kent WA.  The same level of abuse and violence. And deliberately
and conveniently everything gets covered up.  Cps makes out as though the children as
liars when they report crimes against them.  Cps is well versed in accusing others,
denying rights, but denying everything they do and sugar coating themselves.  Cps
provides written statements of how wonderful things are for our children, but who's there
to really know or see if that is true.  We do hear though what our children say.  The

assults we have witnessed against our children, support their claims and the excessive force used on our children is criminal.  Yet, as always there is this pretty picture painted, and the words "in the child's best intrest" but rarely does anyone get to see the truth of what's going on behind closed doors until it makes headline news.  And it does frequently.  The National Center For Child Abuse reports that for every 100,000 cases in the United States children in cps custody are 3 times more likely to be abused physically while in cps custody, than with parents.  It also reports that children are seven times more likely to die, in cps custody, than with parents. Sexual abuse while in cps custody is 112 times per 100,000 cases, as opposed to only 13 per 100,000 cases while with parents.  These data facts. And the crimes we have witnessed against our children will not go unnoticed.  Nor will the conspiracy to steal our children with false manufactured  Dr. reports.   Absolute and or qualified immunity does not protect against crimes against children, nor violation of federal rights, nor conspiracy.  It does not protect against manufacturing falsified or misleading evidence to take other people's children, statutes dictates that.  We have federal and constitutional rights.  Our children have rights.  And we have the right to defend and protect our children despite efforts to forcefully silence everyone but themselves.  There is a growing movement in this country to expose cps for the reasons we have witnessed with our children.  This is my comments regarding my children. If past performance is an indicator, you will proceed  in forcibly and knowingly  doing to our children what is clearly NOT in their best interest. For me, some causes are worth fighting for.  As corrupt as NIA facility is, Tennessee is just as bad, if not worste.

On Friday, April 17, 2020, 08:44:30 PM PDT, Allbee, J'aime (DCYF) <jaime.allbee@dcyf.wa.gov> wrote:

Arthur's update was sent in a previous email to include the WISe team.

James's Friday Update:

James- He had a good week as well. There were no reports outside of the weekend's report that rose to the level of alarm or concern. He too like his brother seems to be in a groove of a routine which has appeared to help with not having as many behaviors. I have also requested his incident reports from camp and am awaiting those reports to read and distribute.

One of the afterhours workers who James would previously assault asked for them to tuck him into bed this week and give him a hug. This is a huge step in building trust and connection with our workers, something we are excited to see take place.

James's apt for chiropractic was moved from Monday to Thursday of next week to fall in line with the schedule we created. This week the apt will be at 4:45 and subsequent weeks (4 at least) it will be at 4:30 as we had put on the schedule.

I had the opportunity to talk with both of the boys about attending the NIA facility. James was reserved and stated he did not want to go and asked if I would make him. I informed him the decision is up to a judge, not me, but that I

am requesting he be placed there. James stated that he and a worker called Friends of Youth, a placement he previously refused and that he was the next on the list for acceptance into placement there. I have reached out to our Placement Team and inquired about this and about the timeline for placement if it's accurate. Arthur was excited to go and picked out the staff he would like to transport him there. Unfortunately I did not explain the timeline very well and he became upset the day after because he was not already leaving for IL. He was able to speak with his CASA as was James and share their concerns and thoughts about being placed at NIA.

We have shared the schedule for the boys both with the afterhours staff and the day staff in hopes that by familiarizing everyone with the schedule it will help provide some consistency for both boys.

Please feel free to reach out with any questions.

J'aime

**From:** James Medicraft <jmedicraft@yahoo.com>
**Sent:** Friday, April 17, 2020 7:21 PM
**To:** shey7734@gmail.com; Olimene, Justine (DPD) <jolimene@kingcounty.gov>; Redman, Helen <helen.redman@kingcounty.gov>; kathleen.mcclellan@kingcounty.gov; Gold, Hannah <hannah.gold@kingcounty.gov>; Allbee, J'aime (DCYF) <jaime.allbee@dcyf.wa.gov>
**Cc:** Leuzzi, Derek P. (ATG) <derek.leuzzi@atg.wa.gov>; Culp, Tabitha M (DCYF) <tabitha.culp@dcyf.wa.gov>; King, Cleveland (DCYF) <cleveland.king@dcyf.wa.gov>
**Subject:** Re: Phone call

And how do we know your statement is true?   James told us a different version.  He said that Arthur was threatened that if he doesn't behave he will not get to talk to his mom and dad.  In other words, his phone time is being weponized. We have heard this threat before ourselves.  I think it's more than coincidence that James told us his version about an hour ago, and then we get this email.   And, for the record, once again James informed us that there is a guy who twice now has been allowed in the room he stays at and sexually molest James. There appears to be numerous accounts of sexual molestation that gets swept under the rug as does all other reports of abuse and neglect to our children that we have reported.  But I am making this officially known now as it was reported to me about one hour ago by my son.  It's just like all the photos of bruises and cuts and strangulation marks on our children while in cps care, that too gets swept under the rug as does all our reports.  One of my children have been forcibly locked in a room as reported to me while at this camp. This does not surprise me as 3 of our children have reported being locked in a room at dcyf, and not being allowed to use even a bathroom and thus having to relieve themselves on the floor.  This is cruel, inhuman and humiliating.  This is traumatizing and may certainly have long term effects.  It is cruel to a child their age.   My children have been improperly and forcibly restrained.  They have been humiliated on several occasions, subjected to cruel punishments and abuse, and choked to the point of their breathing being restricted as photos we have taken show.  Our children, as well as us have rights. They have the right to be safe among other things.  And as I said, tonight once again I was informed about a guy who is allowed to come and molest my son at night alegidly.  We are focusing on those rights specifically for our children's safety now.  These are common rights that the Department, and all affiliated with it including the aag, should know reasonably that a child should not be subjected to.  The actions my children have been subjected to show deliberate indifference and grossly unreasonable violence, trauma and humiliation to them.  We have documented all the coaching the Department has done to them in an effort to deliberately destroy a family.  We have witnessed and have

witnessess to the Department restricting their breathing.  This brings up many federal questions.  But most importantly, as a parent I have a right to be concerned for my childrens well being and safety.

On Friday, April 17, 2020, 05:54:50 PM PDT, Allbee, J'aime (DCYF) <jaime.allbee@dcyf.wa.gov> wrote:

I wanted to pass this along to the parties so everyone was aware why a phone call did not take place tonight.

**From:** Sanchez, Tanessa (DCYF) <tanessa.sanchez@dcyf.wa.gov>
**Sent:** Friday, April 17, 2020 5:33 PM
**To:** Allbee, J'aime (DCYF) <jaime.allbee@dcyf.wa.gov>; Culp, Tabitha M (DCYF) <tabitha.culp@dcyf.wa.gov>
**Subject:** Phone call

Arthur didn't want to talk to his parents tonight. He said he has a pact with his brothers and it is his workout day so he cannot talk.  We asked multiple times.   I am sorry.

# EXHIBIT AA



# EXHIBIT BB

Redacted copy for Clerk of Court
Case # 2:20-cv-01145-JRC

_____ FILED _____ LODGED
_____ RECEIVED

AUG 1 1 2020

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                    DEPUTY

Thank you.

James R. Medicraft



**UNITED STATES DISTRICT COURT**

WESTERN DISTRICT OF WASHINGTON
OFFICE OF THE CLERK
U.S. COURTHOUSE   FILED (DROP BOX)
700 STEWART ST., SUITE 2310
SEATTLE, WASHINGTON  98101

JUL 23 2020

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY_____ DEPUTY

*NOTE: ORIGINAL DROPBOX FORM FROM 7/23/2020 WAS RESUBMITTED 8/11/2*

**WILLIAM M. MCCOOL**
**District Court Executive**
**Clerk of Court**

LORI LANDIS
**Chief Deputy**

## FILING/PAYMENT FORM

FILED _____ LODGED
_____ RECEIVED
AUG 11 2020
BY_____ WESTERN DISTRICT CLERK U.S. DISTRICT COURT
OF WASHINGTON AT TACOMA
DEPUTY

**Date:**  July 23, 2020

**Name:**  James R. Medicraft

**Case Number** (if known):  2:20-CV-01145-JRC

**Email:**  jmedicraft@yahoo.com

**Phone:**  701-650-0168

**Address** (optional for mailing of receipt, return copies, etc.)

_Address_    James R. Medicraft

_City/State/Zip_    310 E. Northside Ave, Marion, S.C. 29571

## Reason for Transaction:

☒ New Case Filing

☐ Payment (Payment made out to US District Court or USDC; DO NOT LEAVE CASH)

☐ Filing Additional Documents

☐ Other: _____

James R. Medicraft

310 E Northside Ave.

Marion, SC. 29571

AUGUST 10, 2020




WILLIAM M. MCCOOL

CLERK OF COURT

700 STEWART ST.

SEATTLE, WA. 98101




Dear Mr. McCool

Enclosed is a redacted version of the papers filed for Case Number 2:20-cv-01145-JRC. I hope this is satisfactory. If you have any questions or concerns please contact me, and please have a wonderful day. Thank you.

James R. Medicraft

| 07/31/2020 | NOTICE TO FILER: re 1 Complaint/Exhibit. Document(s) contain personal identifiers and photographs of minors that must be redacted pursuant to Federal Rule of Civil Procedure 5.2 and Local Civil Rule 5.2. Please file a redacted version of your complaint, and exhibits without photographs as soon as practicable. This will not affect your original filing date. Pursuant to FRCP 5.2 and LCR 5.2, the document(s) have been administratively sealed by the Court. (SP) (Entered: 07/31/2020) |

Rev. 3/2020

# UNITED STATES DISTRICT COURT

**WESTERN DISTRICT OF WASHINGTON**
OFFICE OF THE CLERK
U.S. COURTHOUSE **FILED (DROP BOX)**
700 STEWART ST., SUITE 2310
SEATTLE, WASHINGTON 98101

**JUL 23 2020**

**WILLIAM M. MCCOOL**
**District Court Executive**
**Clerk of Court**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

**LORI LANDIS**
**Chief Deputy**

# FILING/PAYMENT FORM

**Date:** July 23, 2020

**Name:** James R. Medicraft

**Case Number** (if known): 2:20-CV-01145-JRC

**Email:** jmedicraft@yahoo.com

**Phone:** 701-650-0168

**Address** (optional for mailing of receipt, return copies, etc.)

_Address_ James R. Medicraft

_City/State/Zip_ 310 E. Northside Ave, Marion, S.C. 29571

## Reason for Transaction:

☒ New Case Filing

☐ Payment (Payment made out to US District Court or USDC; DO NOT LEAVE CASH)

☐ Filing Additional Documents

☐ Other: _____

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.　(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS

James R. Medicraft

**DEFENDANTS** Derek P. Leuzzi
Lisa (Elizabeth) Sterbick
Tenessa Sanchez
Washington State Dept of Social and Health Services

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:　IN LAND CONDEMNATION CASES, USE THE LOCATION OF
　　　　THE TRACT OF LAND INVOLVED.

**(c)** Attorneys (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1　U.S. Government Plaintiff
- ☒ 3　Federal Question (U.S. Government Not a Party)
- ☐ 2　U.S. Government Defendant
- ☒ 4　Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1　Original Proceeding
- ☐ 2　Removed from State Court
- ☐ 3　Remanded from Appellate Court
- ☐ 4　Reinstated or Reopened
- ☐ 5　Transferred from Another District (specify)
- ☐ 6　Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. 1983　1st Amendment Right　8th Amendment Right
Brief description of cause:
Defendants violated 4th and 14th Amendment right to familial relationship

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:　☒ Yes　☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):　JUDGE _____　DOCKET NUMBER _____

DATE _____　SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____　AMOUNT _____　APPLYING IFP _____　JUDGE _____　MAG. JUDGE _____

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

_____ Division

|  |  |
|---|---|
| James R. Medicraft | Case No. _____ |
| *Plaintiff(s)* | *(to be filled in by the Clerk's Office)* |
| (Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | Jury Trial: *(check one)* ☒ Yes ☐ No |
| Derek P. Leuzzi -v- Liza (Elizabeth) Sterbick Tanessa Sanchez Washington State Dept. of Social and Health Servs | |
| *Defendant(s)* | |
| (Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | |

## COMPLAINT FOR A CIVIL CASE

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | James R. Medicraft |
| Street Address | 310 E. Northside Ave. |
| City and County | Marion (Marion County) |
| State and Zip Code | South Carolina 29571 |
| Telephone Number | 701-650-0168 |
| E-mail Address | jmedicraft@yahoo.com |

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

Name     Derek P. Leuzzi

Job or Title *(if known)*     Assistant Attorney General (WSBA #45508)

Street Address     800 Fifth Avenue, Suite 2000

City and County     Seattle (King County)

State and Zip Code     Washington 98104

Telephone Number     206-464-7045

E-mail Address *(if known)*     Derek.Leuzzi@atg.WA.gov

Defendant No. 2

Name     Liza (Elizabeth) M. Sterbick

Job or Title *(if known)*     Supervisor CFWS/DCYF

Street Address     1313 W. Meeker St. #100

City and County     Kent (King County)

State and Zip Code     Washington 98032

Telephone Number     877-501-2233

E-mail Address *(if known)*

Defendant No. 3

Name     Tanessa Sanchez

Job or Title *(if known)*     CPS Investigator/social worker

Street Address     1313 W. Meeker St. #100

City and County     Kent (King County)

State and Zip Code     Washington 98032

Telephone Number     877-501-2233

E-mail Address *(if known)*

Defendant No. 4

Name     Washington State Dept. of Social and Health Service

Job or Title *(if known)*

Street Address     1313 W. Meeker St. and/or 14th Ave. SE and Jefferson st

City and County     Kent (King County) and/or Olympia (Thurston County)

State and Zip Code     Washington 98032 and/or 98501

Telephone Number

E-mail Address *(if known)*

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question  ☒ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A. If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

1 st Amendment
4 th Amendment
8 th Amendment
14 th Amendment
42 U.S.C. 1983

### B. If the Basis for Jurisdiction Is Diversity of Citizenship

1. The Plaintiff(s)

   a. If the plaintiff is an individual

   The plaintiff, *(name)* James R. Medicraft is a citizen of the State of *(name)* South Carolina.

   b. If the plaintiff is a corporation

   The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____,

   and has its principal place of business in the State of *(name)* _____.

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

   a. If the defendant is an individual

   The defendant, *(name)* Derek P. Leuzzi, is a citizen of the State of *(name)* Washington. Or is a citizen of *(foreign nation)* _____.

2. **The Defendant(s)**

   b. If the defendant is an individual

   The defendant, (name) _Liza (Elizabeth) Sterbick_ is a citizen of
   The State of (name) _Washington_

   c. If the defendant is an individual

   The defendant, (name) _Tanessa Sanchez_ is a citizen of
   The State of (name) _Washington_

   d. If the defendant is an individual

   The defendant, (name) _Washington State Dept of Social and Health Services_ is a citizen of
   The State of (name) _Washington_

   b.    If the defendant is a corporation

         The defendant, *(name)* _____ , is incorporated under

         the laws of the State of *(name)* _____ , and has its

         principal place of business in the State of *(name)* _____

         Or is incorporated under the laws of *(foreign nation)* _____

         and has its principal place of business in *(name)* _____

         *(If more than one defendant is named in the complaint, attach an additional page providing the
         same information for each additional defendant.)*

   3.    The Amount in Controversy

         The amount in controversy--the amount the plaintiff claims the defendant owes or the amount at
         stake--is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the
facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was
involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including
the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and
write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

The defendant(s) Knowingly created and submitted perjured evidence,
false and misleading evidence to take the plaintiffs children into state
custody. Perjury, false or misleading evidence is clearly established by
statutes. The defendant(s) Knowingly denied the plaintiff due process
by taking his children without a court order, or evidence of immanent
harm. The defendant(s) had more than enough time to contin...

Please see next page →

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal
arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the
amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any
punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or
punitive money damages. The parents and children of this family ask the court
to hear the facts to determin if wilful perjured evidence was manufactured
that deprived the family of basic constitutional rights. The basis for this
claim is statutes and that false claims and child abuse and trauma
continues. The children feel hopeless and have expressed suicidal thoughts
because of the hopless feeling of injustice. We feel permanent trauma
has been caused by the defendants. We ask for our children to be
returned and 250 million dollars punative damages. What has been
done to this family should not happen ever. in the United States.

Statement of Claim (Page 2)

Parents and children have a well-elaborated constitutional right to live together without governmental interference. That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency. The plaintiff believes he and his children have a constitutional Due Process right and a Fourth Amendment right protecting against deliberate government use of perjured testimony and fabricated evidence in a court proceeding designed to rupture familial relationships. The plaintiff believes that in Hardwick v County of Orange that it is clearly established that you cannot use perjured evidence to take one's children, or to use it to violate one's rights and the unconstitutionality of that practice. The father, James R. Medicraft believes it is a constitutional right to be free from the knowing presentation of false or perjured evidence, under Due Process, and that perjury and or false evidence is clearly established by statutes. Here are the facts I wish to submit to support my claim.

FACT: I claim the defendants had more than enough time to secure a court order to remove the children if there were actual evidence of imminent danger as law demands, but didn't. Instead they had a meeting as seen in Exhibit 7 Page 53 Line 24 and 25. Mr. Leuzzi stated that he was actually at the meeting discussing the removal of the children.

FACT: On April 25, 2019 Exhibit 1, the court orders the children to be taken into custody. The State claims the no contact order was violated.

FACT: On December 6, 2019 Derek P. Leuzzi (Assistant Attorney General) states in Exhibit 2 page 5 lines 13-15 "The department has had concerns that there were violations of the no contact order for the past several months, but was unable to concretely have evidence of such violations until this week." This shows clearly that there was no concrete evidence in which an imminent danger court order was obtained.

FACT: There never was a trial or due process that found the father to be dangerous or that he had committed any acts of domestic violence. The case as records show, was based only on allegations. Having investigated this case and reading all the reports from New York where the case originated, Derek P. Leuzzi stated in a motion to the court, Exhibit 2 page 2 line 19 and presented to the court to mislead, that, "Mr. Medicraft is dangerous to the family."

FACT: In exhibit 2 page 5 line 1 Derek P. Leuzzi states, "The family is a serious flight risk." He goes on to state, "Most recently, the parents were ordered to appear before Judge Cortese in Montgomery County New York for the more permanent order of protection.

Statement of Claim (Page 3)

When none of the parties appeared, all the parties' attorneys and the court became concerned and used GPS tracking to locate the parent's cellular devices.  They found the parents fleeing New York State"

FACT:  Court transcripts from February 6, 2019 show, and Exhibit 3 page 2 line 7 in papers from Washington Department of Social Service states, "Both parents were present in Montgomery County New York on February 6, 2019 when the court entered a two-year order of protection. This fact was well documented in several papers generated by the State of Washington Department of Social service and CPS office in Kent, WA.  Yet, Derek P. Leuzzi made this claim which was used in a "totality" of claims to take the children. The statement that the parents were a serious flight risk weighed heavy on the Court's decision, and was false.

FACT:  In a sworn statement by Liza (Elizabeth) Sterbick, Exhibit 4 Page 7 Line 17 and 18 which was used in court to have the children taken, she states, "On February 6, 2019, the parties were set to appear for a full no contact order.  Neither party appeared, raising great concern for both counsel and the State of New York."

FACT: Again, in exhibit 3 page 2 line 7 it clearly states both parties, mother and father appeared in Court February 6, 2019.

Fact:  Page 53 line 8-12 Liza Sterbick states in a sworn deposition that the information given to here, in her sworn statement used in Court December 6, 2019 to take the children came from Derek P. Leuzzi.  She also states in line 13-15 that no one else gave her information regarding the New York case.

FACT: On December 6, 2019, Tanessa Sanchez stated in a sworn statement exhibit 5 page 3 lines 15-19, "I additionally found out during this time frame from Mr. Medicraft that the family had lived in a variety of places such as North Dakota, Missouri, Washington, California and New York."  What she didn't state as exculpatory evidence consistent with seeking justice, was that each of these places were lived in due to job transfers by the companies Mr. Medicraft worked for, and were job related and that Mr. Medicraft made that clear to her in their conversations. Ms. Sanchez goes on to say, "Due to this in addition to the previous circumstances in which she (Mrs. Medicraft) left New York, I feel concerned that her and Mr. Medicraft may flee with the children."  Court transcripts from February 6, 2019 show that not only were both parents in court, but Mrs. Medicraft asked the Judge if she was free to leave and go anywhere, she wanted.  The court said yes, that the case was over.  Mr. Medicraft lived in Seattle Washington at the time and simply returned home.

FACT:    Exhibit 2 page 5 line 1 and 2, Derek P. Leuzzi states, "The family is a serious flight risk. Between 2009 and 2019, they have lived in no fewer than seven states..."  Line 9 and 10 he

Statement of Claim (Page 4)

states, "Due to the concerns, and particularly the flight risk, the department removed the children as there is an imminent risk of safety to the children." There was no evidence of being a flight risk. By the legal definition of fleeing, the parents fled nothing. Their moves were job related and they were free to live where they chose. Derek P. Leuzzi did not state the truth, the statement was intended to mislead and it did. The Judge stated that her decision was based on a "totality" of circumstances.

FACT: In exhibit 6, the emergency motion to take the children, which was granted after the children had already been removed, court transcripts from February 6, 2019 will show that the father was attempting to present his case with his attorney, the Judge interrupted the his attorney and stated, "we are done." I've made my decision. The father's attorney again attempted to speak and the Judge again, stated it's over, that she has made her decision. The father also brought an expert witness on his behalf who never got to speak. The children were taken without actual imminent danger being present, and without a court order which the 4th and 14th Amendment require. The 3 oldest boys were removed from school, and the 2 youngest were removed from the safety of their mother. Liza Sterbick states in her deposition that she was coordinating the effort. The pick up was timed so that when the mother went to the school to get her 3 oldest boys cps and the police would be there. The mother was never presented with any court order as it didn't exist.

FACT: On February 12, 2020 a deposition was given to Liza (Elizabeth) Sterbick, Exhibit 7.

FACT: Liza Sterbick stated on page 21 line 5-9 of her sworn deposition that "we" (the dept.) assisted in paying for the mother and children's lodging. Yet there were no payments and the state cannot produce receipts for payment at any time up to the time of her deposition.

FACT: In the statement made on December 6, 2019 to remove the children in court, (Exhibit 4) Liza Sterbick claims knowledge of events in New York. In her deposition dated February 12, 2020 she states as seen in exhibit 7 page 47 line 21 and 22, that she did not speak to anyone in New York regarding the Medicraft case.

FACT: In the statement made by Liza Sterbick dated for the December 6, 2019 hearing, Liza Sterbick claims to have information from Lindsey Hodge regarding the Medicraft family. This information was used to take the children from the parents, as the Judge stated, "The totality" of circumstances. In that same statement, Liza Sterbick made the claim that Ms. Medicraft feared Mr. Medicraft wanted to kill her, which the mother denied as true. This statement was not provided as substantiated, or even true. Yet, in Liza Sterbicks deposition dated February 12, 2020 Liza Sterbick states on page 48 line 4, that she did not speak to Lindsey Hodge.

Statement of Claim (Page 5)

FACT: In exhibit 7 page 49 line 18-23 in Liza Sterbicks deposition she states that the Medicraft family was "Suppose to go to court, but fled." Once again, this was a completely false statement which the judge used in her "totality of circumstances" to grant the emergency motion to take the children, which were already taken. Once again, court transcripts from February 6, 2019 would show this, and, documents from Washington Dept. of Social Services documented that the family was in court that day. The statements made by Derek Leuzzi, Liza Sterbick and Tanessa Sanchez of "fleeing" was perjured, misleading and knowingly false and used to sway the court to take the children.

FACT: Page 53 line 8-12 of exhibit 7, Liza Sterbick states that the information given to her, in her statement used in Court December 6, 2019 to secure the emergency motion to take the children came from Derek Leuzzi. She also states in line 13-15 of page 53 that no one else gave her information regarding the New York case.

FACT: In Exhibit 8 on February 25, 2019. New York sent a statement to Megan Meyer, who at the time was assigned to the Medicraft children's case, and in that document, New York social service stated that the allegations against the father were "unsubstantiated". This too was exculpatory evidence which was ignored and which could have contributed to justice in a court.

FACT: Liza Sterbick in her deposition stated on page 53 line 19 and Derek Leuzzi confirms on page 53 line 24 and 25, that there was a meeting to discuss removing the children. Derek P. Leuzzi states that he was at that meeting. But it goes further, Liza Sterbick was as exhibit 7 shows on page 63 line 12-15, directed to make arrangements to have the kids picked up. The entire ordeal was planned and orchestrated during the meeting and no regard was given to getting a court order or due process as guaranteed by the 4th and 14th Amendment to the US Constitution.

FACT: In exhibit 9 Amanda Fry in a sworn statement dated December 9, 2019 stated that she took pictures of the children after they were taken into custody. When questioned, ▆▆▆▆ the daughter stated that the marks on her were caused while playing with her brother, ▆▆▆▆. These photos which were used in court after the children were taken, by Derek P. Leuzzi, were used in an effort to claim that the parents caused or were responsible for the marks. These photos played a part in the Judge's ruling stating "a totality of circumstances", in granting the emergency order (which was after the fact).

FACT: In Liza Sterbick's deposition, exhibit 7 page 63 line 9-15 Liza Sterbick states she was told to make arrangements to have the kids picked up, on the day of December 6, 2019. The plaintiff, James R. Medicraft feels by the statement of this event occurring this way, that this was all staged and planned out by Derek P. Leuzzi, and those involved in the meeting. The plaintiff believes by the evidence in her deposition that the meeting was to conspire, plan and

Statement of Claim (Page 6)

implement the taking of the children and that day. The plaintiff believes that if imminent danger was a factor, they would have immediately without a meeting gone to pick up the kids, and not take the time to plan and orchestrate a pick up. The plaintiff also feels if there were time to have a meeting, and coordinate an effort, there would have been time to request an emergency court order as the 4th and 14th Amendment guarantees prior to picking up the children and not request and write up an emergency motion request after the fact with which to be used for the sole purpose of keeping the children in state custody. The plaintiff, James Medicraft also feels as fact and evidence show, the motion after the fact was based on perjured evidence. The plaintiff feels according to Hardwick v Orange County, that statutes and rules are clearly established and perjured or misleading evidence cannot be used to take one's children.

Furthermore, the plaintiff James R. Medicraft feels as shown by evidence that his 1st Amendment right to free speech and to address grievances when his children were abused physically and sexually while in state care. The very agency which is suppose to protect the most vulnerable in our society, and their innocence, have abused, traumatized, neglected and victimized the plaintiff's children. The First Amendment gives the father as he believes, the right to complain when his children are harmed, or complain of harm and abuse in an effort to protect them. The children were seized by the state. On visits granted to the father and mother, the children were constantly appearing at the visits with bruises, cuts and complaints of being strangled and whipped. The parents took pictures and complained to the Kent DCYF staff only to be told we are criticizing them. On several occasions the oldest children complained that the abuse they suffered in state care was so bad they said, "I can't take it anymore." The children have begged and pleaded to stop being abused to Kent DCYF staff, who ignored them. When the father complained and showed the bruises and strangulation marks, and pressed the issue, they said they would look into it. Nothing happened and the marks continued. DCYF staff have been witnessed by a WISE team holding my asthmatic son down on the floor and restricting his breathing. My son ▮▮▮▮ complained he could not breath. The full body weight of an adult was pressing down on his chest. His face was red. Cps staff stood around and watched this. The mother, her lawyer, and WISE came running while ▮▮▮▮ screamed in between gasps for air. This happened in the Kent DCYF office. These marks were well documented by the father, see exhibit 12. When the father complained he was told he was "disparaging" the department.

FACT: Exhibit 13 While CPS had custody of the plaintiff's children, they were made to sleep in hotels frequently. On one occasion the mother and father went to the motel in the morning as cps had said the parents can come spend time with the kids. The parents found their son ▮▮▮▮ asleep on a floor with blood all over him and his pillow. When the parents woke him up and asked what happened, ▮▮▮▮ stated that they had teens staying in the room with him and

Statement of Claim (Page 7)

he got beat up by as teen. When the parents complained to CPS/DCYF, they accused the parents of "disparaging" them. The father feels he has every right to complain and address the government agency who took his children in an effort to protect his children. The father has witnessed on many occasions the children trembling in fear after a visit and crying uncontrollably for fear of what stranger they would be passed off to. The father has witnessed after visits the children running away from cps staff crying uncontrollably because they cannot endure any more physical violence or sexual abuse. When the father complains, DCYF staff complain that the father is disparaging them, and not helping them, but show no concern for the cries of young children who range in age from 2 to 9 years old. On numerous occasions DCYF has literally lost the children and had to send the police to find them. Once, a homeless person found one of the boys, and returned him to DCYF. Yet when the father complains, he is accused of "disparaging" the DCYF/CPS staff, and no regard is given to the dangers lost children face. On several occasions the trauma and abuse the children faced was so severe that the children's minds snapped and they became uncontrollable. The department sent them to Seattle Children's Hospital, but never once recognized the cries of the children or the parents to stop the abuse inflicted by them. The departments answer was to seek drugging the children.

FACT: Exhibit 14 The three older boys were often placed in hotel rooms with strangers. Other times the children were threatened that if they didn't do as social workers felt they should, they were punished with having to sleep in cars or on the floor of the DCYF office. On one occasion the three older boys were made to sleep on the floor, next to a glass wall to be displayed like caged animals. The children felt humiliation but tried to make the best of it. When the father complained, DCYF supervisor Jamie and Tabitha accused the father of "disparaging" CPS.

FACT: Exhibit 15. During a visit with the older boys, the father's son ████ came to the visit for the second time with winter snow boots on. The father complained to CPS as this was inappropriate shoes for him to wear, and that these were not shoes, but snow boots. The weather was warm outside. ████ informed his father that the kids at school made fun of him and laughed at him. He informed his father that he had no shoes, nor tennis shoes for school, but was made to wear the snow boots. When the father complained to the DCYF staff, they accused the father of "disparaging" them and showed no concern for the child's shoes while in state custody.

FACT: Exhibit 16 This is the visit room at the Kent DCYF that the children were locked in and not allowed to leave. DCYF staff and security guards would hold the door shut trapping the children in the room for hours. The children stated that they weren't even allowed to come out for bathroom breaks, and then when they couldn't control it and relieved themselves on the floor they were punished. This is also the room that Jaime Allbee and Tabitha Culp made the parents visit their kids in. On some occasions the children and parents were made to sit on the

Statement of Claim (Page 8)

floor with no furniture in the room. Then, if the father complained of inhumane treatment, Jamie and Tabitha accused the father of "disparaging" them. In this room was a glass wall that spanned the entire length of the room. The family was on display like animals at a zoo for all passer byers on the street outside to view. The children felt humiliated as did the family. Jamie Allbee told us more than once, if we do not go into that room to see our kids, she will cancel our visit. This was mean and vindictive. Yet, if the father complained she filed a report saying the father was disparaging her dept. The children were often locked in this room for hours and all day at times. The children would scream and cry. The abuse and trauma the father feels are a violation of their 8th Amendment right to cruel and unusual punishment. The children asked their dad one time, "how can they do this to us?"

FACT: Exhibit 17 Sworn statement by Jason Bragg stating the condition Kent DCYF had the kids in. He stated how they were locked in an empty room and scared wanting to get out. How he had to arrange to bring the kids food, and how just a little bit of kindness from his part calmed the scared children down. But when the mother or father complain of the trauma, abuse and what the father believes to be criminal activity by the department, against his children, they accuse the father of "disparaging" the dept. The father feels he has a 1st Amendment right to speak in an effort to protect his children. The father feels he has a right as do his children to complain to the government actors when his children suffer abuse. Yet, the department at every turn silence the children and parents.

FACT: Exhibit 18 Derek P. Leuzzi files a motion to suspend the father and mothers' visits with their children. The department claims the parents are not helping promote the children to be in state care. The department blame the parents for the children acting up and resisting the abuse by the state. When the father had visits with his children, whether in person or on the phone, and the children reported abuse, including criminal child abuse against the department, they would end the visit or hang up the phone not allowing the children to seek help from their parents. Then the department, accused the parents of causing trouble, and disparaging them, and sabotaging visits. The father feels the children have a constitutional right to be safe from harm and trauma and abuse. Derek P. Leuzzi filed a motion to have the visits canceled in an effort, the father believes, to silence and cover up child abuse. The father believes the dept, Jamie Allbee, Tabitha Culp, and Derek P. Leuzzi falsified evidence, and withheld evidence and dis not speak the truth to Judge Messitt to have a motion granted to end visits. Judge Messitt on June 19, 2020 granted the motion to end visits.

FACT: Exhibit 19 Because of the child abuse by the dept., social workers and security guards, and because the children complained that their CASA wouldn't do anything to help them when they complained, the fathers counsel filed a motion to have an attorney assigned to the three oldest children. The court was made aware that the children had rights, that their rights were being violated, and the court, Judge Messitt denied the motion. As a last effort to try and

Statement of Claim (Page 9)

protect the children, ▓▓▓ the oldest boy asked if he could speak to the Judge personally and make her aware of the severity of the abuse he and his brothers were being forced to endure while in state care. ▓▓▓ came to the court room with his parents escorted by department staff. ▓▓▓ dressed in his best cloth hoping to speak to the Judge to request relief from abuse. The Judge denied ▓▓▓ (the oldest boy of 9 years old) request. Her comment was, I see no need to talk to him he probably just wants to say he wants to be with his parents. It's in the court transcripts from that day. When we exited the courtroom, and told ▓▓▓, he broke down crying and said, "I can't take this abuse anymore." ▓▓▓ went on to say, "and they keep playing with my peepee. It's disgusting."

FACT: Exhibit 20. The Kent, WA. Social Service, DCYF, continually blamed the parents for the behavior of the children, when the children stated many times that they act up because of the abuse caused by the dept. and that the dept. would not listen to them when they complained. The children were also fearful of the dept. and the staff. Derek P. Leuzzi continually along with Jamie Allbee, and Tabitha Culp continued with the narrative of accusing the parents of causing a decline in the children, as if they had nothing to do with it by the way they treated the children. In a statement by the school, (exhibit 20) In two places the school states that there was a decline in the children, and that the decline coincided with the visits by cps to the school to see the children. This fact, of exculpatory evidence was never mentioned by Derek P. Leuzzi, Jamie Allbee (supervisor) or Tabitha Culp (case worker) instead, they blamed the parents.

FACT: Exhibit 21. The mother went to the Bellevue visit center escorted by Kent WA. dcyf/cps staff for a visit with her children. While at the visit center, there were teens who our young children were exposed to. The teens were throwing condoms all around the dcyf office and giving them to our children who were between the ages of 6 and 9. The mother complained to the cps/dcyf staff about her children being exposed to condoms. The staff said, there is nothing we can do. Then, when our young children picked up the condoms, and asked what they were, the teens told our children, "you blow them up and suck on them." Then laughed. Again, the mother complained. Then, a teen girl came up to James, the 9 year old and told James to "put it on his dick, and stick it up in a girl." Again, the mother complained to the social workers and they said there is nothing they can do. At this point the mother complained to the teens and asked them to stop doing this in front of here young children. At that point, one of the teens approached the mother in front of her young children, and "called her a white cunt." The teen went on to say he would, "beat her ass if she didn't shut up." Then, the three youngest children ran up to protect her mother, and a teen pushed one of the children to the ground. The mother called the Bellevue police who responded and left their card. (exhibit 21) When the police arrived, cps/dcyf staff went to talk to them and convinced them to leave. DCYF did nothing to protect the young children from the exposure to condoms, the inappropriate sexual talk, the violence and abuse. When the parents complain of the violent exposure and

Statement of Claim (Page 10)

inappropriate exposure their innocent children are subject too, the department silences them by saying "the parents aren't helping promote us having their kids." And that that is harming the children. In other words, we are supposed to encourage our children to be subjected to violence, abuse and trauma. And if we don't, Jamie Allbee, Tabitha Culp, and Derek P. Leuzzi conspire to have our visits suspended in an effort to not protect the children, but silence abuse.

FACT: Exhibit 22. Motion by Derek P. Leuzzi to suspend visits. In his motion, he states that there is a "history" of domestic violence. In court, as transcripts show, he and dcyf make constant comments of ongoing, and a history of domestic violence. Yet, there has been no domestic violence. There have never been police calls with this family regarding domestic violence. There is no history of drug or alcohol abuse. There has never been a trial, or due process with actual evidence of domestic violence or abuse, yet, he, the department and even the Judge in court accused the mother and father of having on going domestic violence. The only thing that existed was the accusation of domestic violence, which was a lie and perjured. In exhibit 22, Derek P. Leuzzi has the children evaluated by Dr. Solchany, who never spoke with the parents, only the children. The report Dr. Solchany wrote up followed the exact narrative written by Derek P. Leuzzi.

FACT: After the children were taken the mother filed a motion to have the children returned. As court transcripts will show, Derek P. Leuzzi made a comment to the Judge. He said, if the court gives the children back to the mother, I will file a motion to immediately have the children removed again. The father feels that Derek P. Leuzzi is using his position of authority to deliberately, and personally attack the Medicraft family and manufacture a case based on lies and fabricated and misleading evidence, much like McCarthyism.

FACT: Exhibit 23. On December 11, 2019 the father went to the Kent WA. DCYF office for a visit in the late afternoon. During the visit, ████ the oldest boy reached into his back pack and pulled out a pink pill. The father asked him what it was and where he got it. ████ stated that the social workers give him the pills. Then ████ reached into his back pack and pulled out handfuls of these pills. The father notified Jamie Allbee about this, and asked her what they were. Jamie did not seem concerned, and handed the pill back to the father. The father then confiscated all the pills. After the visit, I, the father, went to a pharmacy and asked a pharmacist what the pills were. He said Benadryl. I asked the father if these were lethal to a 9 year old. He said absolutely. He said as few as 5 pills could kill. Later in a document I was going through, I noticed on the same day, while at school, the school staff found multiple pills in ████ back pack. Again, ████ stated cps social workers are handing these pills out to kids. In a visit with ████ Medicraft, my son, he stated cps is giving him pills. He described the pills and told me that the pink ones they give him to make him sleep, then there were blue and yellow pills. He said one of the pills is given to him to make it so he doesn't get hungry. I recorded a video of his statement. The father complained about this too, that his children had in state care

Statement of Claim (Page 11)

a lethal dosage of pills.  The father also told Jamie Allbee that his sons were already feeling suicidal from the abuse and trauma inflicted upon them by dcyf, and dept. staff, and that they now had in their possession the means to overdose to end their pain from trauma and abuse. Jamie Allbee didn't appear to care.  It was as if she knew about the pills and it was a common practice.

## V.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.  For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:

Signature of Plaintiff

Printed Name of Plaintiff

### B.  For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

# EXHIBIT 1

FILED
2019 APR 25
KING COUNTY
SUPERIOR COURT CLERK

CASE #: 19-7-01266-6 KNT

☐ King West  ☐ OICW
☐ White Center  ☐ MLK
☐ King East  ☒ King South

---

**Superior Court of Washington**
**County of King, Juvenile Court**

Dependency of: MEDICRAFT , ▇▇▇▇

DOB: ▇▇/2010

No: 19-7-01266-6 KNT

**Order to Take Child Into Custody and Place in Shelter Care (ORTCC)**

## I. Basis

The court has considered a motion, statement and declaration requesting an order to take the above-named child into custody.

## II. Findings

2.1    A petition has been filed with the court alleging that the child is dependent pursuant to RCW 13.34.030.

2.2    It is currently contrary to the child's welfare for the child to remain at home. The petition and/or supporting declarations and affidavits establish reasonable grounds to believe that the child is dependent and that, if the child is not taken into custody, the child's health, safety, and welfare will be seriously endangered.

2.3    The petitioner has demonstrated that there is a risk of imminent harm to the child in the child's home.  The assessment of risk by petitioner constitutes reasonable efforts to prevent or eliminate the need for removal of the child from the child's home and:

☐ because of the risk of imminent harm to the child, there are no reasonably available services that can be provided to the parent(s) to maintain the child in the child's home at this time;

☐ services previously offered or provided to the parent(s) have not remedied the unsafe conditions in the home;

☐ petitioner is currently unaware of any parent, guardian, or legal custodian known who is    available to take custody of the child; and/or

☐ Other;

Order Taking Child into Custody / Place in Shelter Care (ORTCC) – King County
WPF JU 02.0110 ----- JuCR 2.1, 2.2; RCW 13.34.030, .050, .060

Page 1 of 2
Feb 2010

## III. Order

3.1  A law enforcement officer, probation counselor, or child protective services worker shall take the above named minor child into custody and place the child in a facility licensed pursuant to RCW 74.15.030, or in a home not required to be licensed pursuant to that section, under the supervision of (name of DSHS or Supervising Agency):

3.2  The supervising agency may authorize evaluations of the child's physical or emotional condition, routine medical and dental examination and care, and all necessary emergency care.

3.3  The child shall remain in shelter care for not more than 72 hours from the time the child is taken into custody, excluding Saturdays, Sundays, and holidays, unless the court enters an order authorizing continued shelter.

_____
Dated

_____
Judge / Commissioner

Mafé Rajul

Presented by:

_____
Signature

Lorrie Ortiz, SS/DCYF
Print Name & Title

Order Taking Child into Custody / Place in Shelter Care (ORTCC) – King County
WPF JU 02.0110 —— JuCR 2.1, 2.2: RCW 13.34.030, .050, .060

Page 2 of 2
Feb 2010

MOTION
NAME : **MEDICRAFT** , █████████
No.  19-7 -01266-6   KNT

1. Shaylee E. Medicraft (DOB 01/01/1991) is the biological mother to the following children: ████████
   ██████ (DOB: 09/14/2010), █████ Medicraft (DOB: 03/14/2012), ████████ Medicraft (07/17/2013),
   ██████ Medicraft (09/20/2014) and ████████ Medicraft (02/15/2018)

2. James R. Medicraft (DOB: 02/17/1959) is the legal father to children ██████, ██████, ███████,
   ██████ and ███████ as listed on the birth certificate.  Shaylee and James are legally married and
   per New York court family documents, he is listed as father on all children's birth certificates.

3. On 02/25/2019, the Department received a 72-hour response time intake from New York State with
   concerns of neglect regarding the Medicraft children.  The Department was advised by New York
   State that there is a current no contact order between father, James, and mother along with
   children  Father was reported to be arrested previously for violating the order.  During the violation,
   he threatened to kill the children.  The intake advised that New York had been able to track down
   Mr. Medicraft to Washington state along with Mrs  Medicraft and it was believed the children were
   being forced to stay with him.

4. On 02/28/2019, the department attempted to complete an initial face to face at the address
   provided in Seattle, Washington.  During the attempt social workers met and viewed Mr. James
   Medicraft at the home.  When asked if the children were present with mother he denied that they
   were.  When asked to come into the home, social workers were denied access and Mr. Medicraft
   disclosed the home as belonging to his uncle.  Social workers asked for the location of Mrs.
   Medicraft which James denied knowing and suggested that she may be staying with a niece but he
   did not have her contact information   Social workers provided a business card to Mr. Medicraft at
   that time and requested to pass on their contact information to Shaylee.

5. Later on 02/28/2019, social workers received a call from mother, Shaylee Medicraft.  Mother denied
   having communication with James and stated that he had contacted her niece Barbara Paloma
   Heath to pass on the information for the social worker  Shaylee disclosed during conversation that
   there was contact with James on the drive from New York to Seattle.  Shaylee additionally reported
   to social worker that she was forced into getting a no contact order by New York and she is scared
   of her attorney.  Shaylee denies that James abused the kids.  Shaylee even disclosed she changed
   her phone number so that the attorney could not contact her, as she felt harassed.  Mother
   disclosed her current location with the children as being at the Sunset Motel in Kent.

6. On 03/06/2019, two social workers were able to complete an initial face to face with children at the
   Sunset Motel.  During the visit, children accused the social workers of trying to take their father
   away from them.  Shaylee denied father was staying with them at the motel room and stated that
   only her niece, Barbara Palmoa Heath (DOB unknown), was there with her  In conversation with
   the children, it was disclosed by █████ that the children see their father all the time.  When he
   disclosed the information, ██████ called out to Shaylee to ask for help and began calling Arthur a
   liar.  ███████ also accused ██████ of lying although ██████ continued disclosing that they see their
   father every day.  ██████ additionally indicated that "they" hit us and left red marks but his dad
   doesn't whip them anymore.  Shaylee then told social workers that she allowed the children to
   have a video chat with their father.  ██████ again disclosed that they see their father in real life and
   showed social workers items in a drawer that belonged to his dad.  When social worker asked about
   the items, Shaylee claimed they belonged to Barb's boyfriend.  ██████ continued accusing █████ of
   hallucinating and lying, mom joined in and was yelling as well. Social workers changed the subject
   in order to calm the situation  Social workers confirmed that mother was intending on enrolling the
   children in school and that they plan to stay at the current location

7. On 03/11/2019, the department contacted New York Department of Family Affairs worker via telephone. During the call, the worker shared that Shaylee had ongoing domestic violence concerns that resulted in Child Protective Services involvement in New York. Shaylee was resistant to the department's involvement in New York and did not let them in the house during at one point In the fall of 2018, Shaylee went and obtained a no contact order with father and the children. On 02/11/2019, the children reported to school staff on more that father was back in the home. Local Sheriff refused to complete a welfare check and on the next attempt to visit the children at the home, upon workers going to the home in New York they found that mother had left with dad in the middle of the night. The department was advised by New York that there is an open court case in New York and the children are assigned a Law Guardian, Mike Sutton.

8. Social worker attempted to complete an unannounced visit to the Sunset Motel at the families identified motel room. There was no answer when social worker knocked so she left a business card at the door.

9. On 03/11/2019, social worker spoke with Arthur and Edward while they were at school. While speaking with ▆▆ he initially indicated that he did not want to speak to social worker alone as his parents told him he does not have to. Social worker agreed to this but when she went to get a school staff ▆▆ continued speaking with social worker disclosing that his parents are mad at him because he told the truth and they wanted him to lie. Social worker again advised ▆▆ that he did not have to tell her anything that made him feel uncomfortable but that her job is to help make sure he is safe. ▆▆ then disclosed to social worker that the police came looking for his dad to take him away which made his brother ▆▆ mad at him. ▆▆ reports that his dad told him he could not drive his own car anymore because the police will find him. When asked if anyone hurt him ▆▆ disclosed that his brother had pushed him down at the skate park and he hurt himself. When asked if his parents helped him he disclosed that his parents had left him, ▆▆, ▆▆, and ▆▆ at the park alone ▆▆ described that ▆▆ and ▆▆ ran into the road and ▆▆ was climbing trees. ▆▆ stated that when his parents came back his mother told him that it was to teach them a lesson about listening. ▆▆ described that they get left alone sometimes when their parents go to the store. ▆▆ did not disclose any physical discipline during the conversation.

While speaking with ▆▆, he intentionally disclosed that his dad sleeps with his mom in one bed at the hotel. ▆▆ disclosed spankings occurring in the home but by mother and not by father.

Social worker spoke with school staff who disclosed that dad, James Sr., showed up to the school the first day and introduced himself to the Kindergarten teacher. The school had just received a copy of the no contact order at that time and report calling the police to complete a welfare check. James Sr. appeared unaware that the school had a copy of the no contact order at that time. They have not seen James Sr. since that time and mother gets dropped off at the bottom of the hill and walks the children up the hill to school so they cannot see who is in the vehicle.

10. Social worker received a copy of the no contact order showing that James Sr. is only authorized to have written communication with the children one time per month at a specified post office box. James Sr. is not to have any contact by mail, telephone, email, voicemail or any other electronic means. Children are allowed to respond in writing. The order is good through February of 2021.

11. On 03/12/2019, social worker was informed that Shaylee had called the school to inquire if child protective services had spoken to the children at school. When the school confirmed the information, they describe that Shaylee became extremely upset.

12. On 03/14/2019, social worker had contact with Children's assigned attorney, Mike Sutton, from New York state. Mike confirms that he has been assigned to the children since October of 2018. Mike reports that during his first meeting with the children in November of 2018, they disclosed concerns of corporal punishment being used in the home by father. The biggest safety concern for him

however was they disclosed hearing father threaten to kill mom by chopping her up and throw her into the river on more than one occasion. During his second meeting with the children on 02/09/2019 Mike reports that one child stated that dad could be around if the cops were there, another child stated that if mother is present father does not hurt them so he can be around. The two oldest children, ⬛⬛⬛⬛ and ⬛⬛⬛⬛ again disclosed that father threatens to chop mom up and throw her into the river. Within a week of the court hearing which granted a two year stay away, along with mother having sole custody of the children, mother took off with the kids. When New York pinged both parents phones they were found to be in Ohio and then in Washington.

13. Father was ordered by the New York courts to complete 26 weeks of anger management along with a psychological evaluation. He has not taken any steps to be compliant with this order

14. On 03/21/2019, social worker completed a visit with mother and children at the Sunset motel room. During that time social worker discussed the allegations with mother. Mother initially attempted to deny that the children had seen father then unintentionally later disclosed that father drove with them across the states. Mother reports father as currently staying with his uncle in Seattle.

During the interaction, mother reported to social worker that she is working, when social worker asked mother where the children go when she is working she reported that they stay with a friend named Jessica. Mother refused to provide social worker Jessica's last name, telephone number or address. Mother stated that Jessica lives in the Seattle area. Social worker reminded mother during this visit that father should not be having any access to the children since there is a no contact order. Mother denies any concern for James Sr., or his ability to parent; she additionally described the entire situation as a misunderstanding. Mother denied being fearful of father. Social Worker advised mother to take children to the doctors and provided the list of local resources for benefits along with providing her places that she could get support with clothing, laundry, daycare and housing assistance. Mother followed up the information in person with an email providing additional information.

15 On 3/22/2019, social worker had follow up contact with children's attorney, Mr.Sutton. Mr Sutton advised that there is an arrest warrant issued for Mr. Medicraft and that the court matter will be addressed again on May 12, 2019. The court ordered mother to allow Mr. Sutton to speak with the children via telephone as she had previously denied him this ability.

16. On 03/27/3019 during a collateral contact via phone it was disclosed to social worker that the last known contact James had with the children was when dropping Barbara, Shaylee's niece, off at the motel. It was also disclosed that Barbara is no longer watching the children at this time so mother is most likely in need of assistance with that.

17. On 04/01/2019, social worker had contact with Shaylee. Shaylee advised that she was just able to get her phone turned back on which is why social worker had been unable to reach her. Shaylee confirmed that Barbara is not watching her children. Shaylee confirmed that she was no longer in the Sunset Motel since she could not keep up with payments. Shaylee stated that she is currently staying with a friend of one of her family members. Shaylee would not advise of the name, address or telephone number of the person Shaylee expressed that she feels she will not be able to stay at the home if social worker comes to the home. Social worker again addressed local resources with Shaylee. Shaylee's phone cut off and social worker was unable to reach her back.

18 Shaylee contacted social worker on 04/10/2019 advising that she is currently bouncing around relative's homes. Shaylee confirmed that she was able to start State benefits but that she has not been able to find any housing at this time and has not pursued daycare as suggested by social worker. Social worker asked Shaylee if she had utilized any of the resources which social worker provided her and she reported herself as trying last week but that she has not gotten any call backs regarding housing Social worker advised Shaylee to continue calling the provided resources to get the assistance needed Social worker requested to meet with Shaylee who advised she is willing to

meet social worker at a park with the children on 04/18/19. Shaylee would not provide names, locations or contact of whom she and the kids were staying.

Social worker reviewed ACES system for Shaylee's benefit information to confirm. The address listed for all mail was 9829 42nd Ave SW in Seattle, the same address that James Sr. was previously confirmed to be living at with his uncle.

19. On 04/18/2019, social worker received a call from mother requesting to cancel their appointment. Mother stated that she has work and that she would like to reschedule the appointment. Social worker asked where the kids would be staying while she was at work. Mother advised that they will stay with her friend Jessica. When asked, mother advised that Jessica lives in Seattle but would not provider her last name or telephone number. Mother reports that she has to be to work by 5:30pm. Mother agreed to meet on an alternate date at a public location.

20. On 04/18/2019 in the afternoon, social worker received a call from the children's school stating that there are concerns regarding the family. Social worker was advised that mother had called in asking if a social worker had come and talked to the children at school. School additionally reported mother asked if she should take the children to the doctors. According to the staff, mother called back later in the day to advise that the kids would not be at school the next day as they were going to have doctor's appointments.

21. Social worker met with children ███ and ███ at school on 04/18/2019. Worker was unable to meet with ███ as school was out for the day prior to her getting a chance to speak with him. School staff made additional disclosure to social worker that children have been disclosing dropping dad off prior to coming to school in the morning. During conversation, ███ disclosed to social worker that his dad stays at their uncle's house with them. ███ disclosed that they all sleep in the same room. ███ told social worker that his mom has told him to lie and not tell that his dad is with them. ███ states that his mom told him his dad would be taken away to jail if he tells ███ was fidgety at the beginning of the conversation but after stating about his dad he settled down. ███ also advised social worker during conversation that his dad is able to spank him on the bottom without prompting or asking from social worker. When social worker spoke with ███ he hurriedly told social worker that everything is going fine and they do not see their dad. ███ reported to social worker that they were staying at different places but mostly with their uncle. School was then out and ███ had to leave.

22. On 04/22/2019, social worker met with mother, ███ and ███ at McDonalds. During the interaction social worker witnessed concerning interaction between mother and ███. Mother was whispering in ███ ear after which she would look at the social worker. During one of the incidents mother grabbed ███ by the arm and ███ shouted out. Social worker stated she would like to speak with her alone. Mother went up to ███ where she was and whispered something in her ear prior to her conversation with social worker. While speaking with social worker, ███ disclosed that she sees her dad every day. ███ stated that her dad is currently at work and she knows because she saw him go there. ███ disclosed that her parents both take her to McDonald's or Denny's to eat at times.

Social worker spoke with mother again after speaking with ███ at which time mother confirmed that father has been seeing the children. Mother stated that she will at times leave the children with his uncle while she goes to work knowing that he allows Mr. Medicraft to see the children. Mother reports that she has told the uncle not to allow this but he continues to do so and she still leaves him with the children. Mother reports that father has also provided her money that she needs so he uses that to get access to the children. Social worker asked mother about getting daycare services. Mother stated she has not pursued that but has been thinking about it. Social worker asked mother if she is fearful of father and she stated that she used to be but that she is not anymore. Social worker advised mother that they are going to have a family team decision-making meeting because her allowing him to continue seeing the children when there is a no contact order

is serious. Mother indicated during the conversation but did not specifically disclose that there has actually been domestic violence between herself and Mr. Medicraft in the past despite previously denying anything going on. Mother expressed that if she is going to "get away" from Mr. Medicraft she will have to cut off all ties as he has threatened to take the children from her

23. A family team decision-making meeting is scheduled for 04/25/2019 at 2pm at the Department of Children Youth office in Kent. Mother was advised and notified to show up, mother expressed being fearful of what is going to happen.

24. At this time, the department is requesting a pick up order to have ▓▓▓▓, ▓▓▓▓ ▓▓▓▓, ▓▓▓▓ and ▓▓▓▓ placed into licensed care. Mother has knowingly failed to follow the no contact order to protect the children from contact with Mr. Medicraft and witnessing domestic violence. Additionally, mother has fled the department's attempts to provide intervention and intentionally withheld information regarding the family's whereabouts. Lastly, there are concerns that mother and or father may attempt to flee with the children at notification of the courts petition to intervene. There is no parent or guardian available to provide protective and appropriate care to the children at this time.

**FILED**

2019 APR 25
KING COUNTY
SUPERIOR COURT CLERK

☐King West         ☐OICW
☐White Center      ☐MLK
☐King East         ☒King South

CASE #: 19-7-01266-6 KNT

---

**SUPERIOR COURT OF WASHINGTON
COUNTY OF KING, JUVENILE COURT**

DEPENDENCY OF:
MEDICRAFT , ▓▓▓▓

DOB: ▓▓▓/2010

No: 19-7-01266-6  KNT
Motion for Order to Take Child Into
Custody     (MT)

---

## I. Motion

The undersigned *moves* the court for an order to take the above-named child into custody
based upon the statement that follows.

## II. Statement

The undersigned *states* that:

2.1    A petition has been filed with the Juvenile Court alleging that the child is dependent and
       that if the child is not taken into custody, the child's health, safety, and welfare will be
       seriously endangered.

2.2    There are reasonable grounds to believe that the child is dependent and the child's
       health, safety, and welfare will be seriously endangered if the child is not taken into
       custody.

2.3    The facts in support of paragraph 2.2 above and that demonstrate a risk of imminent
       harm to the child, are attached and are hereby incorporated by reference or are as
       follows:  *(Continue on separate declaration if necessary.)*

### III. Declaration

I declare under penalty of perjury under the laws of the state of Washington that the foregoing statement is true and correct.

**Signed at:**

Kent, WA
(city), WA

By:

Signature

401 Fourth Avenue
Address

4/25/2019
Date

Lorrie Ortiz
Print Name

Kent, WA 98032
City, State, Zip

# EXHIBIT 2

FILED
2019 DEC 06
KING COUNTY
SUPERIOR COURT CLERK

Judge Rajul
Hearing Date: 12/9/19
Time: 8:30 a.m.

CASE #: 19-7-01266-6 KNT

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY
JUVENILE DEPARTMENT

| IN RE DEPENDENCY OF: | NO. 19-7-01266-6 KNT |
|---|---|

IN RE DEPENDENCY OF:

MEDICRAFT,
DOB: ▓▓▓/2010

MEDICRAFT,
DOB: ▓▓▓/2012

MEDICRAFT,
DOB: ▓▓▓/2013

MEDICRAFT,
DOB: ▓▓▓/2014

MEDICRAFT,
DOB: ▓▓▓/2018

Minor Children.

NO. 19-7-01266-6 KNT
19-7-01267-4 KNT
19-7-01268-2 KNT
19-7-01270-4 KNT
19-7-01271-2 KNT

CERTIFICATION OF EMERGENCY
HEARING

(Clerk's Action Required)

COMES NOW the Department of Children, Youth and Families, DCYF by Derek Paul Leuzzi and gives notice to the parties listed below that an emergency hearing in this matter has been set on the CONTESTED CALENDAR pursuant to LJuCR 3.13(a) and (b) for the 9th day of December, 2019, at 8:30 am.

The nature of the emergency is (use attachments if necessary):

Ms. Medicraft is unable to comply with the conditions of placement. Namely she is unable to comply with the no contact order she requested to protect herself and her family from James Medicraft.

CERTIFICATION OF EMERGENCY
HEARING
Rev. 03/01 pp

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206)-464-7744

1    Mr. Medicraft employs verbal and physical violence against the family. The
2    children are extremely traumatized.

3    On November 2, 2019, Department Social Worker Tanessa Sanchez saw Ms.
4    Medicraft, Mr. Medicraft, and all the children at the Federal Way Walmart in clear
5    violation of the protection order. Ms. Sanchez did not realize the gentleman seen with
6    Ms. Medicraft was Mr. Medicraft until December 4, 2019 when she finally was able to
7    meet Mr. Medicraft for the first time.

8    Ms. Sanchez was familiar with the family as she was the responding CPS
9    investigator to at least four intakes. She attempted to personally meet Mr. Medicraft
10   several times to no avail until December 4, 2019.

11   Since the summer, the family has made it clear to the department they want to
12   parent the children together. Ms. Medicraft even called the Office of the Attorney
13   General requesting to have the protection order dropped.

14   This fall, the school has been very concerned about the three children who are
15   school-aged, █████, ███████ and ██████ Concerns have been that the children respond
16   to questions in a coached manner and the children's statements have made school
17   personnel suspicious that the mother is allowing the father to see the children beyond
18   what is allowed by court order.

19   The protection order must be followed. Mr. Medicraft is dangerous to the family.
20   His verbal abuse is well documented in the attached records from New York State,
21   including statements he made in a motion to have the protection order modified, as well
22   as the social worker's declaration.

23   For instance, in her testimony to the court requesting protection, Ms. Medicraft
24   testified:

25

26   CERTIFICATION OF EMERGENCY          2          ATTORNEY GENERAL OF WASHINGTON
     HEARING                                              800 Fifth Avenue, Suite 2000
     Rev. 03/01 pp                                         Seattle, WA 98104-3188
                                                              (206) 464-7744

1   THE PETITIONER: My husband has been belittling me in front of
2   my children telling them that I'm no good, that I'm trash, that I'm not
    worth anything, and then at the last minute at the end of the night he'll
3   come back and say, "oh, I didn't mean it. I didn't mean it." And I say, "but
    the kids still heard it," and then he'd say, "no. I think you're a good mom.
4   You're good with us, an you take care of us well," and then the next day it
    starts all over again.
5       THE COURT: How long has this been going on?
6       THE PETITIONER: Pretty long time. After we started having kids
    stuff started changing where I wasn't able to keep up with certain things
7   like right on that time.

8       . .

9

10      THE PETITIONER: He wants to constantly tell me that I am no
11  good, that I'm just like my mother, I'm trash, I don't deserve nice things,
    that's why he doesn't by me nice things, and then he wants to go and say
12  "oh, but I think you can do better," and this and that, and later on if he gets
    mad at me he says I wanna go screw off with somebody else and this and
13  that, he throws that at me like I wanna go, this and that. I deny it, and I tell
    him that it's not true, that he's just putting things in his head, but then he
14  just gets one track mind thinking this is gonna happen, this is gonna
    happen if I ever make any friends. I can't even actually have friends
15  because every time I'm around somebody he thinks is not worthy of his
    conversations, that he actually makes it where I can't be friends with
16  anybody.
17      THE COURT: So he's preventing you from having any friends?
18      THE PETITIONER: Unless they're his type of friends. Then that's
    the only kind of friends that I'm allowed to make. I can't make friends with
19  other mothers that are in my area because he calls them all trash, and then
    he calls me trash, and he goes back and forth between that.
20      THE COURT: Any weapons involved?
21      THE PETITIONER: No, but verbal all the time, and then he thinks
    that if he says sorry then it's all forgiven, and that I'm gonna keep just
22  putting up with it, and I've been trying to, but it's to the point where I'm
    scared to be around him. I go to sleep with an ache ever night of fear and
23  sadness that I can't fix. I told him that the relationship was over yesterday
    because I deserved to not be sad every night when I go to sleep, and he got
24  so mad he yelled at me to get out of the house. He grabbed me by my arm
    and lead me to the door, and I pulled my arm back, and he said, "if you
25  don't want to be in this relationship, then get the fuck out." Then I walked
26

CERTIFICATION OF EMERGENCY                    3          ATTORNEY GENERAL OF WASHINGTON
HEARING                                                      800 Fifth Avenue, Suite 2000
Rev. 03/08 pp                                                  Seattle, WA 98104-3188
                                                                (206) 464-7744

1    outside the door, and he slammed the door, and I went for a walk, and then
2    later on I tried to come back.

3         Mr. Medicraft immediately violated the temporary protection order On November
4    8, 2018, Mr. Medicraft filed a motion before Hon. Cortese. Mr. Medicraft requests the
5    court drop the protection order because it was "filed under false pretense." Mr. Medicraft
6    claims that Ms. Medicraft is bipolar, schizophrenic with psychotic features, and suffers
7    from post traumatic stress and obsessive compulsive disorder. He claims she goes
8    through manic phases and abuses her children. He claims she hits the children, spanks
9    them with belts, yells profanities at them such as calling Arthur a "fucking ass hole," and
10   creates a bad environment for the children. He claims he has text messages to prove this.

11        He proceeds to allege that Shaylee sought the protection order because "the night
12   before, [Mr. Medicraft] told her while she was in a manic rage, that [he] is taking the kids
13   to safety." He claims she only sought the order to stop him from leaving with the
14   children.

15        He continues to allege that text messages demonstrate that Shaylee is the abuser
16   in the relationship. He alleges she ran from him with the children four times in the past,
17   three of those times half way across the country. He alleges to have chased her down to
18   rescue the children and that once they were living on the streets.

19        He alleges Ms. Medicraft locks the children in the home for hours where they are
20   screaming, terrified, and soiled. He alleges Ms. Medicraft leaves the children in the
21   home with an individual named "Michael."

22        He finishes his motion with an addendum of additional allegations to the court.
23   These include suicide attempts, soliciting a bisexual/lesbian relationship while in Seattle.

24

25

26   CERTIFICATION OF EMERGENCY                4         ATTORNEY GENERAL OF WASHINGTON
     HEARING                                              800 Fifth Avenue, Suite 2000
     Rev. 0301 pp                                         Seattle, WA 98104-3188
                                                          (206) 464-7744

1    This family is a serious flight risk. Between 2009 and 2019, they have lived in no

2    fewer than seven states including two stints in Washington State. Most recently, the

3    parents were ordered to appear before Judge Cortese in Montgomery County New York

4    for the more permanent order of protection.

5    When none of the parties appeared, all of the parties' attorneys and the court

6    became concerned and used GPS tracking to locate the parents cellular devices. They

7    found the parents fleeing New York State, travelling through Ohio on their way to

8    Washington State, where Mr. Medicraft's relatives owned a home in Seattle.

9    Due to the concerns, and particularly the flight risk, the department removed the

10   children as there is an imminent risk of safety to the children.

11   Shelter care was found for these children on April 30, 2019. As a condition of

12   placement with the mother, the mother was to comply with the no contact order. She is

13   unable to do so. The Department has had concerns that there were violations of the no

14   contact order for the past several months, but was unable to concretely have evidence of

15   such violations until this week.

16   The relief sought is:

17   1. A finding that Ms. Medicraft and Mr. Medicraft are violating the no contact order

18      dated February 6, 2019.

19   2. A finding that release of the child to their parents would present a serious threat of

20      substantial harm to the children.

21   3. Entry of a health and education order permitting the department to maintain the

22      children's health and educational needs.

23   4. Placement of the children in Licensed Foster Care as they have no known

24      relatives in the area and due to the flight risk that the family poses if the children

25      are placed in a location known to the parents.

26   CERTIFICATION OF EMERGENCY
     HEARING                                    5              ATTORNEY GENERAL OF WASHINGTON
     Rev. 03/01 pp                                                   800 Fifth Avenue, Suite 2000
                                                                       Seattle, WA 98104-3188
                                                                           (206) 464-7744

5. Supervised visitation with their mother and instructions she is not to discuss the father or the dependency matter with the children.

6. Suspending visitation with their father as continued contact with James Medicraft and his family strengthens his ability to control the mother, influence the mother, and prevent the mother from safely parenting her children.

Signed and dated this 6th day of December, 2019, at Seattle, Washington.

ROBERT W. FERGUSON
Attorney General

By s/ DEREK P. LEUZZI
Assistant Attorney General
WSBA #45508
Attorney General of Washington
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-7045
Fax: (206) 464-6338
E-mail: Derek.Leuzzi@atg.wa.gov

cc:
___ Dependency CASA
___ Court Liaison Unit
___ Mother's attorney
___ Father's attorney

___ AAG
___ Any parent not represented
___ Child's attorney
___ Child over age 12 not represented

CERTIFICATION OF EMERGENCY
HEARING
Rev. 05/01 pp

6

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# EXHIBIT 3

☐King West  ☐OICW
☐West Seattle  ☐MLK
☐King East  ☒King Southwest
☐King Southeast  ☐Adoptions/BRS

| | |
|---|---|
| **Superior Court of Washington**<br>**County of King Juvenile Court** | |
| Dependency of: | **No:** 19-7-01266-6 KNT |
| | 19-7-01267-4 KNT |
| MEDICRAFT, ▓▓▓ | 19-7-01268-2 KNT |
| DOB: ▓▓/2010 | 19-7-01270-4 KNT |
| | 19-7-01271-2 KNT |
| MEDICRAFT, ▓▓▓ | |
| DOB: ▓▓/2012 | **Order of Dependency as to the father, James** |
| | **Medicraft** |
| MEDICRAFT, ▓▓▓ | **(OROD)** |
| DOB: ▓▓2013 | ☐ Agreed |
| | ☐ Contested |
| MEDICRAFT, ▓▓▓ | ☐ Default |
| DOB: ▓▓/2014 | ☐ Dismissed (ORDYMT) 4.1 |
| | ☐ Disposition Order (ORDD) Included |
| MEDICRAFT, ▓▓▓ | **CLERK'S ACTION REQUIRED:** |
| **DOB:** ▓▓/2018 | Paragraphs 4.1, 4.3, 4.6 (EDL), 4.15, and the |
| Minor Children. | boxes below. |

The court will hear ☐ disposition hearing on _____ ☐ initial progress review hearing on _____ at 8:30 a.m. at: King County Superior Court, Room/Department: 1-L, located at: Regional Justice Center, 401 Fourth Avenue North, Kent, Washington 98032

**Additional clerk's action required: Enter the code(s) that apply.**
*About today's hearing:*
Was adequate and timely notice given to the children's caregiver? Yes (CGATN) ☐ No (CGNATN) ☐
Did the court receive a caregiver report? Yes (CGRR) ☐ / No ☐
☐ The caregiver appeared. Did the court give the caregiver an opportunity to be heard? Yes ☐ / No ☐

### I. Hearing

1.1 **Petition:** A petition was filed by DCYF alleging that the above-named children are dependent, and the court held a hearing on _____.

1.2 **Appearance:** The following persons appeared at the hearing:
☐ Father, James Medicraft ☐ Father's Lawyer,
☐ Children's GAL/CASA, Virginia Whalen ☐ GAL/CASA's Lawyer,
☐ DCYF Worker, Megan Meyer ☐ Agency's Lawyer, Sarah Hillman

Order of Dependency (OROD, ORDYMT) - Page 1 of 8
WPF JU 03.0400 (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

1.3 **Basis:** ☐ The court heard testimony ☐ The parties submitted an agreed order.

## II. Findings

Except where otherwise indicated, the following facts have been established by a preponderance of evidence:

2.1 **Children's Indian Status:** ☐ On this date ☒ On 04/30/19, the court asked each participant on the record whether the participant knows or has reason to know the children are Indian children.

The petitioner has made a good faith effort to determine whether the children are Indian children.

Based upon the following, there is not a reason to know the children are Indian children as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do not apply to this proceeding: The mother and father have reported they do not have Native American ancestry and the children are not Native American, as defined by the Indian Child Welfare Act. There is no reason to know the children are members of a federally recognized tribe or the biological children of members of a federally recognized tribe and eligible for membership in the tribe.

2.2 **Facts:** The following facts establishing dependency have been ☐ agreed upon ☐ proved:

1. **The mother of** ▋▋, ▋▋, ▋▋, ▋▋, and ▋▋ Medicraft is Shaylee Medicraft. James Medicraft is the children's father and is named on each of their birth certificates. The parents have been married since 2013.

2. The father has been physically and verbally abusive with the mother and the children. He has exhibited other violent behaviors such as property destruction, and threatened to harm the mother. The children have expressed fear of their father.

3. The mother has a history of mental health issues. She has reported having memory problems, dyslexia, and anxiety.

4. The oldest child has reported the father drinking alcohol.

5. The mother filed a family offense petition against the father in October of 2018 in Montgomery County, New York, where the family had been living for the prior few years. The mother reported the father committed the following against her and/or the children: disorderly conduct, harassment in the first or second degree, aggravated harassment in the second degree, and assault in the second or third degree. The mother reported the father was aggressive with her in front of the children, was verbally abusive toward the children, and threatened her.

6. The mother also filed a petition for custody in October of 2018 in Montgomery County, New York and explained it would be in the best interest of the children for her to have sole custody and the father to have supervised visitations because of his verbal abuse and wanting to flee out of state with the children. The mother reported the father is physically and verbally abusive.

7. Both the parents were present in Montgomery County, New York on 02/06/19, when the court entered a two-year order of protection, preventing the father from having any contact with the children and the mother until 02/05/21.

8. Both parents were also present on 02/06/19, when a court in Montgomery County, New York addressed the issues of custody and visitation and provided the mother has sole legal and physical custody of the children and the father shall have no parenting time with the children until he: 1) completes a psychiatric evaluation (with collateral contacts) and complies with the recommendations for a period of at least three months; 2) completes a 26-week anger management course; and then 3) participates in therapeutic counseling with the children. The court also ordered that neither parent shall engage in corporal punishment.

9. The week after the hearing on 02/06/19, the parents left New York with their children and traveled across the country. An arrest warrant was issued for the father and the Montgomery County Department of Social Services was made an interested party to the proceeding.

10. The family did not return to New York, but instead settled in King County, Washington.

11. The mother allowed the father to have contact with the children in violation of the protection order. Therefore, there is a founded finding of negligent treatment or maltreatment as to both parents.

12. The Department of Children, Youth, and Families in King County filed dependency petitions on behalf of the children and the court held a 72 Hour Shelter Care Hearing on 04/30/19.

13. The court placed the children with the mother upon various conditions, including that she follow the protection order, and provided no visitation for the father.

14. Since the children were placed in the mother, there have been several CPS referrals with concerns regarding their welfare, including about excessive discipline, lack of supervision, poor hygiene, and the older boys being violent.

2.3 **Statutory Basis**: The children are dependent according to RCW 13.34.030(6), in that the children:

☐ (a) have been abandoned, as defined in RCW 13.34.030;

☐ (b) are abused or neglected, as defined in Chapter 26.44 RCW, by a person legally responsible for the care of the children; and/or

☒ (c) have no parent, guardian or custodian capable of adequately caring for the children, such that the children are in circumstances which constitute a danger of substantial damage to the children's psychological or physical development.

2.4 **Placement**: The children should be placed or remain in the home of the mother.

2.5 **Reasonable Efforts**: N/A

2.6 **Sibling contact**: N/A: the children are placed together with the mother.

2.7 **Children's school**: N/A: the children are placed with the mother.

2.8 **Other**:

☐ The parent or guardian/custodian was informed of the right to appear in court for presentation and entry of this agreed order of dependency.

☐ The parent or guardian/custodian appeared before the court for entry of this order.

☐ The parent or guardian/custodian waived his/her right to be present in court for entry of this order by submitting the attached Waiver of Right to Appear In Court.

The Court finds:

1. The parent or guardian/custodian understands the terms of the order he/she signed, including his/her responsibility to participate in remedial services in the below dispositional order.

2. The parent or guardian/custodian understands that entry of the order starts a process that could result in the filing of a petition to terminate his/her parental rights if he/she fails to comply with the terms of the dependency or dispositional orders or fails to substantially remedy the problems that necessitated the children's out-of-home placement.

3. The parent or guardian/custodian understands that entry of this agreed order of dependency is an admission that the children are dependent within the meaning of RCW 13.34.030. The parent or guardian/custodian understands that he/she will not have the right to challenge this determination in a subsequent proceeding.

4. The parent or guardian/custodian knowingly and willingly stipulated and agreed to entry of this order and did so without duress, misrepresentation or fraud by any other party.

## III. Conclusions of Law

3.1 **Jurisdiction**: The court has jurisdiction over the children and the father.

3.2 **Notice**: The following have received timely and proper notice of these proceedings: the father.

3.3 **Default**: The following have failed to appear and a default order has been entered:
☐ The father

3.4 **Dependency**: The children should be found dependent pursuant to RCW 13.34.030.

## IV. Order

4.1 **Dependency**: The children are dependent pursuant to RCW 13.34.030(6)(c).

4.2 **Social study**:
☐ DCYF has conducted a social study, a report of which was filed and provided to the parties.
☐ DCYF has not conducted a social study and shall return a report to the court and to the parties on a timely basis.

4.3 **Disposition hearing**:
☐ A disposition hearing has been held.
☐ A disposition hearing is set for the date and time on page one.
☐ All disposition provisions are agreed.

4.4 **Placement**: The children shall be placed or remain in the home of the mother subject to the following conditions: The mother shall:
1) Ensure all the children are either attending day care or school on a regular basis, provided day care is available and school is in session. Should day care not be available or if the mother is unable to locate a provider that is willing and available to take the children, the Department shall assist the mother in locating a provider. The Department shall continue to provide funding for day care until the mother is eligible for day care assistance through DSHS.
2) Remain in Department-approved housing (and provide as much advance notice as possible to the Department and the CASA if she is contemplating a move out of the Seattle area).
3) Participate in individual counseling. The Department shall provide collateral information to the mother's provider and the mother's attorney and the CASA simultaneously. The mother shall sign a release of information.
4) Continue to cooperate with announced and unannounced home visits by the Department and the CASA.

5) Abide by any current protection order in place.

6) Not allow contact between the children and the father, unless authorized by the dependency court. If such contact is authorized, the Department shall notify the mother with as much notice as possible and provide for the transportation to and from the visits with the father so that the mother does not have to be a part of that process.

7) Ensure █████, █████, and █████ attend counseling and participate in any services recommended by their providers.

8) Ensure █████ attends an assessment for birth to three services and participates in any recommendations.

9) Ensure the children are current in all medical and dental care and follow any recommendations from their providers.

10) Continue to work with her current public health nurse.

11) Continue to work with her current Homebuilders provider. If upon completion of Homebuilders, the provider recommends further services that are not agreed, a party may file a motion to ask that such services be ordered without a change of circumstances.

Absent good cause, DCYF shall follow the wishes of the natural parent regarding the placement of the children in accordance with RCW 13.34.260.

4.5    **Services**: Services for father entered pursuant to RCW 13.34.130 [any evaluation must comply with RCW 13.34.370] are as follows:

**Psychological evaluation with parenting component and follow through with any treatment recommendations**
- The parent's compliance shall be based upon cooperating in selecting a mutually agreed upon evaluator, completing the evaluation in a timely fashion, complying with the recommended treatment, and by progress reports from the service providers.
- Responsibility for payment: the Department shall pay for the initial evaluation. For any recommended treatment, the parent shall pay or utilize funding sources such as medical coupons, if the parent is unable to pay.

**Domestic violence batterer's assessment with a state-certified mutually agreed upon provider and any recommendations**

**Triple P**

**Random urinalysis with ETG testing four times per month**
- The parent's compliance shall be based upon attendance at all required UAs and consistent negative results. An unexcused missed appointment, violation of program rules, or diluted UA shall be deemed a positive result.
- Participation in this service shall begin immediately.
- This requirement shall be completed after 30 days of clean, not missed, not diluted UAs.
- Responsibility for payment: The Department, if at agency referred to by the Department.

**If the father has a positive, missed or diluted UA, he shall participate in a drug/alcohol evaluation with a mutually agreed upon provider and follow any recommendations**
- The parent's compliance shall be based upon making the initial appointment, completing all steps necessary to complete the evaluation, and enrolling in and successfully completing any recommended treatment program. Progress will be verified by reports from the service provider.
- The parent is referred to ADATSA for a funding assessment.

*Father shall abide by the protection order with the mother*

DCYF shall provide and the children shall participate in the following examinations, evaluations, or services:

- ▪ ████, ██████, and ███████: counseling and any recommended services
- ▪ ████████: assessment for birth to three services and any recommendations
- ▪ Day care, if available, as described in the placement section

4.6 Educational Liaison: N/A

4.7 **Visitation**: Once the father has attended a meeting with the social worker, visitation shall start once time per week for two hour each visit, supervised by DCYF or a DCYF designee. Initially visitations shall start with the three older boys at one visit and the younger two children at another visit. Visits shall occur at a DCYF-approved location. DCYF has authority to liberalize in consultation with the children's therapist and the CASA.

4.8 **Restraining Order**: N/A

4.9 **Parental Cooperation**: The parent shall cooperate with reasonable requests by DCYF and provide DCYF with income and asset information necessary to establish and maintain the children's eligibility for medical care, evaluations, counseling and other remedial services, foster care reimbursement, and other related services and benefits.

4.10 **Health Care**: DCYF with custody of the children shall have full power to authorize and provide all necessary, routine and emergency medical, dental, or psychological care as recommended by the children's treating doctor or psychologist, subject to review by the court, as needed.

4.11 **Release of Information**: All court-ordered service providers shall make all records and all reports available to DCYF, attorney for DCYF, parent's attorney, the guardian ad litem and attorney for the children. Parents shall sign releases of information and allow all court-ordered service providers to make all records available to DCYF and the guardian ad litem or attorney for the children. Such information shall be provided immediately upon request. All information, reports, records, etc., relating to the provision of, participation in, or parties' interaction with services ordered by the court or offered by DCYF may be subject to disclosure in open court unless specifically prohibited by state or federal law or regulation.
DCYF may continue to make reasonable efforts to locate and investigate an appropriate relative or other suitable person who is available and willing to care for the children, and is authorized to share information about the children, as necessary, with potential relative or other suitable person placement resources to determine their suitability and willingness as a placement for the children.

4.12 **Reports**: DCYF shall submit a report for the next review hearing to the court and to the parties in a timely manner.

4.13 **Termination Petition**: N/A

4.14 **Children's Indian Status**: Any party who subsequently receives information that provides a reason to know the children are Indian children under 25 C.F.R. § 23.107 shall inform the court.

4.15 All parties shall appear at the next scheduled hearing (see page one).

4.16 **Other**: The permanent plan for the children is to remain home with the mother.

Dated: _____     _____
                                            **Judge/Commissioner**

Presented by:

_____
Sarah Hillman
Assistant Attorney General
WSBA #36712

**Notice:** A petition for permanent termination of the parent-child relationship may be filed if the children are placed out-of-home under an order of dependency. (RCW 13.34.180.)

Copy Received; Approved for Entry; Notice of Presentation Waived:

_____     _____
☐ Signature of **Father**            ☐ Signature of Father's Lawyer
☐ Pro Se, Advised of Right to Counsel
                                     _____
                                     Print Name                WSBA No.

_____     _____
☐ Signature of Children's **GAL**    ☐ Signature of Lawyer for the Children's GAL

_____     _____
Print Name                           Print Name                WSBA No.

_____     _____
Signature of **DCYF Representative**  Signature of DCYF Representative's Lawyer

_____     _____
Print Name                           Print Name                WSBA No.

**AGREED DEPENDENCY/DISPOSITIONAL STATEMENT**
**WAIVER OF RIGHT TO APPEAR IN COURT FOR PRESENTATION**
**AND ENTRY OF AGREED ORDER OF DEPENDENCY**

If the father, mother or legal guardian/custodian agrees to dependency and desires to waive presentation and not appear in court for entry of this order, the following certification shall also be signed.

The undersigned declares that:

I have read or been told the contents of this Agreed Order of Dependency and Disposition, and I agree that the order is accurate and should be signed by the court. I understand the terms of the order being entered, including my responsibility to participate in remedial services as provided in the dispositional order.

I understand that entry of this order starts a process that could result in the filing of a petition to terminate my relationship with my children if I fail to comply with the terms of this order and/or I fail to substantially remedy the problems that caused the children's out-of-home placement.

I understand also that entry of this order is an admission that the children are dependent within the meaning of RCW 13.34.030 and it shall have the same legal effect as a finding by the court that the children are dependent by at least a preponderance of the evidence. I understand that I will not have the right in any subsequent proceeding to challenge or dispute the fact that the children were found to be dependent.

I stipulate and agree to entry of this order, and do so knowingly and willingly without duress, misrepresentation or fraud by any other party.

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

_____          _____
Children's Father                                    Date/Place of Signature

# EXHIBIT 4

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY
JUVENILE DEPARTMENT

IN RE DEPENDENCY OF:

MEDICRAFT,

MEDICRAFT,

MEDICRAFT,

MEDICRAFT,

MEDICRAFT,

Minor Child(ren).

NO. 19-7-01267-4 KNT
19-7-01268-2 KNT
19-7-01266-6 KNT
19-7-01270-4 KNT
19-7-01271-2 KNT

DECLARATION OF DEPARTMENT
SOCIAL WORKER

I, Liza Sterbick, hereby declare as follows:

I am employed by the Department of Children, Youth and Families as a social worker and make this declaration as such. I am over the age of eighteen and competent to testify herein.

In 1993, Mr. Medicraft was the respondent in King County Superior Court Cause number 93-2-12866-5 which appears to be an order transferring Domestic Violence. He was married around that time to his first wife who subsequently passed away. Shaylee Medicraft was born Shaylee E. Aldag-Heath, was born in California. In 1997, she was involved in Riverside County California Child Protective Services. California has roughly 26 intakes regarding the need to secure her safety and well being as a child.

DECLARATION OF DEPARTMENT SOCIAL
WORKER
Rev. 03/01 pp

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1　When she was 16, around the year 2007, Ms. Medicraft was found on the streets of

2　Washington State, alone, far from her home, and without an apparent home. She would

3　have been trafficked or on the run if that was the case. While living in poverty on the

4　streets, Mr. James Medicraft saw her from his car and offered her a place to stay.

5　Within two years, Mr. Medicraft cut Ms. Medicraft off from her entire support structure

6　including friends and family.

7　　　Their first child was born when Ms. Medicraft was 19, in 2010. During the next 9

8　years she would have four other children with Mr. Medicraft and live in more than 5 states

9　including, but not limited to, California, Missouri, South Carolina, Minnesota, New York,

10　North Dakota and Washington State. It is understood that the three older boys were born in

11　North Dakota. Melody was born in Missouri. And there are records that ▇▇▇▇, went to

12　kindergarten in Minnesota. New York CPS reports the family lived for a period of time in

13　South Carolina. Father, in one of the letters to the court detailed below indicates the family

14　spent at least one summer living in West Seattle, WA.

15　　　In 2018, while giving birth to ▇▇▇▇ Ms. Medicraft informed hospital nurses that

16　she feared Mr. Medicraft wanted to kill her. The hospital called CPS. CPS went to the

17　family home, which was an apartment at the back of a motel in Montgomery County New

18　York, and conducted a welfare check. Mr. Medicraft denied social workers access to the

19　home.

20　When social workers met with Ms. Medicraft, she changed her story, causing New York

21　child protective services to close their investigation.

22　　　The family resided in New York for two years, likely between early 2017 and early

23　2019. During that time the Mother was working with Lindsey Hodge, the social worker for

24　the Montgomery School District. Ms. Hodge reports that Mr. Medicraft would not permit

25　Ms. Medicraft to gain any independence. He went so far as to prohibit her from benefitting

26　DECLARATION OF DEPARTMENT SOCIAL　　　2　　　ATTORNEY GENERAL OF WASHINGTON
WORKER　　　　　　　　　　　　　　　　　　　　　800 Fifth Avenue, Suite 2000
Rev. 03/01 pp　　　　　　　　　　　　　　　　　Seattle, WA 98104-3188
　　　　　　　　　　　　　　　　　　　　　　　　(206) 464-7744

1  from social services. Ms. Hodge had to stay secret from Mr. Medicraft and would visit the

2  home and provide supplies such as Tylenol, diaper, and baby formula when Mr. Medicraft

3  was away from the home.

4      In May of 2018, there was a fire drill at East Hill Elementary School in New York.

5  Ms. Medicraft came to the school concerned that Mr. Medicraft would come and kidnap the

6  children during the fire drill. The school took action and made sure the children remained

7  safe during that day.

8      Ms. Hodges remained invested with Ms. Medicraft throughout the year. She

9  witnessed events where Mr. Medicraft made sure Ms. Medicraft made no gains in her

10  independence. For instance, at one point, the family had a van and a car. Ms. Medicraft

11  wanted to sell the car to support her family. Mr. Medicraft took the keys to the car to

12  prevent her from doing so.

13      Ms. Hodges saw the children traumatized by the father and domestic violence in the

14  home. Once the children missed the bus and Lindsey came to the home to help provide

15  transportation for the family to the school. Melody was there with her mother scared and

16  clinging to her.

17      Ms. Hodges is greatly concerned that father manipulates the mother at every turn of

18  her life. Preventing her from being independent, safe, and secure on her own.

19      On October 16, 2018, Ms. Medicraft, on her own, without social worker

20  encouragement or support, sought a protection order against Mr. Medicraft. The following

21  are excerpts from mother's testimony before Hon. Cortese in New York:

22          THE PETITIONER: My husband has been belittling me in front of

23      my children telling them that I'm no good, that I'm trash, that I'm not worth
    anything, and then at the last minute at the end of the night he'll come back

24      and say, "oh, I didn't mean it. I didn't mean it." And I say, "but the kids still
    heard it," and then he'd say, "no, I think you're a good mom. You're good

25

26  DECLARATION OF DEPARTMENT SOCIAL       3       ATTORNEY GENERAL OF WASHINGTON
    WORKER                                         800 Fifth Avenue, Suite 2000
    Rev 03/01 pp                                        Seattle, WA 98104-3188
                                                   (206) 464-7744

with us, an you take care of us well," and then the next day it starts all over again.

        THE COURT: How long has this been going on?

        THE PETITIONER: Pretty long time. After we started having kids stuff started changing where I wasn't able to keep up with certain things like right on that time.

        ...

        THE PETITIONER: He wants to constantly tell me that I am no good, that I'm just like my mother. I'm trash. I don't deserve nice things, that's why he doesn't by me nice things. and then he wants to go and say "oh, but I think you can do better," and this and that, and later on if he gets mad at me he says I wanna go screw off with somebody else and this and that, he throws that at me like I wanna go. this and that. I deny it, and I tell him that it's not true. that he's just putting things in his head, but then he just gets one track mind thinking this is gonna happen. this is gonna happen if I ever make any friends. I can't even actually have friends because every time I'm around somebody he thinks is not worthy of his conversations, that he actually makes it where I can't be friends with anybody.

        THE COURT: So he's preventing you from having any friends?

        THE PETITIONER: Unless they're his type of friends. Then that's the only kind of friends that I'm allowed to make. I can't make friends with other mothers that are in my area because he calls them all trash, and then he calls me trash, and he goes back and forth between that.

        THE COURT: Any weapons involved?

        THE PETITIONER: No, but verbal all the time, and then he thinks that if he says sorry then it's all forgiven. and that I'm gonna keep just putting up with it, and I've been trying to, but it's to the point where I'm scared to be around him. I go to sleep with an ache ever night of fear and sadness that I can't fix. I told him that the relationship was over yesterday because I deserved to not be sad every night when I go to sleep, and he got so mad he yelled at me to get out of the house. He grabbed me by my arm and lead me to the door, and I pulled my arm back, and he said, "if you don't want to be in this relationship, then get the fuck out." Then I walked outside the door, and he slammed the door, and I went for a walk, and then later on I tried to come back.

The court granted the request for a temporary order of protection ordering the following: the parties appear at a hearing on October 23, 2018; that Mr. Medicraft stay away from Ms. Medicraft and their children, the family home, the schools, the place of business and employment of Ms.Medicraft; refrain from communication by mail, telephone, e-mail,

DECLARATION OF DEPARTMENT SOCIAL        4        ATTORNEY GENERAL OF WASHINGTON
WORKER                                 800 Fifth Avenue, Suite 2000
Rev. 03/01 pp                                   Seattle, WA 98104-3188
                                                 (206) 464-7744

1    voice-mail or other electronic or any other means with Ms. Medicraft and their children;

2    refrain from physical, verbal, psychological, and emotional harm; and grants custody of the

3    children to Ms. Medicraft. Violation of the order subjects the offender to mandatory arrest

4    and criminal prosecution.

5          Mr. Medicraft immediately violated the temporary no contact order by facebook

6    messaging Ms. Medicraft. Ms. Medicraft felt emotionally manipulated and filed a petition

7    for violation of a no contact order. In the communication, Mr. Medicraft played himself as a

8    victim, claiming the separation is going to "break him," Ms. Medicraft requested he stop

9    communicating with her twice but he ignored her requests and attempted to make her feel

10    guilty for protecting herself, and her family with statements such as "Would you really put

11    me in jail?"

12          On October 23, 2019, both parties appeared before Hon. Cortese. The Court upheld

13    the temporary order of protection and kept it in effect until April 22, 2019. Earlier that day,

14    Mr. Medicraft filed a petition for custody of his children claiming mother as bipolar and

15    dangerous.

16          On October 23, 2019, Mr. Medicraft came to appeared at the sheriff's office

17    requesting the sheriff do a welfare check on the home. New York CPS made a similar

18    request.

19          On October 24, 2018, Officer Joseph Paresi of Mongtomary County New York

20    Sheriff's department was dispatched to respond to Mr. Medicraft again violating the

21    temporary protection order by texting Ms. Medicraft.

22          On October 25, 2018, Hon Cortese orders CPS to conduct a 1034 Investigation.

23    Beginning New York CPS's second involvement with the family.

24          On October 27, 2018, Mr. Medicraft contacted Ms. Medicraft on facebook

25    messanger and informed her to tell Ms. Medicraft that he does not want the children in

26    DECLARATION OF DEPARTMENT SOCIAL        5        ATTORNEY GENERAL OF WASHINGTON
     WORKER                                             800 Fifth Avenue Suite 2000
     Rev. 03-01 pp                                               Seatle, WA 98104-3188
                                                          (206) 464-7744

1   foster care; That Ms. Medicraft is pushing this. not him; That if Ms. Medicraft keeps this up

2   that both of them will lose; and that she need to drop the case. This comes from the

3   November 14, 2018 petition for violation of the protection order.

4        On October 28, 2018, Mr. Medicraft went to the Montgomery County Sheriff's

5   Office to complain about Ms. Medicrafts ability to care for the children. The Sheriff's office

6   arrested him for an outstanding warrant active from Town of Palatine.

7        While under custody, Mr. Medicraft, called in an intake that Ms. Medicraft's

8   "boyfriend" who turned out to be a friend named Matthew Kennedy, was allegedly kicking

9   the children. Law enforcement was also present. According to them, Ms. Medicraft stated

10  the complaint came in because Mr. Medicraft was mad. Law enforcement considered the

11  children safe and unharmed with their mother and remained involved with the family.

12       On November 8, New York CPS through Amy Desrochers and Karley Raceynski

13  provided a report to the court. CPS informs the court that they and Ms. Lindsey Hodge

14  believe the mother is safely parenting her children. They report the children do not feel safe

15  when their father is around, that they are afraid of their father, and witnessed their father

16  physically and verbally abuse Ms. Medicraft.

17       On November 8, 2018, Mr. Medicraft filed a motion before Hon. Cortese. Mr.

18  Medicraft requests the court drop the protection order because it was "filed under false

19  pretense." Mr. Medicraft claims that Ms. Medicraft is bipolar, schizophrenic with psychotic

20  features, and suffers from post traumatic stress and obsessive compulsive disorder. He

21  claims she goes through manic phases and abuses her children. He claims she hits the

22  children, spanks them with belts, yells profanities at them such as calling ▓▓▓▓ a "fucking

23  ass hole," and creates a bad environment for the children. He claims he has text messages to

24  prove this.

25

1     He proceeds to allege that Shaylee sought the protection order because "the night

2  before, [Mr. Medicraft] told her while she was in a manic rage, that [he] is taking the kids to

3  safety." He claims she only sought the order to stop him from leaving with the children.

4     He continues to allege that text messages demonstrate that Shaylee is the abuser in

5  the relationship. He alleges she ran from him with the children four times in the past, three

6  of those times half way across the country. He alleges to have chased her down to rescue

7  the children and that once they were living on the streets.

8     He alleges Ms. Medicraft locks the children in the home for hours where they are

9  screaming, terrified, and soiled. He alleges Ms. Medicraft leaves the children in the home

10  with an individual named "Michael."

11     He finishes his motion with an addendum of additional allegations to the court.

12  These include suicide attempts, soliciting a bisexual/lesbian relationship while in Seattle.

13     On November 14, 2018, the court orders both parents to complete a mental health

14  assessment at St. Mary's Healthcare.

15     The State of New York continues to assist the family. Attorneys are appointed at

16  least the mother, and the children.

17     On February 6, 2019, the parties were set to appear for a full no contact order.

18  Neither party appeared, raising great concern for both counsel and the State of New York.

19  The court ordered the no contact order to remain in effect to February 5, 2021. Father was

20  further ordered to complete a full psychological evaluation and complete 26 weeks of anger

21  management.

22     Concerned, the State of New York pinged the locations of the family's cellular

23  devices. They located the family crossing Ohio on their way to Washington State.

24

25

26  DECLARATION OF DEPARTMENT SOCIAL     7     ATTORNEY GENERAL OF WASHINGTON
    WORKER                                   800 Fifth Avenue, Suite 2000
    Rev 03/01 pp                                     Seattle, WA 98104-3188
                                             (206) 464-7744

1    On February 25, 2019, Mr. Sutton, attorney for the children, disclosed in an affidavit

2  to the court that the children reported to him of being fearful of their father and that their

3  father threatened to kill "their mother and throw her body in the river."

4    The parents, travelled across the country in violation of the protection order. And the

5  original petition was filed with this court. The CPS intake dated April 28, 2019 from

6  referents at Amara state ████ Medicraft disclosed "mom and dad told us that if we told

7  anybody that we saw dad he'd go to jail." ████ said, "we only saw him on Easter, though.

8  It was just that time." Then ████ said, "no, we saw Dad zero times." Then the boys

9  started calling each other liars.

10    The first shelter care hearing was heard on April 30, 2019. The court found shelter

11  care stating that "without services, the child has no parent, guardian, or legal custodian to

12  provide supervision or care for such child; and/or…" The court also placed the children

13  with the mother on the following conditions:

14        1.      Allow the department unannounced and announced visits.

15        2.      Allow contact between the children and their New York attorney.

16        3.      Report the no contact order violation to law enforcement on April 30, 2019.

17        4.      Follow the no contact order.

18        5.      Cooperate with Solid Ground services, including counselling for all of the

19        children and for herself.

20  Father was not granted visitation at the shelter care hearing.

21    The school reports that the children were reasonably behaved during the Spring

22  Semester of 2019. Ms. Medicraft and her children resided at Solid Ground, a home in

23  southeast king county, and most recently a motel in Des Moines.

24

25

26  DECLARATION OF DEPARTMENT SOCIAL          8          ATTORNEY GENERAL OF WASHINGTON
    WORKER                                                     800 Fifth Avenue, Suite 2000
    Rev. 08/01 pp                                               Seattle, WA 98104-3188
                                                                    (206) 464-7744

1        Ms. Medicraft was referred to and completed two Homebuilders in home services

2  during the summer. Between February 25, 2019 and September 6, 2019, ten separate CPS

3  intakes were received regarding the family.

4        The June 11, 2019 intake details an incident when Ms. Medicraft left the children

5  home alone at Solid Ground. Staff at the housing complex report they found four year old

6  ███████ tied up with shoelaces to the bed. Her feet were changing color because of how

7  tight they were tied. Ms. Medicraft allegedly responded that she was not concerned.

8  Referent noted that the children frequently have bad behavior. They noted the children

9  appear highly traumatized. That their behavior is at times extreme and that the mother is not

10  equipped to handle them.

11       On July 3, 2019, a referrer from YMCA Camp Coleman called in an intake alleging

12  that ██████ made concerning statements that CPS and the Indians are to blame for the death

13  of his father. He continued to speak of guns and weapons. And that he hates CPS.

14       On July 5, 2019, Camp Coleman called in an intake when ██████ made reports that

15  his mother is spanking him and hitting him with a belt. Ms. Medicraft responded to these

16  statements claiming that ██████ is seeing a psychiatrist and has a big imagination.

17       On July 15, 2019, a CPS intake came in when ██████ was kicked out of YMCA

18  Camp Orkila when he physically assaulted staff and other campers. When Ms. Medicraft

19  arrived at the camp, she was observed yelling and screaming at the children, grabbing ██████

20  by the jaw and yelling at him. Furthermore, she was not supervising her other children who

21  were waling in front of cars in the street. ████████ was observed as very dirty, with a soiled

22  diaper and feces on his shirt.

23       On July 25, 2019, ████████ disclosed to staff at Garfield Community Center Summer

24  Camp Program that his mother was mad at him for running into ██████ and she responded

25  by forcefully pulling the hair on the back of his head.

26  DECLARATION OF DEPARTMENT SOCIAL      9
  WORKER
  Rev. 03/01 pp

1    On July 26, 2019, CPS received another intake again from Garfield Community
2  Center alleging that ███████ called other children "nigger bitch." Des Moines elementary
3  informed the department at a later date that these racial slurs are common with seven year
4  old ██████. During their intake, Garfield also alleged that he went into the girls bathroom,
5  made statements that he was crazy, took a stool and swung it around stating he hates
6  everyone and was going to hit everyone.  He also claimed that "he be sexing his brother in
7  the mouth." He stated that referred to ████████.  The Community Center informed CPS that
8  his violent outbursts were witnessed on multiple occasions.

9    On August 26, 2019, the parties agreed to allow father to begin visiting his children.

10    In August 2019, Ms. Medicraft called the Attorney General's Office requesting to
11  have the no contact order between her and Mr. Medicraft dropped.  During this time, she
12  was informing social workers that it was her plan to be reunited as a family with Mr.
13  Medicraft. The State was and remains very concerned that Ms. Medicraft is unable to free
14  herself from the manipulations and domestic violence Mr. Medicraft oppresses against her.

15    During the fall of 2019, Des Moines Elementary school called in an intake that they
16  suspect the father is having unsupervised and unauthorized contact with the children outside
17  of the court order. The school also informed the department that the children are very
18  fearful of CPS coming and taking them away. The state and the school are concerned that
19  they are fed this fear by their parents.

20    The school reports that the mother uses the threat of withholding visits with their
21  father as a form of punishment. The school has heard that some of the children receive
22  special visits with their father.  Mother also threatens to call CPS when she is angry at the
23  boys.

24    The biggest issue at the school are the children's behaviors. ██████ appears
25  parentified and takes on the responsibility of the family. The school is concerned Ms.

26  DECLARATION OF DEPARTMENT SOCIAL          10          ATTORNEY GENERAL OF WASHINGTON
     WORKER                                                        800 Fifth Avenue, Suite 2000
     Rev. 03/01 pp                                                  Seattle, WA 98164-2088
                                                                       (206) 464-7744

1  Medicraft is reinforcing he take on this role. ████ and ████ behavior is so bad that

2  they cannot be schooled. The school reports that the children have no understanding and no

3  ability to participate in structured play, preventing them to befriend their peers and engage in

4  games based learning provided by their educators.

5      The school is concerned about witnessing comments where the mother is

6  disparaging her children.

7      The Medicraft children are unable to take advantage of McKinney-Vento since they

8  pulled out the upholstery of the cabs utilized in this service.

9      The children are dangerously behind in school. The school reports that at first grade,

10 ████ is unable to say all of his letter sounds and cannot write his name well. The school

11 is concerned the parents did not provide the preparation needed for success in elementary

12 school. ████ and ████ appear unable to complete work, which has prevented the

13 school from fully assessing their academic standing and address their academic needs.

14     The school reports that boys consider have low confidence in themselves and

15 consider themselves dumb and awful when they see their peers succeed.

16     The school is concerned that there is at least two months of unaccounted time around

17 February and April 2019 where the children should have been in school.

18     ████ and ████ behavior at school is so terrible that they are sitting out most of

19 their classes rather than attending them. The school fears they are unable to receive an

20 education at all without a lot of supports that they are not receiving.

21     The school is greatly concerned that the children are being coached to tell lies and

22 being coached to withhold information. Educators see the children selectively use their

23 words when discussing thie situation.

24     The school is concerned that Ms. Medicraft does not understand what is happening

25 around her and does not know how to utilize their services. They, like many others, have

26 DECLARATION OF DEPARTMENT SOCIAL          11          ATTORNEY GENERAL OF WASHINGTON
   WORKER                                                800 Fifth Avenue, Suite 2000
   Rev 03/01 gp                                          Seattle, WA 98104-3188
                                                         (206) 464-7744

1  concerns about mother's developmental abilities. They have to assist mother with

2  completing certain school forms. The school is concerned that Ms. Medicraft is completely

3  overwhelmed with what is going on around her and has trouble navigating the systems she

4  is involved in whether that is child care, housing, the dependency action, and everything

5  else. The school strongly recommends that Ms. Medicraft engage in wrap around services

6  to help her navigate the world.

7      On October 10, 2019, Mr. Medicraft violated his no contact order with Ms.

8  Medicraft when he posted on Ms. Medicraft's Facebook page, violating the no electronic

9  communication clause of the no contact order.

10     On the evening of November 2nd, 2019 SW Sanchez was at the Walmart

11  supercenter, located at 34520 16th Ave south in Federal Way, Washington.

12     While shopping with her son, she was walking down the aisle near the toys and

13  electronics when she saw Shaylee Medicraft along with ████ Medicraft, ████ Medicraft

14  and ████ Medicraft. SW Sanchez also noted that there was an older gentleman who was

15  taller than Shaylee with grey and white hair. He was of a slender/athletic build. SW

16  Sanchez did not notice if ████ or ████ was with them as they were walking towards

17  her in the store. She made eye contact with Shaylee but did not have a verbal interaction

18  with her. The children were observed to be walking calmly and acting appropriately in the

19  store. Unlike previous interactions with them, the children seemed to be having proper

20  behaviors.

21     Due to having her personal child with her and feeling uncomfortable, SW Sanchez

22  turned toward the candle aisle to avoid an immediate interaction with them. Upon realizing

23  that she was unsure of who the elder gentleman was SW Sanchez looked back over my

24  shoulder and noted that they had immediately moved away from the area. Based on her

25

26  DECLARATION OF DEPARTMENT SOCIAL          12          ATTORNEY GENERAL OF WASHINGTON
    WORKER                                                    800 Fifth Avenue, Suite 2000
    Rev. 03-01 gp                                             Seattle, WA 98104-3188
                                                              (206) 464-7744

1  previous interactions with the family, SW Sanchez felt that the immediate removal from the

2  area where they had been previously browsing in a leisurely manner it seemed odd.

3      On 12/04/2019 at approximately 4:20pm, SW Sanchez was able to verify through a

4  visual observation room during a visit that the gentleman observed while at Walmart was

5  indeed Mr. Medicraft, father to the Medicraft children.

6      Mr. Medicraft has never been cooperative with the department and did not engage in

7  offered domestic violence and anger management classes, despite being ordered to do so by

8  the State of New York.

9      Ms. Medicraft is the victim of serious verbal and psychical abuse by Mr. Medicraft.

10  She does not have the ability to free herself from Mr. Medicraft and continuously violates

11  the order of protection. This inability to protect herself and her family harms her children.

12  They are terribly traumatized. They have behaviors Ms. Medicraft is unable to manage.

13      Mr. Medicraft withholds all support for his family. On October 28, 2019, Arlyn

14  Medicraft quitclaimed the deed to a home in West Seattle to James Medicraft. Mr.

15  Medicraft is currently living in this home while his family is suffering living in a motel. He

16  provides his family with no financial support.

17      Ms. Medicraft in the meantime is residing in a motel, she is struggling to navigate

18  the housing system, and her children are destabilized. Ms. Medicraft is apparently working

19  every night at Amazon. Which means that her children are not in her care at night, rather,

20  they are attending a night child care center.

21      Ms. Medicraft and Mr. Medicraft are not honest with the Department and their

22  children are coached to deceive provider of their parent's contacts. The family is an extreme

23  flight risk. Despite homeownership, the state of Washington believes that Ms. Medicraft

24  can pack her bags and flee the state with her children with less than an hour notice. The

25

26  DECLARATION OF DEPARTMENT SOCIAL    13    ATTORNEY GENERAL OF WASHINGTON
    WORKER    800 Fifth Avenue, Suite 2000
    Rev 10/02 pp    Seattle, WA 98104-3188
    (206) 464-7744

1   state believes Mr. Medicraft would leave with Ms. Medicraft at that time, or even shortly

2   thereafter if he can sell or rent his home.

3        Their high flight risk is further evidenced by their history of moving from state to

4   state every year for the last decade. The state believes if they are to flee, they will go to

5   paternal relatives in Rousseau Minnesota or maternal relatives in Riverside County

6   California.

7        The state believes that these children are not safe with their mother because of her

8   continuous disregard for the no contact order. By supporting unsupervised visits with the

9   father, Ms. Medicraft exposes them to further physical and verbal violence.

10       Furthermore, Ms. Medicraft is not able to handle the childrens basic needs,

11  particularly their need for a stable home and behavioral regulation. The children are worse

12  now then they were in April 2019. The boys behavior places them at risk of suspension

13  from school. The children are not integrating with their peers.

14       Just this week, Social Worker Leticia Sabado completed a health and safety visit at

15  the motel. ███████ Medicraft's face was covered in scratches. Ms. Medicraft did not permit

16  Ms. Sabado to photograph the child. The department understands that ██████ caused

17  Melody's injuries.

18       These children are no longer safe in the care of their mother and require emergent

19  and immediate removal.

20       I declare under penalty of perjury under the laws of the State of Washington that the

21  foregoing is true and correct.

22       Dated this _____ day of _____, 20___ , at _____,

23  Washington.

24

25

26  DECLARATION OF DEPARTMENT SOCIAL        14        ATTORNEY GENERAL OF WASHINGTON
    WORKER                                              800 Fifth Avenue, Suite 2000
    Rev. 03/01 pp                                        Seattle, WA 98104-3188
                                                            (206) 464-7744

# EXHIBIT 5

1                                     Commissioner/Judge

2                                         Hearing Date

3                                         Hearing Time

4

5

6

7

8         SUPERIOR COURT OF WASHINGTON FOR KING COUNTY
                         JUVENILE DEPARTMENT

9  IN RE DEPENDENCY OF:        NO. 19-7-01267-4 KNT
                                19-7-01268-2 KNT

10  MEDICRAFT, ▮▮▮▮▮▮        19-7-01266-6 KNT
                                19-7-01270-4 KNT

11  MEDICRAFT, ▮▮▮▮          19-7-01271-2 KNT

12  MEDICRAFT, ▮▮▮▮

13  MEDICRAFT, ▮▮▮▮         DECLARATION OF DEPARTMENT
                                SOCIAL WORKER

14  MEDICRAFT, ▮▮▮▮▮

15            Minor Child(ren).

16     I, Tanessa Sanchez, hereby declare as follows:

17     I am employed by the Department of Children, Youth and Families as a social

18  worker and make this declaration as such. I am over the age of eighteen and competent to

19  testify herein.

20     In February of 2019, I first met Shaylee Medicraft and her five children. Over the

21  course of several months, I had multiple interactions with mother and children in attempts to

22  monitor and promote child safety. These actions were completed by multiple face-to-face

23  interactions along with verification of information and referrals for resources.

24     The family was originally brought to the attention of the department due to concerns

25  of interactions with father, James Medicraft Sr. This was reported by New York social

26  DECLARATION OF DEPARTMENT SOCIAL     1     ATTORNEY GENERAL OF WASHINGTON
  WORKER                                 800 Fifth Avenue, Suite 2000
  Rev 10/04 pp                               Seattle, WA 98104-3188
                                      (206) 464-7744

1  worker along with the attorney of the children to be an ongoing concern since the family's

2  time in New York. New York advised of extreme concern as to the safety of the children as

3  a ping of both parents' phones had placed them together. Per documentation provided by

4  New York there was a no contact order in place and already one violation of said order.

5      From February thru September, I completed four separate investigations into concerns for

6  the safety and well-being of the children as reported by a variety of referrers. During the

7  initial investigation mother was dishonest with me about her ongoing involvement with

8  James Medicraft Sr. that caused concern for the safety of the children, as there was no

9  recognition as to the children being at risk of any harm.

10      The initial investigation came in with the address for paternal uncle's home located

11  in Seattle. Social workers went to the home and only Mr. Medicraft came to the door. He

12  denied knowledge of mother's whereabouts and was provided contact information to get in

13  touch with a social worker for the open case. Within a few hours mother called the

14  provided number to discuss the open case. At that initial phone conversation, Shaylee

15  denied having current contact with Mr. Medicraft but admitted to having contact with father

16  while driving across from New York.

17      Shaylee initially mentioned having family in the area as her reasoning for coming to

18  Seattle and reported that they had decided to move back to Seattle because of having family

19  support. Shaylee later told me that she was not intending to come to Washington State but

20  rather go to California with her relatives down there. Social worker was able to speak with

21  Shaylee's mother who confirmed she lives in California with other relatives and that

22  Shaylee would not cut off Mr. Medicraft from the kids if he were helping Shaylee with

23  providing for them.

24      Social worker was able to gather evidence again through contact on March 11, 2019

25  to support that mother was intentionally violating the no contact order between herself and

26  DECLARATION OF DEPARTMENT SOCIAL    2      ATTORNEY GENERAL OF WASHINGTON
WORKER                      800 Fifth Avenue, Suite 2000
Rev. 03/01 pp                        Seattle, WA 98104-3188
                                 (206) 464-7744

1 Mr. Medicraft. Shaylee continued to deny contact with father and would advise that the
2 children were being confused and lying regarding contact with father. Shaylee was open
3 with social worker regarding knowing Mr. Medicrafts whereabouts but was not cooperative
4 in verification of the address.

5       I attempted to work with Shaylee in identifying a support system outside of Mr.
6 Medicraft in the area due to her mention of having family in the area. Shaylee had advised
7 having an uncle in Seattle, which I later found out, was Mr. Medicrafts uncle. She also
8 identified herself as having family in Kent and Spokane however refused to provide any
9 contact information for the alleged family to verify or promote that support. Social worker
10 was only able to verify family ties in California. Social worker spoke to an Uncle along
11 with her mother on the phone. Social worker also met an aunt who lives in California to
12 Shaylee at the court hearing for the children. Shaylee mentioned to social worker wanting
13 to take the children to California to be with family members and asked social worker
14 multiple times when she would be able to leave.

15       I additionally found out during this timeframe from Mr. Medicraft that the family
16 had lived in a variety of places such as North Dakota, Missouri, Washington, California and
17 New York. I believe that Mrs. Medicraft has been able to create a number of contacts in
18 this variety of locations. Due to this in addition to the previous circumstances in which she
19 left New York, I feel concern that her and Mr. Medicraft may flee with the children.

20       During my interactions with the family, I witnessed a number of concerning
21 elements as to the children's daily appearance. I consistently observed the children to have
22 a variety of bruises on them as I noted during my visits with them. The environment was
23 constantly chaotic, to the point that it was a struggle to have conversations. Shaylee advised
24 social worker that the bruises on the children were from them playing roughly with each
25 other rather than discipline or neglect to supervise. Shaylee additionally admitted to pulling

26 DECLARATION OF DEPARTMENT SOCIAL     3     ATTORNEY GENERAL OF WASHINGTON
WORKER     800 Fifth Avenue, Suite 2000
Rev. 03/04 pp     Seattle, WA 98104-3188
(206) 464-7744

1 the children's hair as discipline after receiving services citing it as not being illegal. These

2 observations indicate additional concern for Shaylee's ability to protect the children from

3 each other and support their individual additional behaviors and needs. These behaviors

4 have continued to be a concern despite Shaylee having been thru multiple services with

5 providers during the course of the department's involvement.

6   Shaylee was more resistive and combative in regards to working with me as time

7 went on. Shaylee advised me during the additional investigations that she does not have to

8 allow social workers into her home. I am concerned that her increased resistance to

9 department intervention has increased the children's behaviors and ability to build rapport

10 along with increased the risk of harm as she distances herself from those attempting to

11 support her.

12   Lastly, on the evening of November 2nd, 2019 I was at the Walmart supercenter

13 located at 34520 16th Ave south in Federal Way, Washington.

14   While shopping with my son, I was walking down the aisle near the toys and

15 electronics when I saw Shaylee Medicraft along with &#9608;&#9608;&#9608; Medicraft, &#9608;&#9608;&#9608; Medicraft

16 and &#9608;&#9608;&#9608; Medicraft. I also noted that there was an older gentleman who was taller than

17 Shaylee with grey and white hair. He was of a slender/athletic build. I did not notice if

18 Nickolas or Melody was with them as they were walking towards me in the store. I made

19 eye contact with Shaylee but did not have a verbal interaction with her. The children were

20 observed to be walking calmly and acting appropriately in the store. Unlike my previous

21 interactions with them, the children seemed to be having proper behaviors.

22   Due to having my personal child with me and feeling uncomfortable, I turned

23 toward the candle aisle to avoid an immediate interaction with them. Upon realizing that I

24 was unsure of who the elder gentleman was I looked back over my shoulder and noted that

25 they had immediately moved away from the area. Based on my previous interactions with

26 DECLARATION OF DEPARTMENT SOCIAL   4   ATTORNEY GENERAL OF WASHINGTON
  WORKER                  800 Fifth Avenue, Suite 2000
  Rev. 03/01 pp                 Seattle, WA 98104-3188
                        (206) 464-7744

1    the family, I felt that the immediate removal from the area where they had been previously

2    browsing in a leisurely manner it seemed odd to me.

3         On 12/04/2019 at approximately 4:20pm, I was able to verify through a visual

4    observation room during a visit that the gentleman who I observed while at Walmart was

5    indeed Mr. Medicraft, father to the children.

6         My multiple interactions with the family over the course of time has me deeply

7    concerned for the mental health, safety and well being of the Medicraft children.  There has

8    been an observable decline in their behaviors and Shaylee has been unable to demonstrate

9    the ability to manage them.  In addition, Shaylee has continuously and without regard for the

10    law or the repercussions of the actions continued to interact with Mr. Medicraft outside of

11    department supervision despite having a no contact order with him.  This shows a serious

12    disregard for the safety of herself and her children.

13         I declare under penalty of perjury under the laws of the State of Washington that the

14    foregoing is true and correct.

15         Dated this ___ day of __DECEMBER__ , 20 _19_ . at __KENT__ ,

16    Washington.

17

18

19                      TANESSA SANCHEZ
                             Department Social Worker

20

21

22

23

24

25

26    DECLARATION OF DEPARTMENT SOCIAL      5         ATTORNEY GENERAL OF WASHINGTON
   WORKER                                 800 Fifth Avenue, Suite 2000
   Rev. 03/01 pp                                 Seattle, WA  98104-3188
                                            (206) 464-7744

# EXHIBIT 6

1

2

3  **FILED**
KING COUNTY, WASHINGTON

DEC 09 2019

SUPERIOR COURT CLERK
BY Ramona Harkins
DEPUTY

4

5

6

7  ## SUPERIOR COURT OF WASHINGTON FOR KING COUNTY
JUVENILE DEPARTMENT

8  IN RE DEPENDENCY OF:

9  MEDICRAFT,

10  MEDICRAFT,

11  MEDICRAFT,

12  MEDICRAFT,

13  MEDICRAFT,

14  Minor Child(ren).

| | |
|---|---|
| NO. | |
| 19-7-01267-4 KNT | |
| 19-7-01268-2 KNT | |
| 19-7-01266-6 KNT | |
| 19-7-01270-4 KNT | |
| 19-7-01271-2 KNT | |

ORDER PLACING CHILDREN IN
SHELTER CARE

**[Clerk's Action Required]**

15

16  ## I.  HEARING

17  1.1  A hearing on the motion to place the children in shelter care was heard in court on

18  December 9, 2019.

19  1.2  Present at the hearing were:

20  ☐ The child

21  ☒ The mother
☒ The father

22  ☒ Agency social worker  L. Sterbick
☒ Dependency GAL V. Whalen

23  ☐ DCYF Court Liaison worker
☐ Dependency Guardian

☐ The child's attorney
☒ The mother's attorney  H. Gold
☒ The father's attorney J. Olimpie, T DA
☒ Department's attorney  D. Leuzzi
☒ CASA attorney  K. Martin

24

25

26  ORDER PLACING CHILDREN IN SHELTER
CARE
Rev. 03/05 pp

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

ORIGINAL

1    1.3    The court has considered the motion, supporting documents and declarations
2        submitted by parties and any response to the motion, and having heard argument of
       counsel, the court makes the following:
3

4                 **II.    FINDINGS**

5 The COURT FINDS THAT:

6    2.1    The motion to place the children in shelter care has been properly brought and that
7        proper notice pursuant to LJuCR 3.13(a) has been provided to the parties.

8    2.2    It is currently contrary to the welfare of the child to remain in the child's home because
       ☐    The child has no parent, guardian, or legal custodian to provide supervision or
9        care for such child;
       ☒    The release of the children would present a serious threat of substantial harm
10        to the children;
       ☐    The parent, guardian or custodian to whom the child could be released is
11        alleged to have violated RCW 9A.40.060 of 9A.40.070.

12    2.3    The motion and/or supporting declarations and affidavits establish reasonable grounds
13        to believe that the child is dependent and that the children's health, safety, and welfare
       will be seriously endangered if not removed from Ms. Medicraft's care.
14

15    2.4    Reasonable efforts were made by the department to prevent or eliminate the need for
       removal of the children from his home. For the reasons set forth in the supporting
16        declarations and/or testimony presented to the court:

17        ☒    The risk of imminent harm to the children as assessed by petitioner establishes
       reasonable cause for the out-of-home placement.
18        ☐    Specific services offered and provided to the parent (s) have been unable to
       remedy the unsafe conditions in the home and make it possible for the child to remain
19        or return home.
       ☐    Returning or remaining in the child's home would seriously endanger the
20        child's health, safety and welfare.
21

22    2.5    The Department will make an effort to place the children with a relative known to the
23        children and with whom the children have a relationship. If the children are not placed
       with relatives, the Department will continue to make reasonable efforts to locate and
       investigate an appropriate relative who is available and willing to care for the children.
24

25    2.6    The Court has concerns about all the information from the school, serious allegations
       of domestic violence, and the father's violation of the Protection Order, *and the*

26 ORDER PLACING CHILDREN IN SHELTER       *2 risk*     ATTORNEY GENERAL OF WASHINGTON
    CARE                                *of risk*     800 Fifth Avenue, Suite 2000
    Rev. 03 01 pp                                          Seattle, WA 98104-3188
                                                 (206) 464-7744

2.7 The photographs from the Department show bruises and scratches on the children, some of which may be consistent with an older child against a younger child, but the bruises are very concerning. The information shows the parents have moved to seven states.

Based on the totality of circumstances,

2.8 It is in the children's best interests to be removed from the parent's care at this time.

## III. ORDER

3.1 IT IS HEREBY ORDERED that the Shelter Care Order entered April 30, 2019, placing the children in the mother's care (Sec. 3.1), is modified according to LJuCR 2.5(b).

3.2 The petitioner's motion to remove the children and place in shelter care is granted and the above-named children shall be taken into custody by the DCYF social worker and/or law enforcement, and placed in a facility licensed pursuant to RCW 74.15.030 or in a home not required to be licensed pursuant to that section. The placement shall be under the supervision of DCYF.

3.2 That the supervising agency and/or the parents shall have the power to authorize and provide routine medical and dental examination and care and all necessary emergency care.

3.3 The mother shall have visitation with the children a minimum of three times per week for two hours, supervised by DCYF or approved designee. Mother, GAL and DCYF will discuss the options for additional visitations opportunities.

3.4 The father's visits shall remain according to prior order.

3.5 All prior orders shall remain in full force and effect, except as modified herein.

DATED: DEC 0 9 2019

JUDGE/COMMISSIONER
Mafe Rajul

PRESENTED BY:

Derek Leuzzi, WSBA #45508
Assistant Attorney General

ORDER PLACING CHILDREN IN SHELTER CARE
Rev. 05/01 gp

3

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    APPROVED FOR ENTRY:

2

3    _Hannah Gold_
   Hannah Gold, WSBA # 45516

4    Attorney for Mother

5

6    _Justine Olimene_
   Justine Olimene, WSBA # 99632

7    Attorney for Father

8

9    _Kathleen C Martin_
   Kathleen C. Martin, WSBA # 25636

10    Child's Dependency GAL Attorney

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    ORDER PLACING CHILDREN IN SHELTER CARE      4
   Rev. 03/01 pp

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# EXHIBIT 7

SUPERIOR COURT OF WASHINGTON

FOR KING COUNTY, JUVENILE DEPARTMENT

IN RE THE DEPENDENCY OF:          )    No. 19-7-01271-2 KNT
                                  )    No. 19-7-01267-4 KNT
Medicraft, ▓▓▓▓▓                   )    No. 19-7-01266-6 KNT
DOB: ▓▓▓▓-12                       )    No. 19-7-01268-2 KNT
                                  )    No. 19-7-01270-4 KNT
Medicraft, ▓▓▓▓                    )
DOB: ▓▓▓▓-2010                     )
                                  )
Medicraft, ▓▓▓▓▓                   )
DOB: ▓▓▓▓-2013                     )
                                  )
Medicraft, ▓▓▓▓▓▓                  )
DOB: ▓▓▓▓-2018                     )
                                  )
Medicraft, ▓▓▓▓▓                   )
DOB: ▓▓▓▓-14                       )
                                  )
Minor Children                    )
_____)

## DEPOSITION UPON ORAL EXAMINATION OF LIZA STERBICK

1:00 p.m.
Wednesday, February 12, 2020
124 Fourth Avenue South, Suite 100
Kent, Washington

Laurie B. Porter, CCR
Northwest Court Reporters
1415 Second Avenue, Suite 1107
Seattle, Washington  98101
(206)623-6136

www.northwestcourtreporters.com

2

1                        APPEARANCES

2

3   Representing Ms. Medicraft:
                        HANNAH GOLD
                        KATHLEEN McCLELLAN
4                       Northwest Defenders Division/KCDPD
                        124 Fourth Avenue South, Suite 100
5                       Kent, Washington  98032

6   Representing Mr. Medicraft:

7                       HELEN REDMAN
                        King County Department of Public Defense
8                       710 Second Avenue, Suite 700
                        Seattle, Washington  98104
9
                        JUSTINE OLIMENE
10                      Attorney at Law
                        420 W. Harrison Street
11                      Kent, WA 98032

12  Representing the Witness:
                        DEREK LEUZZI
13                      Attorney General's Office
                        800 Fifth Avenue, Suite 2000
14                      Seattle, Washington  98104

15

16  Also in attendance:   STEPHANIE BROWN and NICOLE JOHNSON

17

18

19

20

21

22

23

24

25

3

EXAMINATION INDEX


By Ms. Gold ............................. 4, 42, 53, 77

By Ms. McClellan ......................... 39, 52, 74, 108

By Ms. Redman ............................ 112


EXHIBIT INDEX

No.    Description                              Marked

1      Declaration, 15 pages                      72

4

1               (Deposition commenced at 1:04 p.m.)

2       LIZA STERBICK,            having been first sworn
                                  under oath by a Washington
3                                 State Certified Court Reporter,
                                  testified as follows:

4

5                       EXAMINATION

6       BY MS. GOLD:

7    Q.  I think you know me, but I'm Hannah Gold.  I am the mother

8        Shaylee Medicraft's attorney, with co-counsel Katie

9        McClellan.  I'm going to be asking most of the questions and

10       taking the deposition today.

11              Do you know everybody else in the room?

12   A.  I recognize Derek, of course.  I don't ...

13              MS. McCLELLAN:  This is Stephanie Brown.  She

14       works in our office.  And then this is Helen Redman.  And

15       she is --

16              THE WITNESS:  Oh, okay.

17              MS. McCLELLAN:  -- one of the attorneys for the

18       father.

19              THE WITNESS:  Okay.

20   Q.  Have you ever been deposed before?

21   A.  Uh-huh.

22   Q.  So I'm going to go over some ground rules.  You may know

23       them already.  I'm going to run through them again.  I'll be

24       asking you questions.  And all of the questions and answers

25       will be recorded by the court reporter.  And then you need

1  to speak loud and say your answers clearly so the court
2  reporter can hear you.  She may ask us to repeat things.
3  And it's important that you wait until I finish my
4  question before you answer it, even if you know what my
5  question is, just so we're not talking over each other for
6  the record.
7  Does that make sense?  Are you able to do those
8  things?
9  A.  Absolutely.
10 Q.  Okay.  And you took an oath to tell the truth.  Do you
11 understand that?
12 A.  Yeah.
13 Q.  Okay.  And it's the same oath like if you were testifying in
14 court.  So it's the same seriousness.
15 A.  I understand.
16 Q.  Okay.  If I ask you a question that doesn't make sense or I
17 don't state it very well, or if you don't understand it at
18 all, don't answer it and ask for clarification.  I would be
19 happy to ask it again.
20 A.  Sure.
21 Q.  And if you need a break, let us know.  It sounds like maybe
22 in two hours Mr. Leuzzi needs a break to move his car.  But
23 let us know if you need another break, and we'll try to
24 arrange that.  We may ask a few questions before the break
25 occurs, but we'll try to arrange that if you are --

6

1   A.   Okay.

2   Q.   There's water here. Help yourself. If you need snacks, let

3        us know. We have some food in the office.

4   A.   I brought my own tea.

5   Q.   Okay. And if you do at any point want to talk to your

6        attorney, that's fine. But I'll just ask that you answer

7        the question -- if there's a question that's outstanding,

8        that you answer that question and finish that answer, and

9        then you can talk to your attorney.

10  A.   Okay.

11  Q.   So if you answer any questions -- this is going to be a long

12       afternoon. If you answer any questions and then a few

13       minutes later or even hours later you realize that there's

14       information that you need to change or that was inaccurate

15       to your answer or you need to clarify, then definitely let

16       us know --

17  A.   Okay.

18  Q.   -- so that you can add something to that earlier answer.

19       And we can do it while it's fresh in your mind. So go ahead

20       and let us know if that pops into your head.

21  A.   Okay.

22  Q.   And sometimes you may give an answer to a question and then

23       realize later it wasn't accurate. Please let me know so you

24       can make those corrections. Does that make sense?

25  A.   Uh-huh.

1  Q.  Okay.  This is a personal question, but because we need to
2      make sure we're getting full, complete information, I need
3      to ask you if you're taking any medications or drugs of any
4      kind today that could affect your ability to do your
5      deposition.
6  A.  No.
7  Q.  Okay.  Are you at all sick?
8  A.  I have a little bit of a cold, but other than that ...
9  Q.  It won't interfere with your ability to answer questions?
10 A.  No.
11 Q.  Is there any other reason you might not be able to give
12     full, complete, and accurate testimony today?
13 A.  No.
14 Q.  Okay.  So we will get started.  Just for clarification in
15     our notes, do you go by any nicknames?
16 A.  My formal legal name is Elizabeth M. Sterbick, and people
17     call me Liza.
18 Q.  And what is your educational background?
19 A.  I have a bachelor's in legal studies and social work.  I
20     have an MSW in social work.
21 Q.  What schools did you go to?
22 A.  Undergrad was Pacific Lutheran University, and my master's
23     was at EWU, Eastern Washington University.
24 Q.  What year did you get your master's?
25 A.  2008.

8

1   Q.  What about your undergraduate degree?

2   A.  1999.

3   Q.  Can you give us your career history?

4   A.  Sure.  From the very beginning?

5   Q.  I'd say since -- yes, since undergrad.

6   A.  Okay.  I had started college early, in my 20s, quit, moved

7       to Alaska.  I lived there for five years, came back, went

8       back to undergrad.

9          And while I was doing -- working undergrad, I worked

10      at Tacoma General Hospital, which is now MultiCare, in

11      prenatal education.  I taught prenatal education classes.

12         I also did internships at Pierce County Juvenile with

13      the ... the acronym is escaping me.  It's for first-time --

14      SSODA offenders, first time SSODA offenders, juvenile sex

15      offenders.  I monitored and tracked juvenile sex offenders.

16         I also did a quick internship with the Department of

17      Assigned Counsel, because they just kept adding them on for

18      my education -- with the Department of Assigned Counsel

19      working with clients who were in the dependency process.

20         Then I graduated, needed full-time work, went to

21      Catholic Community Services.  Please don't quote me on the

22      year.  I worked as a contractor provider for the Department.

23      We did -- it was called the PICS program.  But these were

24      cases where the kids were not in the formalized PICS

25      in-house situation here in Kent.  They were cases where the

1    Department had determined the kids could stay with the
2    parents in home.
3         And we had a very small caseload where we did a lot of
4    intense in-home services to monitor the family, provide
5    services, and, you know, provide feedback to the Department.
6    We would have weekly consultations on Fridays about the
7    cases that we were working with the Department.
8         And that is when I was introduced to the Department.
9    It wasn't something that I was thinking about doing.  My
10   goal back then was to go to law school and be an advocate
11   for families.  I was a single parent and wanted to help
12   families.  That just didn't work out for me.  But it was
13   kind of part of the culture of my family.  I have a family
14   of attorneys.  But that just didn't work out.
15        I was kind of wooed to come to the Department.  And
16   that's where I started in 1995 -- 25 years is tomorrow -- in
17   CFWS.
18        Back then they had lots of temporary stints.  They
19   don't do that as much as they used to in the previous
20   agency.  But I did work with primarily CFWS.  I did
21   adolescent unit, FRS, family reconciliation services.
22        I don't like the rain.  And I grew up in the Pacific
23   Northwest, but I wanted -- we vacationed quite often in
24   Eastern Washington, and I liked it.  So I transferred to
25   Wenatchee, Washington.  And there I was a CFWS supervisor

1     until I left -- I didn't leave State service, but I went to

2     the alliance.

3          Are you familiar with the Alliance?  Do you want me to

4     explain that?

5  Q.  It would be helpful.

6  A.  So the Alliance is a partnership with the Department and

7     with University of Washington to provide oversight and the

8     training for all incoming staff and current staff.  And

9     before the Department had done their own training it was

10    called The Academy.

11         So I did that for -- and I was in region one, so I

12    traveled all over region one providing RCT training, lots of

13    different trainings.  I did that for -- up until 2018 when I

14    came back to the Department.

15         I came back to the Department, and I was the

16    permanency planning program manager for the state of

17    Washington.  Permanency planning was my forte, my expertise.

18    I was well-known for that.  And I did a lot of projects

19    within the Department, peer review, CRT, which is central

20    review, permanency planning summits.  You name it, I did it.

21         And it was after the transition of the old department

22    to the new department.  And it really wasn't what I had

23    expected it to be.  It was far more political than I had

24    anticipated.  I didn't feel like, to be perfectly honest,

25    the headquarters had a realistic sense of what fieldwork was

1      about and what we were up against in terms of what we

2      needed.  But I was willing to stick it out.

3           But my husband had a stroke in February 2019, and I

4      needed to be closer to home and not driving to Olympia.  So

5      I asked to go back to supervision and -- because it just

6      wasn't working out for me there.  That's why I ended up in

7      the Kent office.  My start date was May 15th.  I've been the

8      supervisor there ever since.

9  Q.  Okay.  Great.  Thank you.  And just to clarify, you were

10     talking about PICS earlier.  Can you define what PICS is?

11 A.  Pediatric interim care.  There's two pieces to that:

12     There's the in-home, and then there's the facility here

13     in -- I believe it's in Kent.

14 Q.  Just down the street.  And you were a CFWS supervisor in --

15 A.  -- in Wenatchee.

16 Q.  How long were you doing that for?

17 A.  Ten years.

18 Q.  Can you give me those years, by any chance?

19 A.  Sorry, I don't have my resume in front of me.  2003 or 4,

20     until I left, 2013.

21 Q.  So when you came to the Kent office, which side of the

22     office?

23 A.  The south -- or King Southwest.

24 Q.  Okay.  And how many people did you supervise there?

25 A.  At the time when I first started?  Six staff.

12

1   Q.  And who was your supervisor there?

2   A.  Cleveland (phonetic).

3   Q.  What was your role as supervisor in King Southwest?

4   A.  That's a huge question.  Supervising the CFWS unit, program

5       unit, supporting staff, mentoring staff, coaching staff,

6       giving them guidance, staffing cases, answering questions,

7       providing access and opportunities to trainings, if it be

8       the case, promotional opportunities, leadership training to

9       help staff be the most successful that they can, and making

10      sure things got done as required through practice and

11      policy.

12  Q.  How often were you staffing cases?

13  A.  With staff?  We were required to do one-on-one staffings

14      every month.

15  Q.  For every case?

16  A.  For every case.

17  Q.  And are you still a CFWS supervisor?

18  A.  Yes.

19  Q.  What is your role at this point?

20  A.  I'm on alternative assignment.

21  Q.  What does that mean?

22  A.  That means that there is an administrative investigation

23      taking place.

24  Q.  What is your role during this time?

25  A.  You mean what am I doing?  I am working with adoption cases

1         and redaction for disclosure for adoptive parents, legally

2         free children.

3    Q.   And what office do you work out of?

4    A.   Bellevue.

5    Q.   With, I guess, DCYF and DSHS, since that was the previous

6         agency name --

7    A.   DCYF is not under DSHS.

8    Q.   Correct.

9    A.   I'm sorry.

10   Q.   So you initially worked under DSHS?

11   A.   Children's administration under DSHS.

12   Q.   And then it moved to DCYF.

13   A.   Yes.  Yes.

14   Q.   So in your time doing this work have you had any trainings

15        on child development?

16   A.   Oh, I've had thousands of hours of training.  Yes, child

17        development was under that purview, yes.

18   Q.   Is that partially through your State work and also through

19        your educational and background, or your background -- I'm

20        sorry -- your degrees in social work?

21   A.   Yes.

22   Q.   And how about trainings on child trauma?  Have you

23        experienced those?

24   A.   Well, early on in my career those trainings weren't

25        available.  We've learned so much just in the last decade

14

1       about childhood trauma and adult client trauma and how that

2       impacts our work.  So those have been -- it's been fairly

3       new.

4  Q.  Okay.

5  A.  Yes.

6  Q.  In the last decade have you had those trainings, though?

7  A.  It's been incorporated into quite a bit of trainings.

8  Q.  So you've both had those trainings and taught those

9       trainings as well?

10 A.  Yes.  So through the -- in our investigative stage and our

11      gathering-of-information stage we have what we call the

12      gathering questions, which, one of the sole intents is to

13      understand where the client came from to understand where

14      they're at right now.  Particularly where, perhaps, in the

15      past they've managed well before they came to our attention,

16      to get them back to that.  Part of it is truly understanding

17      where they -- what they've been through.

18          Whereas, unfortunately, our department and our

19      practice didn't do that enough.  Now we realize, through

20      lots of research, evidence-based research data, that it's a

21      very huge issue in our work.

22 Q.  These gathering questions, are they formal questions?

23 A.  Yes.

24 Q.  And so there's like pieces of paper that you fill out?

25 A.  In every program we do what we call assessments.  Right?

1   And so for CPS, the investigative assessment is where they

2   hold the gathering questions.  For CFWS, it's the

3   comprehensive family evaluation, which translates and

4   populates into our court reports.  And all the other

5   programs as well.

6  Q.  And what about trainings on domestic violence?  Have you

7      attended trainings on domestic violence in --

8  A.  Specifically --

9  Q.  -- your work?

10 A.  -- domestic violence trainings?  No.

11 Q.  Are there domestic violence trainings incorporated into

12     other trainings --

13 A.  Absolutely.

14 Q.  -- you've attended?

15 A.  Yes.

16             THE COURT REPORTER:  Excuse me.

17                 (Discussion off the record.)

18 Q.  But you never attended any specific trainings on domestic

19     violence?

20 A.  No.  I wanted to.

21 Q.  And how come you didn't?

22 A.  Time constraints, demands of other work.

23 Q.  Okay.  Did you attend or have you had any trainings on the

24     social worker's guide to domestic violence?

25 A.  Yes.

Liza Sterbick - February 12, 2020

16

1  Q.  What training is that?

2  A.  Well, I provided training around the guide, our domestic

3      violence assessment, what to look for, what questions to

4      ask, what kind of information to gather to assess, you know,

5      the severity or nonseverity of the situation at any time

6      domestic violence is part of the case.

7  Q.  So you're familiar with --

8  A.  Yes.

9  Q.  -- the guide itself?

10      And you've read the guide?

11  A.  Yes.

12  Q.  And you said you trained training over people on it, right?

13  A.  In the domestic violence section for RCT, which is regional

14      core training, there's a section on domestic violence. And

15      yes, I did.

16  Q.  Okay. As part of that RCT, were you training workers on how

17      to identify domestic violence cases?

18  A.  What to look for and how to identify, yes.

19  Q.  What else was included in that training that you were

20      giving?

21  A.  In RCT or domestic violence?

22  Q.  Regarding domestic violence in the RCT training, what

23      else --

24  A.  How to complete the domestic violence assessment. For

25      example, how to determine the seriousness, access to the

1    alleged perpetrator, how to support the nonoffender,

2    services to provide.  Yeah.

3  Q.  Okay.  And I'm going to go back a couple of questions.  You

4    mentioned wanting to go to other domestic violence training

5    but not being able to.  What --

6  A.  Well, in -- when I was with the Alliance -- since 2013 the

7    evolution of domestic violence training has been quite

8    significant.  There were experts.  Like I said, I was an

9    expert in permanency planning.  There were other experts in

10    the Alliance that identified certain people in the regions

11    to get that specific training and provide the training.

12        And I was never able to -- it was either somebody else

13    was going or somebody else was taking care of that for the

14    unit, our particular unit in the region.  And it was

15    something that I was wanting to do, but I just wasn't able

16    to at the time before I left.

17  Q.  Okay.  So it was that specific training that you were --

18  A.  Yes.  It's two-day very intense training.  Lisa Ball wrote

19    the curriculum.  She's our go-to person for staffing cases

20    in the state.  And it's just something I never got to -- I

21    was -- my expertise and directional was more towards

22    permanency planning, current planning.

23  Q.  When you say that Lisa Ball was the go-to for staffing cases

24    in the state, what does that mean?

25  A.  Well, she specifically provides, across regions,

1  opportunities for staff to staff cases that domestic

2  violence is involved.  To get feedback, we do a lot of

3  consensus building and share decision-making in our

4  practice.

5     It's always helpful to get outside eyes and ears or

6  suggestions around something you may not be seeing.  It's

7  always an opportunity -- it's also an opportunity to check

8  bias and just to have -- I don't want to say oversight, but

9  it's -- like I said, we do a lot of consensus building.  So

10  decisions and case planning isn't made in isolation.  It's

11  collaborative and shared.

12  Q.  Okay.  Generally, when you have a case that you've

13     identified as a domestic violence case, do you approach that

14     case differently than you would a case that doesn't involve

15     domestic violence?

16  A.  I don't know what you mean.

17  Q.  So if you have identified domestic violence with a family

18     that you're working with, do you work with that family

19     differently because of that domestic violence at all?

20  A.  No.  Cases, when they get transferred over to CFWS, you

21     know, that investigation, that information-gathering has

22     already taken place.  They have already identified what the

23     issues are, the concerns are, and proposed recommended

24     services that we're going to be having for families.

25     If domestic violence is one of them, one of my

1     obligations and requirements is to make sure that we're
2     offering services around that for the family, both to the
3     nonoffender and the alleged perpetrator.  Yeah, that's how I
4     would approach it.
5  Q.  Let's talk about the Medicraft family.
6  A.  Okay.
7  Q.  What was your role with this family?
8  A.  I supervised the Medicraft case.  And I thought to myself
9     you were going to ask me for what date, and I don't
10    remember.  It's either June or July.  I started May 15th.
11    It was assigned and transferred over to Megan Meyer, and I
12    don't recall the exact date.
13 Q.  Were you supervising it from the moment it moved to CFWS?
14 A.  Yes.
15 Q.  So it went immediately into your unit from CPS?
16 A.  Well, when cases transfer over from CPS to CFWS, we have a
17    transfer staffing, and we identify particular tasks that the
18    sending social worker and supervisor are going to be
19    required to take over and what we, as a CFWS supervisor and
20    social worker, take over.
21         Their job and their role at that point, CPS, is to
22    complete their investigation.  They may have requested
23    information from different providers or different states or
24    wherever it is that they need to get information from, but
25    that doesn't stop us from transferring the case.  We want

1    them to complete their investigation, gather information.

2          We pick up on the engagement and providing services to

3    the family.

4  Q.  Okay.  So based on the engagement and providing services is

5    sort of your starting point, what was your level of

6    involvement in that work?

7  A.  When we got that case, what had happened is that the

8    children had been removed and were returned at shelter care

9    quite quickly after they were removed.  The case came over,

10   a situation where Mom was needing stable housing.  And we

11   needed to provide her with supportive services, not only to

12   her but to the kids, and manage the case, do health and

13   safeties, that kind of thing.

14  Q.  And how much of that you were involved in as a supervisor?

15  A.  Well, all of -- you know, Megan staffed this case monthly.

16   At least monthly, probably more.

17  Q.  Okay.

18  A.  Any time something comes up, there's a question or there's a

19   need, for example, a financial request that needs to be

20   approved by upper management or a need for a specific

21   service that needs supervisor approval, or if they just have

22   questions about service delivery, they will come to me as

23   the supervisor.  And that's what I managed with the

24   Medicraft case.

25         The primary issue with the Medicraft case in terms of

1         service delivery is stable housing, through the period of

2         time that -- when they came over to the time that the kids

3         were removed.  That was one of the primary issues.

4  Q.  What did you do to assist with that issue?

5  A.  Well, we -- she had -- the family had gone from a couple

6         different types of placements where they resided, from a

7         hotel to safe houses, a couple of different ones, back to a

8         hotel.  We assisted with paying for that.  Was that your

9         question?

10 Q.  How did you assist the family in dealing with this housing

11         instability that you identified as the major issue?

12 A.  Well, we also -- she got a voucher.  And that was our

13         primary goal, was to see what would come up with that

14         without completely disrupting the kids' continuity.

15         She didn't want to live far away from the kids'

16         school.  We all did.  We wanted the kids to remain in the

17         same school area, or at least a realistic opportunity for

18         them to attend the same school.  The school was completely

19         wrapped around the family and helping the family and the

20         children.

21         So it was difficult and challenging.

22         The very most -- the most recent situation was that

23         the particular housing that she was in was closing down.

24         They were going to be tearing down the building.  And we

25         needed to get her housing right away.

1    Q.   When you say "most recent"?
2    A.   The one before the hotel.
3    Q.   Okay.
4    A.   The one before the hotel that they were residing when they
5         were removed.  So they were in the hotel.
6    Q.   Right.
7    A.   I can't remember the name.  Kings Arms or something like
8         that.  But the -- Shaylee came to us and talked to us about,
9         "I'm going to be kicked out.  I'm going to be needing help
10        with housing.  I'm going to be" -- it was like in November
11        -- "I'm going to need help with finances."
12             And so we developed -- wrote up the funding request
13        for that, even though while we were still waiting for the --
14        identifying a home where they could go to with the voucher.
15        So that was what we processed.
16             And it actually got approved.  It got approved for --
17        she wanted to go back to the Motel 6 where she had been at
18        previously, but they would not take her.
19   Q.   Okay.
20   A.   So she had to go to this other hotel.
21   Q.   Did you assist her in finding that hotel?
22   A.   No.  She found it, it's my understanding.
23   Q.   Okay.
24   A.   Megan might have, I mean, but I think she found it.
25   Q.   How involved were you personally in working on this housing

23

1      issue?

2  A.  Well, I supported it and approved it and moved it on to the

3      higher chain so it could be approved.  We didn't want her to

4      lose housing.

5  Q.  I guess, how personally were you involved with Ms. Medicraft

6      herself?

7  A.  Before the kids got removed?

8  Q.  Sure, let's start with before the kids got removed.

9  A.  I only had met Ms. Medicraft a couple of times.  She had

10     come into the office to meet with -- especially after Megan

11     left, she wanted to meet with the social worker.  Intakes

12     had come in.  Investigation was taking place.  And it was

13     out of a different -- it was out of East office.

14         Do you want me to go into that investigation?  There

15     were allegations of -- the kids had disclosed to school

16     members that they had been in contact with their father,

17     even though there was a no-contact order.  And they -- there

18     was an investigation taking place in the East office.

19 Q.  Okay.

20 A.  So when that happened, she came in to talk to the new social

21     worker, Leticia, and we met with her together.  She was

22     upset about the investigator, was wanting to file a

23     complaint about the investigator.  She was also upset about

24     the person that was transporting the kids to school.  So it

25     was around those kinds of concerns.

Liza Sterbick - February 12, 2020

24

1          That was the most one-on-one that I had with her up

2    until the time -- or up until after the time that the kids

3    were removed.

4    Q.  How often would you say you interacted with her after the

5        children were removed?

6    A.  She came in almost every day.  Yeah.  And we talked on the

7        phone almost every day and/or text.

8    Q.  So were you speaking to her either in person or by phone or

9        electronically --

10   A.  Yes.

11   Q.  -- at least once a day?

12   A.  I won't guarantee every single day, but almost every day.

13       Especially that first week.  She was, you know, having a

14       really tough time, and I wanted her to be able to talk to

15       her kids.  And where the kids were placed, they wanted me to

16       be involved with that.  We did three-way calls.  I was

17       trying to provide that to her, not only for her, but for the

18       kids.  Because the kids were, as you know, struggling.

19   Q.  Let's go back to before the kids were removed and they were

20       with Mom.  Can you sort of clarify your answer?  How many

21       times do you think you met with Ms. Medicraft?

22   A.  The time that -- for some reason, there had never been a

23       shared planning meeting on this case.  I think I had -- it

24       got lost with ... because of the continued shelter care --

25       or excuse me -- yeah, the continued shelter care, for some

1      reason it had never been scheduled, and I'm not sure why.

2          So when Megan left, which was November 1st, and

3      Leticia got the case -- it got assigned to Leticia, who is a

4      new social worker -- I had not met her prior to that.

5  Q.  You hadn't met Ms. Medicraft?

6  A.  No.

7  Q.  So it was sometime in November that you first met her?

8  A.  Yes.

9  Q.  Do you have a sense of early, late, mid November?

10 A.  I don't have the date.  It was whenever the investigation

11     was taking place.

12 Q.  The first time meeting her is what you explained a few

13     moments ago regarding the investigation, correct?

14 A.  Correct.

15 Q.  Okay.  And her concerns about that.

16 A.  That, and the kids' transporter.

17 Q.  When was the first time you met the children?

18 A.  The day that they were removed.  Oh, no.  I take that back.

19     When she had come in in November, she brought the three

20     older boys.  The two younger were in daycare.

21 Q.  So you met the three older boys that time, and then the next

22     time you met the children was the day of removal?

23 A.  Yes.

24 Q.  So beyond that day when she came in -- or, I guess,

25     before -- let me rephrase that.

26

1        Before the children were removed, were there other

2    times that you met with Ms. Medicraft?

3  A.  Other than what I've just told you, no.

4  Q.  And were you talking on the phone with her at all then

5    either?

6  A.  No.  She had no complaints.  Megan was managing this case

7    quite well.  She was -- usually at the time the case has

8    come to my attention, where I'm getting engaged with the

9    caregivers and the clients, is FTDM planning meetings.

10       Otherwise, if there's not a problem or they don't have

11    a problem about the case manager or a complaint, whatever, I

12    won't necessarily hear from clients, from parents.

13       So Megan was doing a really good job working with the

14    school, wrapping this family around services to address the

15    concerns and issues that were ahead.

16  Q.  When were the children removed?

17  A.  I believe it was December 6th.

18  Q.  We're just using that as a time frame, so I wanted to

19    clarify what we were talking about.  So December 6th.  At

20    that point you had met the mother once?

21  A.  Uh-huh.

22  Q.  And you met her on December 6th again?

23  A.  Uh-huh.  Well, I didn't meet her in person.  I talked to her

24    on the phone.  And then that was a Friday.  So the next time

25    I -- in-person, if that's what you're asking, Monday.

1   Q.  Did you talk to her on the phone over the weekend between --

2   A.  Yes.

3   Q.  And you had mentioned doing a three-way call with the

4       caregivers.  Is that correct?

5   A.  So she could talk to them.

6   Q.  So she could talk to the caregivers?

7   A.  No.  The kids.  The only -- the caregiver of Nickolas was

8       uncomfortable with -- I mean, this isn't a child that can

9       talk -- is not verbal -- who can talk with Mom.  So,

10      basically, she wanted just to talk to the caregiver, get a

11      sense of how he's doing.  And the caregiver was willing to

12      do that if I was on the phone.

13          The other caregivers of the other children were

14      willing to -- I mean, I talked to them over the phone over

15      the weekend, and I talked to Shaylee about that over the

16      phone over the weekend.  But they were willing to facilitate

17      that on their own.

18          So Shaylee had a lot of questions about him and wanted

19      to provide a lot of information to the caregiver about his

20      favorite foods, things he likes to do, his nap schedule.

21      The foster parent was asking appropriate questions about his

22      schedule and eating habits, "What do you want me to look

23      for?"  Things like that.

24          And it went well, for the most part.

25   Q.  The information she was providing the caregiver, was it

1    appropriate?

2  A.  Oh, absolutely.

3  Q.  Okay.

4  A.  She was very emotional.  That's what I'm talking about.  I

5    mean, it was hard for her, and I understand that.  And the

6    caregiver understood that as well.  It was hard for her.

7    She didn't want it to end.  Things like that.

8  Q.  After this weekend that you talked on the phone with the

9    caregiver, then you saw her on Monday; is that right?

10  A.  (Nods head.)

11  Q.  And correct me if I'm wrong.  Was that in court, or was

12    that --

13  A.  I saw her in court, but I think I saw her later that day.

14    We were arranging a visit.  Don't quote me on that.  I

15    believe, though, I did see her.  I'm not absolutely sure.

16           MR. LEUZZI:  Object to form for that.

17           THE WITNESS:  Okay.

18          MS. GOLD:  You're objecting to what?

19          MR. LEUZZI:  So, during depositions, you do

20    objection as to form, and the person -- and the witness

21    continues to answer questions unless I say objection to

22    privilege.

23         MS. McCLELLAN:  So I didn't hear you say "as to

24    form."

25     So he's just objecting as to form.

1      MS. GOLD:  I didn't hear that, "as to form."

2      MS. McCLELLAN:  She said that she didn't

3   understand.

4      So just reask your question and try to --

5      MS. GOLD:  It was as to form.

6      MR. LEUZZI:  And then just to --

7      THE COURT REPORTER:  Excuse me.

8      (Discussion off the record.)

9      MR. LEUZZI:  Just to make things easier, I'm just

10  going to say "Objection," and just assume that's objection

11  to form, in general.

12      MS. McCLELLAN:  You can make your objections

13  however you want, however you want to make your record.

14      MR. LEUZZI:  Can we take a break?

15      MS. McCLELLAN:  Sure.

16      (A break was taken from 1:43 to 1:45.)

17  Q.  (By Ms. Gold)  Once you started talking to Ms. Medicraft, it

18  sounds like daily in some form, almost daily in some form --

19  A.  Yeah.  Either in efforts to arrange visitation, which was a

20  day-by-day kind of decision-making.  We didn't have a set

21  schedule.  There were five children, several different

22  placements.  It was a scheduling facilitation challenge, to

23  say the least.

24      We also had visitation that was on a set schedule with

25  Dad.  We had to work around not only supervision,

1    transportation, but location as well.

2         And so, yeah, between that, and her, you know, wanting

3    to provide more information about the kids, get, you know,

4    things like clothes, toys, things of that nature.

5    Q.   So it sounds like she was actively involved in her case.

6    A.   Very.

7    Q.   Okay.  And what was your relationship like with her?

8    A.   At the beginning up until -- I'm not quite sure about the

9    date, but I think -- I'll guess the 17th.  Without my phone,

10   I don't ... I don't know exactly -- she was very open.  She

11   was open to talking about the current situation, engagement.

12   She was very willing to share how much -- how hard this was

13   on her, her family, you know.  She got emotional quite

14   often.  But for the most part, she's a strong girl, and she

15   did pretty well.

16        And every interaction I had with her was an effort to

17   reinforce that, "You're going to be okay," and that, "We're

18   trying to help you with whatever you need so you can get

19   back on your feet with your kids again."

20        And she shared that she, you know, was thankful about

21   what I was trying to do with help with contact with the

22   kids, that kind of thing.  She even shared that with me --

23   over the phone -- that she appreciated and liked working

24   with me.

25        And then one day, as you know, she made an allegation

31

1     that I assaulted her.

2  Q.  So I'm going to go back.  You said until the 17th.  What

3     month were you talking about?

4  A.  December.

5  Q.  Of 2019?

6  A.  Yes.

7  Q.  Okay.  So you're saying on or around December --

8  A.  Yes.

9  Q.  -- 17th of 2019 --

10  A.  Yes.

11  Q.  -- your relationship changed?

12  A.  Yeah.  Her demeanor changed.  That allegation came out of

13     nowhere.  So it just -- that went out, you know, and

14     compromised the relationship significantly.

15        You had texted me the next day asking if we could do

16     correspondence in a group text between her and myself.  And

17     I decided at that point that that wasn't going to be okay,

18     that I wasn't -- you know, she had, like I said, made an

19     allegation that I had -- I didn't feel safe having

20     correspondence with her one-on-one any longer, and I let you

21     know that, and I let her know that.

22  Q.  When you say "safe," what do you mean by that?

23  A.  I was just accused of assaulting someone, so.  And there

24     were many people around us.  That didn't happen.  And so I

25     didn't feel safe having a conversation without someone else

1      present. I guess that's the best way to put it.

2  Q.  So what did happen that day?

3  A.  She was asking lots of questions. She wanted to know -- as

4      you know, we were still in a continued shelter-care status.

5      She wanted to know what she needed to do to get her children

6      back. And I told her about the recommended services that we

7      were going to be recommending. And I also told her I would

8      share that with you.

9          She asked me questions -- so that, you know, started a

10     dialogue. And then she asked me questions about -- by that

11     time the daily incidents with the kids and interaction with

12     the kids between staff, foster parents, day staff, after

13     hours, had become ... I'm trying to search for an adjective

14     ... unacceptable, unmanageable at times.

15         The kids were making daily allegations against staff,

16     foster parents, after-hour staff, security staff, about

17     being assaulted, made to drink pee, being poisoned, being

18     given pills, destructing -- they were destroying our front

19     lobby several times, punching holes in the wall, ripping --

20     it's not blinders like this, but the long blinders, one at a

21     time.

22         (Ms. Olimene now in attendance.)

23  A.  They were assaulting staff. I myself was kicked twice,

24     punched in the stomach, slapped. My hair was pulled. There

25     was multiple incidences being filed. There was staff coming

1    to my office in tears because they had been assaulted by the

2    kids.

3          She wanted to know what that looked like, what was

4    going on.  And I told her.  I said, "We need to talk about

5    how we can work together to make this stop."

6          She was very upset and crying.  And I tried to console

7    her.  I put my arm on her arm, and she flinched back and

8    said, "Don't touch me."

9          And I apologized multiple times.  I had no idea that I

10   ... the intent was not to hurt her or -- of course, not

11   assault her or traumatize her in any way, shape, or form.

12   Q.  Can you explain in words where you put your hands and how

13       you put your hands?

14   A.  I just did it right here, like this, like on her arm.

15   Q.  Can you do it in words so we have it on the record?

16   A.  Oh, I'm sorry.  Like a cup on her arm, like that.

17   Q.  On the upper arm, sort of below the shoulder?

18   A.  Right here.  Yeah.

19   Q.  Is that accurate?

20   A.  Yes.

21   Q.  Okay.  And obviously, this was an in-person conversation.

22   A.  Yes.

23   Q.  It was between you and Ms. Medicraft alone?

24   A.  No.  There were several people in the lobby.

25   Q.  So this was in the lobby of --

1    A.  Yeah.  Many witnesses.  Yeah.

2    Q.  Okay.

3    A.  But it was benign to the point where nobody thought that

4        something was happening.  I don't know how to explain that.

5        I mean, no one said to me, "Are you okay?  Is she okay?"

6        Or, you know, what have you.

7            It was, like I said, pretty benign, until the next

8        day.

9    Q.  And how did the conversation end that day?

10   A.  I don't recall the exact words.

11   Q.  So I'll back up.  So you --

12   A.  Oh, she was there to get gifts for the kids.  It was the

13       day -- I'm pretty sure it was December 17th.  It was the day

14       where we have kids, families with in-home dependencies, our

15       foster parents or suitable others or relatives.  People

16       donate massive amounts of gifts for the kids.  And they're

17       able to come in and pick what they need for their kids.

18           And she had been planning that for a while prior to

19       the removal.  And I said, "Since the kids have been removed,

20       they're going to let you go through it even though you --

21       and I'll just go back there" -- I told her, "I'll go back to

22       the room" -- it's big conference room in the back area --

23       "And let them know who you are."

24           That was it.

25           So they knew -- because I went to the gal that was

35

1     running the whole thing and said, "These kids were just

2     removed, but I want to let her go through this, pick up

3     stuff for her kids and stuff."

4  Q.  So you put your hand on her arm.  She flinched back.  Right?

5  A.  "Flinched" may be too strong.  She just backed up and said,

6     "Please don't touch me."

7  Q.  Okay.  And then you mentioned before you apologized.

8  A.  Several times.

9  Q.  And then immediately you went into the discussion about the

10     gifts?  Or what happened between those two things?

11  A.  I don't recall exactly.  I mean, we could have talked about

12     something else.  I doubt it.  I don't know the exact words.

13     I don't ... you asked originally how -- you were asking how

14     it ended.

15  Q.  Right.

16  A.  Yeah.

17  Q.  And did you discuss the father at all during this

18     conversation?

19  A.  Probably.

20  Q.  Do you recall what was said?

21  A.  I had many conversations with her.  I don't know if Dad was

22     discussed in this particular conversation.

23  Q.  Okay.

24  A.  I'm anxious about saying something that I don't -- I mean,

25     we talked about Dad.  I don't know if it was that exact day.

1          Is that fair?

2     Q.   Yeah.

3     A.   Okay.

4     Q.   So in this conversation I believe you mentioned that you

5          were talking about services.

6     A.   Uh-huh.

7     Q.   What services did you tell Shaylee you were recommending?

8     A.   We were going to be recommending a psych eval.

9     Q.   For her?

10    A.   Uh-huh.

11    Q.   What else?

12    A.   Nonoffender domestic violence support, counseling, victim's

13         counseling.

14    Q.   Okay.  Anything else?

15    A.   At that point, you know, we would wait for the

16         recommendations of the psych eval.  And at the time we were

17         looking at reunification, some kind of EBP, parenting

18         in-home service for her.  And that's really what all I knew

19         for sure at this point.

20              She wanted to get started in services.  And she said

21         she was open to doing that.  She said, "Make a referral."

22              I said, "I need to let your attorney know."

23              And I sent you an email that day, or, I believe, the

24         next day.

25    Q.   Did you talk to her at all about why you were recommending

1      those services?

2  A.  Not in great detail.  But she had shared that she had

3      suffered quite a bit of trauma growing up in her life.  She

4      had shared that she had been sexually abused.  She had

5      shared that she was in a very nonhealthy-supportive

6      household.  She had shared that before the birth of

7      Nickolas, she had problems that made her very depressed.

8      She had a miscarriage, I think more than one.

9          She had shared that she suffers from depression and

10     anxiety, that she's on medication for it.  She had shared

11     there was bipolar in her family history.  Her mom was

12     schizophrenic.

13 Q.  Okay.  And did you explain that to her?

14 A.  She was sharing those things with me, so.

15 Q.  And you used those things to sort of --

16 A.  She actually didn't question the psych eval at all.  So

17     there was no -- she didn't say, "Well, why do you want

18     that?"  You know what I mean?

19         And generally when we are thinking that a psych eval

20     is indicated is if we know of a known history of past trauma

21     and abuse and neglect, currently what they're exposing --

22     conditions they're exposed to right now.  It helps us drive

23     or be able to identify what services are best for that

24     particular client to help them.

25 Q.  Okay.

1   A.   She was already in counseling, so we didn't need to refer

2        her for a mental health assessment.

3   Q.   Did you tell her why you were asking for the DV nonoffender

4        services, the domestic violence nonoffender services?

5   A.   Yeah.  To help her develop the skills and the knowledge

6        around what a victim is, how to be supportive through that

7        and how to break free.  Yeah.

8            And then she did bring up, when I said that, you know,

9        "I went to domestic violence counseling."

10           And she goes, "Are you familiar with the wheel?"

11           And I said, "Yes, I am.  It's the cycle of domestic

12       violence."

13           And she says, you know, "Some of that's true, but some

14       of it's not.  Some of that applies to me, but some of it

15       doesn't.  You just have to -- it depends on how you look at

16       things."

17           I said, "I understand that.  Totally get that.  You

18       know, you know your life better than we do."

19           But she didn't argue.  Maybe "argue" is a strong word.

20       She didn't say, "I don't want to do those things."

21           She was open to participating in whatever services

22       that she could -- I don't know what her motivation was at

23       the time, I can't speak for her -- to start the journey of

24       getting her children back and returned to her.

25   Q.   What else did you tell her she needed to do to get her

39

1       children home?

2 A.   In terms of services?

3 Q.   Just in general. Did you tell her there were other things

4       that she needed to do in order to get her children home?

5 A.   I don't recall.

6 Q.   So you were saying the services were what she needed to --

7 A.   That's what she was asking. She asked what specific

8       services that she needed to do in order to get her kids

9       back.

10 Q.   All right.

11           MS. GOLD: I think Katie has some questions.

12           MS. McCLELLAN: I just have a question.

13                 EXAMINATION

14   BY MS. McCLELLAN:

15 Q.   So the mom's question to you specifically is what she needed

16       to do in order to get her children back. Isn't that right?

17       That's why she asked to meet with you that morning?

18           MR. LEUZZI: Objection; form.

19       Please answer.

20 A.   I don't know if that's why she asked to meet with me. That

21       was the -- she brought in some more clothes and stuff for

22       the kids. That was not the intent of the meeting, I mean,

23       to ask me what she needed -- I don't -- it was a form of

24       conversation and engagement. It wasn't --

25 Q.   Did the mom ask you if she could talk with you about the

1    case?

2  A.  Ask me?

3  Q.  Uh-huh.

4  A.  She doesn't have to have permission from me to talk to her

5      about her case.  I'm confused.

6  Q.  Okay.  Did the mom ask you what was going to happen next in

7      the case and what she needed to do to get her children back

8      in her care?

9  A.  I don't know if those were her exact words.

10 Q.  Okay.  Was that --

11 A.  But when we were talking, she was folding clothes, and she

12     was openly sharing things about her life.  You know, I asked

13     her about her family, if she had family that could help out.

14        Apparently, prior to the case coming over to my unit,

15     there was a sister or aunt that had come up from California

16     that was willing to help out.  I said, "Is there anyone that

17     we can get in terms of placement, helping with visitation,

18     you know, whatever it is?"

19        And she said there was no one.  She said there was

20     somebody in Eastern Washington but they were too old.

21        These are common things we talk about with staff to

22     try to engage them and try to gather information on family

23     systems, support systems, what they already have that we can

24     bring back into the case, that kind of thing.

25 Q.  But you don't remember if part of this conversation was

Liza Sterbick - February 12, 2020

41

1    Ms. Medicraft asking you what she would need to do to get

2    her kids back?

3  A.  She did ask me what did she need to do to get her kids back,

4    yes.  I don't know if those were her exact words, but yes,

5    it was around that.  Yeah.

6  Q.  Is that what you told her that she needed to do, was a

7    psychological evaluation and domestic violence counseling?

8  A.  I said in terms of -- I said, "The services that we're going

9    to be recommending and" -- like I said.

10  Q.  Okay.  So in this conversation with Ms. Medicraft were you

11    able to tell her what you believed she needed to do to get

12    her kids returned to her?

13  A.  I articulated what that would look like in terms of safety.

14    I said, "We want to make sure that we would keep your kids

15    safe."

16  Q.  So what did you tell Ms. Medicraft she needed to do to

17    demonstrate that she was going to keep her kids safe?

18  A.  Well, first of all, not violating the no-contact order.

19    Yeah.  That was the biggest issue at that point.

20  Q.  Did you and Ms. Medicraft talk about that during that

21    conversation?

22  A.  Briefly.

23  Q.  So you were asked earlier if you talked about the father

24    during this conversation.  Do you recall any more about the

25    substance of what your conversation was with Ms. Medicraft

42

1    about the father and the no-contact order?

2  A.  I don't.  I don't recall specifically.

3         MS. McCLELLAN:  Okay.

4              FURTHER EXAMINATION

5  BY MS. GOLD:

6  Q.  I guess I would like to talk just more about your

7    relationship with Ms. Medicraft.

8  A.  Yeah.

9  Q.  Have you observed her with her children?

10 A.  Yes.

11 Q.  So just to clarify.  You would have observed her with her

12   children after they were removed, correct?

13 A.  No.  I observed her with her children the day that she came

14   in to talk about her complaints.

15 Q.  Okay.  And did you have concerns about her interaction with

16   the children?

17 A.  I had concerns about the kids' out-of-control behavior.

18   They were literally, literally climbing walls.

19 Q.  Before they were removed?

20 A.  And she just came into the lobby, and she couldn't control

21   their behavior.

22 Q.  Did you observe her discipline her children?

23 A.  No.  Well, in an inappropriate way, or just in general?

24 Q.  In general.

25 A.  She tries to redirect them.  She's very stern with them,

1    talks about expectations.  This was the visitation as well,

2    not just that day.

3    Q.  Okay.

4    A.  "You're not supposed to behave that way."

5          But at the same time, she would state to me that they

6    make up stories, they lie.  And she would say, "Don't you do

7    that."

8          You know, it was sometimes conflicting, very

9    conflicting.

10   Q.  Can you explain what that conflict is?  I'm a little

11   confused.

12   A.  In the one sense she would tell me that they lie, they make

13   up stories, but "I tell them not to do these things."

14         You know, yeah.

15         "But I also tell them" -- she would say, you know --

16   "speak your mind.  You have a right to speak your mind.  You

17   have a right to do anything you want to do.  If you're going

18   to express yourself, do it in the building, not outside,"

19   kind of a thing.

20         That was in terms of him running around.  They ...

21   they could not be controlled.

22         We aren't able to touch dependent children.  Security,

23   law enforcement weren't able to do that as well.

24         They were running in the parking lot.  They weren't

25   doing what they were told.  They were not -- you know,

1    wouldn't get into cars when they were told.  It was off the

2    charts.  Yeah.

3  Q.  You said you can't touch children.

4  A.  We can't restrain them.

5  Q.  Okay.  Are there circumstances where you can restrain them,

6    or is it completely off limits?

7  A.  For a Department employee?

8  Q.  Correct.

9  A.  There are certain Department staff that can be trained.

10    It's usually staff that are in a residential facility and

11    such.  I think it's called safe response.

12        And she also said, "Don't touch my children."

13  Q.  So she told you not to touch her children?

14  A.  Uh-huh.  Very specifically, repeatedly.

15  Q.  And did she state that in the November meeting when you met

16    with her and the three children?  Did she state that you

17    were not to touch her children then?

18  A.  I don't know if she said it in that meeting, no.

19  Q.  Okay.

20  A.  She was present when the kids were doing this behavior one

21    time.  That was the time -- one of the times she would say,

22    "Don't touch my children.  Don't hurt my children."  Like

23    that.

24  Q.  So it wasn't the November meeting, but it was --

25  A.  No.  If she said it in the November meeting, I don't recall

Liza Sterbick - February 12, 2020

45

1     that.

2  **Q.**  So after the children were removed she --

3  **A.**  Oh, excuse me. Yeah. It did not take place in the November

4     meeting, no. It was after the children were removed. I'm

5     sorry. I was getting my months mixed up.

6  Q.  But in the November meeting the children were, you said,

7     literally climbing the walls?

8  A.  Yes.

9  Q.  Okay.

10  A.  And she was there to complain about how the person that was

11     transporting the children were allowing -- wasn't able to

12     control them and wasn't keeping them safe. They were trying

13     to get out of the car like at a stop sign or a stoplight.

14     The person was saying if -- she said that they were

15     threatening them.

16  Q.  She said who was threatening?

17  A.  The transporter. I think it was the visit transporter.

18  Q.  So Ms. Medicraft was saying that the visit transporter was

19     threatening who?

20  A.  The kids.

21  Q.  Okay.

22  A.  And that ... yeah.

23  Q.  And these were the transporters for the children to go to

24     the visits with the parents that she was complaining about?

25  A.  We really never ever got there, but I'm assuming so, because

46

1    we didn't have education transporters at that time.

2         But there -- and I say this only because I know at one

3    time we had a -- oftentimes when kids are displaced in

4    placement, whether they are home or in foster care, we'll

5    contract with a school district liaison to have kids

6    transported, like with a taxi or Uber or whatever.  And they

7    wouldn't transport these kids because of their behaviors in

8    the car.

9         So I'm assuming it was a visit -- a person that was

10   transporting them for visits for Dad.

11   Q.  Okay.  So they were being transported for visits with Dad in

12   November, and those were the people Ms. Medicraft was

13   concerned about?

14   A.  That's what -- the initial reason why she was there, yes.

15        And then she wanted to talk about the CPS

16   investigation or the investigator ... yeah, make complaints

17   about the CPS investigator at the time.  Which was not in my

18   office, not under my purview, not something I could help her

19   with.  But I heard her out.

20   Q.  You mentioned the school transporters.  Were you the person

21   who arranged for those school transporters?

22   A.  No.  Megan did.

23   Q.  And you mentioned that they were no longer willing to

24   transport?

25   A.  Uh-huh.

47

1    Q.  Okay.  And who transported the children to school once the

2        taxis were no longer willing to transport the children?

3    A.  Before the kids were removed?

4    Q.  Before the kids were removed.

5    A.  Probably Mom.

6    Q.  But the Department didn't assist with that?

7    A.  Not before the kids were removed, no.

8    Q.  And after the kids were removed, who would have transported

9        the children?

10   A.  The Department, whether it was after-hour staff or day

11       staff.  It was a kind of a daily thing to get those assigned

12       and facilitated, because the kids were blowing out of

13       placement regularly.  And so where the kids got picked up --

14       or they were in hotels.  Where the kids got picked up was

15       different from day to day.  It was a facilitation -- it was

16       chaotic.  So, yes, it was either after-hour staff or day

17       staff.

18   Q.  Okay.  Let me jump around here.  Before the family moved to

19       Washington where were they located?

20   A.  It's my understanding from the record, New York.

21   Q.  Did you speak with anyone in New York about this family?

22   A.  No.

23   Q.  So you haven't spoken with the schools, school district or a

24       social worker at the school at all?

25   A.  In New York?

1  Q. Correct.

2  A. No.

3  Q. So you haven't spoken with someone named Lindsey Hodge?

4  A. No.

5  Q. Did you speak with CPS workers in New York at all?

6  A. Nope.

7  Q. So your information about New York comes from the

8     documents -- or let me ask: Where does the information you

9     have about New York come from?

10 A. The completion of the investigation and gathering of

11    information from the original investigation.

12 Q. So CPS investigated the case and provided you the New

13    York -- the information on the case from New York?

14 A. It was kind of cumulative. Yeah.

15    But when we were preparing for trial, it's my

16    understanding when these witnesses were being asked to

17    either testify or provide statements, or what have you, more

18    information came in. And that was well after the fact.

19 Q. Okay. So you mentioned that CPS did the initial

20    investigation and contacted New York. Who was that person?

21          MR. LEUZZI: Objection; calls for hearsay.

22 A. I believe it was --

23          THE WITNESS: Am I not supposed to answer?

24          MS. McCLELLAN: You can answer.

25          THE WITNESS: Okay.

1   A.  I believe the investigator was Tanessa Sanchez, I believe.

2      I may be wrong.  I'd have to look at the record.

3   Q.  Okay.

4   A.  Do you want me to spell that?

5   Q.  If you can.

6   A.  C A N C H E Z (sic).

7   Q.  So did Tanessa talk with the people in New York about the

8      Medicraft case?

9             MR. LEUZZI:  Calls for hearsay, and objection as

10     to speculation.

11   A.  I don't know what Tanessa's methods were of her

12      investigation or who she spoke with, if it was via email or

13      text or in person, or if it was just information that we

14      gathered that we got from New York.  Meaning us, the

15      Department.  I don't know what those -- that form was.

16   Q.  Okay.  So how did you find out about the Medicraft family's

17      history in New York State?

18   A.  It just -- the -- when it got transferred over to me, or to

19      us, the -- one of the main reasons we got involved was

20      because they had left the state of New York, there was a

21      current no-contact order in place, and that they were

22      supposed to go to court on that case and fled the state and

23      came to Wenatchee -- Washington.

24   Q.  How did you get the information on what happened in --

25   A.  In general summary, it was provided to us at transfer.

1   Q.   At transfer --

2   A.   From CPS to CFWS.

3   Q.   So you received a file that had the documents in it?  Can

4        you explain how you received the information?

5   A.   Well, in general, just a verbal transfer summary and in

6        writing.  And there were still records that needed to be --

7        that were requested that we hadn't received yet from New

8        York.

9   Q.   Okay.  And did you request those records?

10  A.   No.

11  Q.   Who would have requested the additional records?

12  A.   The investigating CPS worker.

13  Q.   And you answered before that it may have been Tanessa

14       Sanchez.

15  A.   It may have been.

16  Q.   But it was CPS --

17  A.   It was a CPS --

18             MR. LEUZZI:  Objection; asked and answered.

19  A.   Sometimes in investigations what I have found -- it

20       wasn't our practice -- well, maybe it was in Wenatchee.  But

21       one person works on an investigation and someone picks up

22       and takes over if someone's on leave or what have you, just

23       so we're within our time frames.  I know that ...

24  Q.   Okay.

25  A.   I have to look at the record.  I'm sorry.  I don't have it

1      in front of me.  And since this -- you asked me -- or
2      subpoenaed me to be deposed, I haven't looked at the record.
3           I actually haven't been assigned to the case since
4      just after the first of the year.  I haven't looked at the
5      record since right after Christmas.
6   Q.  You mentioned before that you were preparing for trial and
7      asking for more information at that point.  Who was
8      preparing for trial?
9   A.  The Department.
10  Q.  What does that mean?  Who?
11  A.  Well, the assigned social worker, the AG, whoever's involved
12     in the case, assigned to the case.
13  Q.  Were you involved in preparing for trial?
14  A.  Be more specific, please.
15  Q.  Well, I guess, what does "preparing for trial" mean?
16  A.  Well, just as any attorney would process legal strategy,
17     what our position is and how we're moving forward and a
18     collective departmental response, what we're going to do, if
19     we're going to settle or if -- I'm talking in general in
20     cases.  You know, what is our position, and what are we
21     going to be recommending?  That kind of thing.
22          MS. McCLELLAN:  I'm going to ask a couple of
23     questions.
24
25

1                    FURTHER EXAMINATION

2      BY MS. McCLELLAN

3  Q.  Earlier Ms. Gold was asking you questions about when you got

4      information about the case.  And you said as you were

5      preparing for trial, more information was gathered.

6           Do you recall saying something along those lines?  The

7      words may not be exact.

8  A.  Yeah, I don't know if those were the exact words.  I'm just

9      saying that more information was -- had come forward.

10 Q.  Ms. Gold was specifically asking you at that point about

11     information from New York and if you had talked to anybody

12     in New York.

13 A.  Correct.

14 Q.  And you said no.  Is that correct?

15 A.  Yes.  Absolutely.

16 Q.  At any point when you had -- when you were working on this

17     case did you speak with anybody from New York?

18 A.  No.

19 Q.  Okay.  To your knowledge, did anybody else speak to somebody

20     in New York and provide you with information?

21              MR. LEUZZI:  Objection; calls for speculation and

22     hearsay.

23 A.  I don't know who spoke to someone from New York.

24 Q.  Did somebody give you information about what people in New

25     York were saying?

1     MR. LEUZZI:  Objection, as far as it would be
2     regarding privilege.  It wouldn't be appropriate to answer.
3          If there's answers outside of privilege, then those
4     can be provided.  But if it's within privilege, then --
5          MS. McCLELLAN:  And I don't know if it's
6     privileged because I don't know the answer to the question.
7          MR. LEUZZI:  I'm leave the question open.
8  Q. (By Ms. McClellan)  So did somebody else give you
9     information that was being reported from New York?
10 A. Yes.
11 Q. Was that person your attorney?
12 A. Yes.
13 Q. Did anybody other than your attorney give you information
14    about what was being reported by people in New York?
15 A. No.
16 Q. Okay.

                    FURTHER EXAMINATION
18 BY MS. GOLD:
19 Q. Let's talk about the removing of the Medicraft children.
20    How was the decision to remove the Medicraft children made?
21 A. It was consensus.  Several, several people in two different
22    offices, supervisors, area administrators.
23 Q. Who were those people?
24         MR. LEUZZI:  I was actually at that meeting, and
25    that whole meeting is attorney-client privilege.

54

1          MS. McCLELLAN:  Not who was at the meeting.

2          MS. GOLD:  I don't think that's correct.

3          MS. McCLELLAN:  It could be what you guys talked

4     about, but not who was at the meeting.

5          MR. LEUZZI:  I think that would all be

6     privileged, actually.

7          MS. McCLELLAN:  You're instructing her not to

8     answer?

9          MR. LEUZZI:  I am.

10         MS. McCLELLAN:  We'll move on, and if we have to

11    get a motion to compel, we will.

12 Q.   (By Ms. Gold)  In your opinion, was removal of these

13    children from the mother at that point the right decision?

14 A.   No one ever wants to remove children from their parents.  I

15    was very concerned about how this would impact the kids.

16    So, yes, I ...

17 Q.   So in your opinion, I guess, were you recommending removal

18    of the Medicraft children?

19 A.   Me specifically?

20 Q.   Correct.

21 A.   As I said, it was a consensus.

22 Q.   What was your personal opinion on whether the Medicraft

23    children should be removed from their mother?

24 A.   I wished we wouldn't have to remove the children from their

25    mother.

1  Q.  I'll ask you again.  What was your personal opinion on

2      whether the Medicraft children should be removed from their

3      mother --

4             MR. LEUZZI:  I believe she just --

5  Q.  -- on December 6th -- I believe is when they were removed?

6             MR. LEUZZI:  I believe she answered that.

7  A.  I didn't want to remove the children from their mother.

8  Q.  Why not?

9  A.  Because we ... I work for a system that does not provide

10     resources, appropriate resources for kids that have behavior

11     problems like the Medicraft children.  It breaks my heart.

12         We are placed in a position where we have to remove

13     children to keep them safe.  But I didn't think they would

14     bode well with their current issues in out-of-home

15     placement.  I didn't believe it would go well, and it

16     didn't.  Very hard for me.

17  Q.  So what was your understanding of the reason that the

18     Department was recommending removal of these children from

19     the mother?

20  A.  Well, we had concerns out on the table, the history of the

21     family.  We were concerned about the family fleeing.  We

22     were concerned about marks on the children, bruises.  Those

23     were the big issues, risk and safety concerns.

24  Q.  You mentioned bruises as a concern.  Were you concerned

25     about bruises prior to removal of the children?

Liza Sterbick - February 12, 2020

56

1   A.  We were concerned about some marks on ███████.  Leticia had

2       gone out to do a health and safety visit, and she had marks

3       on her face.  And Leticia wanted to take a picture because

4       we weren't sure about the source of the -- and Mom wouldn't

5       let her.  And Mom said it was because ███████ had been ... I

6       don't believe she used the word "beat up," but had been

7       fighting with ███████.

8   Q.  Did that seem like a reasonable explanation for those

9       scratches, in your opinion?

10  A.  A reasonable explanation?  I felt like if it was exactly

11      what happened, then why wasn't Mom allowing us to take

12      pictures?  I was concerned.

13          And then after the kids were removed, they took

14      pictures of the kids in their condition.  And we had marks

15      and bruises as well.  Didn't know the source of them.

16  Q.  So knowing what you know about ███████ behavior issues --

17      let me back up.

18          You have observed ███████ behavior issues?

19  A.  I have experienced ███████ -- yes.

20  Q.  And you have experienced ███████ behavior issues even

21      before they were removed from their mother?

22  A.  I observed ███████, ███████, and ███████.  They weren't violent

23      when they were there.  They were just -- their behaviors

24      were out of control and could not be managed by Mom.  But

25      they weren't kicking or hitting any of us or anything like

1      that, no.  In the time in November.

2   Q.  Okay.  In November they were out of control?

3   A.  Uh-huh.

4   Q.  Including ████████, I'm assuming.

5      Given that behavior, do some scratches on his little

6      sisters seem reasonable?  Or does the reasoning that -- I'm

7      sorry.  Let me rewind here.

8      Given what you know about ████████ behavior, does

9      Shaylee's explanation seem credible?

10  A.  At the time -- we are required, when there are allegations

11     of child abuse and neglect, to hear the parents' side or

12     their explanation.  The core of an investigation is trying

13     to find out what exactly happened to the child.

14     But we also are required to trust but verify.  And it

15     was concerning that Mom would not allow us to take a

16     picture.  There was an open investigation going at the time.

17     I directed Leticia to let the other investigator know about

18     what occurred.  That was just a matter of days.  Yeah.

19  Q.  Did you personally observe those scratches on ████████ -- I

20     believe you said her face?

21  A.  When she came into care, yes.

22  Q.  So prior to removal you had not personally --

23  A.  No.

24  Q.  -- observed those?

25  A.  Leticia wasn't able to take a picture.  So no.  No, I had

1     not seen her, no.

2  Q.  Okay.  Once you did see that scratch --

3  A.  It wasn't just a scratch.

4  Q.  Once you did see the -- and we're talking about on her

5     cheek; is that right?

6  A.  I would have to look at the pictures when they came into

7     care to know exactly where they were.

8  Q.  Once you saw the --

9  A.  It wasn't just ███████.  ███████ had marks and bruises as

10    well, and one other child, and I'm not sure which one it

11    was.  I can't remember.  So there were three.

12 Q.  Okay.  I didn't get an answer to my question before.  So

13    once you saw these marks and bruises on the children, and

14    knowing what you know about ███████ behaviors, does it seem

15    plausible that he could have caused those injuries to the

16    children?

17 A.  Anything is possible.  I don't know what happened to those

18    kids.  I don't.

19 Q.  But it could be plausible he caused those injuries?

20 A.  Could be.  Or ███████ or ███████.

21 Q.  Okay.

22 A.  Yeah.  Now that I know what I know now, it wasn't just

23    Arthur.  Yeah.

24 Q.  So, I guess, why?  Why could it have been all of them?  What

25    have you seen that leads you to believe it could be any of

1     those children?

2  A.  Because I was physically assaulted by each one of them.

3  Q.  Do you have any --

4  A.  And not just me.  I mean, I've witnessed it.  And I'm just

5     sharing that I've witnessed it because it happened to me.

6     But it's been documented -- I'm not going to say every

7     single solitary day -- almost daily either by after-hour

8     staff or day staff about being assaulted by one or more of

9     the kids.

10  Q.  Prior to removal did you personally have concerns that those

11     marks were caused by anything other than the Medicraft

12     children?  Or anyone other than the Medicraft children?

13  A.  Prior to the health and safety visit?

14  Q.  Prior to the removal.

15  A.  Yes.  During the day of the health and safety visit.

16  Q.  You personally had concerns?

17  A.  We didn't know what the source was.  All we know is that

18     there were marks, Mom would not let us take a picture.  And

19     that concerned me.

20  Q.  Was there any information to indicate that Shaylee was -- or

21     Ms. Medicraft was the cause of these marks and bruises?

22  A.  For someone other than one of the kids?  We did not have

23     enough information.  We don't know.  It could have been the

24     dad.  The kids were stating that they were with Dad, had

25     been seeing the dad.

1  Q.  So let --

2  A.  That's what the whole source of the investigation was.

3  Q.  Let me just go back.  So was there any information to

4      indicate that Shaylee was the cause of these marks and

5      bruises?

6  A.  Not direct.  There's no direct allegation that Shaylee did

7      it.  We just know that they existed.  We didn't know the

8      source.

9  Q.  So you had no information to indicate that Shaylee was the

10     cause of the marks and bruises?

11 A.  Correct.

12 Q.  Okay.  Did you have any information to indicate that the

13     father was the cause of the marks or bruises?

14 A.  There could be a strong possibility, absolutely.

15 Q.  What information did you have to indicate that it could be

16     the father who caused the marks and bruises?

17 A.  Because we had allegations the kids were sharing that they

18     were seeing Dad.  And then we had a witness who saw the

19     family together.  So we know the kids were having contact

20     with Dad.

21 Q.  In the history of this case were there allegations of the

22     father physically harming these children?

23 A.  I would have to look at the record.

24 Q.  Are you aware of any -- do you have any knowledge of --

25             MR. LEUZZI:  Objection; asked and answered.

61

1    Q.  Do you have any knowledge of the father harming his
2        children, physically harming his children?
3    A.  I would have to look at the record.
4    Q.  So you're not aware of anything?
5    A.  Correct.
6    Q.  You're --
7    A.  There was discussion in the allegations from New York.  I
8        don't know what specifically was said because I'd have to
9        have the record in front of me.
10   Q.  So you personally have not seen -- well, actually, have you
11       seen the father with the children?
12   A.  Yes.
13   Q.  When?
14   A.  Multiple times at visits.
15   Q.  Based on your observations of the father, has he hurt the
16       children during the visits?
17   A.  No.
18   Q.  Has he been at all physical with the children, aggressive?
19   A.  Not to our -- no, not in the records, the records.  Prior to
20       removal the visitation reports were actually quite benign.
21   Q.  Okay.
22   A.  They went fine.  They went smoothly.
23   Q.  Did the children express any fear of the father during their
24       visits?
25   A.  No.

1  Q.  Did they appear fearful of him at all?

2  A.  No, not that I witnessed or observed.  And not in the

3      visitation reports either.

4  Q.  So you haven't seen the children at all be fearful of their

5      father?

6  A.  No.

7  Q.  How did they react around their father?

8  A.  Well, I wasn't there during the visitation.

9          What I do know is, they, they were very anxious to

10     tell their father about how they are being abused by staff

11     and foster parents.  That was the first thing that they

12     wanted to talk about.

13         I'm not there from start to finish.  Yeah.

14 Q.  But what you've observed of the visits with the father and

15     the children --

16 A.  In the visitation reports after the removal, that's what the

17     visitation supervisors reflected.

18 Q.  So what you've observed between the father and the children

19     appears to be healthy at this point?

20 A.  I wouldn't call it healthy.

21 Q.  What would you call it?

22 A.  Benign, not -- no incident.

23 Q.  Okay.

24 A.  I didn't see him physically abuse them.

25 Q.  I want to go back to the removal issue.

1    MR. LEUZZI: Maybe before you do, now's a good

2 time for me to repark my car and take a quick break, unless

3 it's five minutes of questions.

4    MS. GOLD: Can you give me five minutes?

5    MR. LEUZZI: Sure.

6 Q. Where were the older children removed from on the day they

7 were removed?

8 A. School.

9 Q. And based on what you know about the children -- well, I

10 guess, how did the decision get made to remove them from

11 school?

12 A. The decision to remove them from school wasn't specific. I

13 was told to make arrangements to have the kids picked up,

14 and it took multiple staff to do that, which included

15 supervisors and day staff.

16    And the first thing you do when you're going to be

17 removing a child is find out where they're at. It wasn't

18 like a decision was made for them to remove -- "Let's go

19 pick them up from school."

20    In fact, I didn't even know that they had been picked

21 up from school until after they got brought back to the

22 office.

23 Q. So you weren't a part of the --

24 A. No.

25 Q. -- the physical removal of the children?

1    A.   No.  I was taking care of everything else, placement

2         requests -- there's a multitude of processes that have to

3         happen when you remove a child, let alone a sibling group of

4         five.

5              MS. GOLD:  I have more questions.  But if you

6         need to take a break and move your car.

7                   (A break was taken from 2:38 to 2:50.)

8                   (Ms. Brown no longer in attendance.)

9                   (Ms. Johnson now in attendance.)

10   Q.   (By Ms. Gold)  So let's talk about Ms. Medicraft one more

11        time.  What are her identified parental deficiencies?  What

12        have you identified as her parental deficiencies?

13   A.   Lacking capacity to manage her kids' behaviors, lacking

14        capacity to -- she has very little to no insight as to

15        the -- what has led to her kids' conditions and behaviors,

16        the trauma that they must have witnessed or endured, and how

17        it's impacting their day-to-day lives and overall well-being

18        today, and to separate herself from that.

19   Q.   Okay.  So it's managing her kids' behaviors, and insight

20        into her children's trauma?

21   A.   In so many words, yeah.  What brought them here?  What led

22        them to get them here?

23   Q.   Well, what is the trauma?

24   A.   I don't know if we'll ever know exactly what these kids have

25        witnessed or seen or experienced before they came to

1      Washington state.

2             We've staffed this case with school professionals,

3      counselors.  And these kids have experienced trauma.

4      Everyone's professional opinion is that's the case.

5             We don't make these decisions in isolation or make up

6      these recommendations in isolation.  We gather information

7      from professionals who have worked with kids, who have seen

8      this type of behavior before and include that information in

9      our assessment.  And that's pretty consistent.

10  Q.  How do you know that these children experienced trauma?

11  A.  I haven't witnessed anything with their -- you know, we

12      gather information about what they've experienced, what

13      reports tell us.  We have multiple reports from New York

14      about DV incidents in New York with the family.  I wasn't

15      there, so I didn't witness it.

16             But we do know from research and data how it impacts

17      kids' self-worth, self-esteem, their stability, their

18      overall well-being, how it impacts all the domains of life,

19      education, how they interface with people, manage stress,

20      distress, what kids go through.  All of it.

21  Q.  So just to be clear, this data and research is not about the

22      Medicraft children; this is data and research in general

23      about trauma.  Is that what you're talking about?

24  A.  About what we see, the behaviors that come out in kids that

25      have been exposed to extreme trauma.  Yes.

1    Q.  What are the behaviors you're seeing in the Medicraft kids
2        that indicate that to you?
3    A.  A lot of paranoia.  They come across as, by what they have
4        reported and have said to professionals, brainwashed, almost
5        indoctrinated about lots of different things, things that I
6        don't want to, you know, speculate and have judgment on, but
7        the government, religion.  Anybody who tries to -- anyone
8        from the Department, you will be hurt, abused in foster
9        care.
10             They have been told to harm themselves and blame it on
11       someone so that they can get out of foster care or the
12       system.  But that's after -- that's all after removal.
13             Before removal their behaviors are how they interface
14       with other kids.  They were kicked out of camp.  They were
15       kicked out of two different daycares.  Their ability to
16       manage conflict, stress, it's off the charts.
17   Q.  Okay.  I want to clarify a couple of things back there.  So
18       you mentioned paranoia, that the children -- what do you
19       mean by paranoia as a behavior that the children have shown?
20   A.  About everyone's going to be harming them.
21   Q.  How do you know that they --
22   A.  A couple of them have said that to me, then they've relayed
23       it to school staff and other, either after-hours or day
24       staff.
25   Q.  So what have the children said to you specifically?

1  A.  Melody told me that she was told to bite herself and to

2      blame it on someone.  When she was trying to bite herself,

3      we asked her why.

4  Q.  Okay.  And what do you mean "bite herself"?  What do you

5      mean?

6  A.  Bite herself.

7  Q.  Bite her arm?

8  A.  I don't have -- she was trying to bite her arm.  Okay.

9  Q.  Who told her to do that?

10 A.  I don't know.

11         MS. McCLELLAN:  I need you to actually answer.

12 A.  I don't know.

13 Q.  She didn't say who told her to say that?

14 A.  She did not tell me who said that.

15 Q.  Okay.  What are other examples of this paranoia?

16 A.  Their fear of us, the system, foster care, that their rights

17     are going to be violated.

18 Q.  Who has this fear?

19 A.  All of the kids -- well, Nickolas is nonverbal, so.  And

20     Melody didn't share as much.  But the older boys do, quite a

21     bit.

22 Q.  So they have expressed that fear to you directly?

23 A.  Not to me directly all the time.  It's been with everyone.

24 Q.  You mentioned that the kids have been brainwashed.  What do

25     you mean by that?

68

1  A.  It's all along the same lines of what I just shared with

2      you.

3  Q.  I guess, explain what --

4  A.  That people are all out to harm them.

5  Q.  So who would have done this brainwashing?

6            MR. LEUZZI:  Objection for speculation.

7        You can answer.

8  A.  Like I said, some of the times they have reported their

9      parents are telling them these things.  I have heard Shaylee

10     tell the kids that, "If you're going to act out and raise

11     hell, don't do it outside, do it inside."

12        Almost like giving them permission to do so.

13        And she had no insight as to how that impacted her

14     kids' behavior.

15 Q.  When you heard her say that, what were the children doing?

16 A.  Oh, my gosh.  Trying to escape the building, destroying the

17     bathroom, destroyed the visit room, pounding the walls, was

18     one of the times that I got assaulted.  Running around.

19     Anything that they could do to cause havoc.  Getting on

20     chairs, rolling back and forth on the floor, tearing down

21     the -- it's why --

22 Q.  Okay.

23            MS. McCLELLAN:  So I'm just going to ask, it

24     would be really helpful to try to answer the question that's

25     actually -- the specific question that's being asked.  So

69

1     you were giving a specific statement that Ms. Medicraft

2     supposedly said.

3             THE WITNESS:  She asked me why or how or what --

4             MS. McCLELLAN:  Right.  And so is it your

5     testimony that the kids were doing all of those things that

6     day you had that conversation?

7             THE WITNESS:  Every single one of them?

8             MS. McCLELLAN:  Right.

9             THE WITNESS:  Practically, yes.

10           MS. McCLELLAN:  Do you have a specific

11    recollection of the conversation where Ms. Medicraft said to

12    the boys, "If you're going to raise hell, do it inside

13    rather than outside"?

14           THE WITNESS:  Yeah.

15           MS. McCLELLAN:  When that statement was made,

16    what were the children doing?

17           **THE WITNESS:  Running around in the parking lot.**

18           **MS. McCLELLAN:  Okay.  And the parking lot to the**

19    DSHS office?

20           THE WITNESS:  To our office.  Yes.

21           MS. McCLELLAN:  Okay.  Is that a parking lot

22    where there's cars?

23           THE WITNESS:  Yeah.

24           MS. McCLELLAN:  And so was Ms. Medicraft trying

25    to help get the children back inside?

70

```
 1              THE WITNESS:  Yes.
 2              MS. McCLELLAN:  Okay.
 3          Sorry.
 4              THE WITNESS:  I'm not trying to dodge a question.
 5      I'm giving you the answers as I know them.  That's all.  I'm
 6      trying to answer the questions very specifically.
 7   Q.  (By Ms. Gold)  Is there a possibility that Ms. Medicraft's
 8      statement about causing trouble inside rather than outside
 9      was to -- let me finish my question -- was to get the
10      children inside and away from the cars in the parking lot?
11              MR. LEUZZI:  Objection as to speculation.
12   A.  Anything's possible.
13   Q.  In your opinion, is it a good parenting thing to remove your
14      children from a parking lot when there are cars driving
15      around and they are running wild?
16   A.  Absolutely.
17   Q.  So your preference, as someone responsible for these
18      children, would be that they would be inside the building
19      rather than outside the building running around?
20   A.  Can you say that again?
21   Q.  So your preference, as a worker at DCYF who's responsible
22      for these children, would be that the children were inside
23      the building rather than outside the building running around
24      and --
25   A.  Absolutely.
```

1   Q.  So is there a possibility that Ms. Medicraft was trying to

2       assist in getting the children inside and safe?

3                   MR. LEUZZI:  Objection; calls for speculation.

4   A.  There had been conversations about what she could do to, you

5       know, minimize what they were doing.  In fact, she said,

6       "You should be grabbing them and not letting them out the

7       door," in one sentence, and then the next sentence, "Don't

8       touch my child.  Don't discipline my child.  Don't tell my

9       child what to do."

10          It was very chaotic, stressful for everyone, including

11      Shaylee, and confusing.  It was very difficult.

12  Q.  I'm going to ask it one more time.  I understand it was

13      difficult.  Does it seem reasonable or does it -- let me

14      rephrase that.

15          Is there a possibility that Ms. Medicraft was tying to

16      assist the Department in getting her children inside and

17      safe rather than having them run outside in the parking lot?

18                  MR. LEUZZI:  Objection; again it calls for

19      speculation, and asked and answered.

20  A.  I didn't -- I stated and answered your question stating that

21      she was trying to get them back inside the building.

22          This is about what she said to them that -- where

23      you're generating these questions from.  And what she

24      specifically said out of her mouth is that, "I even told

25      them, don't be raising hell.  If you're going to give them

72

1      hell, not outside.  Do it inside the building."

2  Q.  Okay.  You mentioned that they're indoctrinated.  What are

3      they -- what does that mean to you?

4  A.  To fear people.  That's right along the lines of paranoia.

5      To fear anyone outside their family domain.  They're going

6      to be harmed.  They're going to be abused.  That kind thing.

7  Q.  Do you have any examples of that, that the children have

8      said -- or instances that you've observed of them having

9      been indoctrinated?

10  A.  Like my answer before to that question when you asked it,

11      they make statements of being very fearful of staff, foster

12      parents, anyone who's working with them, school.  Anyone.

13                  (Exhibit No. 1 marked for identification.)

14  Q.  What are you hunting for?

15  A.  Was I supposed to doing anything?

16  Q.  I wanted to make sure you were prepared.

17  A.  I was trying to find my lip gloss.  Found it.

18  Q.  Okay.  Take a look at that document in front of you.  Do you

19      recognize that?

20  A.  Yes.

21  Q.  What is that document?

22  A.  It's a declaration from the Department about the removal of

23      the kids.

24  Q.  Who is it a declaration from?

25  A.  The Department.

1  Q.  On the last page, page 15, who signed that document?

2  A.  I did.

3  Q.  And on page 1, underneath the caption, the first line reads,

4      "I, Liza Sterbick, hereby declare as follows."

5  A.  Uh-huh.

6  Q.  Okay.  So this is a declaration from you?

7  A.  It's a declaration from the Department.

8  Q.  So when you signed this declaration -- let's look at page

9      14.  So on page 14, towards the bottom, it states, "I

10     declare under penalty of perjury under the Laws of the State

11     of Washington that the foregoing is true and correct."

12           And then you signed it?

13 A.  Yes, as a representative of the Department.

14 Q.  This declaration starts with the statement saying that you

15     declare the following.

16 A.  Uh-huh.

17 Q.  So this is you declaring what is written in this

18     declaration, correct?

19           MR. LEUZZI:  Objection; that's a leading

20     question.

21 Q.  Okay.

22 A.  So in reference to an earlier question, the information that

23     was gathered that led up to the removal of the kids, that is

24     all of this information.  I didn't acquire it directly.  I

25     declared that this was the information we received, and this

1       is what we were submitting as the Department.

2   Q.  Did you write this declaration?

3   A.  No.

4   Q.  Who wrote this declaration?

5   A.  The AG.

6   Q.  Did you read this declaration?

7   A.  I did.

8   Q.  And can you declare under penalty of perjury that everything

9       in this declaration is true and correct?

10  A.  I can declare under penalty and (sic) perjury that this is

11      the information that we received and gathered and we're

12      declaring to the Court, absolutely.

13  Q.  But you -- let's go through it.

14  A.  Okay.

15                  MS. McCLELLAN:  Can I just ask one question?

16                      FURTHER EXAMINATION

17      BY MS. McCLELLAN:

18  Q.  You said "we."  Who "we"?  Who is the "we" that you keep

19      referencing?

20  A.  The Department.  I'm a Department representative.  And as a

21      supervisor of the case, you know, I have to process things

22      all the time, and --

23  Q.  So I'm asking, who is the "we"?  It's not, it's not a

24      building.

25  A.  Yeah.

75

1   Q.  Okay.  So who is the "we"?  When you're saying "department"

2      in reference to this declaration, who is the "we"?

3   A.  The Department --

4           MR. LEUZZI:  I'm confused why there's a problem

5      with "we" being the "department," Ms. McClellan.

6           MS. McCLELLAN:  Because --

7   A.  See, for example, the reason Leticia didn't sign this is

8      because Leticia was on leave that day, and I was the only

9      one there.

10  Q.  Okay.  So an agency --

11  A.  An agency.

12  Q.  An agency doesn't talk to people and gather information and

13     write a declaration.  So who is the "we" that gathered this

14     information and is declaring it?

15  A.  This information came from many different sources, many,

16     many different -- the investigation, the AG's office,

17     paralegal investigator.  I don't know all the specific

18     people.

19  Q.  So when you were signing this document --

20  A.  Leticia.

21  Q.  When you signed this document under penalty of perjury that

22     everything was true and correct --

23  A.  That was the information that was provided to me.

24  Q.  I'm sorry.  I really do need you to let me answer questions

25     -- finish asking a question before you answer.

1   A.   I thought you did.

2             MR. LEUZZI:  Are you making claims about perjury

3        as to my client, Ms. Sterbick?  I just want to be clear

4        where this is going.

5             MS. McCLELLAN:  I'm asking questions about this

6        declaration.

7             MR. LEUZZI:  Because if it is getting towards

8        claims, she has Fifth Amendment rights and all sorts of

9        rights that are getting implicated here.  So I want some

10       clarity.  Are you making a perjury allegation against my

11       client?

12            MS. McCLELLAN:  You can advise your client as you

13       wish.  We are asking questions in a deposition about a

14       document that she signed and submitted to the Court.

15            MR. LEUZZI:  And I believe she answered that it's

16       the result of an investigation that she reviewed and

17       submitted to the Court.

18            MS. McCLELLAN:  I'd ask that you please stop

19       answering for her.

20   Q.   (By Ms. McClellan)  My question is, who --

21   A.   It's no different than a dependency petition that has been

22       submitted by the Department.  Information is gathered by

23       several different sources -- and I'm just using it as an

24       example -- that we submit to the Court to support what we're

25       asking in the declaration.  And this was the information

77

1     that was provided to me.

2  Q.  From who?

3  A.  I already --

4  Q.  That's the question.

5  A.  I answered that.  It was, like I said, through the AG's

6     office, investigators, paralegals.

7  Q.  Okay.

8  A.  I didn't gather some of this specific information.  It was

9     brought to our attention.

10  Q.  Okay.

11          MS. McCLELLAN:  So Ms. Gold's going to go through

12     it in detail.

13               FURTHER EXAMINATION

14    BY MS. GOLD:

15  Q.  Okay.  So on page 1, there's information in here about

16     Mr. Medicraft's history with the domestic violence order.

17     Where did that information come from?

18  A.  New York.

19  Q.  Who gave you that information?

20  A.  The AG's office, the investigators.

21  Q.  Okay.  I want to clarify.  Take a look at the sentence that

22     begins, "In 1993."

23  A.  Uh-huh.

24  Q.  And I'll ask again, where --

25  A.  I didn't read that, so.

78

1   Q.  Take a look at that, and let's make sure we're talking about

2       the 1993 Superior Court case.

3   A.  That was from one of the AGs, the investigator's office --

4       the investigator.

5   Q.  Okay.  And the rest of that paragraph regarding -- well,

6       actually, regarding Ms. Medicraft's history in Child

7       Protective Services in California, where did that

8       information come from?

9   A.  The AG's office.

10  Q.  How did you get it?

11              MR. LEUZZI:  Attorney-client privilege.

12              MS. McCLELLAN:  You're asserting privilege for a

13      source of a document that you submitted to Court that she

14      signed under penalty of perjury?

15              MR. LEUZZI:  She just asked how did she get it.

16      She got it through privileged communication.

17              MS. GOLD:  Well, I don't know that.

18              MS. McCLELLAN:  Well, it's also waived once it's

19      filed.

20              MR. LEUZZI:  The information inside of there is

21      distributed, but the communication between Ms. Sterbick and

22      myself is privileged.

23  Q.  (By Ms. Gold)  Did you receive this information from the

24      AG's office directly, or did you receive it through another

25      worker in your office?

Liza Sterbick - February 12, 2020

79

1   A.  Some of this information came from the AG's, some of this
2       information came from the investigation.
3   Q.  Can you point out what came from the investigation?
4   A.  I'd have to see the record.
5   Q.  So none of this information you gathered yourself?
6                   (Witness perusing document.)
7   Q.  Well, I was just looking at page 1, I'm sorry, in the first
8       paragraph.  So none of the information regarding Shaylee's
9       history --
10  A.  On page 1?
11  Q.  -- in foster care -- on page 1 and 2, all the way down to
12      line 6 on page 2 -- none of that you gathered yourself?
13                  (Witness perusing document.)
14  A.  Correct.
15  Q.  Do you know whether this information is accurate?
16  A.  It's information that we received in an investigation.  We
17      are declaring it as part of the information we're -- it's
18      like I said, no different than a dependency petition.
19  Q.  And the "we" again is the Department?
20  A.  Uh-huh.  These are allegations and the information that we
21      brought forward.
22  Q.  So you included a sentence, "She would have been trafficked
23      or on the run if that was the case."
24  A.  Which line number is that?
25  Q.  Line number 2 to 3 on page 2.

1   A.   Okay.

2   Q.   Where did that information come from?

3   A.   The AG's office.

4   Q.   So is this a fact or an opinion, "She would have been

5        trafficked or on the run if that was the case"?

6   A.   That's the Department's opinion.

7   Q.   Is that your opinion?

8   A.   Do I believe that Shaylee was trafficked?  It appears so,

9        yes, from the information I've read, gathered.

10  Q.   What information have you gathered regarding that?

11  A.   Well, not that I've gathered.  It's been brought to my

12       attention.

13  Q.   What information have you --

14  A.   What you're specifically looking at.

15  Q.   Say that again?

16  A.   What you're specifically looking at.

17  Q.   So this paragraph indicates that to you?

18  A.   Yeah.  When this was brought to my attention, this list of

19       events that occurred, in my professional opinion -- it's

20       just my professional opinion -- and what I've learned about

21       exploited and trafficked·women, this has all the red flags

22       of that.

23  Q.   What --

24  A.   And it, quite frankly, made a great deal of sense to me,

25       considering what our concerns were with the family.

81

1    Q.   Okay.  What does it mean to be trafficked?

2    A.   To be exploited, trafficked out for others for gain.  It

3         could be for sex.  It could be for anything:  To gain

4         housing, a roof, support, clothes, food, what have you.

5    Q.   And you said that because of your concerns with the family

6         you believed that Ms. Medicraft was trafficked.

7    A.   Yeah, it's my opinion that she was.

8    Q.   What evidence --

9    A.   And the Department's.

10   Q.   What evidence do you have of that?

11   A.   This report, what we got, information that we gathered.

12   Q.   And what is the source of this information?

13   A.   The AG's office.

14   Q.   What is the source from the AG's office of this information?

15   A.   Their investigation.

16   Q.   Where did the AG's office get this information?

17             MR. LEUZZI:  Calls for speculation; hearsay.

18   A.   And I'm not -- I don't know their exact sources.  They

19        interviewed quite a few people, received information.

20   Q.   In your review of the case file have you come across any of

21        this information other than what was given to you by the

22        AG's office?

23   A.   About trafficking?

24   Q.   Yes.

25   A.   Or about any of this?

1  Q.  Let's start with about what is written on this paper.

2  A.  The trafficking piece and the history about how

3      Mr. and Mrs. Medicraft met, no, that was not in the record.

4      That was something that was, that was -- came to us up until

5      the time -- closely to the time that we were involved.

6  Q.  So that came specifically from the AG's office?

7  A.  Uh-huh.

8  Q.  The issue of trafficking.

9  A.  Uh-huh.

10 Q.  Okay.  I'm going to move on just for time sake here.  I just

11     want to clarify.  At the bottom of page 2 you talk about

12     Ms. Hodge reporting that Ms. Medicraft would not permit

13     Ms. Medicraft to gain any independence.

14 A.  Uh-huh.

15 Q.  Have you spoken to Mr. Hodge ever?

16 A.  You already asked me that, and I answered, no, I did not.

17 Q.  So where did this information come from?

18 A.  The AG's office.

19 Q.  Is all the information in this declaration about Ms. Hodge

20     from the AG's office?

21 A.  Specifically to Ms. Hodge?

22 Q.  Correct.

23 A.  It was information from Ms. Hodge, yes.

24 Q.  Who gathered it from Ms. Hodge?

1  Q.  Okay.  So let me back up.  So you said that this

2      information, the sentence, "Ms. Hodge reports that

3      Mr. Medicraft would not permit Ms. Medicraft to gain any

4      independence," you said that information came from the AG's

5      office?

6  A.  Well, I guess, the AG is part of the Department.  We work

7      together.  So that information came from the conversation

8      with Ms. Hodge, that information, which was from the AG's

9      office.

10  Q.  Okay.  So the --

11  A.  Which came then to the Department.  No different than when

12      you guys have investigators or paralegals gather information

13      for you.

14  Q.  I mean, who talked to Ms. Hodge, I guess is the question?

15  A.  There could have been more than one person that talked to

16      Ms. Hodge.  I do know that the AG spoke to Ms. Hodge.

17  Q.  And the AG is Mr. Leuzzi?

18  A.  Yep.

19  Q.  Okay.  Do you know --

20  A.  She was interviewed for trial.

21  Q.  Do you know of any other person who has spoken to Ms. Hodge?

22  A.  I don't know if anybody else spoke to Ms. Hodge.  I don't

23      have any knowledge of anyone else speaking to Ms. Hodge.

24      That doesn't mean that didn't happen.

25  Q.  So Mr. Leuzzi spoke to Ms. Hodge and then provided you with

1    this information?

2          MR. LEUZZI:  Attorney-client privilege.

3  Q.  And then you put that in this declaration; is that correct?

4  A.  Again, I don't know --

5          MR. LEUZZI:  Again, that's a leading question and

6    dives into privilege.

7          MS. GOLD:  I'm not asking what you said.

8          MR. LEUZZI:  But you just did a leading question

9    of the AG office --

10  Q.  (By Ms. Gold)  Did Mr. Leuzzi --

11          MS. McCLELLAN:  I'm just going to stop for a

12    second.  A leading -- we can ask leading questions.  We can

13    ask open-ended questions.  It doesn't -- that's not an

14    objection during a deposition, nor is it an objection if

15    this was cross-examination.  So --

16          MR. LEUZZI:  Is it cross-examination,

17    Ms. McClellan?

18          MS. McCLELLAN:  In a deposition we can ask any

19    form of question that we want.

20          MR. LEUZZI:  Ms. McClellan, I can make

21    objections.

22          MS. McCLELLAN:  Then you start to argue about

23    this --

24          MR. LEUZZI:  Any objection besides privilege

25    she's still going to answer.  But when I invoke privilege, I

1    invoke privilege.

2         MS. McCLELLAN:  So because this is probably going

3    to be a subject for a motion to compel, the question on the

4    table is:  The declaration that she submitted to the Court,

5    the information that she put in this declaration, the source

6    of the information, you're saying that you cannot -- that's

7    privileged?

8         MR. LEUZZI:  What I'm saying is privileged is

9    when Hannah is asking a question of, "Did you get this from

10   the AG's office and how," the how it was transmitted and

11   what was stated through those transmissions is privileged,

12   because it is a privileged communication with myself and my

13   client.

14        Would you like to ask a non-privileged question?

15        MS. McCLELLAN:  Oh, we have asked non-privileged

16   questions.  There's something called a waiver.

17        MR. LEUZZI:  Privilege has not been waived.  This

18   declaration is public, but privilege has not been waived.

19        MS. McCLELLAN:  Okay.

20   Q.  (By Ms. Gold)  Do you have any information -- well, let me

21       strike that and ask a new question.

22        Besides information you received from your attorney,

23   what information do you have to substantiate the allegations

24   in your declaration?

25   A.  The CASA and her attorney gathered quite a bit of

1     information as well. I couldn't break it down to tell you

2     exactly what is what unless I looked at my correspondence.

3 Q. So part of the declaration that you submitted is based on

4     information that you received from the CASA?

5 A. No. That wasn't what you asked me. What I'm saying is, is

6     that in the gathering-information phase that led up to the

7     removal of the children and compelled us to write this

8     declaration, we were getting information from different

9     sources: our AGs, their investigators, the CASA. And it's

10     all part of the record, the Department record. And that's

11     what's reflected in this document, information the

12     Department has received.

13 Q. So I know I've asked this, but I want to clarify it as we're

14     looking at the declaration. All of the information

15     regarding what occurred in New York State is not information

16     that you gathered yourself?

17 A. Not me personally, no.

18 Q. Where did the information on what happened in New York State

19     come from?

20 A. New York State sent the records to the Department and the

21     AGs -- and our AGs, and that's where it came from.

22 Q. On page 6, starting at line 4, it says, "The parents

23     travelled across the country in violation of the protection

24     order. And the original petition was filed with this

25     court."

1        Did you hear any of these statements that these

2    children made?

3  A.  Did I physically hear the kids make these statements?  No.

4    This was before the case came to us.

5  Q.  Have you heard them make statements saying that they saw

6    their father?

7  A.  To me personally?

8  Q.  Yes.

9  A.  No.

10  Q.  Have you --

11  A.  Reports were made to us from school staff.  I'd have to look

12    at the intakes for reference, specifically.  The majority of

13    the school, I believe counselor ... I'd have to look at the

14    intakes for reference.

15        And then we had a social worker who saw them together.

16  Q.  Right.  We'll get to that.

17        At the bottom of page 8, line 21, it says, "The school

18    reports that the children were reasonably behaved during the

19    Spring Semester of 2019."

20        Where did this information come from?

21  A.  It was prior to the case that -- when we got the case.  But

22    the school was very involved with helping the Medicraft

23    family and working with us.  We were working, as I said, in

24    tangent (sic).  Megan and the school staff were speaking

25    weekly.

1  Q.  So where did you get this information, I guess is a better
2      question?
3  A.  We -- the Department gets information from many resources.
4      This came from the school.
5  Q.  Where did you get this information to put in your
6      declaration?
7  A.  The information that is included in this declaration came
8      from the AG's office and/or on record or from the CASA.  It
9      was a compilation of information that was gathered and
10     brought to our attention.  So specifically, what paper or
11     what case note or what phone call or what email, I can't
12     tell you unless I looked at it.
13 Q.  So the phrase "reasonably behaved," which is what the school
14     said the children were, "reasonably behaved," is that your
15     words?
16 A.  That was the school's.
17 Q.  Is that a quote directly from the school?
18 A.  I would have to look.
19 Q.  And I think you answered this already.  Did you write this
20     declaration?
21 A.  No.
22 Q.  Okay.  Mr. Leuzzi wrote this declaration?
23 A.  Yes.
24 Q.  I'm jumping around.  We may go back to some things, but I'm
25     just trying to get clarification on a few things here.

1          On page 10, lines 13 and 14, it says, "The State was

2     and remains very concerned that Ms. Medicraft is unable to

3     free herself from the manipulations and domestic violence

4     Mr. Medicraft oppresses against her."

5          Just to be clear, you did not write that sentence,

6     correct?

7  A.  I would 100 percent agree with it, but I did not write that

8     sentence.

9  Q.  What do you agree with about the sentence?

10 A.  That Ms. Medicraft is not able to get out of this abusive

11    relationship.  Which, she goes back and forth in stating

12    that she was in and wanted to escape.  Then she'll go back

13    to saying she wants to get together with him.

14         It's been going on for quite a while.  Most recently,

15    about getting back together with him in November, when she

16    was talking to investigators during the intakes that were

17    made to the current social worker after Megan left.

18         But in my conversations with her, such as the one on

19    December 17th, she goes, you know, "I belong to this man,

20    and I don't believe in divorce."

21         And, you know, and she said, which interests me --

22    then she would say, just a few days before, "I tried to

23    leave.  I wanted to go to California.  You guys wouldn't let

24    me."

25         And I said, "Who's 'you guys'?"

90

1        And she said, "The Department."

2        And I have no knowledge or anything in the record

3   where she wanted to leave to go to the state of California.

4   But she stated that she did, she wanted to flee him.

5 Q. Would you have allowed her to leave if she chose to leave?

6 A. Oh, yeah.

7 Q. With her children?

8 A. We would have helped if she wanted to leave, absolutely.

9 Q. Had that been expressed to Ms. Medicraft?

10 A. I told her, "Well, that" -- you know, if it was expressed

11   before the case came over, I told her, "If that would have

12   been the case and I had known about it, we would have

13   supported you in that plan."

14        And that's, again, when we brought up -- she brought

15   up -- you know, we talked about family, and I said, "Is

16   there anybody down there that you can be with and live

17   with?"

18        Yeah.

19        Part of working with victims of domestic violence

20   is -- and I used these words exactly with Ms. Medicraft --

21   is to like cocoon them in support networks so she could

22   believe and feel strong enough to do this on her own.

23        And she'd been trying, and I applauded her for that.

24   Instead of, you know ... you can help a victim, a

25   nonoffender, being successful with leaving if you wrap them

1     around with support and give them the tools that they need
2     to do so, whether financial or what have you, so that they
3     can believe that they can do it so they don't feel dependent
4     on this person.
5         But there was, again -- I don't know if you want --
6     the trafficking piece, the exploitation piece.  I believe
7     she was manipulated and brainwashed by him.  Her whole world
8     was around him.
9  Q. I'm still stuck on the trafficking piece.  This belief is
10    from --
11 A. It's just my opinion.
12 Q. Okay.
13 A. The trafficking piece.
14 Q. So you have no evidence of that -- just to be clear, there's
15    no evidence that she's been trafficked?
16 A. That was our assessment, yeah, she has been trafficked, from
17    the information we gathered.
18 Q. Who is "our"?
19 A. As stated in the declaration:  The Department.  It's
20    information that we gathered.
21 Q. So it is your personal opinion and the Department's personal
22    opinion that --
23 A. The Department doesn't have a personal opinion.
24 Q. It is your opinion and the Department's opinion as a whole
25    that the mother is being trafficked?

1  A.  Currently, right now, no.  In the past, definitely,

2      definitely.

3  Q.  And the information you have to back up that opinion is what

4      is written in this declaration?

5  A.  It's what's included in the declaration, yeah.

6  Q.  Have you witnessed Mr. Medicraft manipulate Ms. Medicraft?

7  A.  I have never witnessed them or observed them together.  I

8      take that back.  In court they were sitting, you know, a few

9      feet apart.  I have -- that's the only time I've observed

10     them in the same room.

11  Q.  But you've never observed them interact?

12  A.  No.

13  Q.  Have you observed any instances of domestic violence between

14     Mr. Medicraft and Ms. Medicraft?

15  A.  Domestic violence isn't always something you can observe.

16     It's not about just physical violence.  It's about financial

17     control.  It's about emotional control.  It's about

18     manipulation.  Control.  That's things that you don't look

19     at a person and say -- and witness or observe.  Yeah.

20            MS. McCLELLAN:  So just to clarify, is that a no,

21     you have not observed any instances of domestic violence --

22            THE WITNESS:  Well, tell me what type of domestic

23     violence.

24            MS. McCLELLAN:  You really have to let us finish

25     talking.  She can't type us both at the same time.

1          THE WITNESS:  Okay.

2          MS. McCLELLAN:  So the question was:  Have you

3     observed any incidents of domestic violence between

4     Mr. and Ms. Medicraft?

5          THE WITNESS:  What form of domestic violence?

6          MS. McCLELLAN:  Any form of domestic violence.

7     Have you observed any form of domestic violence between

8     Mr. and Ms. Medicraft?

9          THE WITNESS:  I have not observed any form of

10    physical domestic violence between Ms. and Mrs. Medicraft.

11         MS. McCLELLAN:  Okay.

12  Q.  (By Ms. Gold)  When the children were still in the home with

13    the mother, had you spoken directly to their schools?

14  A.  The only time that I participated in those weekly phone

15    calls was towards the end of November and -- well, it could

16    have been -- throughout November, when the case got

17    transferred from Megan to Leticia, I participated in those

18    calls.

19  Q.  What are these calls you're talking about?

20  A.  Well, they had a school liaison, a school counselor,

21    sometimes a principal, the social worker, the guardian ad

22    litem, talked about the status of the kids, what was going

23    on that week, what we were going to do about it, what

24    services we were going to provide.

25         We talked about getting kids tested.  The kids were

94

1     all very academically behind.  There was discussion about

2     ███████ behaviors, the kids' behaviors, how to manage that,

3     what were the best coping skills, what we could do as the

4     Department to help.

5          They wanted to get involved with helping with the

6     housing piece as well.  They were very committed to these

7     kids.  Just troubleshoot problems, issues, what was

8     happening that particular week.

9   Q.  And the kids were still with the mother at this point?

10  A.  Yes.

11  Q.  Was the mother included in these phone calls?

12  A.  No.

13  Q.  Was she aware they were happening?

14  A.  I don't know.

15  Q.  Was she invited to be a part of the phone calls?

16  A.  I don't know.

17  Q.  Were there notes taken during these phone calls?

18  A.  If there were, it was by the school.  They facilitated them.

19  Q.  So the Department doesn't have any notes of these phone

20     calls?

21  A.  Other than documenting a case note that it occurred, no.

22  Q.  At the top of page 11 it states -- starting on line 2, "The

23     school reports that the children have no understanding and

24     no ability to participate in structured play, preventing

25     them to befriend their peers and engage in games based

95

```
 1        learning provided by their educators."
 2             Where did this information come from?
 3   A.   The school.
 4   Q.   Did it get reported directly to you?
 5   A.   No.
 6   Q.   Who did it get reported to?
 7   A.   Either Megan or Leticia.  The same with lines 5 and 6.
 8   Q.   Okay.  So lines 2 to 4, can you explain what this means?
 9   A.   The school's reporting that the kids are not doing well in
10        school.  But what part is confusing?  I'm sorry.  I'm not
11        trying to be sarcastic.
12   Q.   I know you're not.  Let's break it down.  So, "The school
13        reports that the children have no understanding and no
14        ability to participate in structured play."
15   A.   That's what they're reporting.  You would have to talk to --
16   Q.   Is this a parenting concern?
17   A.   If kids are having trouble in school?  It depends on how it
18        impacts the overall well-being of the child.
19   Q.   Is this a sign of abuse?
20   A.   It could be.
21   Q.   Is it a sign of neglect?
22   A.   It could be.
23   Q.   Are there other reasons it could be causing it?
24   A.   Could be lots of reasons.
25   Q.   So there could be other reasons besides abuse and neglect
```

1    that could be causing these behaviors?

2  A. Absolutely.  The trauma I was telling you about.

3  Q. Lines 5 and 6 on page 11, "The school is concerned about

4    witnessing comments where the mother is disparaging her

5    children."

6        Is that also information that went to Megan or

7    Leticia?

8  A. From the school?

9  Q. Correct.

10 A. Yes.

11 Q. And just to be clear, you're reporting it, then, from their

12    case -- where are you getting this information?

13 A. It's either in supervisor reviews, case staffings.  We staff

14    cases all the time, every day.  It could be in an intake.

15    It could be --

16        MS. McCLELLAN:  I just want to clarify.  Do you

17    have a, like, specific recollection that this information,

18    this source was from either Megan or Leticia?

19        THE WITNESS:  No.

20        MS. McCLELLAN:  Okay.

21        THE WITNESS:  Most of the schools -- the school

22    reported -- the majority of intakes on the Medicraft case

23    came from school.

24        MS. McCLELLAN:  But these specific -- the

25    specific parts of this declaration Ms. Gold has been asking

97

1    you about, do you have like a specific knowledge that Megan

2    or Leticia received this information from the school?

3              THE WITNESS:  I would have to look at the case

4    notes.

5              MS. McCLELLAN:  So is that a no, that you do not

6    have a specific recollection of the source of this

7    information?

8              THE WITNESS:  It came from the school.

9              MS. McCLELLAN:  Okay.

10             THE WITNESS:  Who it was handed to, who it was

11    verbally told to, I'd have to look at the case notes.

12             MS. McCLELLAN:  So does that mean, sitting here

13    today, you do not know who the school told this information

14    to?

15             THE WITNESS:  Exactly.

16             MS. McCLELLAN:  Okay.  Thank you.

17  Q.  (By Ms. Gold)  Lines 5 and 6 on that page, about the

18    disparaging comments made by the mother, have you heard the

19    mother make disparaging comments to her children?

20  A.  Have I witnessed that?  No.

21  Q.  Do you have any idea what the school is talking about when

22    they say disparaging comments about her children?

23  A.  I would have to look at the case information, the case

24    record to read specifically what they said.

25  Q.  Are you aware of how Shaylee worked with the school when

98

1    behavior issues started cropping up with the children?

2  A.  She worked with them.

3  Q.  So she was willing to work with them?

4  A.  Oh, yeah.

5  Q.  And did she go to the school?

6  A.  Yes.

7  Q.  Was she active in their education?

8  A.  She's trying to be.

9  Q.  What prevented her from being more active?

10  A.  I don't know.  You'd have to ask her.

11  Q.  Okay.  So you said she was trying to be.

12  A.  Yeah.  She was open to working with the school to make their

13      education environment more successful, absolutely.

14  Q.  Has she ever expressed to you whether school was important

15      to her?

16  A.  Yes.

17  Q.  Yes, she has said that?

18  A.  Yes.  Good example is, you know, she wanted to make sure

19      that the kids, even though they were having multiple

20      placements, that they could still go to the same school.

21      Which is important to us as well.  Because we all know how

22      important that is -- and the daycare.

23  Q.  Okay.  Same page, page 11, lines 21 through 23, "The school

24      is greatly concerned that the children are being coached to

25      tell lies and being coached to withhold information.

99

1      Educators see the children selectively use their words when

2      discussing the situation."

3              This information was not given directly to you,

4      correct?

5  A.  Yes.

6  Q.  Let me ask that more clearly.  Was this information given

7      directly to you?

8  A.  No.  It was probably the social worker.

9  Q.  Okay.  But this is the same information as above, where

10     you're not quite sure where it came from, correct?

11 A.  Whether it was Leticia or Megan?  No.

12              MS. McCLELLAN:  But do you know it was either

13     Leticia or Megan?  Do you have a specific recollection --

14              THE WITNESS:  Without looking at the case record,

15     I don't know if it was Leticia or Megan or both.  I don't

16     know.

17              MS. McCLELLAN:  Is it possible that Mr. Leuzzi

18     spoke with the school?

19              THE WITNESS:  Yeah.

20              MR. LEUZZI:  Calls for speculation.

21              MS. McCLELLAN:  Is that a yes?

22              THE WITNESS:  If Mr. Leuzzi talked to the school?

23     He could have talked to the school, absolutely.

24              MS. McCLELLAN:  So do you know, sitting here, the

25     source of who the school shared this information with?

1          THE WITNESS:  Another source it could be is CASA.

2          MS. McCLELLAN:  Okay.

3          THE WITNESS:  Or it could have been brought to

4     the attention in one of the weekly meetings.  I don't know

5     the specific person, no.

6          MS. McCLELLAN:  Okay.  That's all we're trying to

7     establish.

8          THE WITNESS:  Okay.

9   Q.  (By Ms. Gold)  Have you witnessed the mother coaching the

10      children to tell lies?

11  A.  No.

12  Q.  Have you witnessed her coaching the children to withhold

13      information?

14  A.  The mother?

15  Q.  Yes.

16  A.  No.

17  Q.  Have you witnessed the father coaching the children to tell

18      lies?

19  A.  No.

20  Q.  Have you witnessed him coaching them to withhold

21      information?

22  A.  No.

23  Q.  Let's move on.  We're running out of time here.

24          Do you have concerns about Ms. Medicraft's

25      developmental abilities?

1  A.  You know, that's been brought up.  I find, without being an

2      expert on testing and such, that she's very intelligent in

3      terms of her -- you can just, you know -- you can have a

4      conversation with someone and understand that.  I don't know

5      what the source of that information is.  But she's able to

6      articulate a lot of interesting different things that tell

7      me that she's intelligent.

8          There has been speculation that she has some

9      developmental issues, her capacity to cognitively understand

10     some things.  That didn't come from me specifically

11     observing her or talking to her.  It's been with other

12     people working with her.

13  Q.  I mean, before you told us you talked to her almost every

14     day since the children -- between the time the children were

15     removed and the time that you left the case.

16  A.  Yeah.  The only -- I mean, about developmental disabilities?

17     Is that what you're specifically asking?

18  Q.  Let me finish my question.  You talked to her about every

19     day in that time span between when the children were removed

20     and when you were off the case.  And is it safe to say you

21     got to know her pretty well during that time?

22  A.  Before I answer that question, it appears that you guys are

23     done asking the question, and that's when I start talking.

24     I'm not talking over anyone.  So I just want you to know

25     that that is not intendful (sic).

1      So the question you have before me now is:  Did I get
2   to know her really well?  As a person?  I don't know.
3   Q.  Okay.
4   A.  I mean, we're in a relationship that is difficult to have,
5   you know.  I made many, many efforts to engage her, to
6   understand, you know, so we could get her in to services,
7   get some help.  I supported her.  I reinforced that I felt
8   like she was a good mother.  But this isn't about that.
9   Everything I could possibly do.
10  Q.  Okay.
11  A.  And then her demeanor changed, and I'm not sure what
12  happened.  And that could be due to a developmental issue or
13  her cognitive capacity to understand certain things.  I
14  don't know.  She seemed to get very angry.
15  Q.  Do you have any evidence that her change in demeanor is due
16  to developmental or cognitive issues?
17  A.  No.  It could have.  Like you asked do I have any knowledge.
18  It could be.  I don't know.  But I did notice the demeanor
19  change, absolutely.
20  Q.  Okay.  Do you have concerns that her developmental ability
21  may impact her ability to parent these children?
22  A.  Concern?  My concern would only be is that if we were not
23  providing service that addressed those developmental issues,
24  if there are some -- which I think we have due diligence to
25  see -- then we're not doing our job correctly.  We need to

1        accommodate that. We need to give service delivery in a way

2        that a client's going to benefit from it.

3  Q.  Okay. But from your interactions with her, you don't see

4        any clear developmental issues with Ms. Medicraft?

5  A.  No. I'm not an expert in that, no.

6  Q.  From what you know and your interactions, you don't see any

7        clear developmental issues with Ms. Medicraft?

8  A.  I have no knowledge of any developmental issues with

9        Ms. Medicraft.

10  Q.  Okay. So the bottom of this page it mentions --

11  A.  Page 11?

12  Q.  Page 12. It mentions Ms. Sanchez running into the family in

13        Walmart. Where did this information come from?

14  A.  King East, Southeast office, their investigation.

15  Q.  Okay.

16  A.  You know, when there's an open investigation on an open CFW

17        case, they, you know, do collaterals with other people

18        who ...

19  Q.  Did Ms. Sanchez tell you this directly?

20  A.  No. I believe she -- I don't know who she told.

21  Q.  And just to be clear, you were not present at this incident

22        at the Walmart?

23  A.  No.

24  Q.  So you have no personal knowledge of what happened on that

25        day?

104

1   A.  I did not witness the incident in Walmart.

2   Q.  Okay.  So on page 13, line 9, it says, "Ms. Medicraft is the

3       victim of serious verbal and physical abuse by

4       Mr. Medicraft."

5   A.  Line 13?

6   Q.  No.  I'm sorry.  Page 13, line 9.  Again, you have not

7       witnessed -- have you witnessed any verbal abuse by

8       Mr. Medicraft of Ms. Medicraft?

9   A.  I have never observed the two speak.

10  Q.  And you have never witnessed physical abuse between those

11      two?

12  A.  Correct.

13  Q.  The next line says, "She does not have the ability to free

14      herself from Mr. Medicraft."

15          What does this mean?

16  A.  To get out of the abusive relationship.

17  Q.  How do you know she does not have the ability to do that?

18  A.  I believe she's tried and hasn't been able to do so.

19  Q.  Have you seen her try?

20  A.  She told me she did.

21  Q.  And she told you she was unable to do so?

22  A.  I stated this earlier, that she wanted to leave and flee him

23      to California, but she said that we stopped her, the

24      Department stopped her.  She was not specific about the

25      social worker or who it was.

1  Q.  Okay.  Line 13 on page 13 states that Mr. Medicraft

2      withholds all support for his family.

3          Have you observed Mr. Medicraft, in your experience --

4      let me strike that.

5          Provide some examples of Mr. Medicraft withholding all

6      support for his family.

7  A.  Well, his wife and children were living in a hotel while he

8      lived in a home.  Why don't we switch that around?  Put the

9      kids and the mom in the home.  Mom was consistently needing

10     financial assistance for basic needs, for rent.

11         However, after this information was brought to our

12     attention, in one of the conversations I had with her I

13     asked her about that, and she did say that he gave her

14     $2,000 at one time.  And I asked her how she got it, and she

15     became quiet and stated that for her -- from her mother, via

16     her mother.  And I don't know what that meant.  So she

17     reports that he gave her $2,000.

18 Q.  So during the time you were on the case there was a domestic

19     violence protection order in place between Mr. and

20     Ms. Medicraft?

21 A.  Correct.

22 Q.  So Mr. Medicraft was not supposed to be communicating with

23     Ms. Medicraft directly, correct?

24 A.  And the children.

25 Q.  Okay.  I'm going to move on to page 14, line number 11 and

1        12.  It states in here, "The children are worse now than

2        they were in April 2019."

3              This declaration was signed December 6th, 2019.  What

4        does it mean that "the children are worse now"?

5  A.  They decompensated over the summer, and it was getting

6        worse.  They weren't able to manage in school, daycare,

7        summer camps.  It was escalating.  And seemed to be after

8        visitation started with the father, which was August or

9        September, I believe.

10  Q.  Okay.  So in your timeline, the children's behavior started

11        escalating in like August or September and had --

12  A.  Well, this is referencing April 2019.  Yeah.

13  Q.  Right.  But in your opinion --

14  A.  From the time that the case got transferred to us, from the

15        time the kids were removed, it never got better.  The

16        condition of the kids and behaviors got worse and worse and

17        worse.

18  Q.  So you didn't know the kids in April of 2019, correct?

19  A.  No.

20  Q.  And you weren't on the case --

21  A.  I wasn't even employed there.

22  Q.  I think you said you were on the case around May.  Is that

23        right?

24  A.  No, no.  That's when I started.  The case came over after I

25        started.  And what I testified to earlier today was, it was

107

1      June or July, and I don't know the exact date.

2   Q.  Okay.  So in December, when you signed this, you're stating

3      that the children are worse now in December than they were

4      in April of 2019.

5   A.  That's what the record reflects.  That's the information

6      that we received at the time that we wrote this declaration.

7   Q.  Are the children better now that they've been removed from

8      their mother?

9   A.  No.

10  Q.  Are they worse?

11  A.  They have been re-traumatized.

12  Q.  They've been re-traumatized by the removal from their mom?

13  A.  From their parents, yeah.

14  Q.  What do you mean by that?

15  A.  Well, any time when you remove a child, it's traumatizing.

16      Any time that you're taken out of everything that you know,

17      placed in out-of-home placement, it's traumatizing.  It's

18      the worse part of this job.

19  Q.  Given what you know now about the children, do you believe

20      they should still be removed from their mother?

21  A.  I haven't been managing this case.  I don't know what's

22      occurred for almost two months.  So -- well, after

23      Christmas.  It's February 12th.  Six weeks.  So I can't

24      answer that.

25  Q.  Okay.  So I'll rephrase that.  Given what you knew before

1     you left and the escalating behaviors you'd seen in the

2     children, do you believe they would be better home with

3     their mother?

4  A.  I don't know, to tell you the truth.  I don't know.

5  Q.  Do you believe they are better off in the Department's care?

6  A.  No.  I believe I answered that, so.  I don't know what it

7     would be like with the mother at this, you know, at this

8     point.

9  Q.  Okay.  And just to be clear, we're talking about when you

10    left the case -- can you give me that date again?  I'm

11    sorry.

12 A.  After the holiday.  So the very first of the year.  After

13    the holiday.  So January 2nd?

14 Q.  So your information on the children ends right around

15    January 2nd?

16 A.  I wasn't managing the case any longer.

17              MS. GOLD:  I don't have anything else.

18              FURTHER EXAMINATION

19 BY MS. McCLELLAN:

20 Q.  Based on your experience as a CFWS social worker, if the

21    children were to be returned to Ms. Medicraft now, are there

22    elements of a safety plan that you would recommend?

23 A.  I can't speculate on that because I'm -- I don't know what's

24    going on with the case right now.

25 Q.  So if the children were being returned to Ms. Medicraft

1     beginning of January --

2  A.  Before Christmas?

3  Q.  -- or right after Christmas, is there a safety plan that you

4      would have recommended?

5  A.  Not with what was going on with the kids, no.

6  Q.  Okay.  So when you were on the case, what was your plan for

7      the children?

8  A.  Oh, stabilize housing, first and foremost, and continue to

9      wrap services around the family.  We were talking about

10     getting the kids tested.  To continue to work with the

11     school.

12  Q.  Hypothetically --

13  A.  Quite frankly, I thought, we've got so much in place for the

14     family, I thought, this might be the best we can do with how

15     they manage.  But just to keep supporting them.

16  Q.  You were talking about housing.  Were you talking about for

17     the mom?

18  A.  Yeah, the mom and kids.

19  Q.  So if the children were going to go home to the mom, one of

20     the issues would be making sure they would have stable

21     housing?

22  A.  Yes.

23  Q.  Hypothetically, if you were told that now, on February 12th,

24     ▇▇▇▇, ▇▇▇▇, and ▇▇▇▇ still do not have a placement, are

25     still in night-to-night care and spending their days at the

110

1     Kent DCYF, the office, and you were managing this case,

2     would you be interested in working with Ms. Medicraft around

3     a safety plan for return home?

4  A.  I can't hypothesize on something I don't know.  So I'm

5     not -- I don't feel comfortable hypothesizing in a

6     deposition.

7         We were always open to a conversation around what's

8     possible in terms of a safety plan and returning children.

9     Returning children is our ultimate goal and priority from

10    the moment they are removed.

11  Q.  Okay.  Ms. Gold asked you a few questions about what I'm

12    going to call the Walmart incident.  Now, that was Tanessa

13    Sanchez that allegedly saw the family at Walmart; is that

14    correct?

15  A.  Yes.

16  Q.  And that occurred, according to Ms. Sanchez, on

17    November 2nd.

18  A.  What page is that on?

19  Q.  Page 12, line 10.

20  A.  Okay.

21  Q.  Is that your understanding, that it happened in early

22    November?

23  A.  I believe that's what her declaration reflects, yes.

24  Q.  You mean your declaration?

25  A.  No, no.  She submitted a declaration as well, I thought.

1     Yeah.

2 Q.  Okay. Now, your declaration also indicates that on

3     December 4th, so about a month later, Ms. Sanchez verified,

4     through a visual observation room, Mr. Medicraft during a

5     visit.

6 A.  Yes.

7 Q.  Were you present for that?

8 A.  No.

9 Q.  Were you part of any discussions about Ms. Sanchez observing

10     that visit that day?

11 A.  With whom?

12 Q.  Anybody.

13 A.  No.

14 Q.  Did you know that Ms. Sanchez was going to go observe that

15     visit that day?

16 A.  Yes.

17 Q.  How did you learn that she was going to observe that visit?

18 A.  It was my understanding that she was asked to.

19 Q.  In your understanding, who asked her to do that?

20 A.  Derek.

21 Q.  Okay.

22           MS. McCLELLAN: I don't have any other questions.

23           MS. REDMAN: I have one.

24

25

Liza Sterbick - February 12, 2020

112

1              EXAMINATION

2      BY MS. REDMAN:

3   Q.  So you mentioned talking to Shaylee Medicraft about her

4       interest in going to California, and she said that she

5       couldn't because the Department said she couldn't.

6   A.  That was her perception, I guess.

7   Q.  Did she ever talk to you about any physical abuse by

8       Mr. Medicraft?

9   A.  To her?

10  Q.  Yes.

11  A.  No, not to me directly.

12  Q.  Did she ever talk to you about any other kind of domestic

13      violence with Mr. Medicraft?

14  A.  No, not to me directly.

15  Q.  Okay.

16              MS. REDMAN:  I don't have anything else.

17              MS. McCLELLAN:  I think we're done.

18                 (Deposition concluded at 4:02 p.m.)

19                 (Signature reserved)

20                 (Exhibit No. 1 attached)

21

22

23

24

25

1
2                        C E R T I F I C A T E
3    STATE OF WASHINGTON)
                         ) ss.
4    COUNTY OF KING      )

5

6              I, Laurie B. Porter, Certified Court Reporter
7    in and for the State of Washington, license number 2376,
8    do hereby certify:
9              That the annexed and foregoing deposition of
10   the witness named herein was taken stenographically before
11   me and reduced to typewriting under my direction;
12             I further certify that the said witness was
13   afforded the opportunity to examine, read, and sign said
14   deposition after the same was transcribed, unless
15   indicated in the record that the parties and the witness
16   waive the signing;
17             I further certify that all objections made at
18   the time of said examination were noted by me upon said
19   deposition;
20             I further certify that I am not a relative or
21   employee or attorney or counsel of any of the parties to
22   said action, or a relative or employee of any such
23   attorney or counsel, and that I am not financially
24   interested in the said action or the outcome thereof;
25             I further certify that the witness before

Liza Sterbick - February 12, 2020

114

1  examination was by me duly sworn to testify to the truth,

2  the whole truth, and nothing but the truth;

3          I further certify that the deposition, as

4  transcribed, is a full, true, and correct transcript of

5  the testimony, including questions and answers, and all

6  objections, motions and exceptions of counsel made and

7  taken at the time of the foregoing examination, to the

8  best of my ability.

9

10

11          IN WITNESS WHEREOF, this 5th day of March 2020.

12

13

14

15

16          _____

17          Laurie B. Porter, CCR
            License No. 2376
18          Certified Court Reporter in
            and for the State of Washington,
19          residing in Issaquah.

20

21

22

23

24

25

115

Laurie B. Porter, CCR
Northwest Court Reporters
1415 Second Avenue, Suite 1107
Seattle, Washington 98101
(206)623-6136


March 6, 2020


Liza Sterbick
C\O Derek Leuzzi
Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104

    Re:    The Dependency of Medicraft
           Cause No. 19-7-01267-4 KNT, et al.
           Deposition taken February 12, 2020


Dear Ms. Sterbick,

    Your deposition taken in the above matter has been
transcribed and is available for you to read and sign and
make corrections, if appropriate.

    Please contact me at the phone number above to
schedule a time to come in and read your transcript, or
you can advise me if you wish to waive that right.

    Please be aware that the court rules provide that the
signature be accomplished within 30 days of receipt of
notice, or before trial, whichever occurs first.


                    Thank you for your cooperation in this matter,



                    Laurie B. Porter, CCR

Enc.
Cc:  Court file
     Hannah Gold
     Helen Redman

116

LAURIE B. PORTER, CCR
Northwest Court Reporters
1415 Second Avenue, Suite 1107
Seattle, Washington  98101
(206)623-6136


March 6, 2020

TO: Hannah Gold
    Northwest Defenders Division/KCDPD
    124 Fourth Avenue South, Suite 100
    Kent Washington  98032


NOTICE REGARDING FILING OF ORIGINAL
DEPOSITION TRANSCRIPT

RE:  Case Name:      In re the Dependency of Medicraft
     Venue:          King County, Juvenile Department
     Cause No:       19-7-01267-4 KNT, et al.
     Deposition of:  Liza Sterbick
     Taken:          February 12, 2020

     Enclosed you will find the original sealed transcript
of Liza Sterbick.

     The original signature page and changes, if any,
received by this office will be forwarded to all counsel.

     Thank you for your cooperation in this matter.


                              Laurie B. Porter, CCR



Cc:  Court file
     File
     Derek Leuzzi
     Helen Redman

# EXHIBIT 8

CONNECTIONS
STAGE SUMMARY

****WARNING****
CONFIDENTIAL INFORMATION
AUTHORIZED PERSONNEL ONLY

CASE ID: 27187786
CASE NAME: Medicraft,Shaylee

STAGE: Investigation
STAGE ID: 32419275
STAGE NAME: Medicraft,Shaylee E
REPORT DATE: 2/25/2019

STATE. THE MONTGOMERY COUNTY SHERIFF WAS ABLE TO PING THE FAMILIE'S PHONES TO OHIO AND THEN AGAIN A FEW DAYS LATER TO WASHINGTON STATE. A CPS REPORT WAS CALLED IN TO THE LOCAL COUNTY IN WASHINGTON STATE. THE FAMILY AND CHILDREN WERE SEEN BY THEIR LOCAL SOCIAL WORKER. THE CHILDREN HAVE BEEN ENROLLED IN SCHOOL IN WASHINGTON STATE. DUE TO THE CHILDREN AND PARENTS LEAVING THE STATE, THE CHILDREN BEING MONITORED BY LOCAL CPS IN WASHINGTON AND BEING ENROLLED AND SEEN IN SCHOOL, THIS CASE IS BEING CLOSED AND THE ALLEGATIONS ARE BEING INDICATED.

Section C        UNSUBSTANTIATED ALLEGATIONS

For each unsubstantiated allegation, please describe how the evidence gathered does not support a finding of abuse or maltreatment as defined in the elements above. Please be sure to address each allegation for each child and subject:

THE ALLEGATIONS OF EXCP AGAINST JAMES MEDICRAFT WITH REGARD TO HIS CHILDREN, ███████ AND ███ MEDICRAFT ARE BEING UNFOUNDED. THE CHILDREN AND PARENTS LEFT AND MOVED OUT OF STATE. THERE WAS NOT ENOUGH CREDIBLE EVIDENCE TO INDICATE THESE ALLEGATIONS.

# EXHIBIT 9



1

                         **FILED**
                 **2019 DEC 19**
               **KING COUNTY**         Commissioner/Judge

2
       **SUPERIOR COURT CLERK**       Hearing Date
                                   Hearing Time

3
        **CASE #: 19-7-01266-6 KNT**

4

5

6

7

8
       **SUPERIOR COURT OF WASHINGTON FOR KING COUNTY**
                  **JUVENILE DEPARTMENT**

9
IN RE DEPENDENCY OF:     NO.

10
MEDICRAFT,████████
████/2012           19-7-01267-4 KNT

11
                            19-7-01268-2 KNT
MEDICRAFT,████████      19-7-01266-6 KNT

12
████/2013           19-7-01270-4 KNT
                            19-7-01271-2 KNT

13
MEDICRAFT,████████
████/2010           DECLARATION OF DEPARTMENT

14
                            SOCIAL WORKER RE PHOTOS FROM
MEDICRAFT,████████      DECEMBER 6, 2019

15
████/2014

16
MEDICRAFT,████████
████/2018

17

18
           Minor Child(ren).

19
I, Amanda Fry, hereby declare as follows:

20
    I am employed by the Department of Children, Youth and Families as a social

21
worker and make this declaration as such. I am over the age of eighteen and competent to

22
testify herein.

23
    I took the photographs attached of ████ and ████ Medicraft on December 6,

24
2019. They are true and accurate depictions of the condition of the children on that date

25
when they were removed from their mother's care.

26
DECLARATION OF DEPARTMENT SOCIAL      1      ATTORNEY GENERAL OF WASHINGTON
WORKER                               800 Fifth Avenue, Suite 2000
Rev. 03/01 pp                              Seattle, WA 98164-3188
                                     (206) 464-7744

1    Additionally, the children were dirty and ████ had underwear one that were

2    soiled from days prior.

3    I declare under penalty of perjury under the laws of the State of Washington that the

4    foregoing is true and correct.

5    Dated this ___7___ day of ___December___, 20_19_, at ___Kent___

6    Washington.

7

8

9    UNAME _Amanda Fry_
     Department Social Worker

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   DECLARATION OF DEPARTMENT SOCIAL            2        ATTORNEY GENERAL OF WASHINGTON
     WORKER                                                   800 Fifth Avenue, Suite 2000
     Rev 03/01 pp                                              Seattle, WA 98104-3188
                                                                (206) 464-7744

# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



## Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# EXHIBIT 10

☐King East ☐King West ☐MLK
☐OICW ☐West Seattle
☒King South East ☐King South West
☐Adoptions ☐Private

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON FOR KING COUNTY
JUVENILE DIVISION

| | |
|---|---|
| Shaylee Medicraft v. James Medicraft | No. 20-2-00916-4 SEA  (FAMILY LAW) |
| IN RE THE DEPENDENCY OF | No. 19-7-01266-6 KNT (DEPENDENCY) |
| | 19-7-01267-4 KNT (DEPENDENCY) |
| MEDICRAFT, ▆▆▆ (DOB ▆▆/2010) | 19-7-01268-2 KNT (DEPENDENCY) |
| MEDICRAFT, ▆▆▆ (DOB ▆▆/2012) | 19-7-01270-4 KNT (DEPENDENCY) |
| MEDICRAFT, ▆▆▆ (DOB ▆▆/2013) | 19-7-01271-2 KNT (DEPENDENCY) |
| MEDICRAFT, ▆▆▆ (DOB ▆▆/2014) | |
| MEDICRAFT, ▆▆▆ (DOB ▆▆/2018 | |
| | **AMENDED Note for Calendar – Juvenile Dependency Motions** |
| Minor Child. | **(Clerk's Action Required)** |

The Clerk of the Court is requested to please note the contested dependency matter:

**CALENDAR:**    Dependency Lead Judge, 516 Third Avenue, Room E-863, Seattle, WA 98104

**TYPE OF HEARING:**  New Motion - Moving Party    **ARGUMENT:** With Oral
**NATURE OF HEARING**: Motion to Terminate Order of Protection
**HEARING LENGTH:**  Estimate 15 Minutes

**DATE OF HEARING:**  Wed, February 5, 2020
**TIME OF HEARING:**  8:30  am

Dated: <u>1/27/2020</u>

Kathleen McClellan, NDD, #43159
Hannah Gold, NDD #45516
710 Second Avenue, Suite 250
Seattle, WA 98104
206-477-9125

Kathleen.mcclellan@kingcounty.gov

Notice to Attorneys/Parties of Record:

Derek Leuzzi, AG
Helen Redman/Justine Olimene, Attorney for Father, TDAD
Kathleen Martin, Attorney for GAL Virginia Whalen

|  | **Court of Washington** | No. 20-2-00916-4 SEA |
|---|---|---|
| **For** | | |

**Shaylee Medicraft**
Petitioner

vs.

**James Medicraft**
Respondent

**Motion to Modify/Terminate Order for Protection**
☒ **Petitioner**
☐ **Respondent (Order Lasts Two Years or Less)** (MTAF)
(Clerk's Action Required)

☒ I am the Petitioner.
☐ I am the Respondent.  The order identified below was granted for a period of time for two years or less. (Respondent: if the order lasts more than two years, do not use this motion.  Use form DV 7.050, Respondent's Motion to Modify/Terminate Order for Protection Effective More than Two Years.)

I request that the court ☐ modify ☒ terminate the:

☐ Temporary Order for Protection, filed on _____ (date).
☒ Order for Protection, filed on  2/6/19 in NY State (see below)_____ (date),
which expires on _2/5/2021_____ (date).
☐ _____, filed on _____ (date).

The order referenced above should be modified/terminated because:_____

The order is no longer necessary. CPS currently has care of my children. The court here has already ordered visits for my children and their father. Therefore the issues in this order are in CPS's hands. My children are struggling in CPS's care. The order is hindering expanded contact with their father, which they need._____

I got this order due to a misunderstanding where I thought my husband was going to take my children out of state. I did not want an order that was this long and it feels extremely long given the circumstances. Because the court is involved, these concerns are no longer an issue._____

This order was initially requested in Family Court of New York, County of Montgomery on October 16, 2018 as docket number 0-01494-18. New York gave Washington jurisdiction over all orders regarding our family. The protection order has since been registered in Washington State under this cause number.

_____
_____
_____
_____
_____
_____
_____
_____
_____

☐ The order referenced above should be modified as follows:

_____
_____
_____
_____
_____
_____
_____
_____

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Dated: 1/22/20 _____        _Shaylee Medcaft_____
                              **Signature of Moving Party**

**This document must be served on the other party, and
proof of service must be in the court file prior to the hearing.**

SUPERIOR COURT OF WASHINGTON
FOR KING COUNTY, JUVENILE DEPARTMENT

Shaylee Medicraft v. James Medicraft

IN RE THE DEPENDENCY OF

MEDICRAFT, ▮▮▮(DOB ▮/2010)
MEDICRAFT▮▮▮ (DOB ▮/2012)
MEDICRAFT, ▮▮▮(DOB ▮/2013)
MEDICRAFT, ▮▮▮(DOB ▮/2014)
MEDICRAFT, ▮▮▮(DOB ▮/2018)

Minor Children

No. 20-2-00916-4 SEA  (FAMILY LAW)

No. 19-7-01266-6 KNT (DEPENDENCY)
19-7-01267-4 KNT (DEPENDENCY)
19-7-01268-2 KNT (DEPENDENCY)
19-7-01270-4 KNT (DEPENDENCY)
19-7-01271-2 KNT (DEPENDENCY)

MEMORANDUM OF MOTHER IN
SUPPORT OF MOTION TO TERMINATE
ORDER FOR PROTECTION

COMES NOW, SHAYLEE MEDICRAFT, through her attorneys Hannah Gold, Kathleen McClellan and the Northwest Defenders Division of King County Department of Public Defense, and hereby submits the following joint memorandum in support of the Petitioner's Motion to Terminate the Order of Protection:

## I.  RELIEF REQUESTED

The Petitioner, Shaylee Medicraft, respectfully requests that the Court terminate the Order of Protection entered in New York on February 6, 2019, and subsequently registered in the state of Washington under Cause No. 20-2-00916-4 SEA (Exhibit A).

MEMORANDUM IN SUPPORT OF MOTION - 1

## II. STATEMENT OF FACTS

The mother's motion to terminate the order for protection is incorporated herein.

Shaylee Medicraft and James Medicraft are the mother of five children: ████ Medicraft (age 9), ████ Medicraft (age 7), ████ Medicraft (age 6), ████ Medicraft (age 5), ████ Medicraft (age 23 months).

On February 6, 2019, the Montgomery Family Court in New York entered an order of protection prohibiting contact between Mr. Medicraft and Ms. Medicraft and the children. Exhibit A. This order expires on February 5, 2021; therefore, the order is a "less than two year" order of protection.

On April 25, 2019, the DCYF filed a dependency petition in Washington regarding these five children. At the initial shelter care hearing, the children were placed in the care of Ms. Medicraft. The children remained in Ms. Medicraft's care until December 9, 2019, when the children were placed in licensed foster care. Since then, the children have been placed in numerous placements; the three older boys have been without placements for significant periods of time.

On June 19, 2019, Judge Cortese from the Montgomery Family Court in New York entered an order declining jurisdiction by New York over this matter. Exhibit B, June 19, 2019 Order. This order specifically stated that the Superior Court of Washington for the County of King Juvenile Department is the most appropriate forum to determine the issues of enforcement, modification, and/or violation of the Order of Protection issued by Montgomery County.

On July 19, 2019, there was a status conference in the dependency case before Judge Berns. Exhibit C, July 19, 2019 Order. In this order, Judge Berns ordered that King County Juvenile Court has exclusive jurisdiction over the Medicraft children, and has the authority to

MEMORANDUM IN SUPPORT OF MOTION – 2

NORTHWEST DEFENDERS DIVISION
KING COUNTY DEPT OF PUBLIC DEFENSE
710 Second Ave, Suite 250
Seattle, Washington 98104
Phone: (206) 674-4700  Fax: (206) 674-4702

1 | address and provide for placement and visitation of the children. *Id.* The Court further stated

2 | that it did not have the authority to modify the existing New York protection order between the

3 | parents until the parents file a motion in this Court for such relief. *Id.*

4 | On August 27, 2019, an order was entered authorizing visitation between Mr. Medicraft

5 | and the children. Exhibit D, August 27, 2019 Order. The Court did not modify or terminate the

6 | order of protection when it entered this order. DCYF has been providing Mr. Medicraft

7 | visitation with the children pursuant to this order. The dependency case is pending trial, and the

8 | purpose of this case is to reunify the children with one or both of their parents.

9 | The mother is now filing a motion, as contemplated in the July 19, 2019 Order, to

10 | terminate the existing order of protection. In order to do so, the mother first had the order

11 | appropriately registered in Washington under Cause No. 20-2-00916-4 SEA.

12 | **III. ISSUES**

13 | Should the Court terminate the order of protection as requested by the Petitioner?

14 | **IV. ARGUMENT**

15 | The Dependency Court has exclusive jurisdiction over matters relating to these children.

16 | RCW 13.04.030. Further, the Dependency Court was explicitly given jurisdiction to determine

17 | the issues of enforcement, modification, and/or violation of the Order of Protection issued by

18 | Montgomery County, New York. Pursuant to LJuCR 3.15(c), the dependency court also has the

19 | authority to hear RCW Title 26 issues. For all of these reasons, the Dependency Court has the

20 | authority to terminate the existing order of protection in place involving this family.

21 | The existing order of protection should be terminated pursuant to RCW 26.50.130(6).

22 | Pursuant to RCW 26.50.130(6), the Court may terminate an existing order of protection upon a

23 | motion filed by the Petitioner, and the Court shall hear the Petitioner's motion without an

24 |

MEMORANDUM IN SUPPORT OF MOTION - 3

1   adequate cause hearing. Because the order at issue is in effect for less than two years, RCW

2   26.50.130(2)-(5) do not apply to this motion.

3          Ms. Medicraft sought the order of protection because she feared that Mr. Medicraft was

4   going to take her children out of state and interfere with her custody of the children.

5   Circumstances have changed significantly since the February 6, 2019 order of protection was

6   entered in New York.  The family relocated to Washington State, and WA DCYF became

7   involved with this family.  A dependency petition was filed in April 2019, and the children have

8   been removed from the care of the parents and placed in the care of DCYF.  Both DCYF and the

9   Dependency Court are monitoring this family and the children.   The King County Superior

10  Court, Juvenile Division, has exercised exclusive jurisdiction over these children.

11         Ms. Medicraft is the Petitioner, and she no longer wishes to have an order in place that

12  prohibits all contact between her and her husband.  She sought this order in response to very

13  specific circumstances in New York relating to the custody of her children and concerns that she

14  had at that time.  Those circumstances are no longer relevant today, and the order of protection is

15  no longer necessary or appropriate.   Therefore, Ms. Medicraft is requesting that the order of

16  protection be terminated as to her.

17         The order of protection protecting the children from their father is no longer necessary.

18  The dependency case remains pending.  The Dependency Court is in the best position to evaluate

19  current information and to make on-going decisions about Mr. Medicraft's contact with the

20  children.  The Dependency Court is able to both liberalize and to restrict Mr. Medicraft's contact

21  with the children as appropriate.  Maintaining the order of protection only serves as a barrier to

22  making appropriate, thoughtful decisions for this family and to work towards permanency with

23  this family.  If a restraining order between Mr. Medicraft and the children is necessary in the

24

NORTHWEST DEFENDERS DIVISION
KING COUNTY DEPT OF PUBLIC DEFENSE
710 Second Ave, Suite 250
Seattle, Washington  98104
Phone: (206) 674-4700   Fax: (206) 674-4702

1 future, the dependency court has the authority to enter such an order after conducting a thorough

2 hearing. Similarly, if the children are returned to the care of Ms. Medicraft, and the Dependency

3 Court has concerns about contact between the children and Mr. Medicraft at that time, the

4 Dependency Court can fashion appropriate conditions of placement.

5        Furthermore, the continued existence of the order of protection is placing all of the

6 parties in precarious situation. The February 6, 2019 order remains in effect. However, this

7 Dependency Court also has entered an order that specifically authorizes contact between Mr.

8 Medicraft and the children, without modifying or terminating the February 6, 2019 order. The

9 Department and the father have been relying on the Court's August 27th order in arranging

10 visitation, but these orders directly conflict. The father should not be put in the position of

11 potentially violating one order in order to comply with a subsequent order that authorizes

12 visitation.

13        Finally, the provisions of the order of protection that restrict contact between Mr.

14 Medicraft and the children are hindering the parties' ability to work meaningfully to reunify the

15 children with their father. These children are struggling in the care of the Department. It is

16 imperative that the parties explore all avenues to maximize contact between the children and

17 both of their parents and reunification for these children.

18

19                 **V. EVIDENCE RELIED UPON**

20 Exhibit A: February 6, 2019 Order of Protection

21 Exhibit B, June 19, 2019 Order

22 Exhibit C, July 19, 2019 Order

23 Exhibit D, August 27, 2019 Order

24

MEMORANDUM IN SUPPORT OF MOTION - 5

[02] Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion or any criminal offense against ██████ Medicraft (DOB: ██████/2012), ██████ Medicraft (DOB: ██████/2013), ██████ Medicraft (DOB: ██████/2010), ██████ Medicraft (DOB: ██████/2014), ██████ Medicraft (DOB: ██████/2018) and Shaylee Medicraft (DOB: 01/01/1991);

[99] Observe such other conditions as are necessary to further the purposes of protection: ORDERED that in the event of an arrest for a violation of this Order, bail is set in the sum of One Thousand Five Hundred & 00/100 Dollars ($1,500.00);

It is further ordered that this order of protection shall remain in force until and including February 05, 2021.

Dated:    February 06, 2019                                    ENTER

ENTERED
MONTGOMERY COUNTY FAMILY COURT

FEB 0 6 2019

CLERK

Honorable Philip V. Cortese

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

The Family Court Act provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties authorizes, and sometimes requires such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

Federal law requires that this order is effective outside, as well as inside, New York State. It must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person restrained by the order is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect due process rights (18 U.S.C §§ 2265, 2266).

It is a federal crime to:
• cross state lines to violate this order or to stalk, harass or commit domestic violence against an intimate partner or family member;
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect (Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against an intimate partner or family member, even after this Order has expired (18 U.S.C. §§ 922(g)(8), 922(g)(9), 2261, 2261A, 2262).

Check Applicable Box(es):

[x] Party against whom order was issued was advised in Court of issuance and contents of Order

[x] Order personally served in Court upon party against whom order was issued

[ ] Service directed by other means[specify]: _____

[ ] [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]:

[ ] Warrant issued for party against whom order was issued[specify date]: _____

[ ] ADDITIONAL SERVICE INFORMATION [specify]: _____

CCs:   Montgomery County Sheriff's Department

F.C.A §§ 446, 551, 656, 842 & 1056                                     GF5a 12/2013

ORI No:     NY028023J
Order No:   2019-000088
NYSID No:   _____

At a term of the Family Court of the State of New York,
held in and for the County of Montgomery, at Courthouse 58
Broadway, P.O. Box 1500, Fonda, NY 12068-1500, on February 06,
2019

**PRESENT: Honorable Philip V. Cortese**

In the Matter of a FAMILY OFFENSE Proceeding

Shaylee Medicraft (DOB: 01/01/1991),
                          Petitioner

O/B/O

███ Medicraft (DOB: ███/2014),
███ Medicraft (DOB: ███/2018),
███ Medicraft (DOB: ███/2010),
███ Medicraft (DOB: ███/2013),
███ Medicraft (DOB: ███/2012)

        - against -

James R. Medicraft (DOB: 02/17/1959),
                          Respondent

File #     12199

Docket #   O-01494-18

**Order of Protection**

**Both Parties Present in Court**

NOTICE: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND
CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR
CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO FAMILY COURT PROSECUTION AND
INCARCERATION FOR UP TO SIX MONTHS FOR CONTEMPT OF COURT.

THIS ORDER OF PROTECTION WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR
CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS
ISSUED. THIS ORDER OF PROTECTION CAN ONLY BE MODIFIED OR TERMINATED BY THE COURT. THE
PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS
ORDER .

A petition under Article 8 of the Family Court Act, having been filed on October 16, 2018 in this Court and On Consent, and James
R. Medicraft having been present in Court and advised of the issuance and contents of this Order.

    NOW, THEREFORE, IT IS HEREBY ORDERED that James R. Medicraft (DOB:02/17/1959) observe the following
conditions of behavior:

[01] Stay away from:

[A] ███ Medicraft (DOB: 03/14/2012), ███ Medicraft (DOB: ███/2013), ███ Medicraft (DOB: ███/2010), ███
    Medicraft (DOB: ███/2014), ███ Medicraft (DOB: ███/2018) and Shaylee Medicraft (DOB: ███/1991);

[B] the home of ███ Medicraft (DOB: ███/2012), ███ Medicraft (DOB: ███/2013), ███ Medicraft (DOB:
    ███/2010), ███ Medicraft (DOB: ███/2014), ███ Medicraft (DOB: ███/2018) and Shaylee Medicraft (DOB:
    01/01/1991);

[C] the school of ███ Medicraft (DOB: ███/2012), ███ Medicraft (DOB: ███/2013), ███ Medicraft (DOB:
    ███/2010), ███ Medicraft (DOB: ███/2014) and ███ Medicraft (DOB: ███/2018) and/or daycare of children;

[D] the business of Shaylee Medicraft (DOB: 01/01/1991);

[E] the place of employment of Shaylee Medicraft (DOB: 01/01/1991);

[14] Refrain from communication or any other contact by mail, telephone, e-mail, voice-mail or other electronic or any other
    means with ███ Medicraft (DOB: ███/2012), ███ Medicraft (DOB: ███/2013), ███ Medicraft (DOB:
    ███/2010), ███ Medicraft (DOB: ███/2014), ███ Medicraft (DOB: ███/2018) and Shaylee Medicraft (DOB:
    01/01/1991) EXCEPT James R. Medicraft may send written communication once monthly to the children at: PO Box 162,
    Fonda, NY 12068; Shaylee Medicraft may review such written correspondence prior to giving to the children; the children
    may respond to such written correspondence in writing;

State of New York }
Montgomery County     ss.:
FAMILY COURT



     I, LAURIE A. FURNARE, Chief Clerk of the FAMILY COURT, do hereby certify that I have compared the foregoing copy of Order dated _____ with the original thereof on file with the Court and that the same is a correct transcript therefrom and the whole of such original.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, this _____ day of _____, 2019 at Fonda, New York.

_____
Chief Clerk of the Family Court

FILED
2020 JAN 10
KING COUNTY
SUPERIOR COURT CLERK

CASE #: 20-2-00916-4 SEA

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

Medicraft, Shaylee

               Plaintiff/Petitioner.

vs.

Medicraft, James

               Defendant/Respondent.

20 - 2 - 00916 - 4 SEA

[✓] SEA
[ ] KNT

NO.

Order for Protection - State of New York    is attached.
(Document Title)

L:/forms/cashiers/gr14coversheet

DATED this 27th Day of January 2020.

s/Kathleen McClellan
Kathleen McClellan, WSBA #43159
Northwest Defenders Division
King County Department of Public Defense
710 Second Ave, Suite 250
Seattle, WA 98104
Telephone: (206) 674-4700
FAX: (206) 674-4702
E-Mail: Kathleen.mcclellan@kingcounty.gov

s/Hannah Gold
Hannah Gold, WSBA #45516
Northwest Defenders Division
King County Department of Public Defense
710 Second Ave, Suite 250
Seattle, WA 98104
Telephone: (206) 674-4700
FAX: (206) 674-4702
E-Mail: Hannah.Gold@kingcounty.gov

MEMORANDUM IN SUPPORT OF MOTION - 6

# FILED

KING COUNTY, WASHINGTON

AUG 27 2019

SUPERIOR COURT CLERK
BY Tara Shoemaker
DEPUTY

☐King West ☐OICW
☐White Center ☐MLK
☐King East ☒King South

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON FOR KING COUNTY
JUVENILE DIVISION

In re the Dependency of:

Medicraft, , DoB 1/10,
Medicraft, , DoB 6/ :12,
Medicraft, , DoB 13,
Medicraft, , DoB 14/,
Medicraft, , DoB 18     Minor
                        Children

No: 19-7-01266-6 KNT  19-7-01270-4 KNT
    19-7-01267-4 KNT  19-7-01271-2 KNT
    19-7-01268-2 KNT

Order ~~on Motion~~ re: Father's Visitation

Clerk's Action Required.

The above-entitled Court, ~~having heard a Motion~~ the parties agree that the father should have visitation with the children, as ~~provided~~ below.

It is hereby ORDERED that Once the father has attended a meeting with the social worker, visitation shall start once time per week for two hours each visit, supervised by DCYF or a DCYF designee. Initially visitations shall start with the three older boys at one visit and the younger two children at another visit. Visits shall occur at a DCYF-approved location. DCYF has authority to liberalize in consultation with the children's therapist and the CASA.

Dated: AUG 26 2019

Judge/Commissioner PT CANM Gould

Attorney for the Department
WSBA # 3690

Attorney for the Father
WSBA # 35773  Division SCRAP-Div.

Attorney for the Mother
WSBA # 33530  Division A080

Attorney for the Youth/CASA
WSBA # 40323  Division

Order on Motion - Page 1 of 1

Revised 4/15/15

ORIGINAL

ENTRY; NOTICE OF PRESENTATION
WAIVED:

_____

33552 , WSBA #
Attorney for Mother AWAD

_____

_____, WSBA # 10753
Attorney for Father

_____

Attorney for CASA/GAL

ORDER
Rev. 9-1-00 pp

3

1    Cortese, stating that New York is declining jurisdiction of the case originally

2    filed in Montgomery County. The dependency proceedings in King County,

3    Washington will proceed as scheduled.

4   2. King County Juvenile Court has exclusive jurisdiction over the above-named

5    children and has the authority to ~~modify any provisions regarding~~ *address and provide for* placement and

6    visitation of the children. It is this court's understanding that Washington does *within context of dependency proceedings*

7    not have the authority to modify the existing protection order between the

8    parents. *

9   3. Proceeding shall continue to be heard on the regular juvenile law calendar at the

10    Kent Regional Justice Center.

11   4. The Court, based on the orders entered in New York between the father and

12    *and safety concerns* children, urges the CASA program to make the assignment of a CASA to this

13    case a priority.

14   * The Court does not have authority to Modify the NY Parenting

15    Plan until the parents file an action in this Court for such relief.

15    DATED this ___ day of July, 2019.

16

17                    JUDGE/~~COMMISSIONER~~

18                    JUDGE ELIZABETH BERNS

19  Presented by:

20  ROBERT W. FERGUSON
     Attorney General

21

22  By

23    MICHAEL COLLINS
     Assistant Attorney General
     WSBA #19375

24

25  COPY RECEIVED: APPROVED FOR

26  ORDER
    Rev. 9-1-00 pp

                          2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

```
 1                              FILED
                             2019 JUL 19
 2                            KING COUNTY
                         SUPERIOR COURT CLERK
 3
                        CASE #: 19-7-01271-2 KNT
 4

 5

 6        SUPERIOR COURT OF WASHINGTON FOR THE COUNTY OF KING
                          JUVENILE DEPARTMENT
 7
     IN RE DEPENDENCY OF:              NO.  19-7-01266-6 KNT
 8                                         19-7-01267-4 KNT
     MEDICRAFT, ████████                    19-7-01268-2 KNT
 9   DOB: ████/2010                         19-7-01270-4 KNT
                                           19-7-01271-2 KNT ✓
10   MEDICRAFT, ████████
11   DOB: ████/2012                     ORDER RE STATUS CONFERENCE

12   MEDICRAFT, ████████
     DOB: ████/2013
13

14   MEDICRAFT, ████████
     DOB: ████/2014
15
     MEDICRAFT, ████████
16   DOB: ████/2018

17

18

19                  Minor Children

20        THIS MATTER, having come on before the court on the its pretrial calendar for a

21   status conference, and the court, being familiar with the records and files herein,  and

22   having heard from the parties, it is hereby:

23        ORDERED, ADJUDGED and DECREED

24     1. All parties have acknowledged that they have received the court order from

25        Montgomery County, New York, dated June 19, 2019, signed by Judge Philip V.

26   ORDER                              1          ATTORNEY GENERAL OF WASHINGTON
     Rev. 9-1-00 pp                                        800 Fifth Avenue, Suite 2000
                                                             Seattle, WA 98104-3188
                                                               (206) 464-7744
```

ORIGINAL

GF15 8/2010

At a term of the Family Court of the
State of New York, held in and for
the County of Montgomery, at
Courthouse, 58 Broadway, P.O. Box
1500, Fonda, NY 12068-1500, on
June 11, 2019

PRESENT:  Hon. Philip V. Cortese

In the Matter of a **Family Offense** Proceeding

**Shaylee Medicraft**,

                Petitioner,

  - against -

**James R. Medicraft**,

                Respondent.

File #:    12199
Docket #:  O-01494-18

**ORDER ON MOTION**
**(Order Declining Jurisdiction)**

The Attorney for the Children, Michael E. Sutton, Esq., having filed a motion brought on by Order to Show Cause signed and entered on February 25, 2019 in the above captioned matter seeking an order reconsidering and modifying the Order of Protection signed and entered on February 6, 2019; and

The matter having come before the Court on March 18, 2019 with appearances by Shaylee Medicraft, electronically, by telephone and by and through her assigned counsel, Rachel A. Rappazzo, Esq.; James R. Medicraft NOT appearing but his attorneys, The Montgomery County Public Defender's Office, Bethany Schumann-McGhee, Esq., of counsel, having appeared in person; The Montgomery County Department of Social Services having appeared by and through its counsel, Adam G. Giangreco, Esq.; and the Attorney for the Children, Michael E. Sutton, Esq., having appeared in person; and

After discussion on the record, the matter was adjourned for further proceedings on May 21, 2019; and

On May 21, 2019, Shaylee Medicraft, appeared electronically, by telephone and by and through her assigned counsel, Rachel A. Rappazzo, Esq.; James R. Medicraft having NOT appeared, but his attorneys, The Montgomery County Public Defender's Office, Richard P. Weinheimer, Esq., of counsel, having appeared in person; The Montgomery County Department of Social Services having appeared by and through its counsel, Adam G. Giangreco, Esq.; and the Attorney for the Children, Michael E. Sutton, Esq., having appeared in person; and

A discussion on the record having been held regarding pending proceedings in the State of Washington, and a question being raised if this Court should contact Hon. Elizabeth J. Berns, King County Superior Court, Washington pursuant to Uniform Child Custody Jurisdiction and

i

Enforcement Act as codified in New York Domestic Relations Law §§ 75 et seq. to determine if this Court should retain jurisdiction or decline jurisdiction, and Attorney Giangreco having made an oral motion to remove the Montgomery County Department of Social Services as an interested party as the family no longer resides in this jurisdiction and the proper authorities in the State of Washington are investigating the family, which motion was granted; and the matter having been adjourned to June 11, 2019 for further proceedings; and

The Montgomery County Family Court, State of New York having issued the last order regarding custody and visitation between the parties, which order was signed and entered on March 11, 2019; and

The aforementioned order having been entered on consent of the parties, their respective counsel and the Attorney for the Child, Michael E. Sutton, Esq.; and

This Court having exclusive, continuing jurisdiction over the issues of custody and visitation by virtue of Uniform Child Custody Jurisdiction and Enforcement Act as codified in New York Domestic Relations Law § 75-i; and

On May 30, 2019 this Court having had a telephone conference with Judge Berns pursuant to Uniform Child Custody Jurisdiction and Enforcement Act as codified in New York Domestic Relations Law § 75-i; and

On June 11, 2019, Shaylee Medicraft, having NOT appeared, but her assigned counsel, Rachel A. Rappazzo, Esq., having appeared in person; James R. Medicraft having NOT appeared, but his attorneys, The Montgomery County Public Defender's Office, Richard P. Weinheimer, Esq., of counsel, having appeared in person; and the Attorney for the Children, Michael E. Sutton, Esq., having appeared in person; and

The Court having advised counsel of the discussions with Judge Berns, and all counsel having moved to have this Court decline jurisdiction as the family is residing in the State of Washington, and the Division for Children, Youth and Families being involved with the family;

NOW, based upon the Court's own motion, consent of the parties and counsel, and all the prior papers and proceedings heretofore had herein, it is

ADJUDGED that the parents and subject children currently reside in the County of King, State of Washington, and have resided in the State of Washington since in or about March, 2019 and it appears they have decided to remain there indefinitely; and it is further

ADJUDGED that substantial evidence is no longer available in the State of New York concerning the subject children's care, protection, training, and personal relationships; therefore, it is hereby

ORDERED that State of New York is no longer the home state of the subject children as defined in Uniform Child Custody Jurisdiction and Enforcement Act as codified in New York Domestic Relations Law § 76; and it is further

ORDERED that this Court declines to exercise jurisdiction on the ground that the Superior Court of Washington for the County of King Juvenile Department, in the County of King, State of Washington, is the more appropriate forum to determine the issues of custody and visitation of the subject children, in addition to the enforcement, modification and/or violation of the Order of Protection issued by this Court which may affect any decision regarding custody and visitation made by the State of Washington, pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act as codified in New York Domestic Relations Law §76-f; and it is further

ORDERED that the above captioned motion by Michael E. Sutton, Esq. to modify the Order of Protection signed and entered on February 6, 2019 shall be and hereby is dismissed with prejudice; and it is further

ORDERED that petitioner, Shaylee Medicraft, or respondent, James R. Medicraft, are directed to file the appropriate papers regarding custody and visitation of the subject children, in addition to the enforcement, modification and/or violation of the Order of Protection issued by this Court to be heard in the Superior Court of Washington for the County of King Juvenile Department, in the County of King, State of Washington; and it is further

ORDERED that petitioner, Shaylee Medicraft, and respondent, James R. Medicraft, shall be provided with a certified copy of this Order on Motion (Order Declining Jurisdiction); and it is further

ORDERED that the Clerk of this Court shall provide a certified copy of this Order on Motion (Order Declining Jurisdiction), in addition to certified copies of the Order of Custody and Visitation made on February 6, 2019 which was signed and entered on March 11, 2019 and the Order of Protection which was made on February 6, 2019 which was signed and entered on February 6, 2019 to the Superior Court of Washington for the County of King Juvenile Department, in the County of King, State of Washington.

State of New York  
Montgomery County     ss.:  
FAMILY COURT

I, LAURIE A. FURNARE, Chief Clerk of the FAMILY COURT, do hereby certify that I have compared the foregoing copy of _Order on Motion_ dated _June 19, 2019_ with the original thereof on file with the Court and that the same is a correct transcript therefrom and the whole of such original.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, this _21st_ day of _June_, 2019 at Fonda, New York.

_____  
Chief Clerk of the Family Court

# EXHIBIT 11

.

Superior **Court of Washington**
for King County

| | |
|---|---|
| Shaylee Medicraft (01/01/1991) | **No.** 20-2-00916-4 SEA |
| _____ | **Order** |
| Petitioner                    DOB | **Modifying/Terminating Order for** |
| vs. | **Protection** |
| James Medicraft (2/17/1959) | [X] Petitioner |
| _____ | [ ] Respondent (Order Lasts Two Years or |
| Respondent                  DOB | Less) |
| | (ORMTPO) |
| | (Clerk's action required) |

The Moving Party (requester) is the:

**[ X ] Petitioner.**

[ ] Respondent and the order identified below was granted for two years or less.
(If the order lasts more than two years, do not use this order. Use form DV 7.080, Order on
Respondent's Motion and Declaration to Modify/Terminate Order for Protection Effective More Than
Two Years.)

The court considered the pleadings, relevant portions of the file, and testimony, if any. *Court noted*
*that there was no opposition by respondent* ·

[ ] The court finds that this is the Respondent's only motion to modify or terminate filed during
the current 12 month period following entry of the order.

The court orders that the:

[ ] Temporary Order for Protection, filed on _____ (date).

**[X] Order for Protection, filed on February 6, 2019 by the Family Court of the State of
New York, Montgomery County, and subsequently registered in King Count under Cause
No. 20-2-00916-4 SEA**

[ ] _____, filed on _____ (date).

is:

**[X] terminated.**

[ ] continued in effect but modified as follows:

Order Modifying/Terminating Order for Protection (ORMTPO) – Page 1 of 2
DV-7.030 (07/2019) – RCW 26.50.130

OTHER: There are pending dependency matters regarding the children. This order does not affect existing orders in those cases, and all orders in those cases remain in full force and effect.

_____

_____

[ ] This order is a temporary modification. It will be effective until the hearing scheduled below.

[ ] The parties are directed to appear for a hearing on _____ (date),
     at _____ a.m./p.m., at:
     _____ (location).

### Washington Crime Information Center (WACIC) Data Entry

**It is further ordered** that the clerk of court shall forward a copy of this order on or before the next judicial day to:

[X] King County Sheriff's Office [X ] Seattle Police Police Department **where petitioner lives** which shall enter it into WACIC.

### Service

[ ] The clerk of court shall also forward a copy of this order on or before the next judicial day to:

[ ] _____ County Sheriff's Office [ ] _____ Police Department **where the other party lives** which shall personally serve _____ (name) with a copy of this order and shall promptly complete and return to this court proof of service.

**or** [ ] The moving party (requester) shall make private arrangements for service of this order.

**or** [X] The other party appeared and was informed of the order by the court; further service is not required.

Dated: Feb 5, 2020 a.m./p.m. 9 10.

Judge/Court Commissioner JUDGE ELIZABETH BERNS

I acknowledge receipt of a copy of this Order:

_____ 2/6/20
Moving Party (requester)          Date

Kaylee O'Cecle - NDD #43159
Attorney for Shaylee Medicraft

I acknowledge receipt of a copy of this Order:

_____ 2/6/2020
Non-moving party          Date

TLCh #38901 atty for father

# EXHIBIT 12

# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# Redacted Photo



# EXHIBIT 13

# Redacted Photo



# EXHIBIT 14

# Redacted Photo



# Redacted Photo



EXHIBIT 16

Pictures from 2.5.220



# Redacted Photo



Picture from 2/4/2019



Redacted Photo



# Redacted Photo



# Redacted Photo





# Redacted Photo





# EXHIBIT 17

SUPERIOR COURT OF WASHINGTON
FOR KING COUNTY, JUVENILE DEPARTMENT

IN RE THE DEPENDENCY OF

MEDICRAFT, ▮▮▮▮
DOB ▮▮▮/2010
MEDICRAFT, ▮▮▮▮
DOB ▮▮▮/2012
MEDICRAFT, ▮▮▮▮
DOB ▮▮▮/2013
MEDICRAFT, ▮▮▮▮
DOB ▮▮▮/2014
MEDICRAFT, ▮▮▮▮
DOB ▮▮▮/2018

Minor Children

NO: 19-7-01266-6 KNT
19-7-01267-4 KNT
19-7-01268-2 KNT
19-7-01270-4 KNT
19-7-01271-2 KNT

DECLARATION OF:

*Jason Bragg*

I, __Jason Bragg__, state as follows: I was at the Kent DCYF office on Wednesday February 5th, 2020. I observed the following as well as the interactions below.

1. I arrived at the Kent DCYF office at approximately 9:15 AM for a committee meeting. As I was approaching the building, I noticed two security guards standing out front with one of the Area Administrators Cleveland King. There were two small boys standing between them. Later I learned their names were ▮▮▮▮ and ▮▮▮▮. Both boys were

DECLARATION- 1

NORTHWEST DEFENDERS DIVISION
KING COUNTY DEPARTMENT OF PUBLIC DEFENSE
124 4th Ave S. Suite 100
Kent, Washington 98032
Phone: (206) 674-4700  Fax: (206) 674-4702

1  soaked from what appeared from being out in the rain. Mr. King was eating some food

2  and requesting the boys to come inside the office. As I walked through the door Mr. King

3  and I exchanged "hellos", and I asked, "Is this where we eat breakfast now?" Mr. King

4  laughed and I walked into the office.

5 2. At approximately 12:00 PM, I exited the building to go and get my lunch from my

6  vehicle in the DCYF parking lot. As I was exiting the office, I observed the same two

7  security guards holding the visitation room door shut by the handle. It was clear that there

8  was someone on the other side of the door attempting to pull the door open.

9 3. Returning into the building from my vehicle, I observed from the outside window that the

10  same two boys that were outside the office earlier, were both inside of the visitation room

11  hanging from the door handle, trying to pull the door open (the same door that the

12  security guards were holding closed). The visitation room appeared empty of all

13  furniture. There weren't any toys or other items in the room. There was little bits of paper

14  all over the floor from what appeared to be the deconstructed sheetrock from the

15  visitation room walls. I returned to the meeting room where my committee meeting was

16  (the Seattle Room), but I remained concerned about what I had observed. I spoke with

17  several members of the committee about what I had observed and decided that we would

18  check in with Mr. King about providing lunch to the boys.

19 4. I immediately left the meeting room again and met Mr. King in his office. I offered to

20  bring the boys' lunch (from our catered committee meeting). He expressed agreement

21  with this plan. Then, Mr. King and I went to the visitation room. The security guards

22  were still present outside of the visitation door, holding the handle to prevent it from

23

24

DECLARATION- 2

1    opening. Mr. King opened the door to the observation room. There were two DCYF

2    social workers present in the observation room, watching the boys in the visitation room.

3    5.   With Mr. King, I then entered the visitation room that the boys were in. I sat down on the

4        floor to talk with them. I asked them if they wanted lunch. The boys and I began talking

5        about what kind of sandwiches they liked, what kind of food they liked. The boys

6        reported a large variety of foods that they like and would want to eat. They wanted to

7        climb on me. They were clearly very energetic and curious about who I was. I explained

8        who I was and what I do. We came up with an agreement that if the boys picked up all of

9        the torn papers in the visitation room while I went and got lunch, when I came back, we

10       would watch a movie on my phone.

11   6.   It was challenging to get out of the room because the boys kept forcing their way out of

12       the room. The boys were upset about being left in the room, however, they all spent time

13       to pick up the papers while I went and got lunch.

14   7.   I returned to the room with food, and again sat on the floor with the boys while they ate

15       lunch and asked them what type of movie they like. The boys sat next to me while

16       watching "Pond Monsters" on Youtube. They remained calm while eating and watching

17       the show. After about 15 minutes, I went to the door and requested chairs or cushions so

18       that we could sit somewhere other than the floor. The office staff provided the boys with

19       a couch cushion and two children's chairs.

20   8.   After about an hour of the boys eating and watching the show, I told the boys that I was

21       going to speak with Mr. King. I left the boys in the visitation room with my phone and

22       went back to my committee meeting.

23

24

DECLARATION- 3

9. At 2:00PM the meeting ended and I returned to the visitation room to check in with the boys. They were still quietly watching "Pond Monsters" on my phone. I asked Mr. King about some kind of activity that the boys could do while they were in the visitation room – like an electronic device, TV or tablet. Mr. King stated that the boys previously had access to TV and other devices, but the boys were no longer able to have access to this because the boys were "climbing on the shelf" and being destructive. We then spoke about handheld devices that could be purchased, but there wasn't a way to connect to the Wi-Fi at the Kent DCYF office for security reasons.

10. When I returned to the visitation room at about 2:30pm, ▆▆▆▆ had escaped the visitation room and he was discovered by several staff members over at the Taco Time across the street on the opposite side of the building. I went in to check in on ▆▆▆▆. He was in the room using my phone to take photos. When I told him that it was time for me to leave, he became very upset. ▆▆▆▆ came running back by the window. I went outside to see if I could talk to him about coming back inside the office. The police showed up and were talking with staff about restraining ▆▆▆▆ to get him to cooperate. I was able to pick ▆▆▆▆ up and bring him inside. He was willing to allow me to do this so long as I agreed to not make him go into the visitation room. ▆▆▆▆ stated, "Not the visitation room we've been in there all day."

11. ▆▆▆▆ then came out of a separate visitation room and was saying things like "oh sure, bring me out so I can calm them down," and "bring me out here so I can get them to do what you want them to do." Then all three boys started tearing up the floor of the main lobby and bending the fire extinguisher case mounted on the wall at the Kent DCYF office. ▆▆▆▆ started to try to punch me. I turned it into a game that could be

DECLARATION- 4

1  constructive.  I continued talking with the younger two boys to get them to sit on the floor

2  next to me. ▆▆▆ agreed to sit down in the lobby with me. ▆▆▆ was in the visitation

3  room screaming to be let out while the security guards continued to hold the door closed.

4  The boys continued to run all around the lobby and visitation room with high intensity.

5  12. At 4:00 PM the children's' mother showed up to the office with milkshakes for the boys.

6  There was a dramatic change in their behavior, energy level and calmness. There chaotic

7  behavior stopped almost like someone had turned it off with a switch.  They greeted their

8  mom and followed her easily into the visitation room. The boys eagerly shared with their

9  mom about their experience at the DCYF office for the day.

10  I,  Jason Bragg  , hereby swear and affirm that the foregoing is true and correct to the best of my

11  knowledge under penalty of perjury in the State of Washington.

12

13  DATED _February 8th, 2020_____

14

15

16

17

18

19

20

21

22

23

24

DECLARATION- 5

EXHIBIT 18

DATE: June 15, 2020
COURT: Judge Messitt, MRJC 1L

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY
JUVENILE DEPARTMENT

IN RE DEPENDENCY OF:

MEDICRAFT, ██████

MEDICRAFT, ██████

MEDICRAFT, ██████

Minor Child(ren).

NO.

19-7-01266-6 KNT

19-7-01267-4 KNT

19-7-01268-2 KNT

ORDER GRANTING IN PART AND
DENYING IN PART THE DEPARTMENT'S
MOTION TO SUSPEND VISITATION

THIS matter comes before the Court on the Department's Motion to Suspend Visitation. The Court is familiar with the files herein and considered the following: (1) Department's Motion to Suspend Visitation, (2) GAL's Response, (3) Father's Response, (4) Mother's Response, and the Department's Reply, as well as the attachments attached to each of these submissions. Under the current orders of the Washington State Supreme Court and Superior Court, this court has considered the written submissions by parties, including the motion, supporting documents and declarations, any response to the motion and reply by the movant, and considered the arguments of counsel through pleadings.

NOW, the Court FINDS as follows:

/

/

ORDER MODIFYING VISITATION

2.1    The prior order of this Court issued February 6, 2020 denied the State's Motion to Suspend the Father's Visitation and expressly provided the father with the opportunity to correct his behaviors during the visits which were the basis for the motion. The Court spoke directly to Mr. and Mrs. Medicraft from the bench and directed them to follow the court's orders. The Court warned Mr. Medicraft, "You'll need to follow them or your visits will be suspended."

2.2    The children have the right to safety and protection of their physical and psychological health.

2.3    Visitation is the right of the family and shall be restricted only when it is in the best interests of the children.

2.4    The evidence before the Court provided by the Department and the GAL show that the father has not complied with the Court's order. The Court finds this evidence to be credible. The father has discussed the case with the children during visits, he has frequently disparaged the Department and social work staff to the children, and has encouraged the children's misbehaviors by his descriptions of the social workers, caregivers, and other professionals.

2.5    The children have historically stated their wish for continued contact with the parents.

2.6    The father has been reminded by the Department on numerous occasions that he is not to continue inappropriate behaviors during the visitation. He has been given advanced notice by the Department that if his behaviors continued, the Department would seek to suspend visitations.

2.7    The father has repeatedly failed to encourage appropriate behavior by the children, including stating that the department was causing ████ to misbehave, including when ████ admitted slapping someone.

2.8    The father told James on June 5, 2020, during a supervised video visit that the Department was "trying to take our visits away." During the same visit, the mother asked ████ if he "still want[s] to be a family."

2.9    The father's visit on June 8 was ended prematurely due to his behaviors in the children's presence, including referring to the Department as "criminals" and accusing the social workers of being part of a "cover-up" when they reminded him to control his behaviors and when they ended the visit.

2.10    The mother has also brought up the subject of court with James, including on April 27 while on a supervised telephone visit, arguing with the social worker even after

ORDER MODIFYING VISITATION

being warned about her inappropriate conversation in ▮▮▮ presence. The visit was ended prematurely and ▮▮▮ reaction was to rip the telephone from the supervising social worker, pull her hair, punch her in the mouth, and run from the DCYF building.

2.11 The parents have twice accused ▮▮▮ of lying when she spontaneously asked if the mother remembered when the mother and children "sneaked" to the father's home while in the mother's care. The parents' reactions on each occasion were not appropriate, including the father referring to a "dictatorship," hanging up abruptly, and in the second call, threatening ▮▮▮ to end the call. The father stated in the child's presence that she was being coached and that "people are whispering things." ▮▮▮ was upset after the father hung up on the call.

2.12 The evidence before the court shows that visits are impacting the children's safety, mental health, and ability to stabilize in placements.

2.13 ▮▮▮ reported to the GAL in a face-time call on May 22, 2020, that in his current licensed care placement, that he was sleeping well, he has good food, and enjoyable, appropriate outdoor and indoor activities. At the time, ▮▮▮ was observed to be smiling and eager to return to what he was doing prior to the call. Shortly afterwards, the GAL observed James to adopt a very different posture with his parents on a video visit, saying he was "exhausted," and while in the foster placement was "watching YouTube" and sleeping. While in the parent visit, ▮▮▮ head was down and he left the visit while his father argued with the social worker.

2.14 The father frequently expresses to his children that DCYF lies to the children, is a corrupt and illegal agency, and that the Department is responsible for abusing the children, and has stated that it is "obvious that CPS is doing everything to create a situation where we cannot be a family again."

2.15 Due to the children's historical statements that they wish to maintain contact with the parents, the father should be allowed to have written contact with the children through letters or cards, provided that the Department reviews in advance to assure the communications are appropriate.

2.16 The parents were offered a parent coach to assist in achieving positive visitations with the children, which the parents declined.

2.17 While the mother has been inappropriate during some visitations, the majority of the inappropriate comments and threats have been made by the father. Her behavior should not be inappropriate during the visits and she should not discuss the court case with the children, and she should not make disparaging and accusatory remarks about the social workers, the Department, or other professionals, or the children's

ORDER MODIFYING VISITATION

1   caregivers.  The mother should not encourage the children to engage in harmful
2   behaviors towards others or themselves, and she should not accuse them of lying while
    in the visits.

3   2.18   The mother should continue visitations with the following conditions in place:
4          1) the mother shall work with a parent coach and follow recommendations;
           2) the mother shall not discuss the case or disparage DCYF;
5          3) the father shall not participate in the visit, shall not be in the room where the
           mother is having the visit (if by phone), and shall not overhear the visit;
6          4) the visit shall not be recorded.

7   AND the Court ORDERS as follows:

8   3.1   IT IS HEREBY ORDERED that the Shelter Care Order entered April 30, 2019 and
9         the Order on Visitation entered February 6, 2020, are modified according to LJuCR
10        2.5(b).

11  3.2   The Department's motion is granted in part and denied in part.

12  3.3   The father's visits are suspended at this time.  The father may have contact with the
          children through appropriate letters or cards, which shall be reviewed by the social
13        worker prior to giving to the children.

14  3.4   The mother's supervised visitation shall continue under the following conditions:
15        1) the mother shall work with a parent coach and follow recommendations;
          2) the mother shall not discuss the case or disparage DCYF;
16        3) the father shall not participate in the visit, shall not be in the room where the
          mother is having the visit (if by phone), and shall not overhear the visit;
17        4) the visit shall not be recorded.

18  3.5   The Department shall complete any referrals necessary for the parent coach service
19        and fund the service so long as the mother attends and participates as directed by the
          parent coach service.
20
    3.4   All prior orders shall remain in full force and effect, except as modified herein.
21
          The Court does not consider a request for in-person visitation as that issue is not
22  properly before this Court.

23  DATED: June 19, 2020
                                                    _____
24                                                  JUDGE ANNETTE M MESSITT

25

26
    ORDER MODIFYING VISITATION

# King County Superior Court
## Judicial Electronic Signature Page

Case Number: 19-7-01268-2
Case Title: ██████ MEDICRAFT

Document Title: ORDER ON VISITATION

Signed by: Annette Messitt
Date: 6/19/2020 4:01:44 PM

Judge/Commissioner: Annette Messitt

This document is signed in accordance with the provisions in GR 30.
Certificate Hash: 6B19445A81BEB1549F2DC622B5DB2784613FDA67
Certificate effective date: 1/10/2019 2:03:48 PM
Certificate expiry date: 1/10/2024 2:03:48 PM
Certificate Issued by: C=US, E=kcscefiling@kingcounty.gov, OU=KCDJA, O=KCDJA, CN="Annette Messitt: cLx7XwvS5hGNxiz3AFk6yQ=="

# EXHIBIT 19

February 20, 2020 at 3:00 pm
Motion Hearing, Court 1L

KING-SOUTH

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
JUVENILE DEPARTMENT FOR KING COUNTY

| | |
|---|---|
| IN RE DEPENDENCY OF:<br><br>MEDICRAFT, ▉▉▉▉<br>DOB: ▉▉▉/2010<br>MEDICRAFT, ▉▉▉<br>DOB: ▉▉▉/2012<br>MEDICRAFT, ▉▉▉<br>DOB: ▉▉▉/2013<br><br>               Minor Children. | No. 19-7-01266-6 KNT<br>    19-7-01267-4 KNT<br>    19-7-01268-2 KNT<br><br><br>FATHER'S MOTION FOR<br>APPOINTMENT OF COUNSEL FOR HIS<br>SONS JAMES, ARTHUR AND EDWARD<br>MEDICRAFT |

TO: CLERK OF THE COURT
TO: AAG DEREK LEUZZI
TO: MOTHER'S COUNSEL HANNAH GOLD AND KATHLEEN MCCLELLAN
TO: CASA'S ATTORNEY KATHLEEN MARTIN

## I.    RELIEF REQUESTED

COMES NOW, the father of the above named minor children, by and through his attorneys of record, Justine Olimene and Helen Redman of the King County Department of Public Defense, The Defender Association Division, and moves this court for an order appointing counsel for his sons ▉▉▉ ▉▉▉ and ▉▉▉ Medicraft.

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft1

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

## II.   FACTS

The father's motion in response to the Department's motion to suspend father's visits (███████Case File 19-7-01267-4 KNT, ECR Subline #163; ███████ Case File 19-7-01268-2 KNT, ECR Subline #162; ██████ Case File 19-7-01266-6 KNT, ECR Subline #168)., together with the mother's emergency motion for return home (██████Case File 19-7-01267-4 KNT, ECR Subline #179; ██████ Case File 19-7-01268-2 KNT, ECR Subline #177; ██████Case File 19-7-01266-6 KNT, ECR Subline #185), are incorporated herein.

On April 25, 2019, DCYF filed a dependency petition in Washington regarding all five Medicraft children. The children were placed in the mother's care at the initial shelter care hearing. The children remained in Ms. Medicraft's care until December 9, 2019, when the court granted the Department's emergency motion to place the children in licensed foster care.

Since their placement in licensed care, the Department has failed to adequately care for them, and the children's behavior has decompensated. The children no longer go to school regularly. They often spend their days at the Kent DCYF office, and nights in night-to-night hotels with different strangers each night. During their days in small empty visitation rooms, DCFY staff often watch them through a two-way mirror and the children are not allowed out of the room. Sometimes staff hold the door shut from the outside to make sure the children do not come out of the room.

Shortly after their removal, the children started appearing at visits with their parents with bruises, strangulation marks and reports of being harmed by DCYF staff and foster placements. The children' behaviors have markedly declined to a crisis point. They have been to multiple placements. They have been kicked out of school. The children recently reportedly destroyed

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft2

**KING COUNTY DEPT. OF PUBLIC DEFENSE**
**THE DEFENDER ASSOCIATION DIVISION**
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

property at the DCYF Kent office. They have reportedly assaulted staff and repeatedly run away in parking lots and across the streets and put themselves in unsafe situations. The Department has utilized the mother to help keep the children calm. While in the mother's care, the children are a lot calmer and do not exhibit these extreme behaviors. The children have maintained they want to return home, and have stated they only feel safe in their mother's care.

Due to its inability to care for the children, the Department has sometimes taken ███ ███ and ███ to Seattle Children's Hospital in order to stabilize them. On January 31, ███ and ███ were admitted, but ███ was not admitted. Both ███ and ███ were discharged on February 4, 2020. In ███ Children's Hospital's Discharge summary, it notes that "the treatment team is in support of in home supports such a WRAParound and WISE services" and that "given ongoing displacement from home, ███ prognosis is guarded." *Mother's Emergency Motion, Exhibit 9.* ███ discharge summary also notes that "prolonged hospitalization was deemed unhelpful in the setting of limited resolution of symptoms and at times contributing to decompensation of behaviors," and also noted the importance of a consistent, stable environment for ███. *Mother's Emergency Motion, Exhibit 10.*

On February 4, the Department filed an emergency motion seeking authority to administer psychotropic medication, as well as authority to place ███ ███ and ███ involuntarily in a psychiatric hospital or CLIP beds. The court found that this motion was not an emergency. The Department struck its motion and agreed to re-note it after the issue of counsel for the children is decided. Neither of these children have any attorney to advocate for their stated interest with regard to this motion, or any other proceeding in their dependency matters, decisions that may greatly impact their health, safety and liberty interests.

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft3

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

## III.  STATEMENT OF THE ISSUES

Should the court appoint counsel for ▓▓▓ ▓▓▓ and ▓▓▓ **when** the youth have stated interests at odds with the CASA's position, and their health, safety and liberty interests are at stake?

## IV.  ARGUMENT & AUTHORITY

The totality of circumstances warrant the court to appoint counsel for ▓▓▓, ▓▓▓ and ▓▓▓ at this time. The children have no stable placement at this time. They are sleeping in night to night motels with strangers, while spending their days in empty tiny locked rooms at the CPS office, like caged animals. All children have significant liberty interests at stake. Their stated interests do not align with the CASA's assessment of the children's best interests.

Perhaps the most compelling reason for assigning counsel for the children is the fact that the Department wants the authority to sedate the children with psychotropic medication and commit them involuntarily in psychiatric hospitals and/or CLIP beds. Without an attorney to provide additional decisional accuracy to the court, there is imminent risk of erroneous deprivation at the motion hearing for psychotropic medication/hospitalization, as well as at fact finding.

### A. STATUTORY AMENDMENTS PROVIDE AUTHORITY AND GUIDANCE WARRANTING APPOINTMENT OF COUNSEL.

RCW 13.34.100(7)(a) provides that "[t]he court may appoint an attorney to represent the child's position in any dependency action on its own initiative, or upon the request of a parent, the child, a guardian ad litem, a caregiver, or the Department." This recent change to state law demonstrates the legislature's recognition of the value of the appointment of counsel for children in dependencies, even those under the age of twelve (12) years old. General Rule (GR) 33(a)(1)(C) provides further legal authority to this court to provide counsel for the above named children.[1]

---

[1] The children have not reached the age of majority. As such, these children may qualify as a person with a disability as defined under GR 33(a)(2) because he has a mental impairment that interferes with one or more major life activities.

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft4

**KING COUNTY DEPT. OF PUBLIC DEFENSE**
**THE DEFENDER ASSOCIATION DIVISION**
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

Only an attorney can advocate on behalf of each child regarding his or her legal interests and stated position. Although the CASA advocates for a child's best interest, each child should also have a voice in this proceeding that could eventually deprive her or him of liberty and parents and make her or him a legal orphan. Further, by participating in the process with the careful explanations of counsel, children can better understand who is making the decisions that most affect their lives and why those decisions were made the way that they were.

Ultimately, attorneys can:

- Represent a child's legal interests and rights;
- Ensure that a child's expressed positions related to the proceedings are effectively presented to the court;
- Educate an abused and neglected child on their legal rights in the dependency proceeding;
- File legal briefs and appeals;
- Present and cross-examine witnesses; and
- Advocate for and ensure the best educational placement and services for the child, thus increasing the chances of educational support, success, and graduation.

Unless the assistance of counsel is provided, children cannot effectively present their wishes and desires to the Court. With legal representation, children will be better able to understand the dependency proceedings, assert their legal rights, and express their needs and concerns about permanency, sibling visitation, and other important court decisions. Each child's legal rights are clearly at stake.

In this case, a CASA has been appointed to advise the court on the best interests of the children. RCW 13.34.100(1). CASAs and attorneys for children serve distinct and unique roles.

_See also_ Americans with Disabilities Act (42 U.S.C. § 12101 *et. seq.*); RCW 49.60 *et. seq.* GR 33(a)(1)(C) specifically directs courts to appoint counsel for otherwise unrepresented parties who have a disability when such appointment is appropriate or necessary to make each court service, program, or activity, when viewed in its entirety, readily accessible to and usable by a qualified person with a disability.

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft5

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

In *In re Dependency of M.S.R. and T.S.R.*, the Supreme Court expounded upon some of the differences between attorneys and GALs/CASAs:

> We recognize that GALs and CASAs are not trained to, nor is it their role to, protect the legal rights of the child. Unlike GALs or CASAs, lawyers maintain confidential communications, which are privileged in court, may provide legal advice on potentially complex and vital issues to the child, and are bound by ethical duties. Lawyers can assist the child and the court by explaining to the child the proceedings and the child's rights. Lawyers can facilitate and expedite the resolution of disputes, minimize contentiousness, and effectuate court orders.

*In re Dependency of M.S.R. and T.S.R.*, 174 Wn.2d 1, 21 (2012) reconsideration denied (May 9, 2012), as corrected (May 8, 2012) (herein referred to as *"M.S.R."*)(citing Randi Mandelbaum, *Revisiting the Question of Whether Young Children in Child Protection Proceedings Should Be Represented by Lawyers*, 32 Loy. U. Chi. L.J. 1, 61-62 (2000)).

Here, the CASA's advocacy differs from the type of advocacy that an attorney can provide. Specifically, an attorney will be necessary to make sure that they have a voice in the process and have the ability to express to the court what they need and want. The CASA's position in this case clearly differs from the children's positions. As reported by the CASA herself, ████, ████ and ████ have asked to be with their mother and for their father to come home. ████ has expressed that the only place he feels safe is at home with his parents. Despite these expressed wishes, the CASA has continued to advocate for continued out of home placement and suspension of the father's visits. *See Exhibit A and B.*

Unlike a CASA, an attorney is bound by the Rules of Professional Conduct to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." RPC 1.4(b). Only a child's attorney is required to advocate for the child's expressed wishes, exhibit competence in the law, keep the child informed, consult with the child,

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft6

**KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION**
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

1    or promptly comply with requests for information, among other unique duties. RPC 1.2; RPC 1.1;

2    RPC 1.4; RPC 1.14.[2] The RPCs also explicitly contemplate even young children directing counsel,

3    noting that:

4           . . . a client with diminished capacity often has the ability to understand, deliberate
            upon, and reach conclusions about matters affecting the client's own well-being.

5           For example, children *as young as five or six years of age*, and certainly those of
            ten or twelve, are regarded as having opinions that are entitled to weight in legal

6           proceedings concerning their custody.

7    RPC 1.14, Comment 1 (emphasis added). ████, ████ and ████ should have an attorney

8    who will advocate for their expressed wishes and keep them informed about regarding their

9    rights and custody. All children are at an age contemplated by the RPCs.

10          The children have fundamental liberty interests at stake related to family, safety and

11   permanency. The Department has previously filed a motion for authority to involuntarily commit

12   these children in psychiatric hospital and medicate them with psychotropic. These children have

13   rights under RCW 71.34, Behavioral Services for Minors. In order for children to truly weigh in

14   on issues -- if they so choose - an age appropriate discussion with a child's attorney would be

15   necessary prior to solicitation of their thoughts. To ensure that such decisions of life-long impact

16   and gravity are made with the lowest risk of error, appointment of counsel for the children is

17   constitutionally required.

18

19

20

21

22   _____

     [2] Attorneys also have a duty to act in a professional manner towards their clients and maintain a traditional relationship
23   with clients with diminished capacity, including children.  Despite legal presumptions of incapacity, minors often have
     the ability to comprehend, consider, and make decisions about the legal matters at issue. It is precisely because children
24   face difficulties in understanding complex legal proceedings that they should be provided counsel, and the RPC guide
     attorneys on how to address the needs of a child-client. *Parents* are not denied counsel because of their capacity issues
25   and, thus, the capacity of children should not be used as an excuse to deny them counsel.

     Error! Reference source not found.Motion for          KING COUNTY DEPT. OF PUBLIC DEFENSE
     Appointment of Counsel for James, Arthur and Edward     THE DEFENDER ASSOCIATION DIVISION
     Medicraft7                                                    420 W HARRISON, SUITE 202
                                                                   KENT, WASHINGTON 98032
                                                                   TEL: 206-477-8700
                                                                   FAX: 253-856-7864

## B. THE DUE PROCESS CLAUSE REQUIRES THAT THE COURT APPOINT LEGAL COUNSEL FOR ████, ████ AND ████ IN THEIR DEPENDENCY PROCEEDINGS

An application of the *Matthews* test to the facts in this case lead to the conclusion that appointment of counsel for ████ ████ and ████ individually is required to ensure due process under the United States Constitution. In 2018, the Washington Supreme Court confirmed that when "determining whether counsel is required, courts are to apply the [*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)] factors on a case-by-case basis." *In re the Dependency of E.H. and S.K.-P.*, 427 P.3d 587, 596 (2018) (Citing *Mathews*, 424 U.S. at 335.) (herein referred to as *"E.H."*). In 2012, the same court found that when the issue of appointing counsel is properly raised, the trial judge should apply the *Mathew* factors "to each child's individual and likely unique circumstances to determine if the statute and due process requires the appointment of counsel." *M.S.R..*, 174 Wn.2d 1, 22.

Though under any circumstances, a judicial officer may appoint counsel for any dependent child, regardless of age, pursuant to RCW 13.34.100(7)(a), application of the *Matthews* test is determinative of when appointment is required. As the court pointed out in *M.S.R.*, "children have *at least* the same due process right to counsel as do indigent parents,". 174 Wn.2d at 13; *Mathews*, 424 U.S. 319 (citing *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981)) (emphasis added). In *E.H* the court emphasized that "in many instances due process might require appointment of counsel. And that trial courts should address the issue of appointment of counsel on the record at as early a time as practical, to preserve the right of appeal." *E.H.*, 427 P.3d at 596.

The *Mathews* test requires the Court to balance: (1) the private interest at stake; (2) the risk of error involved under the current procedures and the probable benefits of additional procedural protections; and (3) the government's interest in the proceeding, including fiscal and administrative

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft8

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

burdens. *Mathews*, 424 U.S. at 335. A careful consideration of all three factors of the *Mathews* analysis reveal an outcome in favor of the appointment of counsel in the dependency cases because 1) much is at stake for these children, including the possibility of being involuntarily committed and medicated, loss of the relationships with their parents and their ability to maintain a relationship with their siblings; 2) the risk of error is high in the absence of an attorney for the children; and 3) fiscal government interests do not excuse a violation of due process. Additionally, the government has an interest in a dependency system that allows children to directly participate and learn about the reason for changes in their lives.

Furthermore, a child's age does not preclude the use of a *Mathews* analysis nor should their interest be unduly diminished based on age. The *M.S.R.* Court acknowledged that under *Mathews* some younger dependent children and even infants will have a constitutional right to have client-directed attorneys (as opposed to non-attorney GALs). 174 Wn.2d at 21-22 ("Surely, under appropriate circumstances, an infant would be entitled to counsel…"). Our Constitution does not distinguish by age in assessing the fundamental liberty interests of children in state custody. *See M.S.R.* and RCW 13.34.100. Moreover, the two subsections of the statute that govern the appointment of an attorney, RCW 13.34.100(6) and RCW 13.34.100(7), do not include any age restrictions or limitations for the appointment.

a. The Children Have Fundamental Liberty Interests at Stake.

In *M.S.R.* the court highlighted the relevant fundamental liberty interests that are at stake for dependent children:

> Applying the *Mathews* factors as the United States Supreme Court did in *Lassiter*, we conclude that under the Fourteenth Amendment to the United States Constitution, children have fundamental liberty interests at stake in termination of

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft9

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

parental rights proceedings. These include a child's interest in being free from unreasonable risks of harm and a right to reasonable safety; in maintaining the integrity of the family relationships, including the child's parents, siblings, and other familiar relationships; and in not being returned to (or placed into) an abusive environment over which they have little voice or control.

*M.S.R.*, 174 Wn.2d at 19. As discussed below, all of these interests must be given their due weight.

### i. *The Children's Physical Liberty Is at Stake*

Where an individual's physical liberty is threatened, there is a presumption that due process requires counsel:

> "[T]he [Supreme] Court's precedents speak with one voice about what "fundamental fairness" has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured."

*Lassiter v. Dep't of Soc. Servs. of Durham County*, 452 U.S. 18, 26-27 (1981).

The physical liberty of children is impacted from the moment the State removes them from their biological families and further when, they are forced to move from one home to another while in placement. *See M.S.R.*, 174 Wn.2d at 14. As the District Court for the Northern District of Georgia noted when discussing effective legal representation for children, "foster children. . . are subject to placement in a wide array. . . of foster care placements, including institutional facilities where their physical liberty is greatly restricted." *Kenny A. ex rel Winn v. Purdue*, 356 F.Supp.2d 1353, 1360-61 (N.D. Ga. 2005). A child's liberty interest may also be affected by the often arbitrary placement process resulting from the lack of suitable foster homes. *Id.* The loss of liberty is compounded given that "foster children are 'involuntarily placed. . . in a custodial environment, and . . . unable to seek alternative living arrangements.'" *Braam*, 150 Wn.2d at 698 (quoting *Taylor*

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft10

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

*ex rel. Walker v. Ledbetter*, 818 F.2d 791, 795 (11th Cir. 1987) (comparing foster children to individuals involuntarily committed to hospitals)); *M.S.R.*, 174 Wn.2d at 14 (highlighting how children can be powerless and voiceless as they are moved between homes). Dependencies directly determine placement of the child and the services to be provided. RCW 13.34.130. Binding any child to a specific place with specific people by virtue of a government ordered placement inherently involves a paramount physical liberty interest that must be considered regardless of age.

Unlike in *E.H.*, where the issue of counsel for the child was raised on motion related to visitation with siblings, the pending matter in this case is a direct limitation on the child's physical liberty. Here, ▮▮▮▮ ▮▮▮▮ and ▮▮▮▮ are bound by court order, to be placed in licensed care. They currently do not have any stable placements. The Department has motioned the court for authority to involuntarily commit them and medicate them. In a dependency trial, their continued physical liberty interest is at stake in a proceeding that could lead to changes in placement and possibly, the filing of a termination petition. Given the grave physical liberty interest at stake in this dependency proceeding, they should each have counsel.

>    ii.    *The Children Have a Fundamental Liberty Interest In Family Integrity.*

Family integrity is among the most important liberty interests that children possess and is explicitly considered in *M.S.R.*'s application of the *Mathews* factors. 174 Wn.2d at 14. RCW 13.34.020, which governs the dependency and termination proceedings, explicitly states that "the family unit is a fundamental resource of American life which should be nurtured," and that "the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized." As such, while a child's safety and health is the paramount concern in dependency and termination proceedings, the child's right to remain intact with his or her family

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft 1

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

is also one of the most important fundamental rights that should be given great weight in the proceedings. *See Kenny A.*, 356 F. Supp. 2d at 1360. In its analysis of the *Mathews* factors, the *M.S.R.* Court noted that "[i]n a dependency or termination proceeding, the parent is at risk of losing the parent-child relationship, but the child is at risk of not only losing a parent but also relationships with sibling, grandparents, aunts, uncles, and other extended family." 174 Wn.2d at 14 (citing *In re Custody of Shields*, 157 Wn.2d 126, 151-52 (2006) (Bridge, J., concurring)). In this sense, a child has an even stronger fundamental interest than his parent in a termination or dependency proceeding.

The Washington Supreme Court specifically addressed sibling visitation as an interest at risk of being erroneously deprived under the *Mathews* test in *E.H.* In that case the court determined that "[w]ithout minimizing that interest… [it] is of a comparatively lesser constitutional magnitude…, although it is a recognized liberty interest. *E.H.*, 427 P.3d at 597. Unlike in *E.H.*, at issue in this case is family integrity as a whole, not just sibling visitation. Here, the James, Arthur and Edward are at risk of having their relationships with their parents, especially with their father, and siblings irreparably altered. The youth do have a strong liberty interest in maintaining ties with their siblings, unencumbered by the state, but also to their family unit as a whole and their relationship with their parents. In this case, the state has removed the children from their mother, when all family members appear to want otherwise. The state's excision of the father from the family, contrary to the family's wishes, inherently affects the family's integrity.

The Washington Supreme Court has, on more than one occasion, emphasized that children have the right to participate in court proceedings that affect family relationships. *See, e.g., State v. Santos*, 104 Wn.2d 142, 147-48 (1985) (affirming that children have a due process right to be a party in paternity proceedings and holding that due process can require appointing someone to

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft12

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

protect the interests of a child in a paternity proceeding); *In re Q.A.L.*, 146 Wn. App. 631, 636-37, (2008) (child has "constitutional right to participate in accurately determining his paternity"); *In re Shields*, 157 Wn.2d 126, 130 (2006) (Bridge, J., concurring) ("child has a constitutionally protected interest in whatever relationships comprise his or her family unit"). In *In re L.B.*, 155 Wn.2d 679, 712 n.29 (2005), the Washington Supreme Court "strongly urge[d]" courts to consider appointing counsel for children in family law-type proceedings, including dependencies, even where GALs were already appointed. The right to participate in proceedings is illusory if a child does not have an attorney trained to interpret and navigate the complexities of the court processes.

The children's liberty interest in family integrity will continue to be impacted by the ongoing dependency proceeding. The children's close relationship with their father is at risk of disruption, alteration, and even destruction under these proceedings and they must therefore be given the opportunity to meaningfully participate. The children also face a real possibility of being involuntarily committed and medicated with psychotropics. They need to have counsel who can advocate for their rights under RCW.71.34.

  iii.  *The Children's Liberty Interests in Their Own Safety, Health, and Well-being Must Be Protected*

██████, ████ and ████ have the right to safety, health, and well-being. RCW 13.34.020; *Braam v. State*, 150 Wn.2d 689, 699 (2003) (holding that foster children have a substantive due process right to be free from unreasonable risks of harm and a right to reasonable safety). It is the child, and only the child, who is at risk of being returned to an abusive or neglectful home or, unfortunately, of being placed in an abusive or neglectful substitute. *See M.S.R.*, 174 Wn.2d at 15. Based on this, the Court in *M.S.R.* held that a child's liberty interest is very different from, *but at least as great as*, the parent's. *Id.* at 16.

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft 13

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

This court will make significant decisions that will affect the children's safety, health, and well-being. To achieve "the best interest of the child," the termination and dependency proceedings demand this court's decisions on a wide range of personal and family affairs, including where and with whom they live, whether they can meet their parents and siblings, and what treatment or services they will receive. RCW 13.34.025; RCW 13.34.130; RCW 13.34.136.

Given the overwhelmingly broad intrusion in the child's life, the risk of harming, rather than helping, the child is great. In *Braam*, the Washington Supreme Court acknowledged that the State can cause harm to foster children when it fails to provide "adequate services to meet the basic needs of the child." *Braam*, 150 Wn.2d. at 700; *see also In re Schermer*, 161 Wn.2d 927, 957 (2007) ("Foster care systems are often ill-equipped to meet the mental health needs of children and may result in greater harm than good."); *Washington State Coal. for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 914 (1997) (finding that the Department may not act within the terms and duties delegated to it by statute and their acts can be "arbitrary, tyrannical, or predicated upon a fundamentally wrong basis").

To ensure that the children are provided *adequate* services, this Court must hear from the children directly about their needs and desires. At a minimum, the children must understand the options available to them, the consequences of those options, and the opportunity to assert their wishes on important decisions impacting their lives. An attorney is best suited to these ends. As the *L.B.* Court noted, "[w]hen adjudicating the 'best interests of the child,' we must in fact remain centrally focused on *those whose interests with which we are concerned*, recognizing that not only are they often the most vulnerable, but also *powerless and voiceless*." 155 Wn.2d at 712 n.29 (emphasis added).

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft14

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

b.    Underline: Without Counsel for the Children, The Risk of Erroneous Decisions is Very High.

The potential risk of erroneous decisions is very high for the children in this proceeding if the court does not assign attorneys for ████, ████ and ████ In determining if an attorney would provide decisional accuracy if appointed, the court should consider 1) the age of the child, 2) whether the child is in legal or physical custody of the state, 3) whether the child's stated interests are aligned with the CASA's assessment of the child's best interests or other party's desires, 4) whether the child disputes facts that form a basis for the dependency determination, 5) whether the child presents a complex argument against the state's proposed action and the issues that are actually disputed or addressed at the hearing, and other relevant facts. *E.H.* 427 P.3d at 597. The factors overwhelmingly support counsel for the youth.

i.    ***Counsel for the Youth Would Provide Increased Decisional Accuracy because of the Youth's Children's Age and Stated Interests***

In its recent decision in *E.H.*, the court acknowledged that the children's age and misalignment with the CASA's position impact the amount of decisional accuracy afforded by an attorney. 427 P.3d at 596 ("If a child's stated interests are indeterminable due to infancy or if they are aligned with her or her GAL's assessment of what is in his or her best interests, then the increased decisional accuracy of an attorney will be low."). In this case, the children in question have routinely expressed their desire to be with their mother and to have their family unit back together. Their stated interests are at odds with the CASA's position for them and their siblings. It is unclear whether the CASA's position is an aggregate of her determination of what is in the best interests of all the children or is the same for each child to which she is assigned. If the children are assigned separate counsel, then those attorneys could clearly advocate each child's specific wishes. Though ████, ████ and ████ positions may align with the father and mother's

**KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION**
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7664

1    positions, each child may have different positions regarding the manner and conditions, if any, of

2    the father's return to the home and outcome of the dependency fact-finding. Though the children's

3    positions might be similar, they may not directly align with either of their parents. Therefore,

4    attorneys for each child would provide substantially improved decisional accuracy.

5

6        i.     *Counsel for the Youth Would Provide Meaningful Protections at The Dependency Fact Finding*

7        Attorneys for each child would provide substantial decisional accuracy considering that the

8    case is currently in shelter care with an upcoming dependency trial. Whether the *Mathews* factors

9    require appointment of counsel depends largely on the "specific circumstances... at the time the

10    motion for appointed counsel [wa]s made." *E.H.* 23 dissent at 23 (citing *M.S.R.*, 174 Wn2d at 22

11    n. 13). This request for youth's counsel comes in advance of the dependency fact-finding, where

12    the determination of a dependency itself, and therefore custody of the children, is at question.

13    Attorneys for the youth at this juncture provide meaningful protections as to the issues addressed

14

15    at the trial, not otherwise provided.

16        In dependency proceedings, courts are granted broad discretion in making determinations.

17    *In re J.S.*, 111 Wn. App. 796, 804 (2002) ("Courts have broad discretion and are allowed

18    considerable flexibility to receive and evaluate all relevant evidence in order to reach a decision

19    recognizing both the welfare of the child and the parental rights"). This risk is exacerbated by the

20    fact that the standard for "best interests" is not specified. *J.S.*, 111 Wn. App. at 804 ("The criteria

21    for establishing the best interests of the child are not capable of exact specification because each

22    case is largely dependent on its own facts and circumstances."). The "imprecise substantive

23    standards that leave determinations unusually open to the subjective values of the judge" serve to

24

25    "magnify the risk of erroneous fact-finding." *Santosky v. Kramer*, 455 U.S. 745, 762 (1982). The

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft16

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL.: 206-477-8700
FAX: 253-856-7864

risk is even greater in a dependency proceeding. As compared to the clear and convincing standard applied in a termination proceeding, a dependency proceeding uses a "relatively lenient preponderance standard." *In re Dependency of Schermer*, 161 Wn.2d 927, 942 (2007). This allows for more flexibility, but greater chance of error. Furthermore, judicial officers cannot conduct their own investigations and are entirely dependent on others to provide them with information about the child's circumstances. *Kenny A.*, 356 F. Supp.2d at 1361. This reliance on others, in conjunction with the subjective decision-making, exacerbates the risk of deprivation.

Only an attorney can reduce the high risk of error that exists in dependency proceedings. Without an attorney for the children, the court will not fully understand the children's stated and legal interests. This is especially true for ████, ████ and ████, who have stated positions contrary to those for which their assigned CASA advocates. Though it is clear that the youth want to be with their parents, it is not clear what their specific positions are regarding a finding of dependency. This lack of understanding can lead to a detrimental result in which the court renders decisions without a full appreciation of the children's legal rights, causing unnecessary destruction of the children's most important family relationships. *See Kenny A.*, 356 F. Supp.2d at 1360. Moreover, the children will have no chance to correct the harm because no one will be capable of appealing based on their stated interest. By denying an attorney for ████ ████ and ████, the court will effectively deprive these children of the right to fair and just hearings, as well as of the right to appeal.

### c. There is No Countervailing Governmental Interest to Justify Denial of Counsel to James, Arthur and Edward

There is no overriding countervailing interest here. The only possible countervailing governmental interest is financial. Where fiscal constraints are the only countervailing interest,

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft17

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

however, the court will not excuse a violation of due process. *Mathews*, 42 U.S. at 348 ("Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard."); *see also Braam*, 150 Wn.2d at 710 ("Lack of funds does not excuse a violation of the constitution and this court can order expenditures, if necessary, to enforce constitutional mandates.").

In fact, a majority of states appoint attorneys for *all* children in dependencies. First Star, *A Child's Right to Counsel: A National Report Card on Legal Representation for Abused & Neglected Children* 22-23 (3rd ed. 2012) (61% of states require the appointment of attorneys for abused or neglected children).[3] *E.g.*, N.Y. Fam. Ct. Act § 241 (recognizing that "counsel is often indispensable to a practical realization of due process of law" and that minors, including those who are allegedly abused or neglected, "require the assistance of counsel to help protect their interests and to help them express their wishes to the court."); La. Child. Code Ann. art. 551 ("Provision of independent counsel for abused and neglected children is an essential due process right provided by Louisiana law to ensure sound and fair decision-making concerning children's safety, permanency, and well-being.").[4] The Model Act on Child Representation in Abuse and Neglect Cases was adopted by the ABA intending to "[give] legislatures concrete language to adopt that provides long-needed uniform guidance to lawyers representing children." Andrea Khoury, *ABA Adopts Model Act on Child Representation*, 30 A.B.A. at 106 (2011). The Model Act states that every child should be appointed a lawyer. *Id.*

---

[3] Washington State is among the very few states that do not mandate appointment of counsel to *any* dependent child. This report is available at http://www.caichildlaw.org/Misc/3rd_Ed_Childs_Right_to_Counsel.pdf.

[4] In addition, at least two counties in Washington State routinely appoint counsel to children on a routine and non-discretionary basis (e.g., Benton-Franklin Counties for children aged eight and older and King County for children aged 12 and older).

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft18

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

Providing legal counsel to the children is, in fact, in line with the state's *parens patriae* interest to protect a child's safety and well-being. *Kenny A.*, 356 F.Supp.2d at 1361 (finding that the state's *parens patriae* function "can be adequately ensured only if the child is represented by legal counsel throughout the course of deprivation and TPR proceedings. Therefore, it is in the state's interest, as well as the child's, to require the appointment of a child advocate attorney."). This is supported by at least one study, which indicated that attorneys can expedite permanency for the child, thereby reducing the State's cost in foster care and prolonged court proceedings, as well as ensuring the child's right to a speedy resolution.[5]

Indeed, children in other similar civil proceedings possess a statutory right to counsel. These proceedings have arguably fewer, less serious, and shorter-lasting consequences than most dependency proceedings. In At-Risk Youth (ARY) and Child In Need of Services (CHINS) proceedings, children are appointed counsel as soon as a petition has been filed. RCW 13.32A.192(1)(c) (ARY); RCW 13.32A.160(1)(c) (CHINS). Children subject to involuntary commitment are also provided with attorneys from the outset. RCW 71.05.300(2).

The liberty interests at stake in ARY and CHINS proceedings are fundamental—yet the interests implicated in dependency proceedings are undoubtedly greater and more numerous. Thus, it is axiomatic that any argument claiming a more weighty countervailing government interest results in the failure to provide counsel to children in dependency and termination proceedings lacks merit.

---

[5] In a recent study conducted in Palm Beach County, Florida, children represented by attorneys experienced exits to permanent homes about 1.5 times more frequently than children who were not afforded counsel. Children with their own lawyers also moved from case plan approval to permanency at approximately twice the rate of those not represented by counsel. Zinn, A. E. & Slowriver, J. *Expediting Permanency: Legal Representation for Foster Children in Palm Beach County.* Chicago, IL: Chapin Hall Center for Children (2008), *available at* http://www.chapinhall.org/research/report/expediting-permanency.

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft19

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

## C. CONCLUSION

Given that the children's physical liberty and fundamental interests in family integrity, safety, health, and well-being are at stake, without counsel, the likelihood of erroneous decisions is extremely high, and that the government has no countervailing interest, this Court must find that these children are entitled to counsel.

## V. EVIDENCE RELIED UPON

Exhibit A: CASA's Response against mother's emergency motion for return home, without Exhibits;

Exhibit B: CASA's Response in support of Department's motion to suspend father's visits, without exhibits.

Pleading and orders previously filed in this case.

## VI. PROPOSED ORDER

Forthcoming.

Respectfully submitted this 12th day of February, 2020.

KING COUNTY DEPARTMENT OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
/s/Justine Olimene
Attorney for Father, WSBA No. 49652
420 W. Harrison, Kent, WA 98032
Tel: 206-477-8700 /Fax: 206-447-3990
jolimene@kingcounty.gov

Error! Reference source not found.Motion for
Appointment of Counsel for James, Arthur and Edward
Medicraft20

KING COUNTY DEPT. OF PUBLIC DEFENSE
THE DEFENDER ASSOCIATION DIVISION
420 W HARRISON, SUITE 202
KENT, WASHINGTON 98032
TEL: 206-477-8700
FAX: 253-856-7864

# EXHIBIT 20

Student ID: ▓▓▓▓
WA SSID: ▓▓▓▓
Date of Birth: ▓▓▓/2010

**Highline Public Schools**
15675 Ambaum Blvd. SW
Burien, WA 98166
206-631-3009

DRAFT

**Evaluation Summary**

| | | |
|---|---|---|
| Student Name: ▓▓ Medicraft | | Student ID No.: ▓▓▓▓ | X Initial | Reevaluation |

Birth Date: ▓▓2010

School: Des Moines Elementary

Grade: 03    Age: 9

Evaluation Group Meeting Date: 02/28/2020

Next Three Year Reevaluation Due Date: 02/28/2023

Primary language of student: English

Primary language at home: English

Parent(s) name(s): J'aime Alibee, Tabitha Culp

Parent interpreter needed? Yes X No

Surrogate parent: X No    Yes    If yes, name:

Evaluation Case Manager (Psychologist/SLP): Nicolette Orkney
                         Title: School Psychologist

**i. Review of Existing Data:**
Date and reason for special education referral:
11/13/2019 - ***DRAFT***
▓▓▓ is a 9 year-old 3rd grade student in Ms. Praven's classroom. He has attended Des Moines Elementary since the spring of 2019 (3/12/19). Prior to that, he attended Fonda-Fultonvill Elementary in NY (▓▓▓/18-▓▓▓/2019) and East Hill Elementary. There is no record of ▓▓▓ attending school between 1/24/19 and 3/7/19.

Ms. Praven reports that ▓▓▓ has foundational skills in all academic areas. He wants to do well, and he responds well to structure, systems, incentives, and positive reinforcement. He can be very engaging, polite, and helpful.

Shaylee Medicraft, ▓▓▓ mother, has requested he be evaluated for special education. She is concerned with his behavior and academic progress. She reports that he has behavioral challenges and his academic performance is low. Ms. Medicraft reports that he "needs special instruction to be encouraged to learn". Ms. Medicraft believes that he is acting out because he is not getting enough attention at home, due to a "lack of home routine".

Ms. Praven reports that she is concerned with ▓▓▓ social, emotional, and behavioral development. He has difficulty regulating his emotions, making and keeping friends, he displays verbal aggression, is non-compliant, and he is disruptive in class. He has a history of eloping from the classroom and school campus. In addition, she is concerned with his reading comprehension, math reasoning, and writing composition.

✱ Steve Colmus (assistant principal) and Rick Wisen (principal) report that ▓▓▓ behaviors began to escalate in mid-November (coinciding with a CPS visit). They are concerned that his behaviors are interfering with his learning.

Description of specific strategies and interventions used to date and the effectiveness of each on student achievement and/or adjustment:
Teacher Report of Strategies/Accommodations/Modifications:
Academic
Use of manipulatives in math. organizational supports provided, use of graph paper, preferential seating, study carrel/separate work space, adjust level of reading materials, provide longer time for processing, shorten assignments, reduce/alter tests and assignments, allow oral responses, extended time for assignments, break down directions into steps, repetition of instructions

Behavior

Evaluation Summary

Student ID: ██████
WA SSID: ████████
Date of Birth: ████/2010

Medicraft

**Highline Public Schools**
15675 Ambaum Blvd. SW
Burien, WA 98166
206-631-3009

## Areas of Evaluation

3s: Spelling/word skills, mechanics

Math
2s: Fluently adds w/in 20, fluently subtracts w/in 20
3s: adds/subtracts to solve word problems, collects/organizes/draws/analyzes using various graphs.

Behaviors that Promote Learning
All "G" (good)

## Social/Emotional/Behavioral

Examiner Name: Nicolette Orkney, School Psychologist, 01/29/2020

**Assessment Summary:**
**DRAFT**
Examiner: Nicolette Orkney, Ed.S., NCSP

Teacher report (1/25/2019): Ms. Praven is mostly concerned about ████ behavior. She reports that his behavior interferes with academics instruction and performance. A structured behavior chart has been used in class. She reports that ████ needs a specific, structured plan for the day with a high rate of incentives. He is motivated by tangibles. She also reports that ████ displays quick emotional escalations. ████ behavior incidences have escalated recently. In particular, following the CPS worker's visit, 2 weeks ago. ████ has been working in Ms. Burtt's classroom. He has been using a behavior plan (chart to earn breaks) in Ms. Burtt's room. He is motivated by Lego, cards, sketch breaks. The team has been building in incentives for him to complete work.

Related Background:
████ was visited by a social worker two weeks prior to the 11/25/2019 referral meeting.
████ was removed from his mother's care and placed in foster care roughly a week after the 11/25/2019 referral meeting.

Formal Assessment: Behavioral Rating Inventory of Executive Functioning, 2nd Ed. (BRIEF-2) Teacher and Parent Form
Date: 12/11/2019 (Ms. Praven, teacher)

The BRIEF is a questionnaire for parents and teachers of school age children to assess a child's executive functioning in the home and school environment. Examples of such behaviors include: Inhibition, shifting between tasks, emotional control, initiation of tasks, working memory, planning, organization, and self-monitoring. This rating scale is designed for a broad range of children from 5 to 18, including those with learning disabilities, attention disorders, traumatic brain injuries, lead exposure, pervasive developmental disorders, depression, and other developmental, neurological, psychiatric, and medical condition.

Scores are reported as T-scores, with a mean of 50 and a standard deviation of 10. For all BRIEF-2 clinical scales and indexes, T scores from 60 to 64 are considered mildly elevated, and T scores from 65 to 69 are considered potentially clinically elevated. T scores at or above 70 are considered clinically elevated. ████ mother, Ms. Medicraft, and his classroom teacher, Ms. Praven, were asked to complete the form by responding to "Never", "Sometimes", and "Often" to a series of questions. Ms. Medicraft did not return the questionnaire.

The Inconsistency and Infrequency validity scores are in the acceptable range. However, the Negativity scale is in the elevated range. The Negativity scale measures the extent to which the respondent answered selected BRIEF2 items in an unusually negative manner relative to the clinical sample. Items comprising the Negativity scale are listed below. A higher raw score on this scale indicates a greater degree of negativity, with less than 3% of respondents scoring 5 or above in the clinical sample. The Negativity score of 6 is at the 99th percentiles and is elevated. This suggests that the respondent's view of ████ may be considerably negative. As a result, the rating

# EXHIBIT 21









# EXHIBIT 22



1
2
Hon. Messitt
June 15, 2020
Without Oral Argument

3
4
5
6
SUPERIOR COURT OF WASHINGTON FOR KING COUNTY
JUVENILE DEPARTMENT
7
IN RE DEPENDENCY OF:

NO.
8
MEDICRAFT, ████████
9
███/12
19-7-01267-4 KNT
19-7-01268-2 KNT
10
MEDICRAFT, ███████
███/13
11
19-7-01266-6 KNT
12
MEDICRAFT, ████████
███/10
MOTION TO TEMPORARILY
SUSPEND PARENTAL VISITATION
13
Minor Child(ren).
14

COMES NOW the Department of Children, Youth and Families, State of
15
Washington, by Derek Leuzzi, Assistant Attorney General, and moves the court for the
16
relief as stated below.
17
18
I.     RELIEF REQUESTED
19
The Department requests Court approval to suspend Mr. and Ms. Medicraft's
visitation with ██████, ██████ and ██████ due to its damaging impact on the children's
20
stability and emotional health. The state includes ██████ in this pleading due to very
21
concerning behavior on the part of the parents that causes her emotional distress during
22
visitation.
23
The Department requests the court suspend visitation for four months with a
24
review set on October 3, 2020. Sadly, this court cannot order the parents services during
25
26
MOTION
Rev. 03/01 pp
1
ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   shelter care, but the Department hopes the parents take advantage of parenting classes,

2   coaching, and engage with mental health providers to improve their ability to meet their

3   children's needs.    Such a commitment would demonstrate the parent's willingness to

4   comply with guidance put in place by the court and visitation providers

5               **II.    STATEMENT OF FACTS**

6               The domestic violence in the Medicraft family is well documented.  This Court

7   found "The domestic violence is disconcerting, and it is quite clearly going on." Ex 1.

8   "It is not just domestic violence between the parents, the violence impacts the children.

9   This is evidenced by the children recreating the violence and perpetrating it upon each

10  other." Ex 1.

11              When the Medicraft family moved to Washington State in February 2019, Mr.

12  Medicraft's visits were already suspended by the New York courts.  Ex 2. Mr. Medicraft

13  was ordered to complete an anger management class and a psychiatric evaluation prior to

14  returning his right to visit his children.    Ex 2.    In August 2019, the parties in this

15  dependency agreed to reinstate the father's visitation.    Ex 3.

16              As summer progressed and fall continued, the children's behaviors continued to

17  decline, resulting in injuries to ▮▮▮▮ and ▮▮▮▮ and the children's removal from the

18  mother's home.  Ex 4, *See December 2019 Motion for Out of Home Placement and*

19  *supporting exhibits,* Ex 5.  The Court ordered removal based on the concerns from the

20  school, the serious allegations of domestic violence, father's violation of the protection

21  order, the parents' risk of flight demonstrated in New York, and the photos of injuries to

22  ▮▮▮ and ▮▮▮ evident at emergency removal.  *Id.*

23              The children's behavior did not improve while in DCYF custody and in January

24  2020, this Court ordered ▮▮▮▮ ▮▮▮ and ▮▮▮ receive psychiatric evaluations from

25  Dr. Solchany.  Ex 6.

26  MOTION                                          2
    Rev. 03/01 pp

1          On January 15, 2020, Laura Muoser at the University of Washington Foster Care

2    Assessment Program issued a report advising DCYF to suspend Mr. Medicraft's visits

3    with the children.  She writes:

> 4          There are benefits to temporarily suspending Mr. Medicraft's visitation
> 5     with the children.  First, there is the possibility (in light of the history of
>        domestic violence), that contact with him is a trauma reminder that is
> 6     impacting the children's behavior.  Second, his current behavior is actively
>        encouraging the children's misbehavior.  Because stabilizing the
> 7     children's placements is critical to their well-being, a temporary
>        suspension (e.g. three months) is indicated.  With both parents, it is
> 8     important that visits be carefully supervised at all times to ensure that
> 9     neither parent engages in inappropriate conversation with the children
>        (encouraging negative behavior, discussing case planning, etc.)  This may
> 10    require additional supervisors at visits.

11   Ex 7.    Ms. Muoser recommended that the children stabilize and receive behavioral

12   services. Ex 7.

13         DCYF moved the court in early February to suspend the father's visits.    In

14   denying the Department's motion, this Court emphasized:

15   -    The Court is concerned about the impact that the father's statements to the
          children.    Particularly the statements discussing the case, disparaging the
16        Department, disparaging the foster care system, and encouraging their
          misbehavior.
17   -    These statements do not benefit the children.
     -    The answer is not to suspend visits in this situation, but rather to give the father an
18        opportunity to correct his behavior.
     -    If the father does not stop engaging the children with these comments, the State
19        may move to suspend his visits.

20   Ex 8.  The court additionally ordered that "the Father shall not discuss the case with the

21   children, he shall not disparage the Department, he shall not encourage the children's

22   misbehavior.  Ex 8.

23         At the end of February, Dr. Solchany released her report on the elder Medicraft

24   boys.  Ex 9.  Dr. Solchany opined: "All three boys presented with highly concerning

25

26   MOTION                                    3            ATTORNEY GENERAL OF WASHINGTON
     Rev. 03 01 pp                                                800 Fifth Avenue, Suite 2000
                                                                     Seattle, WA 98104-3188
                                                                        (206) 464-7744

behaviors which are listed and further discussed throughout this report.  Available
records indicate that the boys have been exposed to patterns of abuse and isolation.  They
also have a history of neglect.  Both parents deny the children have had issues when in
their care, however, there are ample events and examples that the children's concerning
behaviors were present even when in the parents' care."  Ex 9.  "Concerns have been
raised regarding the parents' influence on the children leading to their severe and violent
acting out in multiple situations with numerous individuals.  Several people have been
significantly hurt by the actions of these children."  Ex 9.

Dr. Solchany ends all three of her evaluations with this warning:

> If ████ parents do not engage in supporting the children, reducing their
> fears, and ceasing any actual or perceived encouragement of aggression,
> destruction, defiance, and other acting out, it is more likely than not these
> children will end up in more serious trouble or cause even more serious
> injury to someone.  It would be helpful to better understand these parents
> and it is recommended they both complete full psychological evaluations
> with testing.
>
> Parents report the boys are acting like this because they are in foster care,
> however these issues have been present for these boys before they were
> removed from mother's care.
>
> Visitation notes do demonstrate that when father has visited the children
> things appear to be calm and he seems to do well with them.  However,
> during these visits, which are 2 hours long, the kids are fed foods they
> like, allowed to engage in electronics and movies, and are not in situations
> where they require many limits.  These visits do not reflect actual
> everyday parenting, which requires constant balance of parents' self needs
> and meeting the children's needs, setting rules, meeting basic needs,
> ensuring homework is done and school supports are in place, etc.
> Furthermore, the visits have, at times, become father's platform for
> verbally attacking and undermining the Department in front of his children
> who then become activated and begin to act out with unsafe behaviors and
> a total disregard for others.  The children's fears, insecurities, worry, and
> exposure to trauma re all being increased by these patterns of interaction.

Ex 9.

MOTION
Rev. 03/01 pp

4

1      On March 12, 2020 this Court denied the parents motion for a return home. Ex 1.

2 The Court found that "Mr. and Ms. Medicraft have made it clear they are not willing to

3 follow court orders. That is really disconcerting to the Court. This is based on [a] pattern

4 of behavior that parents will not follow court orders. If returned to mom's care, the Court

5 does not believe she would abide by the court orders." Ex 1.

6      The Court found "Stability is in the best interest of the kids. The best way for that

7 to happen is for DCYF and the parents to work together and reach stability goals." Ex 1.

8 "Everyone needs to work together to seek stability to improve the situation the children

9 are currently in." Ex 1.

10 **COVID 19**

11      The children's emotional health and stability greatly improved during COVID 19

12 due to decreased visitation during the pandemic. Ex 10. Social workers are better able to

13 monitor the comments the parents are telling the children and have an easier time ending

14 visitation when the parents become inappropriate. *Id.* Visits are also less frequent and

15 shorter in duration than before. *Id.*

16      The effect of this is significant. Ex 10. The elder boys are now showing glimpses

17 of affection with caregivers and the department. *Id.* ▆▆▆ was able to be placed in a

18 foster home for a month before the parents' actions disrupted his behaviors when they

19 picked a fight with his caregiver. **Ex 10.** ▆▆▆ and ▆▆▆ were able to safely interact

20 with social workers such that security guards are used less frequently. Ex 10. ▆▆▆ was

21 even placed three weeks ago in a BRS foster home in Yakima. Ex 10.

22      ▆▆▆ and ▆▆▆ who had issues participating in school are now completing their

23 homework. Ex 10. ▆▆▆ **has** a new plant collection. Ex 10.

24      The Department incorporates the Declaration of Tabitha Culp dated June 3, 2020

25 into these facts. Ms. Culp has detailed several instances where the parents have been

26 MOTION
Rev. 03'01 pp

5

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   inappropriate in visitation including two incidents leaving ████ in tears after visits

2   when the parents told her she was not being truthful and two additional times upsetting

3   her at the visits.  Ex 10.

4        Of particular note, was the parents' role in disrupting ████ placement.  Ex 10

5   and 11.  On the May 14, 2020 visit, the parents were disrespectful to ████ caregiver

6   while ████ was on the phone and accused the caregiver of coaching ████

7   comments.  Ex 11. ████ was very upset afterwards and the following day he had to be

8   picked up from daycare after hitting another child and eloping.  Ex 10.

9        On May 17, 2020 visit, J'aime Allbee hosted a special Sunday zoom visit for the

10  family.  Ex 10. ████, ████, and ████ were together in person and the parents were

11  on video.  Ex 10.  The boys began climbing on the car with social worker attempting to

12  stop the dangerous behavior.  Ex 10.  The parents took no part in discouraging the

13  children, rather they encouraged them by telling the children they are recording the event.

14  Unfortunately, ████ took a step on the window shattering the windshield of the vehicle.

15  Ex 10.  And that was only one of three damaging incidents during this visit.  On the same

16  visit, with the children on the phone, the parents disparaged a photograph of Ms. Allbee's

17  husband making inappropriate comments about his appearance.  Ex 10.  The parents also

18  taunted the children with energy drinks.  Ex 10.

19        Two days later, ████ behavior which was decompensating because of this

20  visits became worse, resulting in his placement disrupting after he destroyed a new 2020

21  Toyota Corolla.  Ex 10.

22

23

24

25

26  **MOTION**                                6

### III.   STATEMENT OF ISSUES

1.   When the parents' behavior at visitation destabilizes, taunts, and causes their children to cry, should this Court temporarily suspend visitation to protect the children's welfare?

### IV.   EVIDENCE RELIED ON

Exhibit 1: Order Denying Return Home Dated March

Exhibit 2: New York Order Suspending Father's Visits

Exhibit 3: Agreed Order Implementing Visits

Exhibit 4: Order Removing Children from Parents Care

Exhibit 5: Photos of ███████ and ███████ taken by Amanda Fry at removal

Exhibit 6: Order Authorizing Psychiatric Evaluation for Children

Exhibit 7: FCAP report

Exhibit 8: Motion Denying Suspension of Father's Visitation

Exhibit 9: Reports on ███████, ███████ and ███████ by Dr. Solchany

Exhibit 10: Declaration of Tabitha Culp dated June 3, 2020

Exhibit 11: Email from Visitation Supervisor

### V.   AUTHORITY

1.   Mr. and Ms. Medicraft behavior at visitation is destabilizing the elder Medicraft children, disrupting ███████ placement, and threatening their stability and potential to find homes. Temporary suspension of the elder boys visitation is necessary to secure their welfare.

RCW 13.34.136(2)(b)(ii)(C) permits limitation and denial of visitation when necessary to protect the child's health, safety, or welfare. In every decision of this court, the paramount consideration is the best interests of the child. RCW 13.34.020. When those interests conflict with those of the parents, the children's interests prevail. *Id.*

The single most important thing for the Medicraft boys is stability. During COVID, the Department has witnessed the impact reduced visitation made in improving

MOTION
Rev. 03/01 pp

7

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1 the children's stability. With stability, the Medicraft boys are engaging in their

2 education. They are showing affection. They are far less destructive. ████ and ████

3 have both found periods of stability. ████ is developing healthy non destructive

4 relationships with his social workers.

5       The Department sees a dramatic change in the boys behaviors after visits with

6 their parents, particularly when their parents disobey the court order and discuss the case;

7 When they claim the children are being coached; When they taunt them with energy

8 drinks; When they encourage them to discuss how they are abused; When they pick fights

9 with the other participants in the visit; And when they admonish the boys for their

10 interest in their homework and stability.

11       The parents behaviors addressed at ████ caregiver and during the May 17,

12 2020 visit directly led to ████ placement disrupting after not only a month of

13 successful placement, but a month in which ████ showed remarkable improvements in

14 his behaviors and his ability to appropriately communicate affection.

15       Dr. Solchany is direct when she writes "If ████ parents do not engage in

16 supporting the children, reducing their fears, and ceasing any actual or perceived

17 encouragement of aggression, destruction, defiance, and other acting out, it is more likely

18 than not these children will end up in more serious trouble or cause even more serious

19 injury to someone." Ex 9. The Department can no longer wait for these parents to listen

20 to this Court and specialists working on the case. The parents' influence on the Medicraft

21 boys during visitation damages their chances of maintaining stability and the Department

22 cannot afford to wait to protect the gains made over the last couple months.

23       Suspending visits for four months offers the boys a chance to settle into local

24 foster homes. It offers Mr. and Ms. Medicraft the opportunity to work on their behavior

25

26 MOTION                   8

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  through parent classes and mental health counselling.  It offers Mr. and Ms. Medicraft the

2  opportunity to reflect on how their behavior impacts their children.

3        This is not the first time the Department and the Court implored the parents to act

4  in their children's best interest.  This Court found that it was very concerned with the

5  statements Mr. Medicraft makes to the children during visitation as detailed in CASA's

6  brief for a psychiatric evaluation on January 9, 2020.  Ex 6.  This Court sternly warned

7  Mr. Medicraft that his statements during visits have a negative impact on his children,

8  particularly statements discussing the case, disparaging the department, disparaging the

9  foster care system, and encouraging their misbehavior at its denial of visit suspension on

10  February 6, 2020.  Ex 7.  This Court provided an even further warning to the parents that

11  they need to abide by the Court's orders when it found at the denial of the return home

12  that it was disconcerted by the parents' unwillingness to follow the Court's orders.  Ex 1.

13  The Court instructed the parents that they need to support DCYF in finding and

14  maintaining stability for their children.  Ex 1.

15        To date, the parents continue to ignore this Court's orders, making inappropriate

16  statements and behaving inappropriately at visits.  Ending the ▇▇▇▇ placement.

17  **Bringing** ▇▇▇▇ to tears and inciting destructive behavior in the three older boys.

18        The Department requests this court protect the welfare of the elder Medicraft boys

19  by temporarily suspending their visitation.

20

21        DATED this        day of June, 2020.

22

23                                ROBERT W. FERGUSON
                                Attorney General

24

25                                By Derek Paul Leuzzi
                                Assistant Attorney General

26  MOTION                          9          ATTORNEY GENERAL OF WASHINGTON
    Rev. 03/01 pp                                  800 Fifth Avenue, Suite 2000
                                                  Seattle, WA 98104-3188
                                                  (206) 464-7744

WSBA # 45508

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

MOTION
Rev. 03/01 pp

10

# EXHIBIT 23

3. This GAL is increasingly concerned about the children's deteriorating mental health, including the children's threats of self-harm, their escalating and unsafe behaviors, and their constant hyper-vigilance and distrust of adults including their mental health care services and school staff.

4. On December 18, 2019, DCYF reported that the father, Mr. Medicraft, stated to the children during a recent child visit, that "bad people" are evil, kidnapping our kids, and that they are abusing them.

● On December 17, 2019, ████████ assaulted three DCYF employees, and one employee had to go to the emergency room due to the severity of the injury.

5. On December 16, 2019, this GAL received an email from DCYF indicating that ████████ was assaultive with staff, combative with staff at a visitation facility he was at over the weekend, that law enforcement had to be called, and that he was eventually hospitalized at Seattle Children's Hospital and released that next day.

On December 13, 2019, this GAL spoke with Des Moines Elementary School staff Dean Kimberly Rawlins and school counselor Kay Fortune. They reported there may also come a risk that there being a worker to get people to cooperate and to remedy to the what is taken, including self-harm, to blame people. They reported that one of the children stated that their father told them he asked a pencil to stab a pill, also on the injury concluded is there when the school cited in, and there in the incident also to bolt it out. the school staff reported to see that the parents are telling the children that DCYF is kidnapping children and that the school is keeping the children that DCYF will... They reported that on December 17, 2019, school staff found multiple pills (Benadryl also doxin) in the bottom of ████████ coat and that they are concerned that ████████ would use them to self harm. Ms. Rawlins reported that earlier in the day ████████ behavior was so unsafe that security needed to assist. She reported that ████████ jumped on her back and pulled his hair and that he was locking security.

● On December 5, 2019, this GAL visited Des Moines Elementary School and met with each of the children separately. Dean Rawlins assisted this GAL and was present for portions of the meetings. Ms. Rawlins reported that during the meetings with the children, ████████ reported that ████████ can make me bleed. She reported that Edward rigged their shirt and acted like school staff, it felt like him.

Virginia Winslow
Dependency CASA Program
1401 E Alder Suite 1190
Seattle WA 98122
Telephone (206) 477-1990





UNITED STATES POSTAL SERVICE

*EXPRESS*

USPS MAIL

**EXTREMELY URGENT**

Please Rush To Addressee

Mailing Envelope
For Domestic and International Use

When used internationally
affix customs declarations
(PS Form 2976, or 2976A)

U.S. POSTAGE PAID
MARION, SC
AUG 18, 20
AMOUNT
$64.50
R2305K139995-19

UNITED STATES
POSTAL SERVICE ®

PRIORITY
MAIL
EXPRESS ®

PHONE (701) 650-0168

FROM: (PLEASE PRINT)
James R. Medcraft
310 E. Northside Ave.
Marion, S.C. 29571

DELIVERY OPTIONS (Customer Use Only)

SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)
☐ 10:30 AM Delivery Required (additional fee, where available)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE ( )
Clerk, United States District Court
717 Pacific Ave. Rm. #3100
Tacoma, WA. 98402-3200

ZIP + 4® (U.S. ADDRESSES ONLY)
9 8 4 0 2 -

☐ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
☐ $100.00 insurance included.

PEEL FROM THIS CORNER

PRIORITY MAIL EXPRESS® (For Inc. HI & APO/FPO/DPO)

PO ZIP Code
29571

Day ☐

Scheduled Delivery Date (MM/DD/YY)
8-11-20

Time Accepted
8:10:30 ☐ AM ☐ PM

Date Accepted (MM/DD/YY)
8-10-20

Scheduled Delivery Time
☐ 10:30 AM ☐ 3:00 PM
☒ 12 NOON

Postage
$ 64.50

10:30 AM Delivery Fee
$

Insurance Fee
$

COD Fee
$

Weight
3 lb. 5 oz.
☐ Flat Rate

Special Handling/Fragile
$

Sunday/Holiday Premium Fee
$

Return Receipt Fee
$

Live Animal Transportation Fee
$

Delivery Attempt (MM/DD/YY) Time ☐ AM ☐ PM
Employee Signature

Total Postage & Fees
$ 64.50

Delivery Attempt (MM/DD/YY) Time
Employee Signature

LABEL 11-B, MARCH 2019 PSN 7690-02-000-9996

FILED
AUG 11 2020
RECEIVED
LODGED
DEPUTY





Please
Recycle

This packaging is the property of the U.S. Postal Service and is provided solely for use in sending Priority Mail Express shipments.
Misuse may be a violation of federal law. This package is not for resale.



07000B EM FP-13C JULY 2009
© 2009 USPS

**IN THE SUPERIOR COURT OF WASHINGTON FOR KING COUNTY**

JAMES and SHAYLEE MEDICRAFT, husband and wife and the marital community thereof, themselves and on behalf of their minor children: J.M., A.M., E.M., M.M. and N.M.,

)
)
)
)
)
)
)

**CASE NO. 21-2-10925-6**

**SUMMONS**

**JURY DEMANDED**

Plaintiffs, )
)

v. )
)

THE STATE OF WASHINGTON; DEREK P. LEUZZI and JANE DOE LEUZZI, husband and wife and the marital community thereof; TANESSA SANCHEZ and JOHN DOE SANCHEZ, husband and wife and the marital community thereof; TABITHA CULP and JOHN DOE CULP, husband and wife and the marital community thereof; ELIZABETH STERBICK and JOHN DOE STERBICK, husband and wife and the marital community thereof; CLEVELAND KING and JANE DOE KING, husband and wife and the martial community thereof; TABITHA POMEROY and JOHN DOE POMEROY, husband and wife and the marital community thereof; PHOENIX PROTECTIVE CORP., a Washington State corporation; and JOHN DOES 1 through 20, residents of Washington,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Defendants. )

To:    PHOENIX PROTECTIVE CORP.

A lawsuit has been started against you in the above-entitled court by Plaintiffs JAMES and

SUMMONS - 1

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

SHAYLEE MEDICRAFT, husband and wife and the marital community thereof, themselves and on behalf of their minor children: J.M., A.M., E.M., M.M. and N.M.. Plaintiffs' claims are stated in its written complaint, a copy of which is served upon you with this summons.

In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and serve a copy upon the undersigned attorney for Plaintiffs within twenty (20) days after the service of this Summons, excluding the day of service, if served within the State of Washington (or within sixty (60) days after service of this Summons, if served outside the State of Washington), or a Default Judgment may be entered against you without notice. A Default Judgment is one in which Plaintiffs are entitled to what they ask for because you have not responded. If you or your attorney serves a Notice of Appearance on the undersigned attorney, you are entitled to notice before a Default Judgment may be entered.

You or your attorney may demand that Plaintiffs file this lawsuit with the Court. If such demand is made, it must be in writing and must be served upon the undersigned attorney. Within fourteen (14) days after you serve the demand, Plaintiffs must file this lawsuit with the Court, or the service on you of this Summons and Complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

**NOTICE:** State and Federal law provide protections to defendants who are on active duty in the military service, and to their dependents. Dependents of a service member, or the service member's spouse, the service member's minor child, or an individual for whom the service member provided more than one-half of the individual's support for one hundred eighty days immediately preceding an application for relief.

SUMMONS - 2

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221

One protection provided is the protection against the entry of a default judgment in certain circumstances. This notice only pertains to a defendant who is a dependent of a member of the National Guard or military reserve component under a call to active service for a period of more than thirty days. Other defendants in military service also have protections against default judgments not covered by this notice. If you are the dependent of a member of the National Guard or a military reserve component under a call to active service for a period of more than thirty consecutive days, you should notify the plaintiffs or the plaintiffs' attorneys in writing of your status as such within twenty days of the receipt of this notice. If you fail to do so, then a court or an administrative tribunal may presume that you are not a dependent of an active duty member of the National Guard or reserves, and proceed with the entry of an order of default and/or a default judgment without further proof of your status. Your response to the plaintiffs or plaintiffs' attorneys about your status does not constitute an appearance for jurisdictional purposes in any pending litigation nor a waiver of your rights.

This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 18th day of August 2021.

**ARNOLD & JACOBOWITZ PLLC**

/s/ Nathan J. Arnold
Nathan J. Arnold, WSBA No. 45356
R. Bruce Johnston, WSBA No. 4646
2701 First Ave., Ste. 200
Seattle, WA 98121
(206) 799-4221
Nathan@CAJLawyers.com
*Counsel for Plaintiffs*

SUMMONS - 3

ARNOLD & JACOBOWITZ PLLC
2701 FIRST AVENUE, SUITE 200
SEATTLE, WA 98121
(206) 799-4221