# EXHIBIT CC

```
 1   oral ruling in this case this afternoon, 'cause this has
 2   been going on for a long time, and all the parties, most
 3   importantly the parents, and of even more importance the
 4   children, need to have some kind of finality. I'm not
 5   prepared for—to give you my Findings in writing today. But,
 6   I will make the oral ruling, and then we'll go on with that.
 7        We'll take the 15 minutes. Actually we'll take about 20
 8   minutes or so. I'll be—see you back here about 3:20. All
 9   right. We're in recess.
10        THE BAILIFF: Thank you.
11        MR. LEUZZI: Thank you.
12        [Recess taken from 2:58 p.m. to 3:29 p.m.]
13        THE BAILIFF: We're on the record, Your Honor.
14        THE COURT: All right. Let me just make sure I can look
15   at the gallery here. I see the parents, the attorneys,
16   Ms. Culp, Ms. Whalen. All right. Just wait a second.
17        All right. First of all, I wanted to thank the—the
18   attorneys, all of you, and all of the people who are
19   participating. This was a very lengthy trial. It needed a
20   lot of cooperation, a lot of work by all the attorneys
21   involved, and also by the witnesses, the parents, the
22   witnesses who were called, Ms. Whalen, Ms. Culp, and
23   everybody to make yourselves available. This is a new process
24   by trial by Zoom. It's a—it's rather unknown. I can't say
25   it's difficult, but it's an unknown process. It's a learning
```

1  curve for the Court as well as for all of you. And I wanted
2  to sincerely thank all of you for—for your participation. I
3  also want to acknowledge Mr. and Mrs.—I'm sorry—Medicraft—I
4  spaced out on the name—because it is—it also was a learning
5  curve for them and—them being at home, and—and handling the
6  electronics was also challenging for them as well.
7     I have reviewed the—the petition. As I said, I have six
8  notepads written of notes. And I have reviewed them as—as
9  I've gone through the testimony of all the witnesses who
10 testified in this case.
11    This allegation that the Department has brought is under
12 RCW 13.34.030 Paragraph 6, that the child—and this here is
13 for each one of the five children, has no parent capable of
14 adequate—adequately caring for that child such that the child
15 is in circumstances which constitute a danger of substantial
16 damage to the child's psychological or physical
17 developments.
18    As going through the testimonies, having that allegation
19 in mind, I wanted to say a couple of things first. One is
20 that I reviewed—I listened very carefully and also reviewed
21 my notes as to Dr. Solchany. I have to tell you that
22 Dr. Solchany's testimony is of little value to no value to
23 the Court, and I'll tell you why. It is—it is not at all a
24 reflection of—of the Court's opinion as to Dr. Solchany or
25 her experience, credibility, or her knowledge. It is the way

1   that this happened, the-the evaluations happened.
2   Dr. Solchany was also surprised that the—one of the children,
3   James, was involved in a situation the night before at that
4   foster—night-to-night foster home with another child. I
5   believe the testimony had come up—come up how—that the child
6   was—I believe one—one of the caseworkers—social workers
7   testified to this—maybe it's Ms. Culp—that there was an
8   altercation. I believe the police were called. But that
9   anyway, the After Hours social worker early hours in the
10  morning, I believe three a.m., had to go to that house,
11  remove J████, take him to the Kent office, and either he
12  slept on the couch if there was one or on the floor on the
13  blanket. At any rate, it was a disruptive night, and then
14  the evaluation went forward no matter what. And that's how
15  the child was brought in.
16      A████ was picked up at 5:50 a.m. by an After Hour [sic]
17  social worker—and this is Ms. Culp's testimony, I remember—
18  and from the ferry and brought to the Kent office. And I
19  remember that the question to her, could—could have been
20  follow-up by me, but I—I do remember this, that—that I asked
21  about that, or—or somebody asked, and she said that her shift
22  starts at eight. So, I gather it is an inconvenience for her
23  to go meet the ferry at 5:50 a.m. It would be for anybody.
24  But it definitely is for a child. I'm assuming that the child
25  had to be brought to the ferry, take the ferry to Seattle.

