1

2

3

4

5

6

7

8

9

**Honorable Barbara J. Rothstein**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

10

11

12

13

14

15

JAMES and SHAYLEE MEDICRAFT, *et al.*,

Plaintiffs,

v.

THE STATE OF WASHINGTON, *et al.*,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO. 2:21-cv-01263-BJR**

**PLAINTIFFS' RENEWED**
**FIRST MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**

**NOTED FOR HEARING: 1/27/2023**
*Oral Argument Requested*

16

## I.     INTRODUCTION

17

18

19

20

21

22

23

24

The Washington State Legislature declares that "the family unit is a fundamental resource of American life which should be nurtured… the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized." RCW 13.34.020. The Medicraft family unit was ruptured by the actions of the State of Washington[1] through an investigation that was neither complete nor unbiased, allegedly based upon a no-contact order from the State of New York which had no bearing upon Mrs. Medicraft's ability to care for her children.

25

---

[1] The agency of the State of Washington involved was the Department of Children Youth and Families, referred to herein as "DCYF," the "Department," or the "State."

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Two months after the children were taken, that NCO was vacated. Even then, the State's agents, knowing the children should be returned to their parents, refused reunification, and continued to deprive the family of their statutory and constitutional right to be together. During the continued custody, DCYF violated a panoply of regulations, subjecting the children to abuse and harm..

Defaulted[2] defendant Cleveland King wrote in an email acknowledging the lifting of the NCO *should* change the family's treatment, but "**The AAG's are worried about a tort case if we return to the parents.**" Declaration of Shaylee Medicraft ("Medicraft Dec."), Exh. 1 (emphasis added).[3] Social Worker testimony corroborates this. Declaration of Kimberly Booker ("Booker Dec."). Other Social Workers did not believe the children should have been taken in the first instance. Declaration of Nathan Arnold ("Arnold Dec."), Exh. 1, Sterbick Dep. 111:20-112.8. Instead of mitigating harm, the State, in an attempt to cover up its liability, held the children another eight months, hoping to prevail at the upcoming dependency trial. The outcome of the 17-day trial, however, confirmed the exposure to tort liability the State sought to hide.

Eleven months after the children were taken, eight months after the NCO was vacated, and after a 17-day Family Court trial in King County, the Honorable Susan Amini ordered what the DCYF already knew: the children must be returned to their parents' custody *and* the State's investigation was inadequate and incomplete. The State did not appeal. The Amini

---

[2] *See* ECF No. 73.
[3] The AAG on this case at that time was Defendant Derek Leuzzi, who in his pending motion to dismiss claims to have been acting solely as an attorney and not in a social worker, *e.g.* decision making, role. ECF No. 61.

1    decision is res judicata.  *See*, Dkt. No. 1-1 at p. 19-30, and Exh. A.[4]  that decision confirms the
2    Medicraft children should never have been taken in the first place. *Id*.

3            Attempting to establish the Medicraft children were "dependent," the state necessarily
4    argued that it had made an adequate investigation that the children lacked capable parents, but
5    only after arguing they were in immediate danger and had to be removed from their mother
6    pending trial. The trial court rejected the State's arguments, determined that the children should
7    not have been removed from their home and that the DCYF investigation was incomplete, and
8    ordered the children immediately returned; even then, DCYF defied Judge Amini's Order and
9
10   opened a new investigation, refused to return the children, and Her Honor had to intervene.

11           Having taken the Medicraft family through that 17-day trial, after nearly a year of
12   wrongful custody, having failed to prove dependency (with the presupposition that its
13   investigation was complete and unbiased), and no appeal, including any appeal of Judge
14   Amini's finding that the investigation was "incomplete," the State is precluded by *res judicata*
15
16   and is collaterally estopped from relitigating the claims and issues asserted in that proceeding.

17           While the mission of DCYF is a laudable one, it went seriously awry regarding the
18   Medicrafts. As Judge Amini found, based upon an "incomplete" investigation, they were
19   deprived of what one Defendant social worker testified was a "[v]ery loving relationship[]."
20   Worse, during the long 326 days' separation, the children were repeatedly harmed in the
21   custody of the State, by agents of the State. At minimum, for the eight months post-NCO, the
22
23   family should have been intact, but DCYF refused, preferring a cover-up to its mission to

24
25   ───────────────
[4] The Full Faith and Credit Act, 28 U.S.C. § 1738, "require[s] all federal courts to give preclusive effect to state–court judgments whenever the courts of the State from which the judgments emerged would do so." Allen v. McCurry, 449 U.S. 90, 96, 101 S. Ct. 411, 415, 66 L. Ed. 2d 308 (1980) (applying collateral estoppel as to prior state court judgment in action under 42 U.S.C. § 1983).

protect children.

The dependency proceeding established: (1) the Medicraft children were wrongfully removed, (2) the children, at least the three oldest, were subjected to repeated, serious abuse and harm while in the custody of the State, and (3) the investigation, so-called, was not complete. Each of those holdings establishes, as a matter of law, liability, and the fact of damage. Plaintiffs seek an order of partial summary judgment to narrow issues.

The Washington Supreme Court issued two Opinions in August 2022, making clear that wrongful custody causes injury.  "Removal carries long-term risk of serious emotional and psychological harm to the child."[5] Removing a child from a non-abusive home or placing a child in an abusive home is harmful.[6] The State cannot credibly argue that making children sleep in cars and in overcrowded hotel rooms or offices, does not compound that harm; physically abusing them necessarily compounds the injury further. The fact of damage is further confirmed by the expert psychiatric reports of Dr. Kliman. Declaration of Nathan Arnold ("Arnold Dec."), Exh. 2-8

This Motion is directed exclusively at the State; any collateral estoppel effect on other Defendants is reserved. Medicraft submits herewith additional evidence buttressing Judge Amin's findings. Medicraft further submits, however, that (1) additional evidence is not necessary to the grant of this Motion, and (2) the State cannot place a reasonable quantum of such additional evidence in material dispute sufficient to avoid judgment as a matter of law.

## II.    FACTS ESTABLISHED BY JUDGE AMINI'S FINAL JUDGMENT

Medicraft incorporates Judge Amini's Order as though fully set forth herein and

---

[5] *Matter of Dependency of L.C.S.*, No. 99792-6, 2022 WL 3270003, at *7 (Wash. Aug. 11, 2022).
[6] *Desmet v. State by & through Dep't of Soc. & Health Servs.*, 17 Wash. App. 2d 300, 309, 485 P.3d 356, 363, *aff'd*, No. 99893-1, 2022 WL 3270004 (Wash. Aug. 11, 2022).

specifically directs the Court's attention to the following facts established therein. Medicraft Dec. Exhs. 2 (written order) & 3 (oral ruling, expressly incorporated into written ruling).

