# EXHIBIT 2

**Superior Court of Washington
County of King Juvenile Court**

Dependency of:



| | | | |
|---|---|---|---|
| M | J | (DOB | 2010) |
| M | A | (DOB | 2012) |
| M | E | (DOB | 2013) |
| M | T. M | (DOB | 2014) |
| M | N | (DOB | 2018) |

No: 19-7-01266-6 KNT
√19-7-01267-4 KNT
19-7-01268-2 KNT
19-7-01270-4 KNT
19-7-01271-2 KNT

**Findings of Fact and Conclusions of Law and,
Order Dismissing Dependency
Clerk's Action Required**

## I. Basis

A petition was filed by DCYF alleging that the each of the above-named children is dependent.

This matter came before the court for a dependency fact-finding trial on September 2, 3, 10, 22, 23, 24, 30 and October 1, 5, 6, 7, 8, 12, 13, 14, 15, 19, 20, 21, 22. The Washington State Department of Children Youth and Families (DCYF) appeared through its social worker Tabitha Culp, represented by Derek Leuzzi, Assistant Attorney General. The mother, Shaylee Medicraft, appeared represented by Hannah Gold and Kathleen McClellan, Northwest Defenders Division, King County Department of Public Defense. The father, James Medicraft Sr., appeared represented by Helen Redman and Justine Olimene, The Defender Association Division, King County Department of Public Defense. GAL Virginia Whalen appeared, represented by Kathleen Martin, King County CASA Department. The court delivered its ruling on the record on October 22, 2020.

The court heard the testimony of James Medicraft, Sr., Shaylee Medicraft, Tanessa Sanchez, Natalie Cukierman, Hannah Tilden, Lisa Reasner, Dr. Joanne Solchany, Megan Meyer, Amanda Fry, Tabitha Culp, Virginia Whalen, Michelle Ruelas, and Jennifer Watts. The court also admitted the following exhibits into evidence: 2-9, 11-13, 16-18, 24-29, 3, 85, 145, 150-151, 153, 201, 202, 208, 213, 349-350, 364, 393, 622, 626-628, 630-632, 1007.

Due to the COVID-19 pandemic, this fact-finding trial was conducted via zoom. All parties and all witnesses appeared via zoom for this trial.

The findings and conclusions below are based upon admitted exhibits and the witness testimony, including the court's observation of the witnesses. In addition to the findings and conclusions below, the court hereby incorporates its oral ruling on October 22, 2020.

## II. Findings

The court reviewed all the testimony and admitted exhibits presented at trial and finds that dismissal is appropriate.

Except where otherwise indicated, the following facts have been established by a preponderance of evidence.

The State has failed to prove that the Medicraft children are dependent pursuant to RCW 13.34.030(6)(c). Pursuant to RCW 13.34.030(6)(c), the Department had the burden of proving by a preponderance of the evidence that that the Medicraft children have "no parent", "capable of adequately caring" for them such that they are "in circumstances which constitute a danger of substantial damage" to their "psychological or physical development." The Department did not meet its burden.

1. **Children's Indian Status:** On 04/30/19, the court asked each participant on the record whether the participant knows or has reason to know the children are Indian children. The petitioner has made a good faith effort to determine whether the children are Indian children. Based upon the following, there is not a reason to know the children are Indian children as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do not apply to this proceeding: The mother and father have reported they do not have Native American ancestry and the children are not Native American, as defined by the Indian Child Welfare Act. There is no reason to know the children are members of a federally recognized tribe or the biological children of members of a federally recognized tribe and eligible for membership in the tribe.

2. Shaylee Medicraft and James Medicraft are the parents of five children: J▮▮ M▮▮▮ (age 10), A▮▮ M▮▮▮ (age 8), E▮▮ M▮ (age 7), M▮▮ M▮ (age 6), N▮▮ M▮▮ (age 2).

3. DCYF has the burden of proof by presenting substantive evidence to this Court, in support of its allegations against Mr. and Mrs. Medicraft, and proving its allegations by a preponderance of the evidence.

