# EXHIBIT 14

1       let her explain.
2  BY MS. OLIMENE:
3  A    So, yes. So, I remember the mother filing a request, but I
4       thought it was a request—my recollection was that it was a
5       request for a return home to the mother.
6  Q    Okay. Okay. So, the three older—I mean, the three older boys,
7       who were not in placement at that time—it was a request—
8       okay, so it was a request for return home. And in—in
9       February, she did file a motion, correct? And the Department
10      opposed that motion, correct? It was for return home, the
11      motion for return home.
12 A    The—yes, the mother—I do recall the mother filing a motion
13      for return home, and the Department opposed it, yes.
14 Q    Okay. The Department didn't indicate any positive
15      interactions that the parents had had with the Department,
16      correct?
17 A    I don't recall all of the specifics of what was discussed.
18      I know that the Department had a lot of concerns, which is
19      why, you know, the—the decision to oppose was made. But, I
20      don't remember all of the specifics of the—the pleadings.
21 Q    Okay. Okay. So, I want o move on to you mentioned something
22      about during the talk with J▇▇ in May regarding placement
23      in the newfound BRS home, that there were talks about
24      complaints about a camp and that J▇▇ was told that he would
25      not go to that camp anymore if he was successful, correct?

1  A  Yes. The camp is in the King County area, and so his placement
2     was on the other side of the pass, so he would not continue
3     camp at the new placement.
4  Q  What were the nature of these complaints about this camp?
5  A  Could you specify who—whose complaints? I'm—
6  Q  So, the—the complaint—you received incident reports from the
7     camp, correct?
8  A  Yes.
9  Q  And as the social worker, you had occasion to review this
10    [inaudible] the status of the children and how they were
11    doing in camp, correct?
12 A  Yes.
13 Q  So, you—there were some complaints about basket [sic] holds
14    at the camp, correct?
15       MR. LEUZZI: Objection. This isn't in evidence and
16    foundation.
17       THE COURT: Yeah, I'll sustain as to foundation. You ask
18    some foundational questions first?
19       MS. OLIMENE: Okay.
20 BY MS. OLIMENE:
21 Q  Did you receive any—did you receive any incident reports
22    from the camp—
23 A  Yes.
24 Q  —as part of a case—you're the caseworker, assigned
25    caseworker, correct?

1  A  Yes. So, oftentimes they would come to myself or my
2     supervisor. If they came to my supervisor, the would get
3     forwarded to me.
4  Q  Okay. And did you have occasion to review those incident
5     reports?
6  A  Yes.
7  Q  Do you recall what was in those incident reports?
8  A  I recall a—the general—I may not recall every specific
9     incident, but, yes, I—I recall the general—
10 Q  What were—
11 A  —topics of those incidents.
12 Q  —the general—sorry. I already fast-forward [sic].
13 A  That's okay. So, in general, the incident reports—
14    MR. LEUZZI: Stop, stop, stop. Hello? Objection, hearsay.
15    THE COURT: Her—her knowledge of—of concerns as part of
16 her work, she can—she can testify to and—and the basis of
17 the actions that were taken with regard to the child, that
18 that's part of her job, and she can testify to that, but—but
19 not to what anybody else said, even if it's in the—in a
20 written format.
21    MR. LEUZZI: Thank you, Your Honor. And sorry for saying
22 "stop" so many times. I've been having audio issues. I
23 apologize.
24 BY MS. OLIMENE:
25 Q  What—what—so, Ms. Culp, the general—what were the general

