The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAMES and SHAYLEE MEDICRAFT, *et al.*,

Plaintiffs,

v.

THE STATE OF WASHINGTON, *et al.*,

Defendants.

Civil Action No. 21-cv-1263-BJR

ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE STATE

## I. INTRODUCTION

Plaintiffs are parents who claim they were wrongfully separated from their children by the State of Washington's Department of Children and Families ("DCYF"). Defendants are the State of Washington, DCFY, state contractor Phoenix Protective Services ("Phoenix"), individual State defendants Derek P. Leuzzi, Tanessa Sanchez, Tabitha Culp, Elizabeth Sterbick, Tabitha Pomeroy, Ross Hunter, and Bonnie White, and individual Phoenix defendant Lufti Al Marfadi—all of whom were allegedly involved in either the children's separation or their time in State custody. Plaintiffs moved for partial summary judgment against the State.[1] Having reviewed the motion, the

---

[1] Plaintiffs also filed a motion for partial summary judgment against Phoenix (Dkt. 144), which the Court will address in a separate order.

1

opposition thereto, and the relevant legal authorities, the Court will deny Plaintiffs' motion for partial summary judgment against the State. The reasoning for the Court's decision follows.

## II. BACKGROUND

During the relevant period, Plaintiffs James and Shaylee Medicraft were the parents of five minor children who ranged from one to nine years old. Dkt. 55 ¶ 20. The children had lived with one or both of their parents until the State removed the children from their custody on April 25, 2019. Dkt. 143-2 at 3 ¶ 7. The children were returned on April 30, 2019, but removed again on December 19, 2019. *Id.* The children remained in the State's or foster parents' custody until October 22, 2020, when Washington Superior Court Judge Susan Amini ordered that they be returned to Plaintiffs following a 17-day dependency trial. *See* Dkt. 143-3.

The State's justification for the initial removal of the children was based on a protective order that Ms. Medicraft sought against Mr. Medicraft in October 2018, when the family lived in New York (the "No-Contact Order"). *See* Dkt. 143-2 at 2 ¶ 5; Dkt. 165-2. Ms. Medicraft's request for the order alleged that Mr. Medicraft was "verbally abusive toward [the] children," and that he had yelled at and ridiculed her in front of the children. Dkt. 165-2 at PDF 3-4. Among other things, the New York court ordered that Mr. Medicraft "shall not have parenting time with the children unless he . . . [c]omplete[s] a psychiatric evaluation . . . a 26-week anger management course." *Id.* at PDF 20. The No-Contact Order was to remain in effect until March 11, 2021.

Plaintiffs moved to Washington sometime in 2019. *See* Dkt. 143-2 at 3 ¶ 6. Shortly thereafter, the New York family court entered an order declining jurisdiction over enforcement of the No-Contact Order and determined that the Washington Superior Court was the most appropriate forum. *Id.* After consulting with the attorney appointed to handle the case in New York, the State assumed responsibility for enforcing the No-Contact Order. *See* Dkt. 165-4 at PDF 4-6. Social worker Teresa Sanchez was in charge of the State's initial investigation of the family. Sanchez

2

discovered that Mr. and Ms. Medicraft were communicating and having physical contact, in violation of the No-Contact Order. *Id.* at PDF 8-9. Sanchez also observed what she thought was inappropriate discipline of the children by both parents. Dkt. 164 at 4-5. Sanchez also noted that the children "had behavior issues in school, being disruptive in class, using foul language and having physical interactions with other children." *Id.* at 4 (citing Dkt. 165-4 at 73-75; Dkt. 165-5). Defendants state that "[a]s a result of the on-going no contact order violations, the mother's apparent parental deficits, and inability to manage the children's behavior, DCYF filed dependency petitions on these children." *Id.* at 5.

Initially, the children were placed in shelter care with Ms. Medicraft. *Id.*; Dkt. 165-8. Beginning in May 2019, the children and their mother were to reside at a domestic violence shelter and not have any contact with Mr. Medicraft. Dkt. 164 at 5; Dkt. 165-8. However, in November 2019, Sanchez observed Mr. and Ms. Medicraft together with several of the children "at a store one evening." Dkt. 164 at 5; Dkt. 165-4 at 117-18, 125. As a result of this apparent violation of the shelter-care conditions and the No-Contact Order, the State sought an order removing the children from their parents' custody entirely and placing them in foster care. Dkt. 165 at 5-6. Arguing before the state court, the State also justified the removal based on its "concerns about all the information received from the school, serious allegations of domestic violence, . . . and the risk of flight." Dkt. 165-10 at 2. On December 9, 2019, the court placed the children entirely in the State's custody, with both parents having visitation rights. *Id.* at 3. The No-Contact Order was vacated by the superior court on February 5, 2020, but the children remained in State custody until October 2020 based on the other stated grounds for removal. Dkt. 143-10.