1   So, if you count on that, this child must have been up at
2   4:30 in the morning, if not sooner. Five o'clock. Give him—
3   give him a little break, five o'clock. And then brought to
4   the Kent office and then brought to Lynnwood or North
5   Seattle, wherever the—the office is. Dr. Solchany thought
6   that, oh, well, from the ferry to my office is 30 minutes.
7   But, that's not what Arthur had. And then you complain or
8   somebody complained, Dr. Solchany said—definitely observed
9   that the child were running around and were not happy, and
10  were doing things, kicking, screaming, doing this, throwing
11  things, breaking things.
12      My question is to the Department, why did you set it up
13  this way? And my question to the Department is, if you wanted
14  to use Dr. Solchany, why didn't you set this up—this—the
15  mid-morning? Why didn't you set it up with the parents, with
16  the mother? Why did you set it up this way? Would you do
17  this for yourself? For your child? For your nephew? Niece?
18  Anybody. Would you set this up? Does—is—does that make sense?
19  Honestly it doesn't. It doesn't for an adult. If you were up
20  all night, if you were waking up at 4:30 in the morning, and
21  then you wanted to go and take an exam, take an evaluation,
22  any one of us, including Ms. Culp, would not do it.
23      Well, we have a—we have a way to say, I object. But,
24  these kids did not have it. And so, for all those reasons,
25  if the Department wanted to do this, you had to redo it. You

1   had to redo it when the kids were given proper night's sleep,
2   proper dinner, proper breakfast. And then take them, and
3   then have them evaluated. Of course it's your right to do
4   it. It was an—it—it was a recommendation by Ms. Whalen,
5   absolutely right—right recommendation. I don't fault that at
6   all. The way it was done, it has no value to very little
7   value. The little value that it has is that all the kids
8   told Dr. Solchany—this is her testimony—that the parents—the
9   father did not hit them. All of them said that; all three of
10  them said that. Very little value.
11      I also did not hear any testimony from New York. New
12  York, I mean New York school, New York daycare, New York
13  neighbors, Yew York anybody. And—and I think that that's
14  something that the Court was looking for, because if you are
15  bringing the history, you cannot just bring the history you
16  want to and not the history as a full history.
17      So, I—I'm finding that this may be a case that because
18  it came from another state, that everybody was up in arms in
19  here to follow through to make sure that something was
20  happening that—make sure that—that investigation is done. I
21  understand that, and I think it's a good approach. But, the
22  investigation wasn't done correctly or thoroughly. And
23  nobody listened, nobody observed, nobody listened. And so,
24  that's the problem that I see.
25      Also, when—when the DCYF got involved, when DCYF in

1  December removed the children, and then when they saw the
2  parents saw the children and the father noticed the bruises
3  and noticed the scratches, when the children came with dirty
4  clothes, Mother noticed it, if they had not complained, if
5  they had not brought this up, there would be a big question
6  mark of what kind of parents they are if they see their
7  children having bruises that is not explained, that they
8  don't ask questions from the adults that have taken on the—
9  the responsibility of caring for those children. My question
10 and actually my dismay is that that was turned into why is
11 he complaining, badmouthing DCYF.
12     I did ask Ms. Culp when those questions came up—or
13 complaints came up from the father, was a DCYF person in the
14 room, and the answer was, yes. It would have been different
15 if the father was running around or walking around the room
16 only with the kids and with saying all of this about DCYF.
17 But, Father did not do that according to Ms. Culp. There was
18 a DCYF person there, and he was telling that person about
19 his complaints about his children. That is appropriate for
20 any parent to do so. That's appropriate for any adult to do
21 so if you see a child with bruises and you ask the question.
22     With regard to two youngest children, the Court did not
23 hear any testimony or any substantial evidence, any credible
24 evidence to find that there is—that the State—that the
25 Department has shown by a preponderance of the evidence that