Pre-Removal Deprivation of Family Rights and Negligent Investigation

At the time of the state court trial, in Autumn 2020, JM was 10 years old, AM was 8 years old, EM was 7 years old, MM was 6 years old, and NM was 2 years old. Amini Order ¶ 2. The children love their mother, and they are closely bonded with their mother. Amini Order ¶ 8. JM, AM, and MM all expressed a desire to not be separated from their parents (NM's was too young to be asked). Amini Order ¶ 47.

DCYF knew, when they took the children on December 6, 2019, that Mrs. Medicraft was able to care for them. Amini Order ¶ 10 ("Megan Meyer and Tanessa Sanchez, two DCYF social workers … both testified to the mother's ability to care for the children."); *id.* ¶¶ 11–14. DCYF had no reason to believe Mr. Medicraft was unable to care for them either. Amini Order ¶ 18 ("Meyer testified that she supervised three visits between the father and children and that the father was affectionate, encouraged the children to take turns, and she had no concerns about violence or aggression during visits"); ¶ 19 (Ms. Ruelas, social worker, concurred with Ms. Meyer). Supervisor Liza Sterbick even objected to removal from their mother. Medicraft Dec. Exh. 4, Sterbick Dependency Depo. 54:22-55:16 and Arnold Dec., Exh. 1 at Sterbick Dep. 111:20-112:8, filed herewith. Despite Ms. Meyer, Ms. Sanchez, and Ms. Ruelas' assessments, and Ms. Sterbick's objection, DCYF removed the children in December 2019. Amini Order ¶ 52 & Medicraft Dec. Exh. 5-7.

Despite DCYF's back-up position allegation, post-NCO, that Mrs. Medicraft would "leave with the children," Judge Amini found, Mrs. Medicraft's "history with DCYF, however showed that DCYF had previously removed the children, albeit for a short time, and the mother

1    had not left the state. The history of the family shows that the mother had remained in the state

2    with her children and worked with DCYF and the school." *Id.* [7] Even if the Medicrafts were a

3    "flight risk," that is not basis for the removal of children, which can only be done under certain

4    circumstances dictated by statute. RCW 13.34.020 & .050 ("child's health, safety, and welfare

5    will be seriously endangered if not taken into custody"). The Supervisor on the case was fully

6    aware of the limits upon DCYF authority. Arnold Dec. Exh.9, Sterbick Depo. at 98:21 –

7    101:20. DCYF also failed to follow its own policies and procedures. No Family Team Decision

8    Meeting was held prior to removal—Sterbick, when deposed, could not recall any other time

9    where this critical step was omitted. Arnold Dec. Exh. 10, Sterbick Depo. 61:11 – 63:13, 82:21

10   – 83:9. The Department also failed to fully provide services through a safety plan. Arnold Dec.

11   Exh. 1, Sterbick Depo. 112:6–8.

12

13           Even if the Department had a basis to remove the Children from their mother (they did

14   not) they had the further ongoing obligation to assess the children's father for custody *and*, if

15   a safety concern were determined, to provide reasonable services to ameliorate. *See* RCW

16   13.32.065(5)(a), former RCW 13.34.065(a)(i), and *L.C.S.*, *infra*.  If the Department had

17   followed its governing statutes, the Children would have remained with, at least one loving

18   parent during the eight months, post-NCO, prior to the dependency proceedings.

19

20           The Department did not perform the required complete and unbiased investigation of

21   the Medicraft Family. As Judge Amini succinctly found: "the investigation wasn't done

22   correctly or thoroughly. And nobody listened, nobody observed, nobody listened." Medicraft

23   Dec. Exh. 3 at 2619:21–23.

24

25

---

[7] When the Department commenced the dependency matters in April 2019, it took the children for five days, returning them to Mrs. Medicraft's custody, despite the NCO, by court order after a contested shelter hearing. Amini Order ¶ 7.

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

1

The New York No Contact Order

2

At the time of removal, the Medicraft Parents were involuntarily separated to comply

3

with an out-of-state no contact order which was entered in the first place against Mr. Medicraft

4

due to bureaucratic overreach. Amini Order ¶ 5. After the first removal, the children were

5

returned, despite the NCO. Amini Order ¶ 7. Mrs. Medicraft attempted on multiple occasions

6

to have the order lifted. *Id*. Even apart from the questionable basis for the NCO, *e.g.* "Mrs.

7

Medicraft felt pressured" (Amini Order ¶ 5), it formed no basis to remove the children from

8

**Mrs.** Medicraft. WAC 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 (5)(c) ("exposure to domestic violence perpetuated

9

against someone other than the child does not, in and of itself, constitute negligent treatment

10

or maltreatment"). Far from impuging **Mrs**. Medicraft's ability to parent, it awarded her

11

exclusive custody. Medicraft Dec. Exhs. 8, 9.

12

The NCO was vacated during the dependency, eight months prior to trial. Amini Order

13

¶¶ 5 & 6 and Medicraft Dec. Exh. 10. DCYF admitted in internal email that it should have

14

changed course once the order was vacated, but Mr. Leuzzi convinced it not to because he was

15

"worried about a tort case if [DCYF] return[ed] the children." Medicraft Dec. Exh. 1 & Booker

16

Dec. The logic behind Mr. Leuzzi's insistence is sound, but nefarious. If the Medicraft

17

Children were returned to their parents, now reunited, before the dependency trial, and all went

18

well, that fact would weigh against finding they were unfit parents. DCYF prioritized its own

19

litigation strategy, which ultimately failed, over the wellbeing of the children. The same callous

20

disregard for the rights of the family was on display when DCYF *opposed* the stipulated

21

vacating of the NCO, again prioritizing litigation strategy over "keeping the family unit intact."

22

Post-Removal Deprivation of Family Rights

23

Ms. Culp, the principal DCYF representative at the trial, "acknowledge[d] on cross-

24

25

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

1    examination that the father's visits were summarily suspended by the Department without a

2    court order on January 24, 2020." Amini Order ¶ 31. This, alone, violates RCW 13.34.025.

3         The Department knowingly, or at least negligently, next set the children up for negative

4    evaluations in connection with the dependency, in another egregious example of DCYF's

5    misplaced priorities. JM was evaluated the morning after sleeping in the lobby of the DCYF

6    Kent office, after getting into a fight with another child. Amini Order ¶ 32. AM was woken

7    early in Poulsbo for a 5:50am ferry, driven to Kent, then back to Lynnwood for his evaluation,

8    even though the ferry was only a half hour from the evaluator's office—the day after being

9    assaulted by a Phoenix guard. *Id.* ¶¶ 33, 39. EM, too, was transported an unnecessary distance

10   and placed in a difficult experience directly prior to evaluation. *Id.* ¶ 34. The evaluator was not

11   informed of these circumstances, which she testified could have affected her evaluation. *Id.*

12   Judge Amini also found that the Department willfully further misinformed the evaluator, as

13   her sole source of information. *Id.* ¶¶ 35–37. These failures, some negligent and some willful,

14   resulted in an ill-founded and unreliable evaluation of the children. Amini Order ¶ 38. Again,

15   like the failure to change course after the NCO was vacated, DCYF prioritized its litigation

16   strategy to avoid liability.