4. The Department failed to prove that the parents are not capable of adequately caring for their children.

5. Removal of the children in this case was based on alleged non-violent violation of a protection order that the mother had obtained in New York prohibiting the father from having contact with her or the children. A transcript of the mother's testimony from October 16, 2018, in support of that the original temporary order of protection was admitted as Exhibit 18. In that original testimony in New York, Mrs. Medicraft did not allege any acts of physical violence by Mr. Medicraft against herself or the children. Mrs. Medicraft testified that she sought the order of protection because she feared that Mr. Medicraft was going to take her children out of state and interfere with her custody of the children at that time. At this trial, Mrs. Medicraft testified that she went to the courthouse to seek an order that would prevent Mr. Medicraft and the children from leaving without her. Mrs. Medicraft further testified that once at the courthouse, she was told that they only way to get such an order was to file for a domestic violence order of protection. Ms. Medicraft testified that she felt pressured to follow through with the order of protection, and that the individuals that assisted with drafting the documents told her that she had to follow through with this order or CPS would get involved with her children. The documents she filed to obtain that order are only partially in her handwriting. Ms. Medicraft testified that she tried several times to have the order lifted but was

unsuccessful until the order was terminated in Washington on February 5, 2020. The Court finds Mrs. Medicraft's testimony regarding the protection order plausible.

6. On June 19, 2019, the Montgomery Family Court in New York entered an order declining jurisdiction by New York over this matter, which was admitted into evidence as Exhibit 17. This order specifically stated that the Superior Court of Washington for the County of King Juvenile Department is the most appropriate forum to determine the issues of enforcement, modification, and/or violation of the Order of Protection issued by Montgomery County. The order of protection was subsequently terminated by the King County Superior Court Judge Berns on February 5, 2020.

7. The mother is capable of adequately caring for her children. The mother is able to care for all 5 children by herself. The children lived with their mother continuously since birth until they were briefly removed by the Department on April 25, 2019, only to be returned by the dependency court after a contested shelter care hearing April 30, 2019. They then remained in their mother's care until December 6, 2019, when the Department abruptly removed them a second time.

8. All through the fact finding hearing the Court heard testimony that the children love their mother and that they are closely bonded with their mother.

9. Tanessa Sanchez, the initial CPS investigator, transferred the case to CFWS social worker Megan Meyer in approximately late May 2019. Ms. Meyer was the assigned CFWS social worker for the family until approximately late October 2019. Leticia Sabado was the assigned CFWS social worker and Elizabeth Sterbick was the assigned DCYF Supervisor until January 2020. Leticia Sabodo and Elizabeth Sterbick were assigned to work with this family when DCYF made the decision to remove the children from the mother on December 6, 2020. DCYF did not call either DCYF SW Sabado or DCYF Supervisor Sterbick to testify during this trial. On January 6, 2020, CFWS social worker Tabitha Culp and supervisor J'aime Allbee were assigned to the Medicraft family and remained assigned at the time of trial.

10. Megan Meyer and Tanessa Sanchez, two DCYF social workers assigned to work with the family during the time that Mrs. Medicraft had the children in her care in shelter care status, both testified to the mother's ability to care for the children on her own, including out in the community.

11. In July 2019, Tanessa Sanchez investigated two intakes involving Ms. Medicraft and the Medicraft children. After her investigation, and in consultation with her supervisor Amanda Fry, DCYF issued a decision that the intakes were "unfounded." This included the intake made to DCYF by Hannah Tilden, an employee with Camp Orkila, in July 2019. In September 2019, Tanessa Sanchez investigated an additional intake involving Ms. Medicraft and the Medicraft children. Again, after her investigation, and in consultation with her supervisor Amanda Fry, DCYF issued a decision that intake was "unfounded" Exhibit 364, admitted into evidence, is the letter that DCYF sent Ms. Medicraft informing her that the findings were unfounded. Ms. Medicraft cooperated with the DCYF investigations.

12. While the children were placed in her care from April 25, 2019 to December 6, 2019, Ms. Medicraft cooperated with DCYF and engaged in services requested by DCYF. Ms. Medicraft participated in in-home services, called Homebuilders, when requested by DCYF. Ms. Medicraft also engaged in other services, including but not limited to, programming through the Broadview shelter, programming through the Vine Maple Program, parenting classes, and individual mental health counseling. Ms. Medicraft enrolled J███, A███, and E███ in counseling services with Therapeutic Health Services in the summer of 2019.

13. Ms. Meyer testified that in June 2019, she met the mother at Harborview with all five children when they were there for the children's immunization and blood work, and that the children were able to listen and follow their mother's directions and all of them were clean and well groomed. She testified that in July, August and September, all children were comfortable with their mother,

were well groomed and seemed bonded with their mother in the home. She testified that any bruises on the children seemed age appropriate and noted no concerns. She testified that the Homebuilder's therapist had no concerns of physical discipline in September of 2019.

14. Ms. Sanchez testified that she observed a lot of really creative play between Mrs. Medicraft and her children and neither she nor the Homebuilder's therapist who worked with the mother observed any violent behaviors, signs of physical, sexual, or emotional abuse, nor signs of neglect in the home. She testified that the children were affectionate with their mother and that Mrs. Medicraft improved her parenting strategies through her work with the Homebuilder's therapist.