1       concerns that you were talking about?
2    A  The general reports from the incident reports indicated the
3       kids would frequently display unsafe behaviors with their
4       bodies with peers or staff, and they were required to report
5       those to us if they occurred. So, if they required an
6       intervention such as time—timeout room if they—there was a
7       need for a therapeutic hold.
8    Q  And were there needs for—for those kinds of interventions?
9    A  At times, yes.
10   Q  Okay. And what is a therapeutic hold?
11   A  It's—
12          MR. LEUZZI: [Inaudible].
13          THE COURT: I'm sorry.
14          MS. OLIMENE: She knows.
15          THE COURT: I—I—your voices are cutting off, so I don't
16      know what the basis of objection was, and I didn't hear
17      Ms. Olimene either.
18          MR. LEUZZI: I—Your Honor, my objection was foundation.
19          THE COURT: All right. Okay. And, Ms. Olimene, what did
20      you say?
21          MS. OLIMENE: She just testified about a therapeutic hold.
22      I just asked a follow-up question of what that was.
23          THE COURT: All right.
24          MS. OLIMENE: I—I don't know—
25          THE COURT: All right. And I—I overruled the objection.

1      If Ms. Culp knows what it is, she can testify.
2          MR. LEUZZI: And, Your Honor, I—I ask for some clarity on
3      whether this is—if there's, like, a standard therapeutic
4      hold or if people do different holds, what does that mean?
5      What kind of hold is being done? I—I don't know any
6      information that there's a standard method of this.
7          THE COURT: All right.
8          MR. LEUZZI: That—
9          THE COURT: You—you can inquire in—during your redirect.
10     Ms. Culp, you can continue.
11  BY MS. OLIMENE:
12  A  As I had mentioned before, I don't have any personal
13     training, so I don't know the—it's my understanding there
14     are different types of therapeutic holds. I don't know the
15     specifics about those. But, they are holds that are—
16     individuals get special training in how to do them so that
17     they are ways to safely contain somebody's body so they can't
18     hurt themselves or others, but, like I said, in—in a way so
19     that it's done safely.
20  Q  Do you—do you have any knowledge as to the nature of the
21     timeout rules that they had to go to?
22  A  I have a little bit of information that I received from—one
23     of the individuals from the WISe team used to work at that
24     camp previously, and she explained some of the setup during
25     one of the WISe meetings. And it's my understanding it's a

1  room that's safe, there's nothing dangerous in it, and they
2  go in there I believe with a staff for a certain amount of
3  time until they calm down and go back into the milieu with
4  other—other—where other children would be.
5 Q Okay. So, these holds that you just described, the different
6  kinds that there is, they all involve restraining a child,
7  correct?
8 A I—I don't know the specifics of how they are done. It's my
9  understanding that it's—they are ways to keep their bodies
10  safe and contained. But, I don't know the specifics of what
11  they look like or the different types and how they're done.
12 Q And, did the father ever complain about—about these
13  restraints or the way they were restraining the children?
14  Did you—
15 A The—I've—I observed the father to make statements that this
16  was child abuse, that he told the children they did not have
17  to be restrained before, so he did not understand why they
18  had to be now. And I—him repeatedly calling it child abuse.
19 Q Did the children ever make any complaints about restrained
20  at the camp?
21 A The—
22     MR. LEUZZI: Objection, hearsay.
23     THE COURT: There's an objection as to hearsay. And—and
24  you can answer without saying what the children have said.
25  Sustained as to hearsay.

```
1   BY MS. OLIMENE:
2   A   The—without saying—the nature of their—the impression that
3       I got from the children was that they didn't—that they didn't
4       like being in those holds.
5   Q   They complain about the isolation rooms?
6   A   I do recall them complaining about those timeout rooms.
7   Q   Did they also complain about not being able to see each other
8       during those times?
9   A   I do recall there were some issues there at times. Their
10      behaviors would escalate when they were together, causing
11      unsafe situations. So, there were times at camp when they
12      could not be necessarily in the same places to keep
13      themselves and others safe.
14  Q   Okay. Did the father complain about the medical condition of
15      at least two of the boys who had—who have asthma and concerns
16      about being restrained?
17  A   A—I—I don't recall specifically. I—I remember hearing the
18      mother make a statement about the concerns of asthma and
19      restraints. The—the camp had their medication and was aware
20      of—of their asthma. And, you know, they have the training to
21      do those types of holds properly.
22  Q   You testified about the WISe meetings and that the father
23      took up time talking about concerns about the abuse and the
24      Department's failure to reunite the family; do you remember
25      this testimony?
```