Both parties acknowledge that the children exhibited serious behavioral issues while in the State's custody. These led to escalating problems at school, multiple psychiatric hospitalizations,

and physical altercations with social workers and Phoenix security guards. *See* Dkt. 140 at 9; Dkt. 164 at 6-9; *see also* Dkt. 143-2 at 6. The parties also agree that the State's efforts to find stable placements for the children were largely unsuccessful. *See* Dkt. 140 at 21-22; Dkt. 164 at 6-9. However, the parties have starkly different understandings of what caused these problems. Plaintiffs claim that the State was unable or unwilling to care for the children and that they suffered severe neglect and intentional harm. The State, in contrast, asserts that Plaintiffs actively "encouraged," "approv[ed]," and even "direct[ed]" the children's violent and unruly behavior to "sabotage" the State's custody and placement efforts. Dkt. 164 at 6, 21 ("James Medicraft created an alternative reality for his children, one in which anyone other than the parents is dangerous to the children."). The parties presented these disparate views to Judge Amini during a dependency trial conducted in October 2020. *See* Dkt. 143-2.

## A. Dependency Trial

The State filed a dependency petition pursuant to RCW § 13.34.030(6)(c), alleging that the children had "no parent . . . capable of adequately caring [for them]" such that they were "in circumstances which constitute[d] a danger of substantial damage . . . to their psychological development." Dkt. 143-2 at 2. The State had the burden of proving this fact by a preponderance of the evidence. *Id.* The court found that the State failed to carry its burden and that the children were not dependent. *Id.*

Judge Amini heard the testimony of thirteen witnesses, beginning with Ms. Medicraft. *Id.* at 1. Ms. Medicraft testified that she and Mr. Medicraft were experiencing difficulties in their marriage—and were living separately—when she sought a protective order in 2018. *Id.* at ¶ 5. Ms. Medicraft stated that she feared Mr. Medicraft "was going to take her children out of state and interfere with her custody of the children at that time." *Id.* When she went to the courthouse in New York to obtain an order preventing Mr. Medicraft from taking the children out of the state,

"she was told that th[e] only way to get such an order was to file for a domestic violence order of protection." *Id.* Ms. Medicraft testified that she felt pressured by court employees to file for an order of protection because, if she did not, "[Child Protective Services] would get involved with her children." *Id.* Judge Amini noted that the documents Ms. Medicraft filed with the court were only partially in her handwriting and that she testified she had tried unsuccessfully to lift the order several times. *Id.* Judge Amini concluded that Ms. Medicraft's testimony regarding the No-Contact Order was "plausible." *Id.*

Judge Amini heard the testimony of several social workers who had been assigned to the Medicrafts and noted that virtually all of them reported positive interactions between the parents and the children. *See id.* at 3-4. DCYF had conducted several investigations into the family in 2019 and in each case determined that the allegations that initially prompted the investigations were "unfounded." *Id.* at 3 ¶ 11. Several of the social workers involved in these investigations "testified to [one or both parents'] ability to care for the children." *Id.* at 3-4.

The State's dependency case was largely based on the testimony of two witnesses: Tabitha Culp, a "social service specialist,"[2] and Dr. Joanne Solchany, a psychiatrist who evaluated three of the children. *See id.* at 4 ¶ 21. The court gave "very little weight" to Dr. Solchany's testimony. *Id.* at 8 ¶ 38. Judge Amini noted that Dr. Solchany evaluated the children at a time when "their behavior was significantly elevated" because of a "very unstable placement situation" that, in the court's view, had been created by DCFY. *Id.* at 7 ¶ 34. Specifically, the children had been in night-to-night lodging for two months and had been awoken in the early hours of the morning to travel several hours to the appointment. *Id.* at 7. Judge Amini also noted that one of the children had