1   these children are dependent children. With regard to the
2   three adult children—the-the older—not adult, the older
3   children, the Court similarly does not find that those three
4   children are dependent children and finds that the Department
5   has not shown by a preponderance of the evidence that they
6   are dependent children according to the statute.
7      I'm—again, I said this is my oral ruling because this
8   case has gone on for a long time, because the parents need
9   to know, and the parents need—the children need to know.
10  However, here's—here's the remaining of what I need to tell
11  you. The children are—let me just get the gallery view, make
12  sure I see Ms. Culp. Ms. Culp, you are to schedule a time
13  this afternoon with a link so that the parents and only the
14  parents are able to see the children and tell them what the
15  Court has said. Nobody but the parents is going to be the
16  first person to tell the children this. Do you hear me? Do
17  I need to talk to your supervisor or can you relay this to
18  the supervisor? Because I don't want an email to go out right
19  now of what the Court's ruling is and then somebody will
20  tell the children before the parents get the chance.
21      MS. CULP: Can you hear me, Your Honor?
22      THE COURT: Yes, I can.
23      MS. CULP: I can—I can actually text my supervisor right
24  now to make sure that—
25      THE COURT: You will do that.

```
 1        MS. CULP: —[inaudible].
 2        THE COURT: All right.
 3        MS. CULP: Yeah.
 4        THE COURT: The children are to be returned to the
 5   parents. If there—you—and I want the Department to coordinate
 6   that with the parents. And I want to get an update tomorrow
 7   by four p.m. of what that coordination is. If there are costs
 8   involved, it is to be borne by the Department. When you
 9   returning the children, all their belongings are to be found
10   and returned to the parents. All their equipments, inhalers,
11   sunglasses, eye—eyeglasses, whatever it is that they have,
12   it's all going to have—they have—it has to be found wherever
13   it is, and returned to the parents.
14        I need an update by tomorrow. And you will get my written
15   Findings early next week, by Monday, Tuesday at the latest.
16   But, I wanted to let you know this today so that the parents
17   can have—they can regroup. They can coordinate with you,
18   with the Department, to get this going and an update to my
19   bailiff tomorrow by four p.m.
20        All right. Any questions?
21        MR. LEUZZI: No, Your Honor.
22        THE COURT: All right. Any questions from the parents?
23        MR. MEDICRAFT: Thank you, Your Honor.
24        THE COURT: All right.
25        MS. MEDICRAFT: Thank you so much, Your Honor.
```

```
 1          THE COURT: You're welcome; you're welcome. Any questions,
 2     Guardian ad Litem?
 3          MS. MARTIN: No, thank you, Your Honor.
 4          THE COURT: All right. Thank you. I'll hear with an email
 5     from the Department tomorrow, cc to everybody else, of
 6     course. All right. Thank you.
 7          We are adjourned.
 8          [Session ends at 3:45 p.m.]
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

LEGEND OF SYMBOLS USED

—             Indicates an incomplete sentence or broken thought.

...           Indicates there appears to be something missing from original soundtrack.

[inaudible]   1. Something was said but could not be heard.
              2. Speaker may have dropped their voice or walked away from microphone.
              3. Coughing in background, shuffling of papers, et cetera, which may have drowned out speaker's voice.

[sic]         1. The correct spelling of that word could not be found, but is spelled phonetically, or —
              2. This is what it sounded like was said.

[No response.]   There is a pause in proceedings, but no response was heard.

[No audible response.]   Possible that something was said, but word or words could not be heard.

[Off-the-record discussion.]
              1. Discussion not pertaining to case.
              2. Discussion between counsel and/or the Court, not meant to be on the record.

CERTIFICATE

STATE OF WASHINGTON   )
                      )  ss.
COUNTY OF SNOHOMISH   )

   I, Barbara A. Lane, certify under penalty of perjury under the laws of the State of Washington that the following is true and correct:

   1.   That I am a certified transcriptionist;

   2.   I received the electronic recording directly from the trial court conducting the hearing;

   3.   This transcript is a true and correct record of the proceedings to the best of my ability, including any changes made by the trial judge reviewing the transcript;

   4.   I am in no way related to or employed by any party in this matter, nor any counsel in the matter; and

   5.   I have no financial interest in the outcome or end result of the litigation.

   Dated this 12th day of July, 2021 at Snohomish, Washington.

_____
Barbara A. Lane, CET**D-687
Northwest Transcribers