19   Assaults, Batteries & Failure to Protect

> Ms. Culp testified that … DCYF threatened the children with being sent to the hospital if they did not behave…lost or misplaced the children's prescribed inhalers and eyeglasses…that [JM] was assaulted by a security guard,[8] that on another occasion a security guard threatened to hit [JM] with a belt; and that [EM] was slapped across the face by a social worker. She testified that the children spent some nights either at the DCYF office, or in a state issued car. She testified that [JM] reported sexual abuse by one of the overnight social workers in March/April 2020 and that Department's investigation…only started in September 2020.

---

[8] The "security guards" were agents of Defendant Phoenix Security; they will be the subject of future motions.

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

Amini Order ¶ 24. Ms. Culp was <u>the State's</u> witness. DCYF failed to investigate and could not show that it even "acknowledged the numerous bruises on the children, or addressed them in any way with the parents," nor did the Department take steps to protect the children from physical injuries. *Id.* ¶ 26. Despite calling the police and taking JM to Children's Hospital for behavior concerns, the Department also failed to provide mental health treatment for JM. *Id.* ¶ 28. DCYF did not even investigate JM's accusation of sexual abuse. Amini Order ¶ 24.

The Children suffered physical abuse at the hands of DCYF workers. Medicraft Dec. ¶¶ 11. The Department further endangered the children by sending them to an unlicensed day camp, where they suffered further harm. Medicraft Dec. Exhs. 11–14. The State acknowledged the need for Phoenix guards to undergo anger management training, and provide daily logs, but did not enforce, at least, those provisions of their contract with Phoenix. Arnold Dec. Exh. 11 & 12. The State allowed these untrained Phoenix guards to repeatedly abuse the Children. Medicraft Dec. ¶¶ 13–14 & Exhs. 15–24.

Fact of Damage

DCYF conceded that the children had serious behavior issues *after* removal. Amini Order *passim*. Importantly, the "timeline of the [the children's] behaviors actually shows that the behaviors began and worsened as Department intervention increased.… At different times in January and February 2019 [sic], all three children were hospitalized at Seattle Children's Hospital. Prior to their removal, none of the children had required this type of intervention." Amini Order ¶ 48. Before they were removed, JM, AM, and EM's school counselor gave positive reports of their behavior. *Id.* ¶ 49. The children's issues "immediately escalated after removal from their mother." *Id.* ¶¶ 53, 55. "There was ample evidence that the children's

behaviors were better in the care of Ms. Medicraft, both prior to and after removal on December

6, 2020 [sic]. There was ample evidence of Ms. Medicraft being able to successfully manage

her children's behaviors." *Id.* ¶¶ 56, 63.

### III.   ISSUES PRESENTED

A. Do the doctrines of *res judicata* and/or collateral estoppel, claim preclusion and/or issue preclusion bar the State and its agents from now challenging the findings of fact and conclusions of law of the Superior Court? *Yes*.

B. Was the State negligent in its investigation and removal of the Medicraft Children? *Yes*

*C.* Was the State negligent where it failed to keep the Medicraft Children reasonably safe from harm? *Yes*

D. Did the State fail to report suspected abuse of the Medicraft Children? *Yes*

*E.* Did agents of the State assault and batter JM? *Yes*

*F.* Did agents of the State assault and batter AM? *Yes*

*G.* Did agents of the State assault and batter EM? *Yes*

H. Is the State vicariously liable for the acts and omissions of its agents? *Yes*.

*I.* Does RCW 4.24.595 shield the State from liability? *No.*

J. Was each member of Medicraft family injured by the actions established herein? *Yes*.

### IV.   EVIDENCE RELIED UPON

This motion relies upon the Order of the Honorable Susan Amini,[9] and the Declarations

filed herewith of Kimberly Booker, Shaylee Medicraft and Nathan J. Arnold, and the balance

of filings in this matter.

---

[9] Prior to re-assignment of this case to the Hon. Barbara J. Rothstein, DCYF challenged the authenticity of Judge Amini's Order and incorporated Oral Findings and objected to the redactions in the filed copy.  Should they continue in those untenable position, a certified copy of the Order, unredacted, will be provided to the court's chambers, as it cannot be filed given the redaction requirements of the court and its Clerk. An authenticated copy of the state court Oral Findings is provided in the supporting materials. Of course, DCYF was also there.

PLAINTIFFS' RENEWED FIRST MOTION FOR
PARTIAL SUMMARY JUDGMENT - 10

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## V.     ARGUMENT AND AUTHORITY

A.  Res Judicata and Collateral Estoppel bar re-litigation of claims or issues by the State.

The Full Faith and Credit Act, 28 U.S.C. § 1738, "require[s] all federal courts to give preclusive effect to state–court judgments whenever the courts of the State from which the judgments emerged would do so." *Allen v. McCurry*, 449 U.S. 90, 96, 101 S. Ct. 411, 415, 66 L. Ed. 2d 308 (1980) (applying collateral estoppel from prior state court judgment in action under 42 U.S.C. § 1983). Collateral estoppel "is well-known to Washington law as a means of preventing the endless relitigation of issues already actually litigated by the parties and decided by a competent tribunal. Collateral estoppel promotes judicial economy and prevents inconvenience, and even harassment, of parties." *Reninger v. State Dep't of Corr.*, 134 Wash.2d 437, 449, 951 P.2d 782, 788 (1998). It requires "(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied." *Id.* (quoting *Southcenter Joint Venture v. National Democratic Policy Comm.,* 113 Wash.2d 413, 418 (1989)); *and see In re Det. of Stout*, 159 Wash.2d 357, 378 (2007) (same elements required to collaterally estop the State). Here, (1) the Medicrafts seek to establish only the specific facts found by the prior state court order (buttressed by additional indisputable evidence included here); (2) Judge Amini's Order dismissed the Medicraft children's dependency matters (Amini Order at 12)—it was a final judgment on the merits; (3) DCYF, a Defendant and an arm of the Defendant State of Washington, was party to the consolidated dependency proceedings, *Id. passim*; and (4) there is no injustice in preventing the State from challenging the facts it failed to overcome in a hotly contested, 17-day trial, after nearly a year of investigation. Indeed,

1  relitigation would be unjust to the Medicrafts, particularly the children.