15. The father is capable of adequately caring for the children.

16. Mr. Medicraft testified twice. He testified about his and Mrs. Medicraft's care of the children and their efforts to provide for their children. The Court finds the father's testimony credible.

17. Exhibits 201 and 202 are photographs of the children taken at various times during the years that the parents cared for the children. Mr. Medicraft testified that the photographs are from a time period spanning 2015/2016 to September 2018 and show the parents and children engaged in normal childhood activities like holidays, school activities, school field trips, playing outside, and family vacations.

18. Megan Meyer testified that she supervised three visits between the father and children and that the father was affectionate, encouraged the children to take turns, and she had no concerns about violence or aggression during visits.

19. Michelle Ruelas is a forensic social worker with over 40 years of experience in child welfare. She worked as a DCYF case worker for over 26 years. She is now semi-retired and testified for the defense. Ms. Ruelas testified that she observed a total of six visits by the father and his children in October and November 2019. These visits were divided into two- visits on Tuesdays with the younger two children and on Wednesdays with the older three children. She testified that during these visits, she observed the father to be patient, calm, and shared time equally among his children. He also encouraged his children to share with each other. She testified that she observed the children being spontaneously affectionate with their father, talkative, looking comfortable and cuddling with their father. She testified that the father always brought food, drinks and something for the children to do during visits. She testified that she observed the father change the youngest child, N████s' diaper at each visit. The children also brought schoolwork and crafts that they had made for their father in school. She testified that she did not see the father yell, lose his temper or act inappropriately with the children.

20. Ms. Ruelas also testified that she observed two visits with both parents and four of their children, on February 21 and 26, 2020. She testified that she observed both parents sharing equally in the parenting duties. The parents looked comfortable with each other and the children were comfortable and affectionate with both parents and responded to redirection from the parents. Ms. Ruelas also attended an IEP meeting at Des Moines Elementary where the parents engaged with school staff and asked good questions. She also observed the father responding to a request from the Department to come help keep the children calm.

21. Tabitha Culp testified and identified herself as the petitioner and the primary DCYF employee responsible for this case. Ms. Culp is a "social service specialist" as opposed to a "social worker" as she has yet to obtain a degree in social work and the Court denied the Department's request to certify her as an expert in social work. Although she testified to frequent interactions with the parents and the children it was unclear from her testimony whether she ever observed an entire in-person visit with either parent. When asked on direct examination by her attorney for specific examples of parental behavior to support her request for a dependency, she testified that she had observed the father making very negative statements about DCYF in front of the children and observed father not to redirect the children when engaging in profanity or unsafe behaviors. She

provided no specific examples of problematic behavior by the mother in response to the question from her counsel about her basis for seeking a dependency.

22. On cross-examination, Ms. Culp testified that after the termination of the protection order and after the court ordered the Department to provide the father with his visits, the Department began allowing the parents to visit together. Ms. Culp testified that in February and March 2020, the Department allowed the parents frequent visitation with the children. These visits were very frequent – typically daily – until DCYF cut off in-person visitation at the end of March 2020. There were two periods of time when Ms. Medicraft stayed in the night-to-night hotel room to care for some of the children. By March 2020, the parents were arriving at the hotel in the morning on a daily basis and helping the children bathe, get dressed, provided all meals, and transitioned into spending the whole day with the children, sometimes in the community doing fun things like going to various parks and arcade type places.

23. Ms. Culp testified that in March, when N▮▮▮▮ ▮▮▮▮ and A▮▮▮ were suspected of having COVID-19, the mother was asked by the Department to quarantine at a motel with the children. She testified that the father brought lots of groceries for the family to the motel. She testified that once the children's COVID-19 results returned negative, the children were once again taken away from the mother without any notice. The Department relied on the mother to stay with the children in the motel while the Department employees remained outside of the room. The Department had no alternative plan in the event that the mother had declined or was unable to remain with the children in the motel. When in-person visits were cut-off, Ms. Medicraft was only able to visit with her children remotely by telephone or video.