| | | |
|---|---|---|
| 1 | A | I believe my testimony was that he would make a lot of |
| 2 | | statements claiming that the Department was child abusers |
| 3 | | and that he did not believe the Department was going—working |
| 4 | | to reunite the family. |
| 5 | | THE COURT: I'm sorry, the last part of your sentence? I |
| 6 | | didn't hear. |
| 7 | | MS. CULP: I said that I recalled him making statements |
| 8 | | that he did not believe the Department was working to reunite |
| 9 | | his family. |
| 10 | | THE COURT: All right. Thank you. |
| 11 | BY MS. OLIMENE: | |
| 12 | Q | Okay. And to be clear, the children weren't present at these |
| 13 | | meetings, correct? |
| 14 | A | That is correct. |
| 15 | Q | And—and these were professional parties who are coming |
| 16 | | together to discuss A▮▮▮▮'s mental health and wellbeing, |
| 17 | | correct? |
| 18 | A | Yes. The—the purpose of the meetings was to discuss how to |
| 19 | | support A▮▮▮▮ and his mental health. |
| 20 | Q | Okay. In fact, at one of those meetings, the father reported |
| 21 | | about the out-of-state placement, correct, that the—the |
| 22 | | Department was seeking? Do you recall that? |
| 23 | A | I—I don't recall the specifics of the conversation, but I |
| 24 | | do—I do believe I recall that being brought up during a |
| 25 | | meeting. |

1  Q  Okay. And, it is the father that brought this up; the
2     Department hadn't brought this up to—to the WISe team,
3     correct?
4  A  I—I don't recall that.
5  Q  Okay. And during that meeting, the parents discussed the
6     concerns that they had regarding this out-of—out-of-state
7     placement, correct?
8  A  I—yes, I believe that is correct.
9  Q  Okay. So, they—they reported things that they have—they had
10    researched about these places, correct?
11 A  That's—that's what they stated, yes.
12 Q  Okay. And, those reports included reports of a rape incident,
13    correct?
14    MR. LEUZZI: Objectoin. This is hearsay and double hearsay
15    at this point [inaudible] articles that the parents had read
16    that the parents are stating. The truth of the matter
17    asserted doesn't seem to be appropriate here.
18    THE COURT: And—and I'm going to—I'm going to allow the
19    cross-examination, but to that effect only of the concerns
20    that the parents brought in, but not as to the truth of the
21    matter asserted in what they had researched. So, just the
22    concerns in that conversation, I'll allow—I'll allow that to
23    be testified to. This is cross-examination. Again, it's a
24    broader avenue for—for questions.
25 BY MS. OLIMENE:

1  A  I don't recall the specific concerns that they listed. I
2     just recall them stating they done research and they had
3     listed some concerns. I just don't remember the specifics.
4     And that, you know, basically more claims that they abuse
5     children at the facility and, you know, they weren't
6     supportive of that decision.
7  Q  Okay. And, do you ever recall the parents making any
8     statements regarding whether Oregon State had actually
9     ended, canceled its contracts with one of those placements?
10         MR. LEUZZI: Your Honor, I'm going to renew that
11    objection.
12         THE COURT: All right. And Ms. Olimene, where are you
13    going with that? What's the relevance with that? I mean,
14    you—you've asked about the concerns, what specific contract
15    issues. And I don't know where you're going with that.
16         MS. OLIMENE: It—it just goes to the broader concerns
17    about these—this placement and her response to those concerns
18    that were brought up.
19         THE COURT: So, you can ask as to her response.
20         MS. OLIMENE: Okay.
21 BY MS. OLIMENE:
22 Q  Did you ever do any of the—any research to follow up on these
23    concerns that were being brought up by the parents?
24         MS. MARTIN: Your Honor, I'm going to object to this as
25    not being relevant. The children are not placed there.