---

[2] Judge Amini explained that "Ms. Culp is a 'social service specialist' as opposed to a 'social worker' as she has yet to obtain a degree in social work and the Court denied the Department's request to certify her as an expert in social work." Dkt. 143-2 at 4 ¶ 21.

been assaulted the day before. *Id.* Dr. Solchany apparently did not know of these circumstances when she evaluated the children. *Id.*

The court likewise found Culp's testimony "vague at best and contradictory most of the time." *Id.* at 6 ¶ 30. Judge Amini noted that the only purported evidence of parental unfitness Culp had observed was Mr. Medicraft's criticizing DCYF in front of the children during visitations. *Id.* at 5 ¶¶ 25-26. The court found that "[o]bjecting to DCFY's care of your children and believing DCYF's actions are harmful to your children is not a basis for a dependency," particularly because the parents had made "significant efforts" to assist DCFY in caring for their children despite their disagreement with DCFY's decision to remove them. *Id.* at 6 ¶ 27.

The remainder of Culp's testimony—and indeed much of the DCYF's case—stemmed from "attempt[s] to make connections between the children's [poor] behavior and the parents' visitation." *Id.* at 6 ¶ 30, 9 ¶ 48. After examining the behavior cited by DCYF, Judge Amini found that "the timeline of the behaviors actually shows that the behaviors began and worsened as Department intervention increased [and that] DCYF was not able to appropriately manage the behaviors . . . after the children were removed from Ms. Medicraft." *Id.* at 9 ¶ 48. The court further stated that "the evidence was overwhelming that the children's behavior was better when they were in the care of their mother." *Id.* at 11 ¶ 63.

Based in part on these findings, the court concluded that there was insufficient evidence that Plaintiffs were not capable of adequately caring for the children and thus that there was no basis for a dependency. *Id.* at 3, 4, 11. Apart from Culp's and Dr. Solchany's testimony and documents they referred to, DCYF does not appear to have presented significant additional evidence. Judge Amini noted that, despite the apparent importance of the No-Contact Order, no New York witnesses had been called to testify.

### III.   DISCUSSION

**A.   Summary Judgment**

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)); Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of identifying portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). "If the moving party meets this burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion." *Id.*

**B.   Collateral Estoppel**

(1)   Legal Standard

The doctrine of collateral estoppel prevents the relitigation of facts that have been determined in a prior proceeding. *Hicks v. King Cnty Sherriff*, 143 Wn. App. 1050, 2008 WL 921842, at *8 (2008) ("Collateral estoppel is concerned only with limiting the relitigation of factual issues. The rule has nothing to do with restricting arguments on pure issues of law." (citation omitted)). Collateral estoppel applies only when:

> (1) the issue decided in the prior adjudication must be identical with the one presented in the second; (2) the prior adjudication must have ended in a final judgment on the merits; (3) the party against whom the plea of collateral estoppel is asserted must have been a party or in privity with a party to the prior litigation; and (4) application of the doctrine must not work an injustice.

*State v. Cleveland*, 58 Wn. App. 634, 549 (1990) (quoting *Beagles v. Seattle–First Nat'l Bank*, 25 Wn. App. 925, 929 (1980)). The relevant issue must have been "actually . . . litigated and determined; [collateral estoppel] 'does not operate as a bar to matters which could have . . . been

raised [in prior litigation] but were not.'" *McDaniels v. Carlson*, 108 Wn. 2d 299, 305 (1987) (en banc) (citing *Davis v. Nielson*, 9 Wn. App. 864, 874 (1973)). Furthermore, "collateral estoppel extends only to 'ultimate facts,' i.e., those facts directly at issue in the first controversy upon which the claim rests, and not to 'evidentiary facts' which are merely collateral to the original claim." *Id.* at 305-06; *Kevin F. v. Skinner & Saar, P.S.*, 7 Wn. App. 2d 1030, 2019 WL 355725, at *4 (2019).