2  *Res judicata*, or claim preclusion, applies when there exists between two separate cases

3  (1) identity or privity between the parties, (2) identity of claims, and (3) a final judgment on

4  the merits in the first case. *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct.

5  2424, 69 L.Ed.2d 103 (1981); *Blonder–Tongue Lab v. University of Ill. Found.,* 402 U.S. 313,

6  323–24, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Costantini v. Trans World Airlines,* 681 F.2d

7  1199, 1201–02 (9th Cir.1982); *Western Radio Servs. Co. v. Glickman,* 123 F.3d 1189, 1192

8  (9th Cir.1997). A change in the legal theory underlying claims brought in the first round of

9  litigation will not defeat *res judicata. Mpoyo v. Litton Electro–Optical Systems,* 430 F.3d 985,

10  988 (9th Cir.2005).

12  In the state court dependency proceeding, DCYF asserted that it had conducted a

13  complete and unbiased investigation complying with applicable duties. Rejecting that claim,

14  the state court held: "the investigation wasn't done correctly or thoroughly." Medicraft Dec.

15  Exh. 3, p. 2619: 21-23. DCYF's central claim was that it had lawfully taken custody of the

16  Medicraft children. The state court held the contrary.  Third, because DCYF sought permanent

17  custody, it necessarily claimed that its treatment of the Children was appropriate and superior

18  to the family unit remaining intact.

20  The Medicrafts asserted claims and defenses contrary to DCYF's. They asserted the

21  investigation was improper, they asserted their children were wrongfully taken, and they

22  asserted the care of their children was not consistent with statute or regulation. The Medicrafts

23  prevailed and should not be required to relitigate these issues after a 17-day trial and nearly a

24  year of pre-trial family disruption.

25  The depth and breadth of Judge Amini's findings illustrate that, in contrast to their

careless dependency investigation, DCYF left no stone unhurled in their 17-day attempt to avoid AAG Leuzzi's "worr[y] about a tort case." Indeed, they tried the Dependency *as if it were* a tort case. DCYF cannot now come to this Court and pretend that the Dependency was about different issues than those in this motion. Indeed, any position by the State that those matters should be re-tried constitutes a continuation of the state strategy of injuring the children to avoid or reduce liability.

*Summary Judgment Standard*

Summary judgment is appropriate where the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. Rule Civ. Proc. 56(c). The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party. *Id*. There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply some metaphysical doubt).

Here there is no genuine issue where the material facts have already been found by another court of competent jurisdiction. In addition, the Medicrafts provide herein evidence to support Judge Amini's findings; in the event DCYF is allowed to relitigate these issues at all, they must produce contradictory evidence on all discrete issues.  In this case, the dispute of any single fact does not, and cannot, offset the quantum of evidence supporting summary judgment

B.  The State of Washington was negligent in its investigation of the Medicraft Family

The Washington State Supreme Court recently affirmed *Desmet*,[10] setting forth the standards for claims of negligent investigation. Negligent investigation requires a claimant to prove the department "gather[ed] incomplete or biased information that results in a harmful placement decision, such as removing a child from a non-abusive home, placing a child in an abusive home, or letting a child remain in an abusive home." *Id*.

The State's failures here also implicate Constitutional rights where due process was not followed:

> "Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). "That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Id*. Moreover, "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

*Hardwick v. Cty. of Orange*, 980 F.3d 733, 740–41 (9th Cir. 2020).

*The Department's Investigation was Incomplete*

Judge Amini, in her oral ruling, incorporated into her final written ruling, stated: "the investigation wasn't done correctly or thoroughly. And nobody listened, nobody observed, nobody listened." Medicraft Dec. Exh. 3, p. 2619: 21-23. Judge Amini's admonishment of the Department is emblematic of their negligence toward the Medicraft family:

> And my question for the Department is, if you wanted to use [Department's expert], why didn't you set this up-this-the mid-morning? Why didn't you set it up with the parents, with the mother? Why did you set it up this way? Would you do this for

---

[10] *Desmet v. State by & through Dep't of Soc. & Health Servs.*, No. 99893-1, 2022 WL 3270004, at *1 (Wash. Aug. 11, 2022), 514 P. 3d. 1217.

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

1
2

> yourself? For your child? For your nephew? Niece? Anybody.
> Would you set this up? Does-is-does that make sense? Honestly
> it doesn't.

3

4

Medicraft Dec. Exh. 3, 2618:12-19. And Judge Amini was correct, it did not make sense;

5

especially when viewed in the light of DCYF's fear of tort liability, and unconscionable bias

6

against the Medicraft family.

7

   Independent of Judge Amin's Findings, it is beyond question that the Department's

8

investigation was not complete.

9

*The Department failed to hold an FTMD*

10

   "Family Team Decision Making (FTDM) meetings … engag[e] the family and others

11

who are involved with the family to participate in critical decisions regarding the removal of

12

children from their home..."[11] The FTDM ***must*** be held prior to "Removing a child and anytime

13

out-of-home placement of a child is being considered. … Moving a child from one placement

14

to another." *Id*. "Participants listed on the Guide to Shared Planning Meetings DCYF

15

CWP_0070 publication ***must*** be: Invited to the FTDM meeting." *Id*. (emphasis added).

16

17

   The Medicraft Family was not afforded an FTDM prior to removal. Arnold Dec.

18

Exh.10, Sterbick Depo. 61:1 to 63:13, and 82:21-9 and Exh. 13, Sterbick Depo. 21:5 to 23:2,

19

52:6-15, 65.3-24, and 131:7 to 133:21.        Supervisor Sterbick could not recall another time

20

that the parents, their attorneys, and the Children's GAL had not been invited to an FTDM

21

prior to removal. *Id*. 119:1-120:7. At the dependency trial, Ms. Tabitha Culp, DCYF case

22

worker, testified similarly, that FTDMs are required whenever a child is moved and required

23

to inform the parents and be documented in the casefile. Arnold Dec. Exh. 14, Dependency

24

25

---

[11]https://www.dcyf.wa.gov/1700-case-staffings/1720-family-team-decision-making-meetings(August 20, 2022).

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

1    trial testimony of Tabitha Culp 1761:20-1765:3.

2          If the decision makers, whoever they actually were, had interviewed social workers in

3    a more complete and unbiased investigation, they would have determined, for example, that

4    the family had a "[v]ery loving relationship." Arnold Dec. Exh. 15, Bonnie White Depo., 46:11

5    to 46:14. The supervisor assigned did not believe removal was in the best interest of the

6    children. Medicraft Dec. Exh. 4, Sterbick Dependency Depo. 54:22-55:16 and Arnold Dec.

7    Exh. 1, Sterbick Depo. 111:20-112:8. Other DCYF workers testified that Mr. and Mrs.

8    Medicraft *were* capable. Amini Order ¶¶ 10 & 18. And Mr. King acknowledged DCYF's

9    obligation to promote reunification. Medicraft Exh. 1. Who then, other than AAG Leuzzi,

10   sincerely believed the family should not remain intact? And did a complete investigation lead

11   to that belief? Judge Amini found not.