24. Ms. Culp testified that DCYF called the police on the children multiple times and that there was a time where police were coming to the DCYF office frequently; that DCYF sent the children to Seattle Children Hospital multiple times for psychiatric hospitalization, the last hospitalizations being in February 2020, and that DCYF threatened the children with being sent to the hospital if they did not behave. She testified that the parents expressed concern about the children's hygiene; that during the COVID pandemic the children were being cared for by a rotating team of social workers and security guards, that the department lost or misplaced the children's prescribed inhalers and eyeglasses and that the parents had to get replacements; that J▮▮▮ was assaulted by a security guard, that on another occasion a security guard threatened to hit J▮▮▮ with a belt; and that E▮▮▮ was slapped across the face by a social worker. She testified that the children spent some nights either at the DCYF office, or in a state issued car. She testified that J▮▮▮ reported sexual abuse by one of the overnight social workers in March/April 2020 and that Department's investigation regarding J▮▮▮ report only started in September 2020. She testified that J▮▮▮ spent the night in the car on January 20, 2020.

25. Photos of the children taken by the parents were admitted into the evidence (Exs. 626, 627, 628, 631, 632, 1007). The parents testified that the children were removed from the mother on December 6, 2019 and that during their December visit with the children, they noticed multiple bruises and scratched on the children. The parents took photos of the children's injuries. Father protested to the Department employee present at the visit and criticized the Department for lack of care of the children while in the Department's care.

26. Ms. Culp testified that the father made his comments during the visitation and that there was a social worker present in the visitation room. While the Department objected to the father's criticism, there was no testimony that the Department acknowledged the numerous bruises on the children, or addressed them in any way with the parents. Ms. Culp testified that the Department obtained a court order telling the father what not to say during visits and that the Department ultimately obtained court orders to stop his visits with his 3 older children. This Court is not convinced that the Department fully explained father's concerns and the reasons for his protest and criticism when the Department brought their motion. In her testimony, Ms. Culp did not testify to any steps taken by the Department to protect the children from physical injuries while in the Department's care. DCYF points to the parents for raising concerns about their children's

treatments and argues that this was evidence that they are not capable of caring for their children and meeting their children's needs. DCYF did not demonstrate that the parents' actions were inappropriate or harmful to their children. On the contrary, the parents' concerns for the health, safety, and welfare of their children were understandable and warranted under the circumstances and the condition that they found their children.

27. Both Mr. and Mrs. Medicraft testified credibly that it was very difficult for them to see the treatment and condition of their children while in DCYF care. This made the parents relationship with DCYF difficult. Based on the evidence presented throughout trial, the Medicrafts' concern about the care of their children by DCYF was credible. Objecting to DCYF's care of your children and believing DCYF's actions are harmful to your children, is not a basis for a dependency. Despite the parents' grave concern about DCYF's care of their children and their disagreement with the decision for the children to be removed from the mother, both parents made significant efforts to be available to assist DCYF in caring for their children and in managing their behavior.

28. Ms. Culp testified that since December 2019, while the Department has called Law Enforcement and has taken J▇ to the Children's Hospital due to his behavior, the Department has not started mental health treatment for J▇. Department has begun horse therapy for J▇ but not mental health therapy.

29. Regarding children's behaviors, Ms. Culp testified on direct examination that she started seeing improvements in March and April, but later testified on cross-examination that in May and June 2020, there were incidents where Law Enforcement had to be called for the children, and that the children were still assaultive and destroying property. Ms. Culp testified that although the children have not been suspended from school during this school year, they have been in a much smaller class and have separately attended school only a few hours a day. She testified that the children, especially J▇ and A▇, still experienced problematic behaviors and that the Behavior Rehabilitation Services ("BRS") caregiver had noted new concerning behaviors in the summer of 2020.

30. Ms. Culp's testimony was vague at best and contradictory most of the time. While she testified with confidence during her direct examination, during the cross examination, she had to correct and change most of her testimony. She would answer in general terms and at times wandered off to other topics rather than directly answer to the question. Throughout her testimony, Ms. Culp attempted to make connections between the children's behavior and the parents' visitation schedule, but this testimony was not supported by the facts elicited at trial.

31. Ms. Culp repeatedly testified to remembering or witnessing things when questioned by her attorney or the CASA attorney that she corrected on cross-examination and acknowledged that her first answers were not accurate. For example, she originally testified that in January of 2020, the parents were visiting together, but then later had to acknowledge that the parents did not start visiting together until after the protection order was terminated on February 5, 2020. She claimed that the children's behaviors were escalated and the children damaged a visitation room after visitation with both parents on or around January 30, 2020. She then had to acknowledge on cross-examination that the father's visits were summarily suspended by the Department without a court order on January 24, 2020, and then only reinstated by the court on February 6, 2020, so he could not have been visiting the children at the time of the escalated behavior and property destruction. She admitted that neither parent was present when the three boys destroyed DCYF property and that, in fact, the Department was keeping the three oldest Medicraft children in a visitation room that was stripped of all furniture and toys. The boys were left alone in the room while social workers observed them through a one-way glass. On cross-examination, Ms. Culp also acknowledged some positive interactions with the father in February 2020, including him talking with A▇ about his behavior and making efforts to work with Ms. Culp to help stabilize A▇'s behavior.