To determine which issues in a prior litigation amount to "ultimate facts," courts consider "whether a rational jury could have grounded its verdict upon an issue other than that which the [party] seeks to foreclose from consideration." *United States v. Sikes*, 15 F.3d 1094, 1994 WL 1260, at *2 (9th Cir. 1994) (citation omitted). For example, the Ninth Circuit affirmed a district court's refusal to apply collateral estoppel when a jury in the prior litigation had been given two possible theories of liability, and the theory on which the verdict was based was ambiguous. *Hardwick v. Cnty of Orange*, 980 F.3d 733, 742 (9th Cir. 2020) ("Given that [plaintiff's] state jury returned special verdicts finding that [defendants] violated her right to familial association *or* her right to privacy, we cannot conclude that the jury actually decided that [plaintiff's] right to familial association was violated." (emphasis in original)).[3]

(2)   Analysis

Plaintiffs argue that Defendants are collaterally estopped from relitigating any facts that Judge Amini found in Plaintiffs' favor during the dependency trial.[4] In Plaintiffs' view, these facts

---

[3] Some courts have applied a more "functional approach" to assessing ultimate facts, broadly considering whether the issue in question was central to the prior litigation (even if not logically necessary to the outcome) and "of unquestioned relevance and importance" in the present litigation. *E.g.*, *In re Westgate-California Corp.*, 642 F.2d 1174, 1177 (9th Cir. 1981).

[4] Plaintiffs also make passing reference to the doctrine of res judicata. *See* Dkt. 140 at 11. Res judicata applies to claims or causes of action—not individual facts or issues—that have previously been litigated by the parties. *Seattle-First Nat'l Bank v. Kawachi*, 91 Wn. 2d 223, 225 (1978). The

alone, if taken as undisputed, entitle them to summary judgment on their negligent investigation, substantive due process, assault, battery, and failure to report claims. Defendants argue that collateral estoppel does not apply because the instant case does not involve the same issues as those litigated in the dependency trial.

As noted above, collateral estoppel requires that the issues in the previous action and the instant case be identical. The "issues" are defined as the "ultimate facts" determined by the fact-finder in the previous action. Ultimate facts are those which were necessarily determined by the fact-finder, as opposed to "evidentiary facts" that may have contributed to the decision but were not indispensable to it.

Plaintiffs do not dispute the dependency court's finding: that Plaintiffs' children were not dependent, and that the State had failed to prove, by a preponderance of the evidence, that Plaintiffs' children were dependent—i.e., that they had "no parent . . . capable of adequately caring [for them]" such that they were "in circumstances which constitute[d] a danger of substantial damage . . . to their psychological development." Dkt. 143-2 at 2; Dkt. 173 at 6. Plaintiffs also do not claim that this ultimate fact is identical to any issue in the present action, nor do they cite it as support in their summary judgment motion. Rather, Plaintiffs argue that Washington law has "evolved" to relax the ultimate-facts standard, such that evidentiary facts like those found by Judge Amini are within the ambit of collateral estoppel. Dkt. 173 at 7. Plaintiffs do not cite any case in support of their analysis of Washington law. Their interpretation is based on extrapolation from a 1985 law review article and a historical analysis of the Restatement (2d) of Judgments, which documents a "change in common law." *Id*. However, the Court's review of recent collateral estoppel cases finds no

---

doctrine clearly does not apply here, as the previous action concerned a dependency petition, not tort claims.

support for Plaintiffs' characterization of the law and no indication that Washington has relaxed the distinction between ultimate facts and evidentiary facts. *E.g.*, *State v. Eggleston*, 164 Wn.2d 61, 74-75 (2008) (en banc); *Kevin F. v. Skinner & Saars, P.S.*, 7 Wn.App.2d 1030, 2019 WL 355725, at *4-5 (Jan. 28, 2019); *In re Marriage of Akon*, 160 Wn.App. 48, 63 (2011); *Hick v. King Cnty Sherriff*, 143 Wn.App. 1050, 2008 WL 921842, at *8 (Apr. 7, 2008).

Plaintiffs next argue that, even if collateral estoppel is limited to the ultimate facts found during the dependency action, the dependency court necessarily determined whether the children were wrongly removed—a fact that is essential to Plaintiffs' negligence claims in this action. Plaintiffs are incorrect. The dependency court was not tasked with—and did not make—an affirmative finding that Plaintiffs were capable parents or that the children were wrongfully removed from their custody. Rather, the court found that the State had failed to carry its burden of proving that Plaintiffs were not capable parents. Additionally, even if Judge Amini had made an affirmative finding that the children were wrongfully removed, that would merely have been one of many different grounds on which her ultimate dependency finding could have been based. That is precisely the type of fact that is considered "evidentiary" under Washington law. *E.g.*, *Eggleston*, 164 Wn.2d at 74-75 (jury could have reached verdict without determining motive); *Hardwick*, 980 F.3d at 742 (jury had multiple possible grounds for verdict); *C.f. Sikes*, 1994 WL 1260, at *2 (jury's verdict necessarily implied defendant lacked intent).