12          The Washington Supreme Court recently took review of a dependency matter, <u>despite</u>

13   <u>it being moot</u>, "given the substantial public interest involved in keeping families together and

14   the potential that this issue will further evade review" and issued a unanimous decision

15   addressing DCYF's duties. *Matter of Dependency of L.C.S.*, 514 P.3d 644, No. 99792-6, 2022

16   WL 3270003, at *1 (Wash. Aug. 11, 2022). Former RCW 13.34.065(a)(i) (now RCW

17   13.34.065(5)(a)) mandates that: "The court shall release a child alleged to be dependent to the

18   care, custody, and control of the child's parent, guardian, or legal custodian unless the court

19   finds there is reasonable cause to believe that:

20
21          (i) After consideration of the specific services that have been
                provided, reasonable efforts have been made to prevent or
22              eliminate the need for removal of the child from the child's home
                and to make it possible for the child to return home;
23          ii)(A) The child has no parent, guardian, or legal custo-
                dian to provide supervision and care for such child; or
24          (B) The release of such child would present a serious
25

1
2
3

> threat of substantial harm to such child, notwithstanding an
> order entered pursuant to RCW 26.44.063; or
> (C) The parent, guardian, or custodian to whom the child
> could be released has been charged with violating RCW
> 9A.40.060 or 9A.40.070

4
5
6
7
8
9
10

The Department's failures under this mandatory statute were, at least, two-fold. First, it deprived the Medicraft Parents of both the requisite FTDM *and* if some actual threat was identified there, a Safety Plan. But, like the lack of FTDM, no safety plan was put in place before removal. Indeed, this is only allowed under statute if there is no safety threat *and* that threat cannot be ameliorated by services. Here, there was no real safety threat, particularly post-NCO, only DCYF's fear of liability.

11

*The Department's Investigation was Biased*

12
13
14
15
16
17
18

The Court need not move to bias where it has been conclusively established, and there is also no genuine dispute, that the Department's investigation was not complete. But the Department's investigation was also biased. At a hearing on February 11, 2020, AAG Derek Leuzzi brazenly stated: "if the children are returned home, the State is going to be requesting for out-of-home removal." Medicraft Dec. Exh. 25. In other words, "it doesn't matter what this court decides, we are taking these children under any circumstances."

19
20
21
22
23
24
25

And Mr. Leuzzi followed through on his threat. Even after Judge Amini ordered the family reunited at the conclusion of trial, the Department opened a *new* investigation against the Medicrafts and refused to return the children as ordered; Judge Amini then had to step in and, once again, order the Department to return the children to their parents. Arnold Dec. Exh. 16-18. The proof of Mr. Leuzzi's concern over tort liability in the record, renders an explanation for DCYF's otherwise inexplicable objection, and its defiance of Judge Amini Order.

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

1    DCYF, bizarrely, complained that the Medicraft Parents' had reported the abuse of

2    their Children *while in state custody*. This is further evidence of bias. As Judge Amini found

3    "That is appropriate for any parent to do so. That's appropriate for any adult to do so if you

4    see a child with bruises and you ask the question." Medicraft Dec. Exh. 3, Oral Ruling of the

5    Hon. Susan Amini 2620:19-21. Even if the Medicraft Parents reports were baseless (they were

6    not) it would not support dependency. Instructive on this point is *Matter of Dependency of*

7    *Q.S.*, No. 38027-1-III, 2022 WL 2047233 (Wash. Ct. App. June 7, 2022):[12] "The law does not

8    allow a child to be taken away from a parent because of the parent's anger toward CPS, DCYF,

9    or state providers, <u>even if the anger is illegitimate</u>." *Id.* at *14 (emphasis added). Like in *Q.S.*,

10   the State knew that Mrs. Medicraft was herself an abuse victim in foster care and apparently

11   failed also to take that into account. Medicraft Dec. ¶ 17. Worse, it quite apparently biased

12   DCYF against her.

13   DCYF's reliance on the NCO, which *awarded* custody to Mrs. Medicraft, thus

14   establishing her fitness, shows further bias. An NCO is no basis for dependency; indeed, even

15   actual domestic violence between parents is not a basis for dependency WAC 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

16   (5)(c). DCYF's election to take children based on an out-of-state NCO, where the statute does

17   not allow it, can only be explained by some other bias. This is particularly so where the

18   Department knew that the Medicraft Parents wished to reunify their family and were in the

19   process of doing so. Mrs. Medicraft had even requested assistance in that regard from DCYF.

20   Medicraft Dec. ¶ 19. The Department has an affirmative duty to take reasonable steps to keep

---

[12] This Unpublished Opinion is cited pursuant to Washington GR 14.1(a); it is submitted as persuasive, because DCYF was a party, and the quotation is directly relevant to a position taken in the state dependency proceeding by DCYF.

1
2
3

children in their home. *See*, *L.C.S., discussed infra*.[13] Not only did they refuse to help – they objected. Medicraft Dec. ¶ 20. Worse, it carried on its biased investigation even <u>after</u> the Medicrafts had the NCO vacated by the Superior Court. Medicraft Dec. Exh. 10 & 26.

4
5
6
7
8
9
10
11
12

Once its already inadequate premise under the NCO was lost, and instead of focusing on the Children's actual well-being, the Department fabricated a "flight risk." But, as J. Amini found, the mother had always cooperated with DCYF, even after the children were taken the first time. In any event, there is no basis in any governing statute for removal for fear that the parents may move, that does not pose a risk to well-being. Indeed, "[f]reedom of movement is kin to the right of assembly and to the right of association. These rights may not be abridged" *Aptheker v. Sec'y of State*, 378 U.S. 500, 520 (1964); *De Jonge v. Oregon*, 299 U.S. 353 (1937); *NAACP v. Alabama*, 357 U.S. 449, 460—462 (1958).

13
14
15

Once the NCO was lifted, the State also had an affirmative duty to place the children with Mr. Medicraft, even if it had a valid basis to not return them to Mrs. Medicraft.

16
17
18
19
20

> absent the risk of such harm and given the serious long-term trauma that removal may cause, the Department is required to make reasonable efforts toward both parents to prevent removal whenever possible. In this case, although the Department made reasonable efforts to maintain placement with the mother, it failed to do so for the father, citing emergent circumstances. The Department is required to make <u>reasonable efforts for both parents</u>.

21
22
23

*L.C.S.* at *8. Of course, if DCYF *successfully* carried out its statutory duty, and the children were returned to their parents DCYF would lose its shot at a finding of dependency, and DCYF would be exposed to liability. The bias in that is axiomatic.