32. With regard to Dr. Solchany's evaluations, Ms. Culp testified that the night before the evaluation, J▇▇ was at a night-to-night foster home and that there was an altercation with another boy; that in the early hours of the morning, J▇▇ was picked up by a social worker and that he had spent the night/early morning sleeping in the lobby of the DCYF office in Kent (on the floor or on a couch) before his evaluation with Dr. Solchany on February 6, 2020. She further testified that A▇▇ had been placed in Poulsbo and had to be picked up at the Poulsbo Ferry terminal at 5:50 in the morning on the day of his evaluation, be driven to the DCYF office in Kent before being driven from Kent to Lynnwood to Dr. Solchany's office for his evaluation on February 7, 2020. A▇▇ had also been assaulted by a security officer the day prior to his evaluation.

33. Jenn Watts, WISE parent partner, testified. Ms. Watts was a member of the WISE team for A▇▇. Ms. Watts testified that immediately after the first WISE meeting, on February 6, 2020, she witnessed an incident where A▇▇ was being physically pinned to the ground by a security guard in the Kent DCYF lobby. This incident occurred while Ms. Medicraft and other professionals involved in the case were meeting, and upon exiting the meeting room, she heard screams coming from the lobby. J▇▇ and E▇▇ witnessed this incident. Ms. Medicraft immediately intervened. Ms. Watts testified that Ms. Medicraft held A▇▇ in her lap and consoled and comforted him after this incident. This incident occurred the afternoon before A▇▇ was evaluated by Dr. Solchany.

34. The time frame that Dr. Solchany evaluated J▇▇, A▇▇ and E▇▇ was during a time when their behavior was significantly elevated, and the children were in a very unstable placement situation in DCYF night-to-night placements. At the time Dr. Solchany evaluated J▇▇, A▇▇ and E▇▇ they had been in an unstable placement environment since their removal from their mother on December 6, 2020. All three children had to be transported a long distance for this evaluation. There was evidence that the children were placed in difficult experiences directly prior to their evaluations. Dr. Solchany was not aware of the events that occurred with the children in the days and hours prior to the start of her evaluation. Dr. Solchany admitted that the children's instability and environmental stressors at the time of the evaluation could have impacted the evaluation.

35. The Court has additional concerns about Dr. Solchany's testimony. Dr. Solchany's testimony showed that she did not know about the children's behavior before April 2019 (when the children were first removed from the mother). Dr. Solchany further testified to factors about the children that she had considered where such factors were not established during the trial. As an example, she testified several times that the family lived in isolation, and "off the grid". Nothing in the record pointed to the family having lived "off the grid" or in isolation. It also appeared to the Court that Dr. Solchany did not have a balanced information about the children. It seemed that Dr. Solchany had relied only on the information given to her from the Department and on her observation of the children when they had experienced assaultive incidents and had not had a chance of proper sleep.

36. As part of her evaluation, Dr. Solchany testified that she had collateral contact with DCYF social worker Tabitha Culp, DCYF supervisor Leticia Sabado, and GAL Virginia Whalen. Dr. Solchany also testified that she reviewed collateral information provided to her by DCYF, the GAL, and parents' counsel. Despite being specifically asked to do so by mother's counsel, Dr. Solchany did not have any contact with Ms. Medicraft as part of the evaluation of the three children. From her testimony, it did not appear that Dr. Solchany gave much weight to or paid much attention to the information provided by parents' counsel. Instead, it appears that Dr. Solchany relied heavily on the information provided by DCYF. Dr. Solchany did not have any direct contact with anyone from the children's school, from Seattle Children's Hospital, or from any of the children's treating mental health counselors.

37. Dr. Solchany acknowledged that, at the time she evaluated the children, they were experiencing trauma responses to their removal from their mother and their unstable living environment. Given the timing of Dr. Solchany's evaluation, the environmental stress the children were under at the time of the evaluation, the limitations in the scope of her evaluation, and the concerns related to

the reliability of the information used to render her opinions, Dr Solchany's opinions do not provide useful and reliable information to make a current assessment of the mental health needs of J‬███ A███ and E███ now. It has now been more than eight months since Dr. Solchany had contact with any of the three children.

38. While Dr. Solchany's testimony is considered by the Court, it was not convincing to the Court that a proper evaluation of the children was done. Additionally, because of the dramatic events in the lives of the children right before being brought for Dr. Solchany's evaluation and because Dr. Solchany was not notified of such events and did not take them into consideration (she testified that such events would have had an impact on her evaluation), the Court finds her testimony to be of minimal help for the Court and the Court has given very little weight to Dr. Solchany's testimony.