Likewise, Plaintiffs' motion cites other statements by Judge Amini that clearly represent "evidentiary facts" not necessary to the court's decision. For example, Plaintiffs quote Judge Amini's statement that "the [State's] investigation wasn't done correctly or thoroughly." Dkt. 140 at 14. As an initial matter, Judge Amini did not expressly find that the State was negligent in its investigation, and the quoted statement alone would not be enough to satisfy any element of

Plaintiffs' negligence claims. Judge Amini observed an apparent lack of thoroughness in the investigation as she reviewed the State' evidence, but the trial was not directed at the appropriateness of the State's conduct. Furthermore, even if Judge Amini's statements could be construed as finding that the State's investigation was negligent, that finding would merely serve as an evidentiary fact supporting her dependency decision. There is no indication that Judge Amini's decision hinged on the State's negligent investigation, as she cited "overwhelming" evidence of Plaintiffs' parental fitness that had nothing to do with the investigation. Similarly, Plaintiffs' citing Judge Amini's finding that "DCYF's witnesses repeatedly contradicted themselves" is clearly an evidentiary fact to which collateral estoppel does not apply. Dkt. 140 at 14, 20.

The Court recognizes that the dependency action and the instant case have overlapping facts and evidence because they are based on the same underlying events, and that many of Judge Amini's findings are highly relevant to this action. This order decides only that the relevant testimony, records, and findings brought out during the dependency action are evidentiary facts which, under Washington law, Defendants cannot be collaterally estopped from litigating.

**C.    Plaintiffs' Claims**

Plaintiffs argue that even if collateral estoppel does not apply, there is no genuine dispute as to any material fact with respect to their claims against the state. The Court will consider each claim in turn.

*1.    Negligent Investigation*

(1)    Legal Standard

Washington recognizes a negligent investigation cause of action against DCYF when, in the course of investigating suspected child abuse or neglect, the agency "gather[s] incomplete or biased information that results in a harmful placement decision." *Desmet v. State*, 200 Wn. 2d 145, 160

(2022) (en banc) (quoting *M.W. v. Dep't of Social & Health Servs.*, 149 Wn. 2d 589, 602 (2003)). A "harmful placement decision" includes "removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home." *Id.* A plaintiff must also establish that "the Department's negligent investigation was a proximate cause of the harmful placement decision." *Rae*, 2022 WL 16549052, at *5; *McCarthy v. Cnty of Clark*, 193 Wn. App. 314, 329 (2016)). Whether a defendant's conduct amounted to negligence is a question of fact generally decided by a jury. *See Desmet*, 200 Wn. 2d at 162 ("At the initial summary judgment stage of the proceedings, it is not for this court to decide whether the Department committed actionable negligence [in their investigation].").

RCW 4.24.595 grants DCYF and its employees limited immunity (1) from negligence in emergent placement investigations (prior to a shelter care hearing), except when DCYF engages in gross negligence and (2) from harm proximately caused by "acts performed to comply with . . . court orders," such as shelter care placement and dependency orders. *See Desmet*, 200 Wn. 2d at 160-61.

(2) Analysis

Plaintiffs argue that no reasonable jury could find that Defendants were not negligent. Plaintiffs first rely on statements (quoted above) by Judge Amini during the dependency trial criticizing the State's investigation. Judge Amini's order indeed criticized the State's investigation but did not make a finding that the State was negligent or that the children were wrongly removed. Judge Amini found only that Plaintiffs were capable parents and that their custody of the children should be restored. Furthermore, the Court has found that Judge Amini's findings do not amount to undisputed facts in this case and do not support summary judgment.

Plaintiffs also attempt to support their claim by noting that DCYF failed to hold a Family Team Decision Making ("FTMD") meeting prior to removing the children. Dkt. 140 at 15.

Plaintiffs cite a DCYF policy manual that says an FTMD meeting must be held prior to children being placed in shelter care. *Id.* at 15 n.11 (citing https://www.dcyf.wa.gov/1700-case-staffings/1720-family-team-decision-making-meetings). However, Plaintiffs do not point to any statute or decision holding that a failure to hold an FTMD meeting amounts to per se negligence.