24
25

Further, in addition to disregard of other statutes, and as further evidence of bias, there

---

[13] *Matter of Dependency of L.C.S.*, 514 P.3d 644  No. 99792-6, 2022 WL 3270003, at *1 (Wash. Aug. 11, 2022).

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

was no Court order in place when the children were taken on December 6, 2019. Medicraft Dec. ¶ 6-8. The Supervising Social Worker was lied to, and falsely told there was an Order, before executing her pick-up. Arnold Dec. Exh. 9, Sterbick Dep. 99:9-101:20.

Not only was the State's investigation biased, DCYF's claims to the Dependency Court were demonstrably false. Ms. Sterbick testified that the children had bruises from their father's abuse; this was false. Medicraft Dec. Exh. 4, Sterbick Dependency Dep. 60:12-62:8. And, as Judge Amini found, DCYF's witnesses repeatedly contradicted themselves. Amini Order ¶ 30.

Again, rather than consider the children's wellbeing, and other statutory mandates, DCYF engaged in a biased campaign of litigation over child welfare. The Ninth Circuit, has, unfortunately, seen this mis-prioritization before:

> No official with an IQ greater than room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law. The social workers in this case are alleged to have knowingly and maliciously violated the law in their attempt to sever [the child's] protected relationship with her mother.

*Hardwick v. Cty. Of Orange*, 844 F.3d 1112, 1118–19 (9th Cir. 2017).

Post-NCO, Mr. King knew the claimed basis for custody was gone, but he refused to prioritize the children nonetheless. Medicraft Exh. 1. The dependency proceeding should have been dropped once the NCO was resolved. In this connection, Judge Amini's observation that no testimony was brought forth from anyone in New York by DCYF is instructive. Medicraft Dec. Exh. 3, 2619:11-24. With its resources, and the extensive efforts undertaken in the trial, if evidence from New York was favorable, DCYF could have presented it; it was within the trial court's discretion to draw the negative inference that DCYF knew the evidence would not be favorable. That both displayed and compounded the bias of DCYF.

1

2

C.   <u>DCYF failed to keep the Medicraft children free from reasonable risk of harm</u>

Once torn from their "[v]ery loving relationship" the State compounded its damage to

3

4

the Medicraft family by failing to keep the children safe. Children "have a substantive due

process right to be free from unreasonable risk of harm, including a risk flowing from the lack

5

6

of basic services, and a right to reasonable safety." *Braam v. State of Washington*, 150 Wn. 2d

689, 699-700, 81 P.3d 851 (2003). Based upon Judge Amini's findings, and the additional

7

8

evidence provided herewith, the State indisputably failed to keep the Medicraft children free

from multiple unreasonable risks. Again, if not precluded, DCYF must put forth evidence

9

10

meeting the strictures of *Celotex, supra.* to create a genuine issue of material fact.

11

The State did the opposite of what is required by *Braam* – it <u>created</u> the unreasonable

12

risk of harm. The State then attempted to perpetuate it by willfully setting up the children's

13

14

evaluations to fail. Amini Order ¶¶ 34-38. The only explanation for DCYF abandoning its

mission and duties was its belief that a win in family court would cutoff liability; indeed, DCYF

15

16

has a statutory duty to seek reunification, it instead attempted to sabotage the process. Even if

*res judicata* and/or collateral estoppel did not apply, summary judgment should issue based

17

18

upon the following indisputable evidence.

19

One of the primary issues in *Braam* was the harm caused children by the separation of

20

siblings. The State indisputably separated the Medicraft children. Medicraft Dec. Exh. 27-28.

21

And as Judge Rothstein correctly pointed out in *D.S. v. DCYF*, Cause No. 21-113-BJR:

22

> Whatever [counsel for the state] is going to say to the court, I
> don't think he's going to argue that one-night stays at hotels are
> good for these kids.
> …
> They shouldn't be staying in hotels in the first place.
> …
> kids should not be sleeping in cars,
> …

23

24

25

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

> this exceptional-placement program be reorganized in such a way that children not end up sleeping in cars, and on the floor of offices. That's unacceptable. And without going into great detail now, it has to be violative of at least one, or two, or three statutes. Can't happen.

Arnold Dec. Exh. 19.[14] And, as Judge Amini found, the Court's concerns in *D.S.*[15] are exactly what the young Medicraft Children were subjected to. Amini Order ¶¶ 24 & 57.

The State cannot genuinely dispute that it not only failed to keep the Medicraft Children safe from harm, but it actually created the very harm they suffered.  The Declaration of Jason Bragg outlines a, relatively pedestrian, day of *Braam* violations. Medicraft Dec. Exh. 29.  The Children had many overnight car stays. Medicraft Dec. Exhs. 30-37.  Conditions when the Children were forced to stay in the office was little improvement. Medicraft Dec. Exhs. 38-40. The Children were forced to stand in the rain as punishment. Medicraft Dec. Exh. 41.  The Children were deprived of sleep *Id*. Exh. 42.

During these unacceptable placements, the children suffered a myriad of physical injuries, in addition to the psychological trauma thrust upon them. The Children were abused by Phoenix security personnel. Medicraft Dec. ¶¶ 15 & Exhs. 15-24.  The Children were also placed with much older children, unsupervised, and routinely beaten. Medicraft Dec. ¶ 28 & Exhs. 43-44. And the children suffered additional injuries while in state custody. *Id.* Exhs. 45-48.

And, despite Article IX of the Washington State Constitution, the Department also interfered with the children's education, creating additional harm. Medicraft Dec. ¶¶ 32-33.

The State's treatment of the children violated *Braam* in most ways possible and

---

[14] Unfortunately, this practice remains rampant at DCYF. Arnold Dec. Exh. 20.
[15] The Medicrafts congratulate Class Counsel in *D.S.* on their recent approval of settlement.

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

subjected them to treatment which would support dependency if perpetuated by a parent.

D. <u>The State of Washington was negligent in their failure to report suspected abuse</u>

The Department failed to investigate and could not show that it even "acknowledged the numerous bruises on the children, or addressed them in any way with the parents," nor did the Department take steps to protect the children from physical injuries. Amini Order ¶ 26.

RCW 26.44.030 imposes a duty to report suspected child abuse for certain professionals and supports an implied cause of action against a professional for the failure to fulfill that duty. *Evans v. Tacoma Sch. Dist. No. 10*, 195 Wash. App. 25, 43, 380 P.3d 553, 562 (2016). DCYF itself is liable: "[t]he duty to report child abuse clearly would be within a District employee's scope of employment. Therefore, even if the District cannot be directly liable for the failure to report child abuse, the District can have vicarious liability for the negligence of its employees." *Tacoma Sch. Dist. No. 10* at 44.