39. The Court is dismayed that the Department did not plan the children's appointments with Dr. Solchany with practical consideration of the children's placement locations, time and length of travel or other factors that would have an affect on the children such as having been assaulted. There was no testimony that the Department could not schedule the evaluations for a time that would, for example allow A███ sufficient sleep. Dr. Solchny testified that the Poulsbo Ferry terminal was only about half an hour from her office, but it ███ was picked up at the Ferry terminal in the early hours of the morning, driven south to the Kent office only to be turned around and driven back up to the doctor's office. Dr. Solchany was not aware of how long A███ had been in transit.

40. Shaylee Medicraft testified twice during this trial. She was initially called as a witness by DCYF as part of DCYF's case in chief, and she testified as part of her case in chief. Ms. Medicraft's testimony was credible. Ms. Medicraft testified that she and Mr. Medicraft were having problems with their relationship in October 2018, and this contributed to her decision to seek the order of protection. Ms. Medicraft also testified that both she and Mr. Medicraft were influenced by gossip and reports from other people about each other. Ms. Medicraft further testified that once the order of protection was lifted in February 2020, she and Mr. Medicraft were able to communicate and work through their past issues. Ms. Medicraft testified about the efforts that they have made to improve their communication, and how that has had a positive change in their relationship. Ms. Medicraft testified that Mr. Medicraft has never physically hurt her. Ms. Medicraft testified that she does not feel unsafe with Mr. Medicraft. Ms. Medicraft testified that she does not have any safety concerns about her children in the care of Mr. Medicraft, and that if she did, she would take action to protect them. Ms. Medicraft testified that there is no domestic violence in her relationship with Mr. Medicraft.

41. The Department and CASA made allegations related to domestic violence but failed to support these allegations with any substantive evidence of actual or threatened violence as required by RCW 26.50.010. Additionally, per RCW 26.44.020(18), "exposure to domestic violence as defined in RCW 26.50.010 that is perpetrated against someone other than the child does not constitute negligent treatment or maltreatment in and of itself."

42. DCYF did not present substantive evidence, proving by a preponderance of the evidence, that there were any incidents of physical domestic violence by Mr. Medicraft towards Ms. Medicraft or any of the children. DCYF did not present substantive evidence, proving by a preponderance of the evidence, that there were any incidents of emotional or verbal domestic violence by Mr. Medicraft towards Ms. Medicraft or any of the children. DCYF did not present substantive evidence, proving by a preponderance of the evidence, that the children have been exposed to any domestic violence while in the care of either of their parents.

43. DCYF's allegations in this case were premised in large part on allegations reported by individuals from New York State. Neither DCYF nor the CASA called any individuals to testify at this trial that were allegedly involved with this family in New York State. While referenced in passing during

trial as part of the hearsay evidence forming the basis of certain witnesses' opinions, this Court did not receive any substantive evidence or testimony from Michael Sutton, Lindsay Hodge, any New York State social workers, or any New York state school employees. The Court did not receive any substantive evidence or testimony from any social workers or school personnel that had contact with this family in any states that they lived in other than Washington. The parents also testified extensively about these pleadings and provided additional context to circumstances surrounding these court filings. While these pleadings indicate that the fall of 2018 was a difficult time in the parents' marriage and there was a breakdown in communication, as acknowledged by Ms. Medicraft during her testimony, that played out in family court litigation, these pleadings do not prove that parents are not currently capable of adequately caring for their children. The parents' statements in these pleadings, particularly when reviewed in conjunction with their current testimony, are not sufficient to establish the existence of past domestic violence in this family. The parents' statements in these pleadings do not establish that the children were exposed to domestic violence in the family. Ms. Medicraft credibly testified about positive changes in her marriage since the order of protection was lifted on February 5, 2020.

44. The parents have both been living in Washington since at least February 2019. DCYF has presented no evidence of any incidents of domestic violence of any type while the family has lived in Washington. The order of protection has been terminated since February 5, 2020. DCYF has presented no evidence of any incidents of domestic violence of any type since the order was terminated.

45. This Court admitted into evidence previous court orders from this dependency case that were entered during the course of proceedings prior to the trial (Exs 24-29, 31, 85, 150, 151). However, these court orders were admitted for the limited purpose of establishing the case history and the existence of such orders. These orders were entered while the case was in the shelter care status, under different legal and evidentiary standards than this fact finding trial. This Court does not adopt any of the factual findings or conclusions of law contained in these court orders as part of its ruling in this trial. Similarly, this Court does not adopt any of the factual findings or conclusions of law contained in these court orders as a basis for a dependency finding.