Furthermore, Defendants have made specific allegations disputing Plaintiffs' characterization of the investigation. Defendants assert that they had observed Plaintiffs violating the No-Contact Order, in addition to other allegedly concerning behavior by the parents toward their children. A jury could find that Defendants acted reasonably based on the information they had at the time. Accordingly, there is a genuine dispute of fact as Plaintiffs' negligent investigation claim, and their motion for summary judgment is denied as to that claim.

(3) Immunity

In their opposition brief, Defendants claim that they are entitled to immunity from negligent investigation claims under RCW 4.24.595(2). Neither party moved for summary judgment on the issue of immunity, but Defendants raised it as a defense. Dkt. 164 at 19-20. An immunity defense presents a "pure question of law" that must be decided prior to trial, and thus the Court will address it. *See Community House, Inc. v. City of Boise, Idaho*, 623 F.3d 945 (9th Cir. 2010) (noting that qualified immunity is a pure question of law and that Ninth Circuit may consider it *sua sponte*); *Desmet*, 200 Wn. 2d at 162 (finding that scope of RCW § 4.24.595 immunity appropriately decided at summary judgment stage).

As noted above, RCW § 4.24.595(2) grants the State and its agents limited immunity from harm caused by "acts performed to comply with . . . court orders." In *Desmet*, the Washington Supreme Court emphasized that the scope of the immunity is narrow and that "[t]his court has established that the Department's investigative function is . . . wholly separate from court orders and proceedings." *Id.* at 162-63. Defendants argue that the State's taking and maintaining custody

of the children were "actions taken in compliance with the court ordered placement." Dkt. 164 at 19. Defendants claim that they simply "reported" Plaintiffs' violation of the No-Contact Order to the state court, that the court ordered a shelter-care placement,[5] and that all subsequent actions were taken in compliance with that order. *See id.*

As an initial matter, this is not an accurate description of the undisputed record regarding the placement order. DCYF did not merely report a violation of the No-Contact Order; its argument before the state court was also independently based on its agents' observations and reports from the children's school that evidenced "the mother's apparent parental deficits[] and inability to manage the children's behavior." Dkt. 165-10 at 2. This is plainly stated in the state court's order and further evidenced by the fact that the State maintained custody of the children for nearly nine months after the No-Contact Order was vacated. *Id.*; Dkt. 143-10.

More broadly, it is clear that Plaintiffs' allegations are centered on the State's investigative function, not its compliance with the state court's orders. Plaintiffs allege that Defendants conducted an inadequate and biased investigation—both with regard to the circumstances of the No-Contact Order and Plaintiffs' ability to parent their children—that presented a misleading picture to the state court. Plaintiffs essentially argue that, if Defendants had conducted a thorough and unbiased investigation, the state court would not have ordered that the children be removed from their parents.

Plaintiffs' allegations of an incomplete or biased investigation are colorable. The dependency court found that there was "overwhelming evidence" of Plaintiffs' parental fitness—including the testimony of several social workers and the results of DCFY's own investigations—

---

[5] This refers to the Washington Superior Court's order removing the children from Plaintiffs' custody entirely, not its earlier order allowing Ms. Medicraft to retain custody in a domestic violence shelter.

yet the State chose to premise its case almost entirely on the testimony of a one "social service specialist." Moreover, Judge Amini specifically noted that she was "not convinced" that DCYF presented accurate information to a state court on at least one occasion. Dkt. 143-2 at 5 ¶ 26. It is also notable that, as described above, Defendants did not accurately describe the events surrounding their immunity defense to this Court.

Therefore, the Court finds the state court's shelter-care placement and other related orders do not shield Defendants from Plaintiffs' colorable allegations that those orders were the result of Defendants' negligent investigation and presentation of facts. As the Washington Supreme Court phrased it in *Desmet*, "[s]hould the Department's negligence have caused an unnecessary and prolonged disruption of the family unit in this case, RCW 4.24.595(2) will not shield it from suit simply because the Department convinced the court to continue [a child's] shelter care placement." *Id.* at 163. This Court holds that RCW 4.24.595(2) does not grant Defendants immunity from Plaintiffs' claims.