Despite taking JM to the Children's Hospital for behavior concerns, the Department failed to provide mental health treatment. Amini Order ¶ 28. As quoted above, Judge Amini summarizes more or these harms at her Order ¶ 24. And The State cannot argue that it was not on notice of these concerns. Medicraft Dec. Exh. 48-50.

Even if Judge Amini's Findings do not bind the State, which they do, the undisputed evidence is that DCYF, through its employees, failed its duties.

**<u>The Medicraft Family's Claims Sounding in Assault and Battery</u>**

*Assault and Battery Standard*

An assault is an attempt to cause apprehension of a harmful or offensive contact. Restatement Second, Torts § 21. A battery is an intentional and unpermitted contact with the plaintiff's person. *McKinney v. City of Tukwila*, 103 Wash. App. 391, 408, 13 P.3d 631, 641

1   (Div. 1 2000) A plaintiff must prove the following elements to establish a prima facie case of

2   battery: (1) an act by the defendant that results in harmful or offensive contact with the

3   plaintiff's person; (2) intent by the defendant to bring about the harmful or offensive contact;

4   (3) causation; and (4) injury. Restatement Second, Torts § 13.

5       E.   Agents of the State of Washington assaulted and battered JM.

6           Judge Amini found that JM "was assaulted by a security guard" and "a security guard

7   threatened to hit [JM] with a belt." Amini Order ¶¶ 33.  Independent of that Order, there remains

8   no genuine issue of material fact. At least one of these incidents was egregious enough that the

9   Kent Police were called by DCYF in regard to the assaults and batteries by a Phoenix employee.

10  Medicraft Dec. Exh 9. DCYF can hardly now claim that was a false report. JM was subjected

11  to further assault and battery at the camp DSHS sent him to. Medicraft Dec. Exh. 6. The

12  Children were repeatedly assaulted by other Phoenix security guards as well. Medicraft Dec. ¶¶

13  8 & Exhs. 9-14.

14      F.   Agents of the State of Washington assaulted and battered AM.

15          Judge Amini found that [AM] was "assaulted by a security officer the day before" his

16  evaluation. Amini Order ¶¶ 33, 39 & 48. Judge Amini's Findings preclude the State from

17  relitigating this issue.  Independently, there is no issue of material fact.  DCYF cannot avoid

18  liability by arguing either (1) while those batteries and assaults occurred, we didn't commit any

19  others, or (2) those were "just" "simple assaults" – that is a damages issue. Nor can it be disputed

20  that other state agents assaulted AM. Medicraft Dec. ¶¶ 13-14 & Exhs. 17, 21-23.

21      G.   Agents of the State of Washington assaulted and battered EM.

22          Judge Amini found that EM "was slapped across the face by a social worker," There is no

23  dispute that a social worker assaulted AM; she admitted it under oath. Amini Order ¶¶ 24 and

1    Arnold Dec. Exh 21 (White Dep. 13:25 to 14:9), Exhs. 22-23.

2        H.  <u>The State is vicariously liable for the acts of its agents.</u>

3        The law in Washington State is "clear that, once an employee's underlying tort is

4    established, the employer will be held vicariously liable if 'the employee was acting within the

5    scope of his employment.'" *Robel v. Roundup Corp.*, 148 Wash. 2d 35, 52–53, 59 P.3d 611,

6    620, (2002), *quoting*, *Dickinson v. Edwards,* 105 Wash.2d 457, 469, 716 P.2d 814 (1986).

7
8            An employee's conduct will be outside the scope of employment
             if it "is different in kind from that authorized, far beyond the
9            authorized time or space limits, or too little actuated by a
             purpose to serve the master." Restatement (Second) of Agency
10           § 228(2) (1958); see also Restatement, supra, § 228(1). This is
             not to say that an employer will be vicariously liable only where
11           it has specifically authorized an employee to act in an
             intentionally harmful or negligent manner;
12
13   *Robel* at 53. The only inquiry is whether the employee was fulfilling his or her job functions

14   at the time he or she engaged in the injurious conduct. *Id*. This is not a case where any State's

15   agent "steps aside from the master's business in order to effect some purpose of his own." *Id*.

16   at 54. It is not disputed that the actions of all DCYF employees were fulfilling job functions;

17   they were exercising custodial prerogatives over the children.

18
19       The State is also vicariously liable for the acts of Phoenix guards engaged as contractors

20   with the state. An exception to the general rule that one who employs a general contractor is

21   not liable for injuries sustained by independent contractor's employees is where an employer

22   of an independent contractor retains control over some part of the work. *Afoa v. Port of Seattle*,

23   247 P.3d 482 (Wash. Ct. App. Div. 1 2011).

24       The State exerts control over the security guards. By express contract, Phoenix

25   personnel were required to "enforce the DSHS Codes of Conduct". Medicraft Dec. Exh. 51.

1   The Department also controlled Phoenix personnel's day to day assignment: "Locations of

2   coverage may vary, depending upon location and needs of the youth, Uniform Officers will

3   contact the DCYF After Hour Supervisor (See DCYF Supervisor Schedule below) before the

4   start of their shift, to receive exact location of coverage needs." Medicraft Dec. Exh. 52

5   Security guards were required to "respond to" (*i.e.* be directed by) DCYF staff while on shift.

6   Medicraft Dec. Exh. 53.

7
    K.   RCW 4.24.595(2) shields neither the State nor its agents[16]

8   RCW 4.24.959(2) states:

9
            (2) The department of children, youth, and families and its
10          employees shall comply with the orders of the court, including
            shelter care and other dependency orders, and are not liable for
11          acts performed to comply with such court orders. In providing
            reports and recommendations to the court, employees of the
12          department of children, youth, and families are entitled to the
            same witness immunity as would be provided to any other
13          witness.[17]

14
15  This statute has no application here, however. First, there was no court order that the children

16  be slapped in the face, forced to sleep in cars, and the significant other abusive conduct

17  complained of. Second, there was no Court order on December 6, 2019, when they took the

18  Medicraft Children from their mother. Third, RCW 4.24.959(2) does not apply to negligent

19  investigation or to negligent infliction of emotional distress claims. *Desmet.* Fourth, the statute

20  does not apply to the "act of providing false information and misrepresenting evidence to the

21  juvenile court." *Id*. at 312.

22
        *Desmet* was affirmed by the Washington State Supreme Court on August 11, 2022:

23
24
25  ───────────────

[16] The State's other affirmative defenses fail for the same reasons articulated at ECF No. 110 and will be the subject of future motion if on-going attempts to compromise break-down.
[17] RCW 4.24.959(1) deals with "emergency placement" and has no application here because the Medicraft's claims relate to actions after the initial shelter care hearing. *Desmet* at 311.

PLAINTIFFS' RENEWED FIRST MOTION FOR
PARTIAL SUMMARY JUDGMENT - 26

1
2
3
4
5

> The plain language of RCW 4.24.595(2) grants the Department liability immunity for complying with court orders. This court has established that the Department's investigative function is mandated by statute and is, thus, wholly separate from court orders and proceedings. Should the Department's negligence have caused an unnecessary and prolonged disruption of the family unit in this case, RCW 4.24.595(2) will not shield it from suit simply because the Department convinced the court to continue A.K.'s shelter care placement.

6
7

*Desmet v. State by & through Dep't of Soc. & Health Servs.*, No. 99893-1, 2022 WL 3270004,

8

at *8 (Wash. Aug. 11, 2022) (internal citations omitted). And, just as the investigative function

9

is a creature of statute, so too is the State's obligation to keep family units intact. None of the

10

acts alleged by the Medicrafts, relevant to this motion or otherwise, were done *pursuant to* a

11

court order. RCW 4.24.959(2) does not apply.

12

L. Fact of Injury

13

      Although the Medicrafts reserve their damages for future motions practice or trial, they

14

acknowledge that fact of damages must be established; it was so established by Judge Amini.

15
16

None of the children required psychological intervention <u>prior</u> to being taken into the State's

17

custody. Amini Order ¶ 48.

18

      Regarding the Medicraft children's assault and battery claims, whether contact is

19

harmful or offensive is determined by the standard of what would be harmful or offensive to

20

an ordinary person. *Kumar v. Gate Gourmet Inc.*, 180 Wash. 2d 481, 325 P.3d 193 (2014);

21
22

*Sutton v. Tacoma School Dist. No. 10*, 180 Wash. App. 859, 324 P.3d 763, (Div. 2 2014);

23

Restatement Second, Torts § 19; Prosser & Keeton on Torts § 10 (5th ed. 1984). DCYF can

24

make no argument that threats by Phoenix guard, working for the State, to beat a child with a

25

belt, or a social worker actually slapping another child across the face, a Phoenix guard

throwing a child hard enough that the police are called, or nearly asphyxiating another,[18] does not contain a quantum of harm to a child, especially when perpetrated by those supposed to protect them. And Judge Amini also found that the children's behavioral issues accelerated in State's custody. Amini Finding ¶¶ 48, 49, 56.

The Medicraft children have all been damaged by removal, the State's failure to protect, and the State's inflicting harm upon the Children.

> Removal carries long-term risk of serious emotional and psychological harm to the child. See Shanta Trivedi, The Harm of Child Removal, 43 N.Y.U. Rev. of L. & Soc. Change 523, 527-41 (2019). It is important that courts consider not only the potential harm of remaining at home but also the trauma and harm that may come from removal. See Vivek Sankaran, Christopher Church & Monique Mitchell, A Cure Worse Than the Disease? The Impact of Removal on Children and Their Families, 102 Marq. L. Rev. 1161, 1165-71 (2019) (detailing the traumas associated with removal and placement in foster care).

*L.C.S.* at *7. "The harm of changing foster homes often overweighs the harm of keeping a child with a subpar inadequate parent." *Q.S.* at *14.

There is no fairly debatable issue that removal is harmful, the Washington Supreme Court has held it is. Mrs. Sterbick testified that it "always" is. Here, even if the State could, in this procedural posture, satisfy the Court under *Celotex,* that its initial removal was appropriate, it cannot explain how, eight months prior to trial, once the NCO was vacated, Mr. Leuzzi's fear of tort liability outweighed statutory commands to keep the family unit intact which, independently, allowed the perpetuation of physical abuse.

Separation is so harmful that even a 22-day disruption of the family unit has been

---

[18] Both throwing a child and interfering with a child's breathing are presumptively unreasonable even if done by an actual parent. RCW 9A.16.100.

ARNOLD & JACOBOWITZ PLLC
8201 164TH AVE NE, SUITE 200
REDMOND, WA 98052 (206) 769-3759

deemed 'not minimal' and the court erred in granting those <u>parents'</u> request for a continuance. *Matter of Dependency of T.P.*, 12 Wash. App. 2d 538, 547, 458 P.3d 825, 830. The action of taking the Medicraft Children from their parents is equivalent to, if not worse, than screaming into a child's ear "your parents are terrible people."

While those of us who have reached maturity and had our own children, may forget how badly a frightened child wants his or her mother or father, it simply cannot be argued that a child wrongfully held in strange hotels rooms, forced to sleep in cars or on office floors, pinned down and beaten by adults who should have been protecting them, were not injured thereby and, independently, by the absence of their parents - even soldiers on the battlefield scream for their mothers. A quantum of damage is undisputable, its breadth is addressed by experts, with more expert opinion to be provided, to include employment and future earning potential, further demonstrating that damage is beyond reasonable debate. Arnold Dec. Exh. 2-8.

## VI.    CONCLUSION

The Medicraft Children were torn from a "[ver]y loving relationship[]" by an "investigation [that] wasn't done correctly or thoroughly," during the pendency of which they should have been at home with their parents, particularly after the NCO was vacated. Even then, instead of keeping the family unit intact, DCYF prioritized AAG Leuzzi's worry "about a tort case if we return to the parents."

DCYF compounded the injury by not only failing to keep the children safe from the risk of harm, but by creating and exacerbating many of the harms which befell them, including its agents directly assaulting them.

Fact of injury is beyond debate. "Whatever [counsel for the state] is going to say to the

1   court, I don't think he's going to argue" that any jury could find excuse for the treatment of this

2   family.

3       Partial summary judgment should issue to narrow issues for those jurors and conserve

4   judicial resources.

5       The undersigned certifies that he met and conferred with counsel for the State, both

6   prior counsel, Ms. Janay Ferguson, and current counsel, Mr. Peter Kay, prior to bringing this

7

8   motion.

9       DATED this 31st day of December 2022.

10

11                      **ARNOLD & JACOBOWITZ PLLC**

12                      /s/ Nathan J. Arnold
                        Nathan J. Arnold, WSBA No. 45356
13                      2701 First Ave., Ste. 200
                        Seattle, WA 98121
14                      (206) 799-4221
                        Nathan@CAJLawyers.com
15                      *Counsel for Plaintiff*

16

17

18

19

20

21

22

23

24

25

1

2

**CERTIFICATE OF SERVICE**

3

        I hereby certify that on December 31, 2022, I electronically filed the foregoing with the

4

Clerk of the Court for the United States District Court Western District of Washington by using

5

the CM/ECF system. Participants in the case who are registered CM/ECF users will be served

6

by the CM/ECF system.

7

8

        DATED this 31st day of December 2022.

9

10

/s/ Nathan J. Arnold
Nathan J. Arnold, WSBA No. 45356

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' RENEWED FIRST MOTION FOR
PARTIAL SUMMARY JUDGMENT - 31