46. Similarly, this Court admitted into evidence court orders entered by the Montgomery County Family Court in New York in 2018 and 2019 (Exs.4, 6, 8, 11, 13, 16, 17). These court orders were admitted for the limited purpose of establishing the case history and that such orders were entered. This Court does not adopt any of the factual findings or conclusions of law contained in these court orders as part of its ruling in this trial. Similarly, this Court does not adopt any of the factual findings or conclusions of law contained in these court orders as a basis for a dependency finding.

47. GAL Virginia Whalen testified. Ms. Whalen testified to the expressed wishes of J▓▓ A▓▓ E▓▓, and M▓▓ of consistently having been their wish to return home to their parents. Ms. Whalen testified that due to his age, she did not gather N▓▓'s expressed wishes. Ms. Whalen testified in support of a dependency finding. Ms. Whalen also made three different intake reports regarding the children's report of physical altercations and abuse.

48. The Department attempted to link the children's behaviors to the parents but the timeline of the behaviors actually shows that the behaviors began and worsened as Department intervention increased. DCYF was not able to appropriately manage the behaviors of J▓▓ A▓▓ and E▓▓ after the children were removed from Ms. Medicraft. At different times in January and February 2019, all three children were hospitalized at Seattle Children's Hospital. Prior to their removal, none of the children had required this type of intervention.

49. J▓▓ A▓▓ and E▓▓ were enrolled in Des Moines Elementary School in the spring 2019. Two employees from the school testified: Natalie Cukierman and Lisa Reasner. Ms. Reasner, the school counselor, testified that when she first met the children her first impressions were that J▓▓ was a polite, typical student, and a little quiet; she described A▓▓ as friendly, with a lot of

energy, and talkative; she described E▓▓▓'s more similar to J▓▓▓ – quiet and polite. This was prior to the first DCYF removal of the children from their mother.

50. When A▓▓▓ and E▓▓▓ displayed some behavioral issues at the Des Moines Elementary School in the fall of 2019, Mrs. Medicraft was actively involved with the school staff to work to address the issues collaboratively. Mrs. Medicraft was responsive to the school staff, and as requested by the school, she spent time in the school with the children to help with their behavior. Mrs. Medicraft requested that the school put Individualized Education Programs ("IEP")s in place for J▓▓▓, A▓▓▓ and E▓▓▓. After some initial delay, the school started the IEP process and both Mr. and Mrs. Medicraft actively engaged in the process and participated in the IEP meetings. IEPs were finalized for J▓▓▓, A▓▓▓ and E▓▓▓ late in the 2019-2020 school year. The 2020-2021 school year is the first school year where these children began to receive the benefit of their IEPs in the school environment.

51. On December 6, 2020, DCYF removed the five Medicraft children from their mother's care. The Court heard testimony that the DCYF showed up unannounced at the Des Moines Elementary School to remove J▓▓▓, A▓▓▓ and E▓▓▓ from the school, and then to remove M▓▓▓ and N▓▓▓ from Mrs. Medicraft when she arrived to pick up the older children.

52. The Court heard testimony that the DCYF's action and the method of removal of the children was based on the concern that the mother would leave the state with the children. The mother's history with DCYF, however showed that DCYF had previously removed the children, albeit for a short time, and the mother had not left the state. The history of the family shows that the Mother had remained in the state with her children and worked with DCYF and the school.

53. Amanda Fry testified that upon removal from the mother, all five children were visibly upset. The behaviors of J▓▓▓, A▓▓▓ and E▓▓▓ immediately escalated after removal from their mother

54. The removal of the children at the school appears to have been a traumatic experience for the five children as well as Mrs. Medicraft. The Court heard testimony that DCYF was aware that J▓▓▓, A▓▓▓ and E▓▓▓ had expressed fear and concern that they would be removed and separated from their mother. The Court heard testimony from DCYF that the children were closely bonded with their mother, that the children followed the mother's directions and that the mother was able to calm them down.

55. The testimonies before the Court showed that the children's behavior worsened after their removal in December 2019.

56. There was ample evidence that the children's behaviors were better in the care of Ms. Medicraft, both prior to and after removal on December 6, 2020. There was ample evidence of Ms. Medicraft being able to successfully manage her children's behaviors.

57. All five children have been in multiple placements since their removal. N▓▓▓'s placement situation has been the most stable. M▓▓▓ has had multiple placements as well, although she is currently in a stable placement. From December 6, 2019 – mid-May 2020, J▓▓▓ was primarily placed in night-to-night DCYF placement. From December 6, 2019 to mid-June 2020, A▓▓▓ was primarily placed in night-to-night DCYF placement. From December 6, 2019 to mid-June 2020, E▓▓▓ was primarily placed in night-to-night DCYF placement but did have one placement that lasted about 30 days. Night-to-night placement typically meant staying in a hotel with DCYF staff and other children in DCYF-care, but also included a night-to-night stay in foster homes where the child is dropped off late in the evening and picked up early in the morning. J▓▓▓, A▓▓▓ and E▓▓▓ spent a significant amount of time in DCYF offices being supervised by revolving shifts of DCYF social workers.

58. The Medicrafts purchased a home in South Carolina in February 2020. Mr. Medicraft testified that the intention was to relocate to South Carolina after the conclusion of the dependency trial and

after the children were returned to them. The dependency trial however was delayed several times throughout this case. Mr. Medicraft testified that they remained in Washington as they were able to have in-person visitation with the children until late March when the Department cancelled all in-person visitation due to COVID-19 pandemic. Mr. Medicraft testified that they would have remained if they could have in-person visits with the children.

59. Mr. and Mrs. Medicraft had to make a financial decision to go stay in their home in South Carolina as they did not have the means to remain in Washington at that time. Mrs. Medicraft was able to have some in-person visits with J███, A███, and E███ starting in July of 2020, and she had one in-person visit with M███.

60. While the parents are currently located in South Carolina, this is not a factor in whether or not these children are dependent children. Both parents testified that they can travel to Washington immediately to pick up the children if the children are released to their care. The parents have a home prepared for the children in South Carolina, and have access to resources and care providers in South Carolina. The parents would be capable of caring for the children in their home in South Carolina. The parents are currently caring for a younger child, who is not a subject to these proceedings, in this home.

61. Since the removal of the children Mr. and Mrs. Medicraft have shown that they are available to parent their children. In fact, DCYF and the children's school have relied on the parents to care for the children on a daily basis. From early February to late March, the parents took care of all of the children's daily needs. During this time, the father's visitation time with the children was limited to two hours per week with DCYF having the authority to expand his visitation, which DCYF did. DCYF also had the authority to cut back the father's visitation to the two hours per week. DCYF did not do so. In fact, the parents had visitation with the children all day, every day and were able to go to the community. The parents' time with the children were supervised by DCYF and there were no reason or occasion that caused DCYF to reduce the parents' time with the children until the COVID-10 pandemic.

62. There was no evidence presented to suggest that N███ or M███ have any special needs. There was no credible evidence presented that the parents are not capable of adequately caring for N███ and M███.

63. J███, A███ and E███ do have some behavioral challenges. The evidence is clear that these behavioral challenges were less severe when the children resided with Ms. Medicraft. It also appears that these behavioral challenges have lessened since the children have been placed in actual placements, and were no longer subject to DCYF night-to-night care. Even when the children's behaviors were more challenging in January – March 2020, the evidence was overwhelming that the children's behavior was better when they were in the care of their mother during visits. DCYF acknowledged this by increasing her visitation with the children and relying on Ms. Medicraft to assist them with caring for the children. The evidence has shown that Ms. Medicraft is capable of advocating for the children in obtaining services – like IEPs and counseling – and she has been actively involved in those processes for her children. DCYF failed to prove the parents are not capable of adequately caring for J███, A███, or E███.

64. The Petitioner, DCYF, did not prove, by a preponderance of the evidence that J███, A███, E███, 19███, or N███ Medicraft are dependent children within the meaning of RCW 1334.030(6)(c). Specifically, the Petitioner failed to prove that any of the children have no parent capable of caring for them such that capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

### III. Conclusions of Law

**Jurisdiction**: The court has jurisdiction over: the children, the mother, and the father
**Notice**: The following have received timely and proper notice of these proceedings: the mother and the father
**Dependency**: The children are not dependent pursuant to RCW 13.34.030(6) and the matter should be dismissed

## IV. Order

**Dependency**: The children: J▇▇ A▇▇, E▇▇ M▇▇ and N▇▇ M▇▇ are not dependent pursuant to RCW 13.34.030(6)(c).

For the reasons above, the dependency proceedings as to J▇▇, A▇▇ E▇▇ M▇▇ and N▇▇ Medicraft are dismissed.

Dated: October 28, 2020

_Judge Susan H. Amini_

Order Dismissing Dependency - Page 12 of 12
WPF JU 03.0650 (07/2018) – RCW 13.34.237. 13.34.267