### 2. ***Braam* Substantive Due Process**

#### (1) Legal Standard

In *Braam*, the Washington Supreme Court recognized that "foster children have a constitutional substantive due process right to be free from unreasonable risks of harm and a right to reasonable safety." *Braam v. State*, 150 Wn. 2d 689, 704 (2003) (en banc). Therefore, the State "must provide conditions free of unreasonable risk of danger, harm, or pain, and must include adequate services to meet the basic needs of the child." *Id.* Liability attaches "only when [the child's] care, treatment, and services 'substantially depart from accepted professional judgment, standards or practice.'" *Id.* The *Braam* court cautioned against a "mechanical application" of the standard, noting that whether the state's actions were reasonable "must be determined by balancing

. . . liberty interests against the relevant state interests." *Id.* (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)).

                (2)     Analysis

To succeed on their substantive due process claim, Plaintiffs must prove, *inter alia*, that Defendants "substantially depart[ed] from accepted professional judgment, standards or practice" while they had custody of the children. There are genuine disputes as to several facts going directly to this claim. Defendants claim that, despite the State's best efforts, Plaintiffs actively encouraged their children to misbehave, which greatly hindered the State's ability to find stable placements for them. Plaintiffs deny this assertion and claim that the State gravely mishandled their custody of the children and bears sole responsibility for the harm they suffered. Each side has presented witness testimony supporting their position. There is a genuine dispute of fact appropriate for a jury to decide, and summary judgment is denied as to Plaintiffs' substantive due process claim.

       **3.**     ***Assault and Battery***

                (1)     Legal Standard

Battery is the intentional infliction of harmful or offensive bodily contact that causes the plaintiff injury. *McKinney v. City of Tukwila*, 103 Wn. App. 391, 408 (2000). Assault is intentionally causing someone to fear that harmful or offensive contact is imminent. *Brower v. Ackerley*, 88 Wn. App. 87, 92-93 (1997).

                (2)     Analysis

Plaintiffs attempt to support their assault and battery claims with statements made by Judge Amini during the dependency trial, such as her noting that "[one of the children] was assaulted by a security guard." Dkt. 140 at 24 (citing Dkt. 142-3 ¶¶ 33, 39, 48). As noted above, the dependency court's findings do not amount to undisputed facts in this case. Furthermore, Judge Amini did not truly make a finding that an assault had occurred, but rather remarked on what appeared to have

been an assault based on the testimony of one witness. *See* Dkt. 164 at 25. Beyond Judge Amini's comments, Plaintiffs do not present any undisputed evidence going to the elements of assault or battery. As Defendants note, "Plaintiffs . . . at a minimum have failed to establish that any of the alleged actors acted with intent to cause contact or apprehension." *Id.* at 26. Indeed, Plaintiffs' motion does not discuss intent at all, let alone establish that no genuine dispute of fact exists as to that necessary element of both claims. *See* Dkt. 140 at 23-24. Therefore, Plaintiffs' motion for summary judgment is denied as to their assault and battery claims.

The Court notes that the parties' summary judgment briefs also refer to a dispute as to whether the State is liable for the acts of its third-party contractor Phoenix. *See* Dkt. 140 at 25. This dispute is also part of Plaintiffs' motion for partial summary judgment against Phoenix, filed separately from the instant motion against the State Defendants. The Court will decide this question in a separate order. Whether Phoenix or the State is liable for alleged assault and battery is not relevant to this order because there remains a dispute of fact exists as to whether an assault or battery actually occurred.

### 4. **Failure to Report Abuse**

RCW § 26.44.030 recognizes an implied right of action against a "mandatory reporter" who fails to report suspected child abuse. Plaintiffs claim Defendants violated this statute but their only evidence is Judge Amini's statement that Plaintiffs observed "numerous bruises" during their visitation, and that the children were hospitalized for mental health problems while in the State's custody. Dkt. 140 at 23. Defendants allege that there was no reason to believe the children had been abused while in their custody and claim that the bruises (and other injuries) were self-inflicted. Dkt. 164 at 24. This presents a genuine dispute of fact, and summary judgment is denied as to Plaintiff's claim under RCW § 26.44.030.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for partial summary judgment against the State (Dkt. 140) is denied. Defendants' RCW 4.24.595(2) immunity defense is dismissed. The Court will resolve questions regarding Phoenix's agency relationship with the State in a separate order.

DATED this 23rd day of May, 2023.

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE